ORDER

ROSZKOWSKI, District Judge.
TABLE OF CONTENTS
PROCEDURAL HISTORY.908
LEGAL STANDARDS.909
STUDENT TRACKING AND ABILITY GROUPING.912
SEGREGATION OF STUDENTS BY RACE WITHIN SCHOOLS.915
STUDENT ASSIGNMENT.917
FACILITIES AND EQUIPMENT DISPARITIES.919
1989 REORGANIZATION PLAN .922
EMPLOYMENT DISCRIMINATION.923
STAFF ASSIGNMENT.924
INEQUITABLE ACCESS TO TRANSPORTATION.925
DISCRIMINATORY CONDITIONS IN THE COMPOSITION OF THE BOARD ... 926
EXTRACURRICULAR ACTIVITIES.928
BILINGUAL EDUCATION AND OTHER EDUCATIONAL DISCRIMINATION ISSUES AFFECTING HISPANICS.929
SPECIAL EDUCATION.929
CONCLUSION .980
ORDER.933

INTRODUCTION

This matter comes before the court on the plaintiffs’ motion for a permanent injunction. Hearing was held before Magistrate Judge P. Michael Mahoney, who issued a Report and Recommendation making extensive findings of fact and conclusions of law, ultimately concluding that the defendant had violated the plaintiffs’ Fourteenth Amendment rights to equal protection under the law by separating public school children on the basis of race. The plaintiffs, the defendant, and the intervenor-defendants have all filed objections to the Report and Recommendation. The parties have all extensively briefed the issues and the court hereby makes its findings of fact and conclusions of law.

PROCEDURAL HISTORY

This lawsuit was filed on May 11, 1989. It was filed by the plaintiffs, People Who Care, et al., as a reaction to the 1989 Reorganization Plan that had been adopted by the defendant, Rockford Board of Education School District #205, in January and February of 1989. The lawsuit not only attacks the 1989 Reorganization Plan, but also alleges that the school district historically has engaged in a pattern of intentional segregation and discrimination on a systemwide basis.
Approximately two months into the litigation, the parties entered into an Interim Settlement in response to the plaintiffs’ motion for a preliminary injunction. The Interim Settlement dealt mainly with the 1989 Reorganization Plan. The settlement was embodied in an Interim Agreed Order entered by the court on July 7,1989. That order provided for certain modifications of the Reorganization Plan and for other remedial steps to be taken by the District.
A Second Amended Complaint was filed on November 9, 1989. On April 24, 1991, the plaintiffs and the defendant agreed to, and the court approved and entered, a Second Interim Order. The Second Interim Order was a more comprehensive interim remedial plan. The Second Interim Order did not resolve the plaintiffs’ underlying liability claim and the District made no admission of liability in connection with either of the Interim Remedial Orders. Certain parts of the Second Interim Order were subsequently stricken by the Seventh Circuit Court of Appeals. See People Who Care v. Rockford Bd. of Educ., 961 F.2d 1335 (7th Cir.1992).
*909 On June 29, 1992, this court, by Minute Order, referred all matters pertaining to the plaintiffs’ motion for a supplemental remedial order to Magistrate Judge P. Michael Maho-ney for ruling. By Order of September 8, 1992, this court, pursuant to Local Rule 1.71(c)(4) of the General Rules of the Northern District of Illinois, and pursuant to 28 U.S.C. § 636(a), (b) and (c), transferred to the Magistrate Judge all “matters currently pending.”
On April 8, 1993, this court reiterated the referral to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and in April of 1993 the Magistrate Judge commenced hearing the motion for a permanent injunction.
The injunction hearing began April 2,1993. Approximately thirty witnesses testified on behalf of the plaintiffs, and approximately nine witnesses testified on behalf of the defendant and the intervenor-defendants. Over 3,600 pages of testimony were taken over the twenty-four days of the hearing. In addition, the court has taken into consideration 150 depositions presented to the court as evidence in lieu of testimony, as well as the literally thousands of pages of documents that have been presented to the court.
Pursuant to an “Agreement of Plaintiffs, Defendant Rockford School District 205 and Intervenor-Defendants Concerning the Liability Hearing Adjudication Process and Certain Remedial Matters,” dated May 5, 1993, all parties stipulated that the Magistrate Judge would make a Report and Recommendation to this court which would then rule upon the permanent injunction and liability issues. Pursuant to the May 5th Agreement, the parties agreed that all present and future remedial matters in this case, without limitation, would be referred to the Magistrate Judge under 28 U.S.C. § 636(c)(1) and (c)(3), and under the rules of the United States District Court for the Northern District of Illinois. The Agreement also allowed the plaintiffs to file an amended complaint which conformed to the proofs presented. This Third Amended Complaint was filed June 23, 1993.
On May 5,1993, pursuant to Rule 53 of the Federal Rules of Civil Procedure, the Second Interim Order, and Paragraph 13 of the May 5 Agreement, this court appointed Dr. Eugene E. Eubanks as Special Master.
The permanent injunction hearing ended on May 13, 1993. The parties submitted post-hearing briefs as well as proposed findings of fact and conclusions of law.
On November 3,1993, Magistrate Judge P. Michael Mahoney issued his Report and Recommendation. The Magistrate Judge made extensive findings of fact and conclusions of law, recommending that the defendant be found liable for violating the Fourteenth Amendment rights of the plaintiff class, and that the court enter an appropriate injunction and declaratory order against the defendant. All parties have filed objections to the Magistrate Judge’s Report and Recommendation and have extensively briefed their objections.
Pursuant to Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1)(C), any party may serve and file written objections to a Magistrate Judge’s proposed findings of fact and recommendation. The statute further provides, in pertinent part:
A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.
28 U.S.C. § 636(b)(1)(C).
The standard calls for a de novo determination, not a de novo hearing. United States v. Raddatz, 447 U.S. 667, 674, 100 S.Ct. 2406, 2411, 65 L.Ed.2d 424 (1980). In making its de novo determination of the record, the court is entitled to afford the Magistrate Judge’s credibility findings “such weight as their merit commands and the sound discretion of the judge warrants.” Id. at 683, 100 S.Ct. at 2416.

LEGAL STANDARDS

Fourteenth Amendment and the Equal Protection Clause

No State shall make or enforce any law which shall abridge the privileges or immu *910 nities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
U.S. Const, amend. XIV, '§ 1.
This ease is based upon the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The plaintiffs have alleged thajrthe defendant has separated public schooFchildren by race and has discriminated against African-American and other minority school children because of their race>~?For almost forty years, federal law on this issue has been clear. “[I]n the field of public education, the doctrine of ‘separate but equal’ has no place. Separate educational facilities are inherently unequal.” Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954).
The elements for a prima facie case of intentional discrimination against a school district requiresmatTheré be segregation or discrimination, causation and intent. Keyes v. School Dist. No. 1, Denver, Col., 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973); Diaz v. San Jose Unified School Dist., 733 F.2d 660, 662 (9th Cir.1984), cert. denied, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985). The Equal Protection Clause requires State and local governments to treat similarly situated groups of people in a similar fashion if that government classifies individuals in the distribution of particular benefits and burdens. Hooper v. Bernalillo County Assessor, 472 U.S. 612, 618, 105 S.Ct. 2862, 2866, 86 L.Ed.2d 487 (1985). Classifications which burden a discrete and insular minority group are inherently suspect and are subject to “strict” judicial scrutiny. See United States v. Carolene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938). Racial classifications are inherently suspect and are presumptively invalid absent an extraordinary justification. Personnel Administrator v. Feeney, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292-93, 60 L.Ed.2d 870 (1979). Even facially neutral state action violates the Equal Protection Clause when such action is intended to have a racial effect and does, in fact, have such an effect. Washington v. Davis, 426 U.S. 229, 240-41, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976).
The fact that racially segregated schools exist is not automatically a constitutional violation. Columbus Bd. of Educ. v. Panache, 443 U.S. 449, 464, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979). It is a violation when intentional governmental conduct has created or perpetuated the segregative conditions. Keyes, 413 U.S. at 213-14, 93 S.Ct. at 2699-2700. Absent statutory segregation in a state, a school district violates the constitution when “school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system.” Id. at 201, 93 S.Ct. at 2694. To establish unconstitutional racial imbalance within a school system, the plaintiff must show that the governmental authorities created or maintained racial segregation in the schools and that their actions were motivated by segregative intent. Id. at 208, 93 S.Ct. at 2697; Diaz, 733 F.2d at 662.
Absolute segregation is certainly prohibited, as well as substantial segregation and racially identifiable schools. Pursuant to Green v. County School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the court must examine the ethnic and racial composition of the schools as well as “every facet of school operations—faculty, staff, transportation, extra-curricular activities and facilities.” Id. at 435, 88 S.Ct. at 1693. The court will also consider the quality of education provided to both white and minority students. See Freeman v. Pitts, — U.S. -, -, 112 S.Ct. 1430, 1446, 118 L.Ed.2d 108 (1992).
Causation is established when it is showm that the defendant’s conduct contributed in a substantial manner to the creation or perpetuation of racial segregation. In other words, the defendant’s conduct must have more than a de minimis impact. United States v. Yonkers Bd. of Educ., 624 F.Supp. 1276, 1379 (S.D.N.Y.1985), aff'd, 837 F.2d 1181 (2nd Cir.1987); Berry v. School Dist. of Benton Harbor, 442 F.Supp. 1280, 1292 (W.D.Mich.1977).
*911 Second, the plaintiff must show segregative intent. Circumstantial evidence is sufficient to establish segregative intent. Diaz, 733 F.2d at 662. Types of proof which support an inference of segregative intent include: discriminatory impact of acts, omissions or policies of the defendant; the history of events leading to conduct maintaining or exacerbating racial imbalance in schools; departures from regular procedures and policies used by the decision-makers; and evidence concerning the decision-making process. Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 266-68, 97 S.Ct. 555, 563-65, 50 L.Ed.2d 450 (1977). Upon a showing of a prima facie ease of intentional segregation, the burden shifts to the defendant to show that the same segregative conduct would have occurred “even had the impermissible purpose not been considered.” Id. at 271 n. 21, 97 S.Ct. at 566 n. 21.

Injunctive Relief

For a permanent injunction to issue from the court, the plaintiffs must prevail on the merits of their claim and establish that equitable relief is appropriate. Beacon Theatres, Inc. v. Westerner, 359 U.S. 500, 506-07, 79 S.Ct. 948, 954-55, 3 L.Ed.2d 988 (1959). Beacon Theaters implies that the factors considered for a permanent injunction are the same as those considered for a preliminary injunction, with victory on the merits replacing a reasonable likelihood of success. See e.g., United States v. Rural Electric Convenience Co-Op. Co., 922 F.2d 429, 432 (7th Cir.1991). Those other factors in the balance of equities are: an inadequate remedy at law; irreparable harm to the plaintiffs absent in-junctive relief; the degree of hardship on the defendant; the public interest served; and the ability to fashion an appropriate injunction. The Magistrate Judge found each of those factors favored the plaintiffs and recommended that appropriate injunctive relief be entered against the defendant.

Objections to Evidence

Hearing on the motion for a permanent injunction was held before Magistrate Judge P. Michael Mahoney pursuant to this court’s referral order under 28 U.S.C. § 636 and Rule 1.71(c)(4) of the General Rules of the Northern District of Illinois (“Local Rules”). Pursuant to the referral, the Magistrate Judge entered a report and recommendation for review by the court. The district court has de novo review over such a report. “A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.” 28 U.S.C. § 636(b)(1).
As an initial matter, the parties have objected to various rulings made by the Magistrate Judge. A substantial number of depositions and affidavits were received in evidence in lieu of live testimony at the hearing. The Magistrate Judge allowed the submission of this evidence with the provision that specific objections made to deposition testimony would be ruled upon, and ruled upon those objections in an order dated June 23, 1993. The plaintiffs have objected to those rulings arguing that the defendant has waived those objections, that the court has previously rejected such objections, and that those objections are meritless. The defendant argues that its objections were based on the Federal Rules of Evidence and were hot waived, based on an agreed order of the parties and approved by the court, allowing the defendant to preserve its objections to deposition testimony. Although the Magistrate Judge did overrule many of the defendant’s motions in limine, a part of the basis for his ruling was that the defendant’s objections were too generalized to identify to what the defendant had objected. Furthermore, some of the defendant’s objections, once specified to particular portions of evidence, were meritorious. The defendant’s objections to parts of the depositions focused on relevant , matters such as whether the testimony was based on personal knowledge, whether there, was proper foundation, whether the testimony was hearsay or multiple hearsay, whether the testimony related to post-1989 conduct, or whether the testimony was improper opinion testimony.
The depositions and affidavits were admitted into evidence subject to objections, which *912 were made to specific portions of testimony, rather than the generic, generalized objections made in the defendant’s motions in limine. Having reviewed the depositions and affidavits and the plaintiffs’ objections, and the Magistrate Judge’s rulings, the court cannot find that the Magistrate Judge was clearly erroneous in any of those rulings. Therefore, the plaintiffs’ objections to the rulings on the defendant’s objections to depositions and affidavits are overruled. The depositions and affidavits are admitted, except for the portions of those depositions and affidavits which have had objections sustained to them.
The defendant’s primary objection throughout its briefs is that the Magistrate Judge erred in concluding that the defendant intentionally discriminated against minority students. The defendant argues that the plaintiffs failed to prove by a preponderance of the evidence that the defendant engaged in purposeful and intentional discrimination and that the Magistrate Judge improperly jumped to that conclusion. The defendant further argues that the Magistrate Judge improperly gave too much weight to evidence it characterizes as “[isolated incidents of conduct by school officials” and that “almost all' evidence favorable to the District has been excluded from the proposed findings.” The defendant correctly points out, as the court has stated earlier, that this court is reviewing the evidence de novo. The court is mindful of the burdens of proof in this case and is also aware of the degree of circumstantial evidence presented. As stated earlier here, and in the Magistrate Judge’s Report, circumstantial evidence can be sufficient to infer the defendant’s intent.
The court has reviewed all the evidence in this case in considering the Magistrate Judge’s Report and Recommendation. The following discussion should be read in conjunction with the corresponding sections of the Magistrate Judge’s opinion.
The court will not attempt to answer each and every objection to the Magistrate Judge’s Report and'Recommendation filed by the parties, but will briefly comment on some of those objections. The parties have filed a multitude of objections, many of which have no basis in the record. Those objections not discussed here are rejected as meritless.
As stated earlier, the standard that guides the court in a case such as this, is that this court must make a de novo determination of the record. As the courts have consistently held a de novo hearing is not required. Furthermore, the court is entitled to accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge, and to afford his credibility findings such weight as their merit commands and the sound discretion of the court warrants. United States v. Raddatz, 447 U.S. 667, 674-76, 100 S.Ct. 2406, 2411-13, 65 L.Ed.2d 424 (1980). The excellent Report and Recommendation submitted by the Magistrate Judge evidences a thorough understanding of both the law and the facts and how those facts apply to the law. In making its de novo determination in this case, the court has given due consideration to the Magistrate Judge’s Report and Recommendation in conjunction with the evidence.

STUDENT TRACKING AND ABILITY GROUPING

The Magistrate Judge found that the ability grouping and tracking practices of the Rockford School District (hereinafter RSD) did not represent a trustworthy enactment of any academically acceptable theory or practice and that the RSD tracking practices skewed enrollment in favor of whites and to the disadvantage of minority students. The Magistrate Judge further found that it was the policy of the RSD to use tracking to intentionally segregate white students, and that the policy existed in 1989 and had existed for many years prior thereto.
The defendant’s principal objection to this finding is that the Magistrate Judge relied, to a large extent, on the testimony of the plaintiffs expert witness, Dr. Jeanne Oakes. The Magistrate Judge stated that “the most devastating witness testifying on behalf of the plaintiffs was Dr. Jeanne Oakes.” Report and Recommendation at 940. '
The defendant objects to the Magistrate Judge’s finding because, the defendant asserts, “Dr. Oakes neither visited a single *913 school, nor spoke with a solitary student, administrator, or member of the Rockford community. She completed all of her analysis relative to the District through reliance on hearsay without ever personally viewing any of the Rockford Public Schools.” Further, the defendant seems to question the Magistrate Judge’s acceptance of Dr. Oakes as an expert witness, questioning her qualifications to state her opinions, based on her qualifications.
The court rejects the defendant’s contentions. The Magistrate Judge’s conclusion on this point is convincingly supported by the evidence.
First, Dr. Oakes is clearly qualified to testify on the subject of tracking[1] and her testimony is entitled to great weight, as the Magistrate Judge found. Dr. Oakes’s expertise, integrity and credentials were acknowledged by the defendant’s counsel. Tr. at 818, 322. Her conclusions were supported, at least in part, by the defendant’s own expert, Dr. James Heald. Tr. 3293.[2]
Furthermore, contrary to the defendant’s contention, Dr. Oakes’s analysis was not based on hearsay. As the Magistrate Judge stated in his Report and Recommendation, her analysis is based upon an examination of a wide range of materials, which are documents obtained from- the defendant’s files.[3]
In addition, Dr. Oakes’s testimony is wholly corroborated by the testimony of the defendant’s personnel who are intimately acquainted with the tracking practice of the District. Specifically, see the testimony of Mr. William Bowen (Report and Recommendation at 947) and Mr. Nathaniel Martin’s (Report and Recommendation at 948) both veteran administrators of the District, with many years of experience in observing the operation of the District’s tracking method.
The defendant also objects to the Magistrate Judge’s finding that the defendant’s tracking practices “did not represent a trustworthy enactment of any academically acceptable theory or practice.” This conclusion is supported by the testimony of Dr. Oakes and, in large part, by the testimony of Dr. Willis.
The Magistrate Judge further found that “it was the policy of RSD to use tracking to intentionally segregate white students from minority students.” Report and Recommendation at 940. The defendant objects on the grounds that “no evidence was adduced at the hearing which demonstrated that the defendant was motivated on the basis of race to track or ability group students according to their race or had the invidious intent to do so.” As the plaintiffs correctly point out, the defendant’s intent is what is at issue here, not its motivation.[4]
Furthermore, there is ample evidence to support the Magistrate Judge’s conclusion on this point, including but not limited to: the assignment of minority students to lower track classes in consistently disproportionate numbers (Report and Recommendation at 946, 950-53), knowledge of these racial disproportions and woefully inadequate efforts *914 to correct them (Report and Recommendation at 999), placing black students whose achievement scores qualified them for two or more tracks in lower tracks (Report and Recommendation at 959) and corroboration by District personnel (Report and Recommendation at 947-48).
The defendant also objects to the Magistrate Judge’s finding that children were publicly labelled when they were “tracked.” Contrary to the defendant’s objections, the evidence clearly supports this finding, including the testimony of Dr. Oakes and the incredibly insensitive practice of the District of labelling the students by color-coding them for all of the student body to see. Not only is this evidence compelling, it is astonishing, and completely uncontroverted.
The defendant also attacks Dr. Oakes’s expertise on statistical analysis, although it presented no statistical expert in order to impeach her analysis, which it could have done. The defendant’s claim is without merit.
The defendant objects to the Magistrate Judge’s finding that the matters contained in Dr. Oakes’s charts and tables are true and correct and his adopting them as findings of the court. The Magistrate Judge further found that “the record is replete with situations where, there were students (usually white) who scored below the national mean and who were still placed in the honors classes and, incredibly, there were students (usually minority) who scored in the ninety-ninth percentile who were placed in basic classes.” This finding is amply supported by the record in this case. It is significant that the defendant offered no evidence to rebut the plaintiffs’ proof, presumably because it could not do so.
The defendant also objects to the Magistrate Judge’s finding that the defendant did not track students objectively and had a rigid tracking program. The defendant attributes these inequities to “mistakes” and not “intentional discrimination.” The evidence on this point is replete with statistical, documentary and anecdotal support which establishes that the defendant was aware of the problem, but chose to do nothing to correct it. It is supported by the record in this ease.
The Magistrate Judge found that the tracking systems used by the RSD did not remedy differences or ameliorate disparities in achievement among racial groups, nor did it function to move students out of the low-level track or move minority students into high-level tracks.
The ability grouping used by the RSD, therefore, cannot be justified as an attempt to target minority students with the hope of advancing them to higher achievement levels. The grouping practices used created racially identifiable classrooms, provided unequal opportunities to learn and served no remedial function for minority students. These practices did not even enable minority students to sustain their position relative to white students in the district achievement hierarchy.
Report and Recommendation at 999.
The defendant’s objections to this finding seem to be that since the plaintiffs failed to prove that all minorities were improperly placed, no intent to discriminate can be found. The court finds such a suggestion to be incongruous and without any legal foundation. It would obviously be an impossible burden in any discrimination case to require the plaintiffs to demonstrate that every act of the District was discriminatory.
Furthermore, the record reflects that the evidence supports that groups of higher track students whose scores fell within a range that would qualify them for participation in either a higher or lower track were consistently “whiter” than groups of students whose scores fell within the same range but who were placed in the lower track and in a number of cases, high track classes included exceptionally low-scoring white students, but this was rarely the case for blacks. Conversely, quite high-scoring blacks who were often excluded from high track classes, were often found instead in low track classes. This was seldom the case for white students. Report and Recommendation at 959.
The defendant apparently contends that these disparities show that since the District mistracked both black and white students, no racial discrimination is shown. Contrary to the defendant’s position, the evidence pre *915 sented reveals that while blacks were misplaced “down” (i.e. into lower classes), whites were misplaced “up” (i.e. into higher classes).
The evidence clearly supports a finding that the mistracking resulted in unfavorable treatment for minority students. The ultimate result of this mistracking was that minority students whose achievement scores qualified them for regular and basic tracks were far more, likely to be placed in the lower than the higher track for which they qualified, and white students were far more likely to be placed in the higher track than the lower track when their achievement scores qualified them for both tracks. Report and Recommendation at 977.
As to the defendant’s contention that socioeconomic factors account for the disparate treatment of minorities in track placement in the District, there is little, if anything, in the record supporting the defendant’s position.
The defendant raises additional objections to the Magistrate Judge’s findings under the heading “Student Tracking and Ability Grouping.” The court finds that those objections are without merit and adopts the finds of the Magistrate Judge on those issues.

SEGREGATION OF STUDENTS BY RACE WITHIN SCHOOLS

In conjunction with the segregative practices involved in the tracking of students, the Magistrate Judge also found further use of special programs to separate children by race within Rockford public schools. During the periods when the RSD was involved with the Illinois State Board of Education (ISBE) and the QUEFAC lawsuit,[5] the RSD took actions which were purported to have de-segregative effects. The Magistrate Judge found that those actions did not bring about any real racial interaction and instead, used programs which included intact busing and part-time programs, which had little, if any, desegregative effect. Those programs were subsequently rejected by the QUEFAC court and the ISBE in the mid-1970’s.
The RSD then began to use both full-site and partial-site programs. Full-site programs included focus centers and open enrollment. Partial-site programs included such programs to place students in classrooms separate from the regular students in a school where the transfer students would not have much contact with the regular students. The use of the so-called “high status” partial-site programs, those with academic entrance requirements, placed groups of white students in minority schools, but the structure of the programs prevented the students from interacting with the minority students of the host school. The use of these kinds of programs allowed the District to count desegregation in terms of numerical percentages without consideration of continued separation of students within individual schools.
Furthermore, prior to the filing of this lawsuit, the RSD used voluntary alternative programs for desegregation which were primarily composed of white students. Desegregation programs for minority students were primarily mandatory transfers and often included mandatory busing. The alternative programs created isolated classrooms of white students in predominantly black schools in which children were in the same buildings, but had no interaction.
The defendant objects to the Magistrate Judge’s findings on the basis that they are not supported by the evidence and because many of the programs discussed were done with the approval of the QUEFAC court. The QUEFAC court did not make a finding that the RBE violated the rights of minority students. The case was, in fact, dismissed pursuant to a voluntary dismissal. Plans such as the Grade Exchange Plan and the Special Interest Centers were not ordered by the court. The Grade Exchange Plan was rejected because it effected no true integration. The plan for Special Interest Centers was allowed to proceed although Judge Bauer had serious reservations about the plan. He allowed the plan to go forward *916 only because there was no time in which to implement an alternative.
In 1977, the ISBE placed the RSD on probation because the plan it had submitted was found not to comply with the ISBE rules. Although these rules were held invalid by the Illinois Supreme Court, they did place the RSD on notice of the concern other governmental agencies had about its practices.
The defendant also objects to the findings regarding the partial-site programs stating that the separation between the gifted students and the regular students occurred because the students would “necessarily be located in different classrooms.” The court finds this position meritless. The evidence supports the conclusion that minority students were excluded from the programs, with the resulting segregation among classrooms.
The Grade Exchange Plan provided for the transfer of students and their teachers from predominantly white schools to predominantly minority schools and vice versa. Each class transferred remained intact at the receiving school. Again, this was a program to effect the appearance of integration without actually mixing minority and majority students. The defendant argues the evidence does not support this conclusion; however, the evidence is clear from the minutes of the school board and from the proceedings in QUEFAC.
After the rejection of the Grade Exchange Plan, the District began using “Interest Centers” in 1975 to attempt to mix racially diverse students. The Interest Centers were designed to provide a course specific curriculum, but only for a five or ten day period during the school year. The plan was to provide a means to mix students while educating them in one particular field. The evidence shows, however, that classes were transferred en masse; minority classes were placed within an all white school, but were still kept separate.
The evidence also supports the Magistrate Judge’s findings that even when minority students were placed in white schools, they were still kept separate from white students. The conclusion is supported by the discussion of student tracking, as well as the uncontra-dicted testimony of William Bowen and Keith Wilson. Further, the evidence supports the conclusion that many of the minority transfer students were part of Chapter I pull-out programs, who were then “pulled-out” of white classrooms to attend separate classes for significant portions of the day. The defendant asserts that this was not intentional segregation, but rather a means to maximize the District’s funding under Chapter I. The defendant offers no evidence to support its argument. This objection is also contradicted by Dr. Stolee’s testimony that there were no funding incentives to keep minority students in minority schools.
In conjunction with the full-site magnet programs, the District used partial-site alternative programs which were highly segregated. The defendant objects stating that the evidence does not support the Magistrate Judge’s conclusions regarding the Focus Centers and Alternative Programs. The defendant states no basis for its objection. In 1987, the District changed its transportation policy, restricting eligible bus service to the school, which forced some minority students to drop out of the program because of the lack of transportation. Further, Dr. Greene’s testimony about his experiences at Haskell School is evidence of the District’s failure to support the Focus Center there and is not contradicted by the defendant. The RAES and RAMS showed promise as desegregative programs but were changed to partial-site programs and moved from the Lincoln Park school building. In 1982, RAES and RAMS were discontinued. The defendant argues that the closing of those programs does not show intent. The court disagrees. As the Magistrate Judge found, the use of these magnet programs showed that white students would participate in these types of desegregation programs.
In the late 1970’s and early 1980’s, the RSD created partial-site magnet programs, “Alternative Programs”, and full-site programs called “Focus Centers.” In 1982, the RSD cancelled transportation to the Focus Centers, and effectively shut them down. The partial-site programs were of two types: the so-called “high status” programs such as *917 the Gifted Program, CAPA, Montessori, and the Arts Alternative Program; and “low status” programs such as GIT and CASS. The Magistrate Judge found that the alternative programs were used as a means to emphasize and reinforce racial separation. The court agrees. Over time, the high status programs became more segregated white, while the low status programs continued with disproportionately high minority enrollments through the 1980’s. The District also created a “Minority Gifted Program”, but did not allow minority students to enter the all-white Gifted Program, even though the Program’s Director stated the minority gifted students were capable of performing just as well in the regular Gifted Program. The defendant’s objections that those findings are not supported by the evidence are without merit and the court adopts the Magistrate Judge’s findings regarding these programs.
Within school segregation by intentional conduct is the same as intentional conduct resulting in systemwide segregation. This internal segregation is unlawful. Reed v. Rhodes, 607 F.2d 714, 731 (6th Cir.1979); Hobson v. Hansen, 269 F.Supp. 401, 511-14 (D.D.C.1967), aff'd sub. nom. Smuck v. Hobson, 408 F.2d 175 (D.C.Cir.1969). Such internal segregation may even be more invidious because its effects are observable to the students every school day. Hart v. Community School Bd. of Educ., New York School Dist. #21, 383 F.Supp. 699, 740 (E.D.N.Y.1974), aff'd, 512 F.2d 37 (2nd Cir.1975). The Magistrate Judge concluded, as does the court, that the RSD engaged in intentional and purposeful discrimination in the operation of the District’s purported desegregation programs, tracking system, bilingual education programs, magnet school programs, and the various alternative education programs. The defendant’s objections to these findings are dismissed.

STUDENT ASSIGNMENT

The Magistrate Judge’s section on Student Assignment found that over the years the RSD manipulated school attendance areas to separate majority students from minority students. When state and federal agencies pressured the RSD to change its practices, the changes had limited effects and often placed a disparate burden on the minority students. The section covers a long period of time, from the late 1950’s through the 1980’s. The defendant initially objects to the admission of evidence prior to 1973 as too remote in time to have any relevancy. The court has broad discretion in determining the admissibility of evidence based on remoteness. Cason v. Texaco, Inc., 621 F.Supp. 1518, 1527 (C.D.La.1985); Keyes v. School Dist. No. 1, 521 F.2d 465, 473 (10th Cir.1975). The plaintiffs presented this historical evidence to show long-standing practices in the District, as such, their evidence is admissible. The defendant’s objection goes only to the weight of the evidence and not its admissibility.
The defendant also argues that the Magistrate Judge’s findings are not supported by the evidence. This objection is meritless. The defendant has offered nothing to contradict the substantial evidence presented by the plaintiffs regarding the movement of students in school assignment. The defendant also suggests that the QUEFAC court did not find the RSD had intentionally discriminated. The court is fully aware of that fact and of the fact that no findings were made because of a voluntary dismissal. No disposition was made on the merits. The court does not infer anything against the defendant based on QUEFAC, but does examine the total sum of evidence, including those time periods.
Similarly, the defendant has objected to evidence dealing with actions taken with the ISBE and under the rules and regulations promulgated by the ISBE. The ISBE Rules dealing with desegregation efforts were determined to be unconstitutional by the Illinois Supreme Court in Aurora East Public School Dist. No. 131 v. Cronin, 92 Ill.2d 313, 66 Ill.Dec. 85, 442 N.E.2d 511 (1982). The Magistrate Judge found, as does the court, that evidence of resistance or failure to comply with state law provisions can be evidence of unlawful intent. Diaz, 733 F.2d 660, 666; Morgan v. Kerrigan, 509 F.2d 580, 585 (1st Cir.1974) cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975); Johnson v. San Francisco Unified School District, 339 *918 F.Supp. 1315, 1342 (N.D.Cal.1971), vacated on other grounds, 500 F.2d 349 (9th Cir.1974). As in QUEFAC, the District worked with the ISBE to formulate desegregation programs. Although the rules and regulations of the ISBE were found to be an unconstitutional exercise of authority by a state agency, the actions taken by the RSD while those rules were in effect is probative of the pattern of segregative practices which the plaintiffs have alleged. Therefore, the defendant’s objection is dismissed.
Most of the evidence presented here, as in the rest of this case, has been gleaned from the RSD’s own records. Changes in the school attendance boundaries and attendance patterns were established by the RSD’s School Boundary Descriptions, Student Attendance Maps, Board Minutes, RSD Memo-randa, RSD correspondence with the United States Department of Justice, RSD correspondence with the- ISBE, and the various RSD plans and reports, including the 1989 Reorganization Plan and the Individual Building Analysis. Additional support was provided by the testimony of former Superintendent Dr. Thomas Shaheen, former Board Member Marcella Harris, Pupil Placement Committee Member Robert Kufalk, Rev. William Collins, Bill Page, former Board Member Jo Minor, former ISBE Member Dr. Justine Walhout, M. Dickover and RBE Equity Consultant Dr. Harriet Doss Willis. Further documentary support included reports from the Community Desegregation Committee and the Pupil Placement Committee, the record of Quality Education For All Children, Inc. v. School Board, 362 F.Supp. 985 (N.D.Ill.1973) and ISBE • Reports. The defendant offered nothing to contradict this evidence. In fact, most of the evidentiary basis has been stipulated to by the defendant. The defendant argues that the evidence does not support the Magistrate Judge’s findings. The court, however, finds the evidence amply supports the Magistrate Judge’s findings.
Although the Magistrate Judge adopted a substantial portion of the plaintiffs’ proposed findings, the plaintiffs’ have objected to the Magistrate Judge’s failure to adopt certain findings they proposed.
Specifically, the plaintiffs object to the Magistrate Judge’s failure to adopt findings regarding the Teacher Development Center (TDC) and the study done by the American Association of University Women and the League of Women Voters. The court finds the Magistrate Judge properly rejected those proposed findings. Although the TDC was subsequently dropped by the Board, the plaintiffs have not sufficiently established that it was done with segregative intent. As to the plaintiffs’ objection to the study of the American Association of University Women and the League of Women Voters, the Magistrate Judge properly rejected findings regarding the study. The plaintiffs failed to establish the reliability of the methods and procedures used. The court rejects these objections to the Report and Recommendation as well as the plaintiffs’ other objections to the Magistrate Judge’s failure to adopt their proposed findings.
School districts have often been found to have developed attendance boundaries in which racial segregation in school assignments resulted. See Report and Recommendation at 1078 (and citations therein). The court adopts the Magistrate Judge’s findings and conclusions regarding school attendance zones as well as the conclusions that those attendance zones were used to create and maintain separate school systems based upon race. The court adopts the Magistrate Judge’s conclusion that the RSD’s policy of maintaining neighborhood schools was, in fact, a policy of maintaining neighborhood white schools. Report and Recommendation at 1079. Furthermore, the RSD also used feeder patterns for student assignment at the District high schools as well as satellite zones for elementary students to maintain segregation in the schools.
The use of optional attendance zones also contributes to the segregative conditions in a school district. United States v. School Dist. of Omaha, 521 F.2d 530, 540-43 (8th Cir.), cert. denied, 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975). The result of giving majority and minority students the option of attending predominantly majority or minority schools is often student choices which will create or intensify student segregation. The *919 court finds that the RSD’s open enrollment policy did not aid desegregation. Rather, the open enrollment policy benefited majority students with access to alternative programs, while burdening minority students through mandatory one-way busing.
The RSD’s policies in the construction of new schools or school additions and the closing of old schools also contributed to segre-gative conditions in student assignments. See Report and Recommendation at 1079-80. The court adopts the Magistrate Judge’s findings and conclusions that the RSD maintained segregative conditions when schools were closed so that white students were assigned to racially-identifiable white schools and minority students were assigned to racially-identifiable minority schools. Further, in the construction of school additions, the RSD intentionally added facilities to promote and maintain segregation within the school system.
The court further finds that the RSD manipulated school capacities and student transfer policies to maintain segregative conditions in the District. Racially-identifiable white schools were operated at overcapacity levels to avoid transferring white students to racially-identifiable minority schools. Transfer policies in the RSD allowed special transfers for majority students even when those transfers had a segregative effect on the schools involved.
The court adopts the Magistrate Judge’s conclusion that the RSD was aware of desegregation plans which would have integrated the District. The RSD rejected those proposed plans and adopted plans which burdened minority students and benefited majority students.

FACILITIES AND EQUIPMENT DISPARITIES

In his Report and Recommendation, the Magistrate Judge concluded that:
Systemwide disparities in facilities, equipment, materials and supplies between minority and predominantly white schools is unlawful. Such policies and practices of the RSD clearly indicate intentional discrimination.
Report and Recommendation at 1081. The Magistrate Judge further found that system-wide disparities in facilities and in equipment, materials and supplies between predominantly minority and predominantly majority schools existed during the past two decades.
The defendant’s objections to these findings are: 1) that they are unsupported by the evidence, and 2) while the evidence covered a period of forty years, the Magistrate Judge’s finding that disparities existed applies to only twenty years.
At no time did the defendant offer any evidence to counter the evidence produced by the plaintiffs on this issue. There is ample testimony in the record to support such a finding.
The defendant objects to the Magistrate Judge’s reliance on the testimony of certain witnesses, specifically Carl Towns, a former Board Member; Eloise Beals, a former teacher; Pat Redmond, a former student; Marcella Harris, a former Board Member; Hiram Gregory Luna, a former member of the School Desegregation Committee; Michael Bozym, a former teacher; Dr. Thomas Shaheen, the former superintendent of the District, and Dr. Joanne Shaheen, his wife, who was also a teacher in the District; and Mary Williams, a former teacher in the District. The gist of the defendant’s objections to the Magistrate Judge’s reliance on the testimony of all these witnesses seems to be that the testimony was hearsay, that it was based on observations of events which occurred prior to the last two decades and that any opinions were the opinions of lay witnesses and were, therefore, inadmissible.
The court rejects the defendant’s objections. First, all of these witnesses testified as to their personal observations which are clearly admissible, whether they are the observations of lay or expert witnesses. Second, even though they may have been evidence of events which occurred prior to the last two decades, such evidence may be probative of the attitude and practices of the defendant over an extended period of time. Third, under the Federal Rules of Evidence, a lay witness may state opinions, provided that such testimony is limited to those opin *920 ions or inferences which are: (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’ testimony or the determination of a fact in issue.[6] In each of these instances, the objection goes to the weight of the evidence, not its admissibility.
All of the witnesses relied upon by the Magistrate Judge testified to their own personal observations and any opinions[7] they may have had were based on the rational perception of the witness and their opinions were helpful to a clear understanding of the witness’ testimony or the determination of the fact in issue.
The defendant also objects to the following Magistrate Judge’s finding in his Report and Recommendation:
Chart I shows the mean ranking of the physical systems by school type (African-American, integrated, white), ranked on a scale of 1 to 4, with 1 being the lowest and 4 being the highest. African-American schools had a mean ranking with regard to physical systems of 2.45. Integrated schools had a mean of 2.51, and white schools a mean of 2.57.
Report and Recommendation at 1082. The defendant’s principal objection seems to be on the grounds that it is simply a subjective judgment concerning “physical systems” broken down by “school type.” The defendant contends that without any type of explanation, such a finding cannot support a conclusion that the defendant intentionally discriminated with respect to physical facilities.
Contrary to the defendant’s contention, the chart was based on the District’s own document, entitled “District Facility Plan.” Furthermore, the defendant stipulated to the chart. In view of the stipulation and the fact that the data used in the preparation of the chart was obtained from documents prepared by the District, it is difficult to see how the defendant can object to the Magistrate Judge’s finding.
The defendant also objects to the Magistrate Judge’s findings, that: 1) for each category of equipment, as the percentage of African-American students in the school increased, the number of pieces of equipment allocated to the school declined, and 2) that the equipment disparities revealed by defendant’s January 2, 1990, Facilities and Equipment Evaluation were known to the School District through' an annual equipment inventory process conducted by the District. Report and Recommendation at 1084, 1090. In short, the defendant states that “the analysis provided simply counted objects with no consideration for the factors noted above. Without addressing these other factors, a finding of intentional discrimination based on such an incomplete and inconclusive analysis is without merit and cannot withstand review.”
The court notes that the 1990 Facilities and Equipment Evaluation was prepared from the District’s own data for the purpose of evaluating equipment disparities between predominately white and predominately minority schools. Furthermore, the defendant presented no evidence as to why these equipment disparities existed or the reasons for the disparities. The court can only conclude that no such evidence was presented because none existed.
The defendant also objects to the Magistrate Judge’s finding that:
Defendant’s failure to produce pre-lawsuit inventory lists makes precise evaluation of equipment allocation to African-American schools at the time this suit was filed impossible. However, even defendant’s post-lawsuit equipment evaluations, performed after some remedial measures were taken, showed strong disparities in equipment allocation.
Report and Recommendation at 1090. The defendant’s objection is that:
*921 One cannot conclude that, in the absence of inventory data for thirty years, the inventory data gathered after the filing of this lawsuit are dispositive of defendant’s intent prior to the filing of the lawsuit. No correlation was drawn by the Magistrate Judge. Furthermore, on November 28, 1993, the Magistrate Judge entered an order on three issues related to implementation of the Second Interim Order, such Order stating, inter alia, that:
[A]s near as the court can tell, as of the date of this order the Board is substantially in compliance with and has engaged in no intentional violation of the Second Interim Order.
Specifically, the defendant objects to the Magistrate Judge’s finding that the District’s annual inventories are both probative of the usefulness of equipment and of the defendant’s knowledge of the disparities in equipment.
As to the knowledge which may be imputed to the defendant, the court notes that the inventory process was prepared, or at least coordinated, by the defendant’s Director of Purchasing. Under these circumstances, it is difficult to see how such knowledge cannot be imputed to the Director’s principal, the defendant. Furthermore, the defendant’s own forms called for comments on the condition of the various equipment. As to the defendant’s objection to the Magistrate Judge’s reliance on post-filing inventory, the court finds that under the circumstances here, the Magistrate Judge was entitled to rely on the data and to draw reasonable inferences therefrom, since they were the only inventories made available by the defendant.
The defendant also objects to the following finding of the Magistrate Judge:
Prior to its closing in 1973, Muldoon School, a predominantly African-American school in the Southwest Quadrant, was in dire need of renovation. Muldoon was an old, previously closed Catholic girls’ school, that was purchased by the RSD and operated for only one year, housing 4th, 5th and 6th grade children from Ellis. In response to parent protests, the RSD allocated a small sum of money for repair work for the school year 1972-73.
Report and Recommendation at 1092-93.
The court is amazed that the defendant would even mention the conduct of the District as it relates to this finding. The Magistrate Judge’s finding, was, in fact, very understated in view of the circumstances attending the so-called “restoration” of Mul-doon School. In fact, the evidence revealed that the defendant received a life safety report which outlined an expenditure of $350,-000.00 for necessary restoration and repairs. In response to the parents’ protests, the District expended a total sum of $3,700.00, approximately one percent (1%) of the amount recommended, which failed to include a fire alarm or new heating system.[8] The court finds it incredible that the defendant would now point to such actions as “positive steps.” Although it is true that the students were housed in this building for only one year, the District is fortunate to have averted a tragedy during that year.
The defendant also objects to the Magistrate Judge’s finding that the RSD’s private gifts policy contributed to EMS disparities. Specifically, the Magistrate Judge found that:
For twenty-five years, the RSD consistently operated in a manner that allowed parent gifts and other private gifts to provide a much better educational experience for white students than for minority students. Schools serving middle and upper income students received more gifts from their PTAs, PTOs and other third-parties, than schools serving lower income students. Accordingly, the schools serving middle and upper income students had far more equipment, materials and supplies.
Report and Recommendation at 1094.
The defendant objects to these findings on the basis that private acts of non-state officials (e.g. PTO, PTA, etc.) do not support state action sufficient to prove a violation of *922 the Fourteenth Amendment. The defendant further contends that knowledge of a twenty year history of accepting gifts cannot be imputed to each School Board and that no one Board had the benefit of knowledge of acts of its predecessory Boards so as to understand the impact of a policy on gifts accepted over a twenty year history. With respect to the chart contained on page 1096 of the Report and Recommendation and the statistics cited on page 1095, the defendant objects on the basis that these percentages were never “stipulated to by the parties, as is stated in footnote number 14.”
Contrary to the defendant’s contention, the District’s practice in allocating these gifts was an exercise of its discretion, an affirmative state action. Furthermore, the Board was put on notice many times over a long period of years that its private gift practice had a disparate impact on predominately minority schools.[9]
As to the defendant’s denial that it did not stipulate to the by-quadrant gift figures, the plaintiff has filed an affidavit of one of its counsel, which is unrebutted, confirming the stipulation.
The defendant raises some minor additional objections relative to the “Facilities and Equipment Disparities” section of the Magistrate Judge’s Report and Recommendation. The court rejects those objections as without merit and adopts the Magistrate Judge’s findings as its own.

1989 REORGANIZATION PLAN

The complaint in this case was filed shortly after the RSD adopted a District-wide reorganization plan on February 28, 1989, entitled “Together Toward a Brighter Tomorrow.” (“The 1989 Reorganization Plan” or “Plan”) The immediate effects of the Plan as proposed were to close the naturally integrated West High School, resegre-gate District elementary schools and impose extreme disparate burdens on minority students.
Some aspects of the Plan were implemented, many others were not. For the purposes of the Magistrate Judge’s Report and Recommendation, and this opinion, the court evaluates the Plan in terms of the effects the RSD anticipated at the time of adoption, primarily through enrollment and program projections the RSD had on February 28, 1989, and projections made through May 11, 1989, the date this lawsuit was filed.
The defendant’s initial objections are that because the Plan was never fully implemented, the court cannot use it as a basis for a finding of intentional discrimination. The court examines the intent of the defendant at the time of the filing of the lawsuit. This includes past and present actions of the RSD. In this instance, the court is examining the completed action of the Board, namely, the adoption of the Reorganization Plan. Also, the Magistrate Judge often referred to proposals in the Plan as completed actions. As noted in the Report and Recommendation, however, and made clear throughout his discussion, the Magistrate Judge was looking at projected effects had the Plan been fully implemented from the time of the filing of the lawsuit to determine the defendant’s intent. In evaluating the Plan, the Magistrate Judge also considered evidence of earlier versions of the Plan. The defendant objects, arguing that those versions were not implemented and that public protest from portions of the community does not evidence intentional discrimination. The court finds that the events preceding the defendant’s decision is relevant to intent. Arlington Heights, 429 U.S. at 266-69, 97 S.Ct. at 563-69. Furthermore, the defendant’s responsiveness to public comment on its actions and foreseeability of the impact of its decisions are also relevant to the defendant’s intent.
The defendant also objects to former Superintendent Maurice Sullivan’s testimony as an “ ‘after-the-fact’ criticism of the deliberative process.” The court finds Dr. Sullivan competent to offer testimony as an experienced school administrator and educator. He has a broad base of knowledge about the *923 District and its practices. The court finds Dr. Sullivan well qualified to offer Ms opinions regarding the considerations taken in formulating the Reorganization Plan.
Prior to the Reorganization Plan, the RSD had the following distribution of elementary schools:
% of # of
Schools Schools
36% Racially-identifiable white 14
Desegregated 15
Racially-identifiable minority 10 26%
Total 39 100%
At that time, the percentage of elementary students attending each type of school was as follows:
African-American/ Hispanic Students White Students
Racially-identifiable white 5% 42%
Desegregated 39% 43%
Racially-identifiable minority 57% 16%
Report and Recommendation at 1099.
The Plan contained proposals for individual schools which District staff themselves had classified as de jure segregation. The Plan also proposed the creation of the so-called “mega schools” at Wilson and Washington schools. Wilson was projected to have 1227 elementary students, over twice the number of students than at any previous school in the District, and four times the size of the average elementary school in the District in 1988-89. Report and Recommendation at 1107. Evidence supports the conclusions that there was no educational justification for such a mega-school and the lack of such justification supports an inference of the defendant’s intent to adopt such changes to promote segregation.
The defendant has also objected to the admission of the 1981 Individual Building Analysis report. The court finds that this report was a valid analysis made by RSD staff- in wMch staff reported that proposed measures for individual schools would constitute de jure segregation. The defendant argues that these standards were used by laypersons who were not using the term de jure segregation in its proper legal sense. The court does not take the conclusions in the report as legal conclusions, but as evidence of segregative effects within the District and as evidence of knowledge of segregative effect.
The court finds the evidence supports the Magistrate Judge’s findings regarding the effects of the 1989 Reorganization Plan. The court adopts the Magistrate Judge’s findings that “the 1989 Reorganization Plan would have had a devastating impact of the Rockford School District’s minority commumty. The impact of this Plan is evidence that the Board intentionally sought to racially isolate minority elementary students in the Rockford School District.” Report and Recommendation at 1125. The court also finds that the Plan closed the naturally integrated West High School for the pretextual reason of cost savings. The closing of West was not cost effective and increased the burdens placed on minority students. The court concludes that the 1989 Reorganization Plan was adopted with the intent to discriminate against the plaintiff class, and rejects the defendant’s objections.

EMPLOYMENT DISCRIMINATION

The Magistrate Judge found the RSD failed to meet minority hiring goals over the last twenty years. The Magistrate Judge found the District failed to effectively recruit minority applicants and failed to remedy underrepresentation of minorities in upper levels of the District administration.
The defendant objects arguing that those findings do not support a finding of intentional discrimination against the minority students of the District. The defendant does not dispute the factual basis of the Magistrate Judge’s findings. The RSD set forth minority hiring goals, and those goals were not realized. The court must consider what the evidence means with regard to the allegations of intentional discrimination against minority students.
Discrimination in recruitment, hiring, and promotion of staff is properly considered in determining whether the rights of minority students have been violated. Morgan v. Kerrigan, 530 F.2d 401, 432 (1st Cir.), cert. de *924 nied, 426 U.S. 935, 96 S.Ct. 2648, 2649, 49 L.Ed.2d 386 (1976). Because the court is considering the rights of the students, a strict employment discrimination analysis is not applied. Morgan v. O’Bryant, 671 F.2d 23, 27 (1st Cir.1982) (proof of individual hiring discrimination irrelevant).
The evidence establishes that since at least 1973, the RSD was aware that minorities were underrepresented in the District’s work force. At that time, the RSD formally decided to redress this underrepresentation. The defendant set a goal of 15% minority employment at all levels and set a timetable of achieving this goal within three to five years. The RSD never met its goals. In fact, the percentage of minority certified staff was approximately the same in 1991-92 as it was in 1973, approximately 7%. In itself, failure to meet those goals is not necessarily evidence of discrimination, however, neither the defendant nor defendant-intervenor has provided evidence disputing the appropriateness of the District goal or evidence that the goal was unachievable. Absent such evidence, the court may properly consider the hiring goal and the failure to meet the stated goal. See Morgan v. Kerrigan, 530 F.2d at 432-34.
In adopting the Magistrate Judge’s findings, the court does not comment on the dedication or abilities of the District teaching staff. In fact, the evidence supports the conclusion that most teachers were extremely dedicated to providing a quality education to all of their students. The court finds, however, that the RSD’s failures in meeting hiring goals did contribute to the overall disparities in the District.

STAFF ASSIGNMENT

Closely related to the section on employment discrimination is the Magistrate Judge’s discussion of staff assignment. The Magistrate Judge found minority teachers were predominantly assigned to racially identifiable minority schools. The Magistrate Judge found the same pattern existed for minority staff. The defendant objects to the findings stating that the evidence does not support them. The court finds the evidence does support the Magistrate Judge’s factual findings and adopts them. The defendant and defendant-intervenors also object to the use of those findings to support the conclusion of intentional discrimination. In that regard, the court agrees and must reject several of the Magistrate Judge’s conclusions.
As an initial matter, the defendant objected to certain findings which were based upon evidence of minority staff and staff percentages after the filing of the lawsuit. The court previously affirmed the Magistrate Judge’s ruling that such post-1989 evidence is properly admitted in the discretion of the court when there is a sufficient showing of a direct relationship between the post-1989 evidence and discriminatory intent of the defendant prior to 1989. The court finds the data charts the defendant objects to properly include data after the filing of the lawsuit. The data shows a continuation of the patterns of the previous years of conditions in the assignment of minority employees and is properly considered.
Although the data does indicate a disparity in the distribution of District staff, the plaintiffs have not established that this was caused with intent to discriminate against students. As the defendant-intervenors point out, the District was under certain obligations through collective bargaining agreements with District employees. These agreements gave teachers rights in their assignment based upon seniority and qualifications. Experience remained a qualification for promotional transfers. In cases where applicants had substantially equal qualifications, the selection was then based on seniority.
The plaintiffs have not established the statistical disparities in staff assignment contributed to the intentional discrimination against minority students. Furthermore, the District employees had rights through their union contracts. Absent a finding of intentional discrimination, the District could not disturb the assignment agreements with the unions to reassign employees based upon race. People Who Care v. Rockford Board of Education School District #205., 961 F.2d 1335 (7th Cir.1992). The court finds that although employee' assignments in the District show some racial disparity, the plaintiffs *925 have not established these disparities were done in furtherance of an intent to discriminate against the plaintiff class:

INEQUITABLE ACCESS TO TRANSPORTATION

The Magistrate Judge found the RSD placed disparate transportation burdens on minority students as opposed to minor burdens placed on majority students. The defendant objects arguing that the cutbacks in transportation it made were due to serious financial troubles in the District and the cutbacks were made equal for all students. The defendant further argues in its brief that when there were transportation burdens placed on minority students, the District had the tacit, if not express, approval of either the ISBE or the QUE FAC court to impose such burdens. The court finds the evidence does not support the defendant’s objections.
The defendant argues that the cutbacks were because of financial constraints throughout this case. The defendant has not provided a factual basis for this argument. As found in the section dealing with the 1989 Reorganization Plan, the court found the arguments of financial constraint were based on faulty projections of the need within the District. The defendant also does not establish that it acted on the basis of this financial constraint. The closing of West High School required a substantial increase in transportation costs. The defendant has not shown the court evidence in the record that transportation cutbacks were inevitable.
The defendant also argues that cutbacks were made affecting minority and majority students equally. The defendant has provided no evidence to support that argument. For example, the 1981-82 elimination of transportation for open enrollment transfers had a distinct segregative effect. Also, the cutbacks in transportation to full-site alternative programs had a disparate negative impact on minority students. Report and Recommendation at 1154.
The defendant’s remaining objections primarily are that the Magistrate Judge’s findings are not supported by the evidence. The court finds the defendant’s objections to be without merit. The defendant further argues that there was no evidence that the Board ever received the notes and memoranda supporting the disparities in transportation. The District’s liability is based on a pattern of discriminatory conduct over time and a governmental entity is liable for unconstitutional acts of its employees when there is a continuing widespread pattern of such unconstitutional conduct. See Yonkers, 624 F.Supp. at 1447 n. 12; Brown v. City of Ft. Lauderdale, 928 F.2d 1474, 1480-81 (11th Cir.1991).
The defendant has also objected to inferences the court made regarding notations made on various District records. The defendant has stipulated to most of these records and has stipulated to the appearance of the notations on District records. For example, a “mass transit only” notation appears next to many “minority open enrollment” and “bilingual focus” categories while “mass transit only” never appears next to a majority open enrollment or majority focus category. See Report and Recommendation at 1157-58. The notations are corroborative of evidence of disparate treatment based on race. When there is an explicit racially conscious classification, the conduct is suspect and the burden shifts to the defendant to provide a compelling justification for the classification. Palmore v. Sidoti, 466 U.S. 429, 433-34, 104 S.Ct. 1879, 1882-83, 80 L.Ed.2d 421 (1984); Personnel Admin. v. Feeney, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). The defendant has not overcome its burden and has not offered a compelling justification for providing majority desegregation participants more favorable transportation than minority participants.
The evidence establishes that there were numerous transportation problems for students in the open enrollment programs. These problems were related to the defendant’s provision of transportation, the defendant had notice and knowledge of the problems, and the problems in transportation had an adverse effect on minority open enrollment.
The court further finds the Magistrate Judge’s findings regarding the burdens of *926 RMTD travel as opposed to RSD provided bus service to be supported by the evidence. See Report and Recommendation at 1165. The RSD’s rule to provide transportation for children living more than 1.5 miles from their assigned school had a racially discriminatory result in its application. Further, majority students were provided transportation by the RSD, while minority students “were required to bear the cost of RMTD transportation and to suffer the qualitative differences of transportation provided to majority schools.” Report and Recommendation at 1171.
The court also finds the evidence supports the Magistrate Judge’s findings regarding the so-called “privy stops” to provide transportation to selected students had a racially discriminatory application. The court finds the disparate effect of the privy stops indicative of discriminatory intent, and adopts the Magistrate Judge’s findings.
The court must consider the way a school district provides transportation to and from school to its students in a case alleging racial discrimination. Transportation has become a major factor in how students are distributed within a district and is named in Green as one of the major factors considered in determining whether there is intentional discrimination. Both the benefits and the burdens of transportation must be operated in a unitary and non-discriminatory fashion. The court finds the RSD had a longstanding practice requiring the mandatory assignment of minority' students to schools outside their neighborhoods for desegregative purposes without imposing a similar burden on majority students. The court finds this practice to be unfair and unconstitutional. More generous transportation services were provided to the predominantly majority students in voluntary integration programs, as opposed to the involuntary integration students who were predominantly minority. The court further adopts the Magistrate Judge’s conclusions that the RSD’s argument of cost as a justification for transportation cutbacks was pretextual, and that the RSD’s opposition to mandatory busing for desegregation was in fact opposition to the mandatory busing of white students for desegregation.

DISCRIMINATORY CONDITIONS IN THE COMPOSITION OF THE BOARD

The defendant objects to the Magistrate Judge’s finding that the RBE intentionally maintained an electoral system that.it knew would minimize minority participation on the Board. The Magistrate Judge found that fi-om 1965 through 1989 substantial evidence exists showing that the RBE intentionally pursued a policy to keep the Southwest Quadrant underrepresented on the Board.
The defendant’s specific objections to this finding may be summarized as follows: 1) as a matter of law,[10] the Board could not, by itself, make the decision to move to a system of electing board members by sub-districts; 2) since white voters dominated the District, and therefore the “at large” election process, placing the issue before the voters would be futile, since such a proposition would be defeated; 3) that there is no evidence that the defendant was in violation of the Voting Rights Act; and, 4) that the Magistrate Judge has exceeded his authority in addressing these issues.
As to the defendant’s first objection, namely that the Board was not responsible for maintaining a discriminatory electoral system because it was the voters, and not the Board, who were responsible for ultimately determining the type of system to be used in electing Board members, the court rejects the defendant’s contention. The defendant *927 misconstrues the Magistrate Judge’s finding on this issue. What the Magistrate Judge found was that despite having had the statutory power to do so (105 ILCS 5/9-22), with one exception (1976), the Board failed to place the issue on the ballot for a vote by the public. This was true despite the fact that the Board has been requested to do so on many occasions. Report and Recommendation at 1179.
The defendant’s assertion that placing the issue on the ballot would have been futile is refuted by the fact that the electorate passed a referendum in 1989 approving sub-district voting. Furthermore, the defendant offered little evidence, other than the defeat of the 1975 referendum, to support its position on this issue.
The defendant’s third objection is clearly without merit. No separate Voting Rights Act claim is necessary to support a claim of segregation and discrimination in education. See Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).
The defendant’s further objection encompasses the Magistrate Judge’s finding regarding the “RBE Gerrymandering of Sub-district Electoral Boundaries.” The defendant objects to these findings on the basis that there is a valid consent decree in force in these proceedings and the Magistrate Judge does not have the authority to alter a consent decree through his findings or conclusions.
The Magistrate Judge found that subsequent to the 1989 referendum, the Board adopted an electoral map that interfered with the voting and representational rights of minority voters in the District. Also, after passage of the subdistrict referendum in November 1989, and prior to the first election by subdistrict in November 1991, Board member Holzworth, on several occasions during Board or Board committee meetings, urged the RBE to gerrymander the new subdistriet to avoid creating a subdistrict with a majority of African-Americans.[11]
The defendant objects to the Magistrate Judge’s findings in this area on the grounds that: 1) the Magistrate Judge ruled on pre-1989 conduct in violation of this court’s previous order;[12] 2) that two members out of five appointed from 1965-1989, were minorities, making the Magistrate Judge’s finding on this issue unsupported by sufficient evidence; 3) that there was an insufficient basis for the Magistrate Judge to conclude that the defendant intentionally created discriminatory conditions in drawing an effective and legal map, given the inherent difficulties encountered in drawing such a map.
Finally, the defendant points to a portion of this court’s order of September 12, 1991, as supporting its contention that it was acting in good faith in attempting to adopt a conforming map.[13]
Although the court agrees with the overall finding of the Magistrate Judge that there was substantial evidence of intentional discrimination on the issue of the make-up of the Board, the court disagrees with the Magistrate Judge’s findings that the Board deliberately gerrymandered the District in drawing the map which was submitted to the court. Although it is true that this court rejected that map and ultimately adopted the map which was jointly agreed to by the plaintiffs and the defendant, the evidence supports, and the court finds that, insofar as the production of the map is concerned, the District was acting in good faith in attempting to develop a conforming map.
In addition, the court does not agree with or adopt the finding of the Magistrate Judge insofar as it seems to impute the actions and comments of one Board member, Mr. *928 Holzworth, to other members of the Board. On the contrary, it appears to the court that the majority of the members of the Board, at that time, acted in good faith in attempting to correct some of the many inequities of the past. Although the Board did initially submit a deficient map which was rejected by this court, that is not to say that the court is of the view that the other Board members shared Mr. Holzworth’s views. In fact, it appears that the opposite was true, at least as to the majority of the members. Board member Josephine Minor testified that she ignored Mr. Holzworth’s “rantings and ravings” and that she did not believe any other Board member took Mr. Holzworth seriously. Minor Dep. at 47. The court rejects this finding of the Magistrate Judge.
Finally, with reference to the Magistrate Judge’s finding that the Board’s failure to appoint minority members to the Board constituted intentional discrimination, the evidence on this point is simply insufficient to support such a finding. As the defendant correctly points out, only five Board members were appointed to the Board between 1965 and 1989, and two of them were African-American constituting 40% of all vacancies, hardly sufficient evidence supporting the conclusion that there were efforts to exclude minority applicants for vacancies on the Board. Williams Dep. at 7. The court rejects this finding of the Magistrate Judge and strikes the references to that finding.
Although the court disagrees with some of the Magistrate Judge’s findings on the issue of discriminatory conditions in the composition of the Board, that is not to say that the court disagrees with his conclusion that from 1965 through 1989 substantial evidence exists showing that the defendant intentionally pursued a policy to keep the Southwest Quadrant underrepresented on the Board. Indeed, the court agrees with the Magistrate Judge’s conclusion that substantial evidence exists that the defendant intentionally pursued a policy to keep the Southwest Quadrant underrepresented on the Board.

EXTRACURRICULAR ACTIVITIES

The defendant objects to the Magistrate Judge’s finding that the defendant did not provide children in the District with equal opportunities in extracurricular activities. Specifically, the defendant objects to the Magistrate Judge’s reliance on various statements of certain minority students on the grounds that such statements are unfounded hearsay, without foundation, and inflammatory. The defendant further contends that the Magistrate Judge recognized a complete absence of discrimination in the RSD’s extracurricular athletic activities.
Although the defendant’s objection to some of the testimony of certain students and parents on hearsay grounds has merit, the Magistrate Judge’s conclusion on this issue is supported by the record on two grounds: 1) the District’s failure to provide equal access to transportation; and, 2) Superintendent Bowen’s testimony regarding the selection process at East High School.
The Magistrate Judge’s finding regarding after-school transportation is fully supported by the record. The evidence easily supports the conclusion that the defendant created inequitable travel demands on minority students. The defendant’s statement, that after-school student transportation was not provided to any students, ignores the fact that it was the defendant’s one-way busing policy that required the minority students to attend schools far away from their homes. Although it is true, as the defendant contends, that some minority students were able to make alternative transportation arrangements, this does not excuse the District’s policy on this point. The record supports the conclusion that minority students were saddled with disproportionate and discouraging travel burdens.
As to Mr. Bowen’s testimony regarding his observations and the changes he made in the selection of cheerleaders while he was Principal at East High School, this finding of the Magistrate Judge is clearly supported by the very credible testimony of Mr. Bowen.
Insofar as some of the testimony of certain students and parents are unsupported hearsay and uncorroborated, that testimony may be stricken. However, much of that testimony, particularly that which is based upon the observations of those witnesses, may stand.
*929 The objections of the defendant to the Magistrate Judge’s findings that the defendant did not provide children in the District with equal opportunities in extracurricular activities are overruled. The Magistrate Judge’s conclusion on this issue is adopted by the court.

BILINGUAL EDUCATION AND OTHER EDUCATIONAL DISCRIMINATION ISSUES AFFECTING HISPANICS

The Magistrate Judge found the RSD engaged in discriminatory conduct with regard to the District’s Bilingual Program and with regard to other educational issues affecting Hispanic students. The Magistrate Judge found the RSD moved the location of the Bilingual Program four times in a twelve year period. The involuntary movement of the bilingual students was for the stated purpose of desegregation. The moves placed transfer burdens on those students while placing no similar burdens on majority students. The Magistrate Judge also found inferior transportation was provided to the bilingual students as compared to voluntary white desegregation students. Once in the program, the Magistrate Judge found the bilingual students were segregated within the receiving schools and provided an inferior education as compared to white students.
The defendant objects to the use of evidence regarding the relocations of the Bilingual Program in support of a finding of discrimination. The defendant points to the fact that the program was moved only four times since its inception in 1972. However, that objection ignores that fact that the first relocation occurred in school year 1977-78 and thereafter was moved every three years, on the average, from Barbour and King schools to Whitehead, from Whitehead school to New Milford and Gregory, from New Milford school to Walker and from Walker school to Nashold in 1989-90.
The defendant states these. moves were necessitated by desegregation directives from the ISBE and facility constraints within the District. The evidence does not support the defendant’s argument. There is no indication that relocation of the Bilingual Program was necessitated by the ISBE nor that it was the only way to achieve integration. The one alternative of pairing Barbour school with a majority school was ignored by the RSD. The RSD used the Bilingual Program as a desegregation device without placing any similar burdens on majority students.
The defendant also argues that there was community support for relocation of the Bilingual Program, however, there ⅛ no evidence supporting the defendant’s argument. The evidence supports the findings that parents expressed many concerns about relocation, especially moving the program away from the Hispanic area in which it was originally located. The court finds the relocations of the Bilingual Program placed undue burdens on the bilingual students where no similar burden was placed on majority students for desegregation purposes.
The court further finds the segregation of bilingual students by using the Bilingual Program as a full-time program rather than a part-time pull-out program is fully supported by the evidence and adopts the Magistrate Judge’s findings. Additionally, the inequities in transportation for bilingual students as compared to majority students is supported by the evidence discussed in the Magistrate Judge’s opinion in this section and the section dealing with transportation. The court adopts the Magistrate Judge’s findings on those issues as well.
The goal of these types of language remediation programs is to integrate Spanish-speaking students into English language classrooms. Castaneda v. Pickard, 648 F.2d 989, 998 n. 4 (5th Cir.1981). They should not be used to isolate students. Id. The court finds the RSD operated the Bilingual Program in violation of the constitutional rights of the bilingual students. The court finds the defendant’s objections to be meritless and adopts the Magistrate Judge’s findings and conclusions in full.

SPECIAL EDUCATION

The Magistrate Judge found that Special Education students should be exempt from desegregation programs, finding that those students have enough problems without being moved around in order to make a *930 building appear numerically integrated. The Magistrate Judge further found that in the school year 1988-89, the District assigned 99.6% of the Southwest Quadrant elementary students to non-southwest schools. The Magistrate Judge concluded that he was not convinced that the assignment was an act of intentional discrimination and that the RSD should continue to exempt special education students from desegregation programs.
The plaintiffs object to the Magistrate Judge’s general conclusion that “the court has not been convinced that the assignment was an act of intentional discrimination” and state that regardless, “in the context of the 1989 Reorganization Plan which the Magistrate Judge found to be ‘a plan to resegre-gate Rockford’s schools’, (see Report and Recommendation at 1125), the continuation of the disparate burdens on the RSD’s Southwest Quadrant minority students was clearly an act of intentional discrimination because even though it was stipulated by the parties that it was specifically called to the RSD’s attention by its own special education staff, no corrective action was taken by the RSD in the 1989 plan.”
The court agrees with the plaintiffs’ contention. It is difficult to see how the defendant’s conduct could not have been intentional. The Magistrate Judge found that in the 1980-81 school year, full-time SCSE students were much more likely to be assigned to non-southwest side schools. See Report and Recommendation at 1193. While the southwest side schools constituted roughly a third of all elementary schools, they received only 13.6% of the SCSE students. As a result, non-southwest schools had an average number of full-time elementary SCSE students that was roughly double that for southwest schools (an average of 42 versus an average of 22, respectively).
Although the court agrees with the Magistrate Judge’s conclusion that the RSD should continue to exempt special education students from the desegregation programs, it is difficult to conclude, in the face of the record before the court, that the assignment of Special Education students was not an act of intentional discrimination. To the extent that the Magistrate Judge concluded that those acts were not intentional, the court declines to adopt the Magistrate Judge’s Report and Recommendation. Because of their unique position, however, the District should continue to exempt special education students from desegregation programs.

CONCLUSION

In the preparation of this order, this court has examined hundreds of documents and reports, and read numerous depositions and transcripts of the testimony of various witnesses. The court has also examined, in great detail, the excellent Report and Recommendation prepared and submitted by Magistrate Judge P. Michael Mahoney. In addition, the court has read and considered carefully the objections to the Magistrate Judge’s Report and Recommendation and the supporting briefs submitted by the plaintiffs, the defendant, and the intervenor-de-fendants. The court has previously commented on those objections and will, therefore, make no further comments on those specific objections. The court is impressed by the Magistrate Judge’s statement of the law of educational segregation and its application to the evidence and will not repeat the thorough analysis prepared by the Magistrate Judge. The court will, however, attempt to summarize the law of the case and the conclusions it draws from the law and the facts as they apply here.
In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the United States Supreme Court held that “in the field of public education, the doctrine ‘separate but equal’ has no place”, and that “separate educational facilities are inherently unequal.” Id. at 495, 74 S.Ct. at 692. The court further observed that “[t]o separate [minority children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.” Id. at 494, 74 S.Ct. at 691.
The law governing liability in a school desegregation ease can be summarized in one sentence: a state or local authority may not intentionally segregate or discrimi *931 nate against minority students because of their race. A prima facie case establishing liability contains three elements: 1) “segregation or discrimination” (minority students must, in fact, experience either segregated conditions or suffer the detrimental effects of discriminatory conduct—or both); 2) “causation” (school authorities must have caused, created or maintained such segregation or discrimination); and, 3) “intent” (the conduct of school officials must have been undertaken “intentionally”).
This standard derives from the Equal Protection Clause that provides that “[n]o state ... shall deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV, § 1.
Cases subsequent to Brown, have clearly established that government conduct that leads to racial imbalance in school systems violates the Constitution. A constitutional violation occurs in school districts that have never been subject to statutorily-mandated racial segregation where “school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system.” Keyes, 413 U.S. at 201, 93 S.Ct. at 2694. In order to prove unconstitutional racial imbalance in a school system, a plaintiff must show that: 1) the governmental authorities created or maintained racial segregation in the schools and, 2) their actions were motivated by segre-gative intent. Id. at 208, 93 S.Ct. at 2697; Diaz at 733 F.2d at 662.
In addition to proving that the defendant’s conduct created or maintained racial imbalance in the schools, a plaintiff must show that the conduct was motivated by segre-gative intent, the second Keyes factor. Ordinarily, only circumstantial evidence is available to establish segregative intent. Diaz, 733 F.2d at 662. Evidence of the discriminatory impact of acts, omissions or policies is one type of circumstantial evidence supporting an inference of segregative intent. Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 563-64, 50 L.Ed.2d 450 (1977). Other types of circumstantial evidence relevant to proving segregative intent include: 1) the historical background and sequence of events leading up to the conduct maintaining or exacerbating racial imbalance in the schools; 2) departures from typical procedural sequences or substantive criteria normally considered important by the decisionmaker; and, 3) contemporaneous evidence concerning the decision-making process. Id. at 267-68, 97 S.Ct. at 564-65. If a plaintiff succeeds in establishing a prima facie case of intentional segregation, the burden then shifts to the defendant to establish that the same segre-gative conduct would have occurred “even had the impermissible purpose not been considered.” Id. at 271, n. 21, 97 S.Ct. at 566, n. 21.
Further, a finding of intentionally segregative school board conduct in a meaningful portion of a school system creates a presumption that other segregated activity within the school system is not coincidental. Keyes, 413 U.S. at 208, 93 S.Ct. at 2697. This presumption places a burden upon the defendant to show that segregation in other schools and activities within the system have not resulted from intentionally segregative conduct. Id. In discharging this burden, the school authorities must rely upon more than some allegedly logical, racially neutral explanation for their actions. Id. at 210, 93 S.Ct. at 2698. The school district’s burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated its actions. Id.
The issue of the presence or absence of unlawful intent is one of fact. Armstrong v. O’Connell, 451 F.Supp. 817, 822 (E.D.Wis.1978). The ultimate determination of segre-gative intent rests upon examination of the record as a whole, including the multiplicity and cumulative effect of the defendant’s policies and practices. Morgan v. Hennigan, 379 F.Supp. 410, 479 (D.C.Mass.1974). A plaintiff may prove intent by direct, indirect, or circumstantial evidence. Armstrong, 451 F.Supp. at 826; Berry, 442 F.Supp. at 1291; NAACP v. Lansing, 429 F.Supp. 583, 590 (D.C.Mich.1976). Since direct evidence is difficult to obtain, ordinarily only circumstantial evidence is available to establish segre-gative intent. Diaz, 733 F.2d at 662.
*932 In the context of school desegregation cases, courts have cited a myriad of factors that by themselves or in combination with other facts support an inference of discriminatory intent. Evidence of the foreseeable segregative impact of decisions is one type of circumstantial evidence supporting an inference of segregative intent. See Arlington Heights, 429 U.S. at 266, 97 S.Ct. at 563-64. Arlington Heights identifies several other types of evidence this court has used that supports the inference of intent:
1) “[T]he historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes;”
2) “the specific sequence of events leading up to the challenged decision;”
3) “contemporary statements by members of the decision making body, minutes of its meetings or reports;”
4) “departures from the normal procedural sequence;”
5) “substantive departures [from prior policies] ... particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached;” and,
6) “[t]he legislative or administrative history ... especially where there are contemporary statements by members of the decision making body, minutes of its meetings, or reports.”
Id. at 266-69, 97 S.Ct. at 563-66. The Supreme Court explicitly recognized this list as being non-exhaustive of the potential factors probative of intent. Id. at 268, 97 S.Ct. at 565.
Separated from all of its rhetoric, the defendant’s purported defense in this case seems to be that even if the District is guilty of the conduct charged in the plaintiffs’ complaint, they did not intend to violate the plaintiffs’ constitutional rights, and, therefore, should not be held liable in this case. The court rejects the defendant’s argument on this issue. In any case, whether criminal or civil, where proof of intent is involved, it is a rare circumstance indeed, where a defendant admits that there was an intention to violate the law. Indeed, that is the usual defense in such cases. The courts, in both civil and criminal cases, have consistently made clear that proof of facts and circumstances which support an inference that the defendant is guilty of violating the law is sufficient to support a finding of an intentional violation. Here, the cumulative evidence overwhelmingly supports such a finding.
In segregation cases, such as this one, the courts have held that segregative intent should not be confused with evil motive.[14] Instead, the required intent is simply the intent to keep the races separate. Furthermore, conduct motivated by such intent is actionable even when there is no desire to inflict educational harm upon any racial group.
In this ease, proof of intent is shown not by evil motive or a desire to inflict educational harm on the minority community; instead, a pattern of facts and circumstances occurring over a long period of time clearly supports a finding of intentional conduct by the defendant, as recommended by the Magistrate Judge. The Magistrate Judge’s Report and Recommendation contains a thorough discussion and analysis of those facts and circumstances and need not be repeated here. Suffice it to say that no finder of fact, be it judge, jury or administrative body could have reached any other conclusion than the one reached by Magistrate Judge Mahoney.[15] *933 Indeed, a jury selected at random from citizens of the District would, in the opinion of the court, have reached the same conclusion based on the evidence contained in the record of this case.
The court finds that the Rockford Board of Education is a public body created by the State of Illinois to administer and supervise its public schools within its statutorily-defined area and, under the laws of the State of Illinois, may sue and be sued. The court further finds that the current racial segregation of students in the public schools in Rockford was caused, in substantial part, by the acts and omissions of the defendant. Specific practices of the defendant that unlawfully segregated students on the basis of race and ethnic origin include, but are not limited to:
(1) The tracking of students by race into various educational programs offered by the RSD;
(2) The drawing and alteration of school attendance area boundaries in such a way as to create, maintain or increase racial or ethnic segregation of students;
(3) The maintenance of racially and ethnically segregated branches of schools;
(4) The failure to design and implement an effective desegregation plan even when ordered to do so by a Federal Court and by the ISBE;
(5) The provision of inequitable transportation and access to transportation to students based upon their race and ethnic origin;
(6) The disproportionate placing of the burdens of desegregation on minority students;
(7) The disparate placement of facilities and equipment so as to burden minority students and not provide them with an equal educational opportunity;
(8) The perpetuation of discriminatory conditions in the make-up of the Rockford Board of Education; and,
(9)The disproportionate burdens placed on minorities in the assignment of special education students.
These practices, among others discussed in this order, occurred over a substantial period of time and in a substantial portion of the Rockford public schools and constituted a system-wide attempt to separate the races. As discussed, the objections of the plaintiffs, the defendant, and the defendant-intervenors are granted in part and denied in part. Except as otherwise noted herein, the court agrees with the findings and conclusions contained in the Report and Recommendation. The court hereby accepts and adopts, as modified, the Magistrate Judge’s Report and Recommendation.
The court agrees with the Magistrate Judge that equitable relief is appropriate in this case.[16] Accordingly, the court enters the order set forth below.

ORDER

1) The plaintiffs have prevailed on the merits of their claim and have established that the defendant has violated the constitutional rights of the plaintiffs;
2) The plaintiffs have demonstrated that the balance of equities weighs in favor of the grant of injunctive relief, inasmuch as:
a) The plaintiffs have no adequate remedy at law;
b) The plaintiffs face irreparable injury in the absence of injunctive relief;
e) No undue or unnecessary hardship is placed on the defendant by requiring it to carry out its affirmative duty to remedy the effects of its intentionally segre-gative and discriminatory acts; and,
d) The public interest is best served by granting permanent injunctive relief.
3) There are no inherent difficulties in shaping injunctive relief that is appropriate, *934 narrowly tailored and adequate to protect the plaintiffs’ rights.
The parties are directed to submit an appropriate Agreed Injunction and Declaratory Order, consistent with this decision, for approval by the court within ten days from the entry of this order. If the parties ’ cannot agree to such an order, they are each directed to submit a proposed order and the court will prepare an order which is consistent with the court’s opinion in this case.
Inasmuch as the parties have concurred and voluntarily consented that all present and future remedial matters in this ease, without limitation, shall be referred to the Magistrate Judge under 28 U.S.C. § 636(c)(1) and (c)(3), and under the Rules of the United States District Court for the Northern District of Illinois, this matter is hereby referred to the Magistrate Judge for all present and future remedial matters.
TABLE OF CONTENTS
INTRODUCTION.939
PROCEDURAL HISTORY.939
STUDENT TRACKING AND ABILITY GROUPING.940
INTRODUCTION.940
FINDINGS OF FACT .940
CONCLUSIONS OF LAW. 999
1001 SEGREGATION OF STUDENTS BY RACE WITHIN SCHOOLS.
1001 INTRODUCTION.
1002 FINDINGS OF FACT .
1002 Within-School Segregation In Mid-1970 “Desegregation Programs” ..
1002 Intact Busing: The Grade Exchange Plan.
1003 Within-School Segregation Through Part-Time Programs.
1004 Segregation Of Minority Transfer students Within Receiving Schools
1004 Elementary Schools.
1005 Segregation Of Students Within Schools By Tracking.
1005 Segregation Of Elementary Bilingual Students.
1006 Segregation Of Special Education Students...
1006 The RSD’s De-Emphasis Of Full-Site Magnet Programs.
1006 May 1972 One-Week Magnet Schools.
1006 Bloom Focus Center.
1008 Haskell Focus Center.
1009 The Alternative Middle and Elementary Schools.
1009 Purposeful Creation Of Segregated Partial-Site Alternative Programs
1011 The Gifted Program.
1013 Partial Desegregation, Followed by ReSegregation, of the Gifted Program, 1977-1986.
The RSD’s 1987 Report and Personnel Testimony Revealing Gifted Program Segregation. T—i o t—I
Continuing Segregation of the Gifted Program Up Through 1989.... T—1 o r—I
1017 Physical Segregation of Gifted from Regular Students Within the Schools.
1017 The RSD’s Separate “Minority” Gifted Program
1018 RSD’s “Satellite” Gifted Programs.
1020 The Creative And Performing Arts Program (CAPA)
1022 Montessori.
1023 The Academies Plus Program.
1023 Arts Alternative.
1024 Low-Status Alternative Programs.
1024 CONCLUSIONS OF LAW.
STUDENT ASSIGNMENT 1026
INTRODUCTION. 1026
*935 FINDINGS OF FACT .1027
Student Assignment and School Boundaries Prior to the QUEFAC Lawsuit and the ISBE Investigation.1027
Student Assignment in the Late 1950’s and Early 1960⅛.1027
Attempts By Superintendent McIntosh to Re-Assign Students.1028
Assignment of Northeast Quadrant Students to Guilford Rather Than West High School.1030
Conversion of Jefferson Junior High School to a Senior High School.. 1030
West Side Elementary School Boundaries—Late 1950’s—Early 1960’s.. 1031
Refusal to Reassign Students to Balance School Utilization in 1965.... 1031
Assignment of Morris Kennedy and Nashold Ninth Graders From School District 125 to Auburn High School.1032
“Rockford Team” 1967 Integration Proposals.1032
The Pupil Placement Committee (PPC) .1033
The Middle Schools Proposal.1036
The Veritas, REA and the RSD Principals’ 1970 Redistricting Proposals.. 1038
New School Construction in 1969-71 . 1038
1969 Elementary School Attendance Area Boundary Changes and Reassignments.1039
Walker and Carlson Busing of Public Housing Children.1040
Construction of John F. Kennedy and Eisenhower Junior High Schools.. 1041
Proposals in 1966-67 to Close Old Schools in the Central Rockford Area.. 1042
Closing of Hall School. 1043
Closing of Montague School.1043
Construction of Martin Luther King School .1044
Closing of Franklin School.1045
Packing of White Schools to Maintain Segregation in the 1970’s and 1980’s.1045
Closing of Morris Kennedy Elementary School in 1971 . 1047
Packing of African-American Schools to Maintain Segregation.1048
Student Assignment and School Boundaries During the QUEFAC Lawsuit and the ISBE Investigation.1048
The Community Desegregation Committee.1050
Closing of Muldoon School and Clustering.1051
Reassignment of Lincoln Park Sixth Grade and Use of Portable Classrooms .;.1052
Noncomplianee With The ISBE Rules in September of 1973. 1052
1973 QUEFAC Proceedings.1052
Grade Exchange Plan.1053
REA Intervention in the QUEFAC Litigation .1054
Interest Center Implementation .1056
The RSD’s Knowledge of Successful Integration Efforts.1056
The RSD 1975 Integration Plan.1057
Mandatory Assignment of African-American Students From Satellite Attendance Zones.1058
Open Enrollment Policies.1058
1975 Status Report on Integration.1060
The RSD’s Refiisal to Comply With The ISBE’s 1976 Rules.1061
Alternative School Programs: Failures, Disparate Burdens and Benefits.. 1062
1976 RSD Integration Plans.1065
ISBE Finding of Noncomplianee.1065
October 1976 Revised Integration Plan.1066
1977 ISBE Finding of Noncompliance and Probationary Sanction.1067
May 1977 Integration Plan.1067
Revisions of the May 1977 Plan.1068
Construction of New Jefferson High School.1069
Noncompliance With The ISBE Rules in The Late 1970’s.1070
The ISBE 1980 Finding of RSD Noncompliance.1071
The RSD Defiance of The ISBE Rules—Opposition to Student Assignment Goals.1071
*936 Disparate Burdens on African-American Students By Continuing Mandatory Assignment to Eastside Schools.1071
Student Assignment and School Boundaries Subsequent to the QUEFAC Lawsuit and the ISBE Investigation. 1073
1980 Student Reassignments and Closing of Schools.1073
Integration Efforts of the RBE in 1981 . 1075
1983 School Closings .1076
Dismantling of Alternative Programs.1077
CONCLUSIONS OF LAW.1077
FACILITIES AND EQUIPMENT DISPARITIES.1081
INTRODUCTION. 1081
FINDINGS OF FACT .1081
Systemwide Disparities In Facilities And EMS .1081
Data Demonstrating Systemwide Disparities.1082
Witness Testimony.1090
Disparity Examples At Individual Schools.1092
The RSD’s Private Gifts Policy Contributed To EMS Disparities.1094
CONCLUSIONS OF LAW.1097
THE 1989 REORGANIZATION PLAN.1098
INTRODUCTION.1098
FINDINGS OF FACT . 1098
The Extent Of Segregation In The School System Prior To The Reorganization Plan.1098
The January Version Of The 1989 Reorganization Plan.1099
The Revised February 1989 Reorganization Plan.1100
The Deliberative Process In Adopting The 1989 Plan Was Seriously Deficient.. 1102
The Effects Of The Reorganization Plan On the RSD Elementary Schools;. 1102 The Reorganization Plan Resegregated The District’s Elementary Schools
And Students In Terms Of School Enrollments.1103
Resegregation of Southwest Quadrant Students.1103
Resegregation of Non-Southwest Schools.1103
Systemwide Resegregation of African-American/Hispanic Elementary Students.1104
Systemwide Resegregation of White Elementary Students.1104
The 1989 Plan Resegregated Schools By Adopting Measures That The District Itself Had Identified As Constituting De Jure Segregation___ 1104
De Jure Segregation Criterion in 1981 IBA Report.1104
Church School.1105
Dennis School.1105
Stiles School.■.1105
Ellis School. 1105
McIntosh School .1106
The New Wilson Elementary School.1106
King and Barbour Schools.1106
Haskell School.1106
Garrison School.1107
Resegregation of Non-Southwest White Schools.1107
The 1989 Plan Resegregated African-American/Hispanic Students By Placing Them In Huge Warehouse Schools, Without Promised Educational Support .1107
The 1989 Plan Segregated The Schools By Promising, But Not Delivering, Educational Improvement Measures For African-American/Hispanic Students . 1109
The 1989 Plan Resegregated the Schools by Sharply Restricting Voluntary Transfer Opportunities.,... 1110
The 1989 Plan Resegregated The System By Removing The Alternative Programs From Southwest Elementary Schools.1111
The Plan, As Initially Adopted And Implemented, Created Segregated Academics Plus Alternative Programs.•.1111
*937 The Pattern Of Elementary School Closings Imposed Disparate Burdens On Minority Students And Neighborhoods.1112
Complete Closures of Schools.1112
Partial Closures Through Split Grade Structures.1112
Closings and Pairings as a Percentage of Schools in a Quadrant.1113
Under The Plan, The Schools In The Southwest Quadrant Were Overcrowded And No Space Was Available For Special Programs.1113
The Effects Of The 1989 Reorganization Plan On RSD Secondary Schools.. 1114
The 1988 Level Of Desegregation In the RSD Secondary Schools.1114
High Schools.1114
High School Attendance Areas As Of 1988 . 1114
Middle School Attendance Areas As Of 1988 . 1115
Recommendations Of The Ad Hoc Citizens’ Committee.1115
The Board’s Goals For The Reorganization Plan And Criteria For School Closings.1116
Information Before The Board In Its Deliberations. 1116
The Administrative Staffs January 17 Recommendations To The Board .. 1117
The January 24 Reorganization Plan.1118
Public Reaction To The January Plan.1119
Reconsideration Of The West High Closing.1119
The RSD’s February Reorganization Plan.1122
Option Zones In The Final February 28 Secondary Boundaries.1124
The 1989 Plan Promoted Segregated Conditions In Secondary Schools By Eliminating Voluntary Transfer Opportunities For Minority Students .... 1124
CONCLUSIONS OF LAW.1125
EMPLOYMENT DISCRIMINATION to N r—( r—(
INTRODUCTION. to N t—I r-H
FINDINGS OF FACT . to (M r—i t—I
Failure To Meet QUEFAC-Era Hiring Goals And Other Affirmative Action Obligations. to <M rH i—i
CONCLUSIONS OF LAW o CO t—i rH
STAFF ASSIGNMENT.1130
INTRODUCTION.1130
FINDINGS OF FACT .1131
Assignment Of Black Teachers To Black Schools.1131
Principals And Other Administrative Staff.1139
Other Staff.1143
Collective Bargaining History: Teachers And Other Professional Staff.1147
Collective Bargaining History: Clerical Employees.1151
Custodial Staff.1152
Other Staff.1152
CONCLUSIONS OF LAW.1152
1154 INEQUITABLE ACCESS TO TRANSPORTATION.
1154 INTRODUCTION.
1154 FINDINGS OF FACT .
1154 Transportation Policies And Practices Affecting Desegregation And Desegregation Burdens.
1154 Transportation Policies And Practices Diminished Desegregation.
1155 1970⅛ and Early 1980’s: Transportation Problems Discouraging Open Enrollment Transfers.
1157 1970’s and 1980’s: Discriminatory Provision Of Open Enrollment Transportation .
1970’s and 1980’s: Effects of Discrimination and Transportation Problems on Success of Open Enrollment. 1—*■ >_l C7T CO
1980-1989: Direct Restriction of Open Enrollment Transportation. i—[1] J-A Cn 00
Discriminatory Transportation Policies and Practices As Between Minority Integration Participants and White Integration Participants. )—*• o* to
Transportation Costs As Pretext For Anti-Busing Stance. l—[1] as crc
*938 938 851 FEDERAL SUPPLEMENT
Additional Transportation Inequities (“Privy Stops”).1169
CONCLUSIONS OF LAW.1171
DISCRIMINATORY CONDITIONS IN THE COMPOSITION OF THE BOARD .. 1171
INTRODUCTION.1171
FINDINGS OF FACT .1172
Board Members: 1965-1989 . 1172
Basie information.1172
Board Member Residency.1175
Board Member Race .1175
Electoral System: The RBE’s Role In Maintaining An Electoral System That Had A Disparate Impact On Minority Representation On the Board
Of Education.1178
' RBE Gerrymandering of Subdistrict Electoral Boundaries.1179
CONCLUSIONS OF LAW.1181
EXTRACURRICULAR ACTIVITIES.1181
INTRODUCTION.1181
FINDINGS OF FACT .!.. 1181
Historical Discrimination In The Selection of Cheerleaders.1182
CONCLUSIONS OF LAW.1183
BILINGUAL EDUCATION AND OTHER EDUCATIONAL DISCRIMINATION
ISSUES AFFECTING HISPANICS.1184
INTRODUCTION.-.1184
FINDINGS OF FACT .1184
Disproportionate Desegregation Burdens Placed On Hispanic-American Students ...1184
Segregation Of Elementary Bilingual Students.1187
Transportation Discrimination.1187
Educational Deficiencies... 1187
State of Illinois And U.S. Department of Education Findings of Deficiencies.. 1187 Failure to Provide Effective Special Education to Non-' and Limited-
English-Speaking Students.1190
CONCLUSIONS OF LAW.1191
SPECIAL EDUCATION.1192
INTRODUCTION.1192
FINDINGS OF FACT .1192
CONCLUSIONS OF LAW. 1196
THE LAW OF EDUCATIONAL SEGREGATION AND ITS APPLICATION TO
THE EVIDENCE.1196
Overview of the Law.1196
Causation—The First Keyes Factor.1198
Intent—The Second Keyes Factor.1199
The Scope of Liability—Once the Keyes Factors Have Been Established.1208
Liability For The Conduct Of Agents And Employees.1203
Natural Residential Segregation/Neighborhood Schools Defense.1204
Incremental Segregative Effect.1206
Equitable Relief Is Appropriate .1206
CONCLUSION .1207
DEFINITIONS.1207
ADDENDUM: SCHOOL HISTORIES ........_

*939
REPORT AND RECOMMENDATION

MAHONEY, United States Magistrate Judge.

INTRODUCTION

In the greatest dissent ever written, the first Justice Harlan stated:
The white race deems itself to be the dominant race in this country. And so it is, in prestige, in achievement, in education, in wealth and in power.... But in the view of the Constitution, in the eye of the law, there is in this country, no superi- or, dominant ruling class of citizens. There is no caste here. Our Constitution is color blind and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man and takes no account of his surroundings or of his color when his civil rights, as guaranteed by the supreme law of the land, are involved. It is, therefore, to be regretted that this high tribunal, the final expositor of the fundamental law of the land, has reached the conclusion that it is competent for a state to regulate the enjoyment by citizens of their civil rights solely upon the basis of race.
Plessy v. Ferguson, 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896). Justice Harlan was dissenting from a decision of the United States Supreme Court that was later used to allow the separation of races in education. That decision was overturned by a later Supreme Court in the case of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In Brown v. Board of Education, a unanimous Supreme Court pointed out:
In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. .Such an opportunity, when the state has undertaken to provide it, is a right which must be available to all on equal terms.
Id. at 493, 74 S.Ct. at 691.
The following opinion relates the activities of a school district that has consistently and massively violated the dictates of Brown v. Board of Education. It is the story of a school district that, at times, has committed such open acts of discrimination as to be cruel and committed others with such subtlety as to raise discrimination to an art form.

PROCEDURAL HISTORY

This lawsuit was filed on May 11,1989. It was filed by Plaintiffs as a reaction to the 1989 Reorganization Plan that had been adopted by Defendant, Rockford School District # 205, in January and February of 1989. The lawsuit not only attacks the 1989 Reorganization Plan, but also alleges that the school district historically has engaged in a pattern of intentional segregation and discrimination on a system-wide basis.
Approximately two months into the litigation, the parties entered into an Interim Settlement in response to Plaintiffs motion for a preliminary injunction. The Interim Settlement dealt mainly with the 1989 Reorganization Plan. The settlement was embodied in an Interim Agreed Order entered by the court on July 7, 1989. That order provided for certain modifications of the Reorganization Plan and for other remedial steps to be taken by the District.
A Second Amended Complaint was filed on November 9,1989. On April 24,1991, Plaintiff and Defendant agreed to, and the court approved and entered, a Second Interim Order. The Second Interim Order was a more comprehensive interim remedial plan. The Second Interim Order did not resolve Plaintiffs underlying liability claim and the District made no admission of liability in connection with either of the Interim Remedial Orders. Certain parts of the Second Interim Order were stricken by the Seventh Circuit Court of Appeals. See People Who Care v. Rockford Bd. of Educ., 961 F.2d 1335 (7th Cir.1992).
On June 29, 1992, District Court Judge Stanley J. Roszkowski, by Minute Order, referred all matters pertaining to Plaintiffs motion for a supplemental remedial order to the Magistrate Judge for ruling. By Order *940 of September 8, 1992, Judge Roszkowski, pursuant to Local Rule 1.71(c)(4) of the General Rules of the Northern District of Illinois, and pursuant to 28 U.S.C. § 636(a), (b), (c), transferred to Magistrate Judge P. Michael Mahoney all “matters currently pending.”
On April 8,1993, Judge Roszkowski reiterated the referral to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(C) and in April of 1993 the Magistrate Judge commenced hearing the motion for a permanent injunction.
The injunction hearing began April 2,1993. Approximately thirty witnesses testified on behalf of Plaintiff and approximately nine witnesses testified on behalf of Defendant and Intervenor-Defendants. Over 3,500 pages of testimony were taken over the twenty-four days of trial. In addition, the court has taken into consideration 150 depositions presented to the court as evidence in lieu of testimony, as well as the literally thousands of pages of documents that have been presented to the court.
Pursuant to an “Agreement of Plaintiffs, Defendant Rockford School District 205 and the Intervenor-Defendants Concerning the Liability Hearing Adjudication Process and Certain Remedial Matters,” dated May 5, 1993, all parties stipulated that the Magistrate Judge would make a Report and Recommendation to Judge Roszkowski, who would then rule upon the permanent injunction and liability issues. Pursuant to the May 5th Agreement, the parties agreed that all present and future remedial matters in this case, without limitation, would be referred to the Magistrate Judge under 28 U.S.C. § 636(c)(1) and (c)(3), and under the rules of the United States District Court for the Northern District of Illinois. Therefore, pursuant to Minute Order entered on May 5, 1993, Judge Roszkowski has referred all present and future remedial matters to the Magistrate Judge. The Agreement also allowed Plaintiffs to file an amended complaint which conformed to the proofs presented. This Third Amended Complaint was filed June 23, 1993. The following is the Report and Recommendation of the Magistrate Judge pursuant to the referral of the District Court and the stipulation of all parties.

STUDENT TRACKING AND ABILITY GROUPING

INTRODUCTION

The court finds that the ability grouping and tracking practices of the Rockford School District (hereinafter “RSD”) did not represent a trustworthy enactment of any academically acceptable theory or practice. The RSD tracking practices skewed enrollment in favor of whites and to the disadvantage of minority students. The court finds that it was the policy of the RSD to use tracking to intentionally segregate white students from minority students, and that the policy existed in 1989 and had existed for many years prior thereto.

FINDINGS OF FACT

The most devastating witness testifying on behalf of Plaintiffs was Dr. Jeannie Oakes. Dr. Oakes is one of the leading experts in student tracking and related fields.[1] She received her Ph.D from the University of California, Los Angeles in 1980. From 1981 to 1985 she was senior research associate, Graduate School of Education, UCLA. In 1985 she joined the RAND Corporation as Sr. Social Scientist. In 1989 she returned to UCLA to accept the position of Associate Professor, Graduate School of Education. Dr. Oakes currently holds the position of full professor and is the vice-chair of the Department of Education in the Graduate School of Education at UCLA.
Dr. Oakes testified that she had studied the tracking practices in the Rockford School District. She examined the broad range of objective documentary material provided by the District. Her analyses included data tapes of the 1st through 6th grades for the years 1986 and 1987. She also reviewed the 10th and 12th grades for the same years. In *941 addition, she examined middle school student data from 1988-89 and 1989-90. The data tapes examined by Dr. Oakes, therefore, cover the time period from 1987 through 1990.
Dr. Oakes testified that tracking is ability grouping. Tracking constitutes a set of strategies that a school and school district use to organize students for instruction. The • object of ability grouping is to group students together in ways that narrow the range of their ability or prior achievements so that a teacher is able to target instruction to the level of the students within the identified group.
Three core features are always present in every tracking system: 1) Adults in the school system make judgments about how much intelligence children have and how likely is their potential for learning; 2) After the adults make their judgment, the children are placed into groups; 3) The groupings are then publicly labeled. This public labeling can take on a hierarchical nature. The groups are not thought of as equal. The highest grouped children are on the top, and the lowest children are on the bottom. It is easy, and people often slip, to associate the top children with being “the best kids” and the bottom children with being “the worst kids.”
The educational reason for tracking is to tailor a curriculum and an instructional strategy for the children that are tracked into the class. What occurs in reality, is that different children are given different opportunities to learn and children in different groupings are given different access to knowledge.[2]
The court finds, based upon Dr. Oakes’ testimony, that the RSD tracked students in a variety of ways. The tracks were different paths that Rockford students followed through the curriculum of the RSD. Some of the paths led to certifying a student as being prepared for college, some led to specific occupational preparation and other paths led essentially nowhere.
The heart of the tracking placement process were intelligence tests supplemented by other strategies such as teacher recommendations. Defendant claimed, however, that the objective test scores were supposed to be the primary basis across the grade levels for placement into groups and tracks.[3]
The stated purpose of ability grouping in the RSD was to narrow the range of achievement levels in classes so that instruction could be targeted to the appropriate level of the students. Dr. Oakes pointed out that the RSD, therefore, was making four fundamental assumptions: 1) Students were going to learn better if grouped; 2) low ability classes and low track general and vocational programs would provide a safe haven for students who were not very smart; 3) the RSD knew how to track students into groups to achieve homogeneous ability groups and they knew how to do it in ways that were accurate and fair; and 4) teaching is easier if one does not have to deal with a diverse group of students.[4] Ability grouping in the RSD began at the end of the kindergarten year. At that time students were put into either a regular first grade or a transition class based upon a standardized test score and a teacher’s recommendation. The transition class was essentially low-track first grade, and operated to put the transition class students approximately one year behind. Further, tracking and ability grouping at the elementary level consisted of both within and between class ability grouping. Students were divided into groups within classes; slow, middle, and fast learners; or were divided across classrooms so that teachers taught all of one ability group.
*942 Also at the elementary level in the District there were separate programs for the highest achieving students. These programs were called gifted programs. Separate programs for the low achievers were called GIT (Get it Together) and CASS (Career Awareness and Survival Skills).
At the middle school and junior high level, tracking was a much more formalized system where the academic subjects were divided into three different levels designed for students with different abilities: 1) Below grade level classes called “basic” classes; 2) at-grade level classes called “regular” classes; and 3) above grade level classes called “honors” classes. Separate programs were also available for highly gifted and talented students.
At the senior high' school level there was an overlapping of these two systems. The first system had two or three ability/achievement levels of the same course in the same subject areas (e.g. basic, general and honors English). The second system consisted of tracks of different courses in other subjects (e.g. math and science). Tracks, therefore, existed that: 1) prepared a student to go to college; 2) prepared a student for college but at a slower pace; 8) provided accelerated progress toward college preparation; and 4) did not prepare a student for college.
Dr. Oakes’ testimony analyzed the various tracks that existed in the RSD and their racial composition. She found that the evidence is absolutely consistent.” Whether one looks at the District’s public figures or the statements of district officials or does a completely separate analysis of the data itself, as she has done, one .inescapably comes to the same finding, which the court hereby adopts: African-American students were enrolled in consistently disproportionate numbers in the slow track, low ability classes. (Compared to the representation in the school as a whole). Furthermore, these students were consistently over-represented in classes for those students identified as having special educational needs. This conclusion is also true in regard to Latino students.
In contrast, the overwhelming evidence finds white students at all grade levels disproportionately assigned to high ability, college preparatory programs. In the RSD, the higher level of class examined, the whiter the class. The actual statistical analysis is contained in the graphs produced by Dr. Oakes, and the court incorporates those graphs into this opinion. Suffice it to say that the court finds, as was testified by Dr. Oakes, that these numbers were so striking that one could, simply by walking into a class and looking at the color of the children’s skin, determine if the class was a high, middle or low ability class.
Enrollment in Gifted and Regular Programs
by School and Race
Grade 2, 1986-87
[[Image here]]
*943 [[Image here]]
Note. Grade 2 Gifted Program at these three elementary schools only. Enrollment in Gifted and Regular Programs
by School and Race
Grade 5, 1986-87
[[Image here]]
Note. Grade 5 Gifted Program at King Elementary only. Enrollment in English Tracks
by School and Race
Grade 8, 1989-90
[[Image here]]
*944 [[Image here]]
Enrollment in Math Tracks
by School and Race
Grade 8, 1989-90
[[Image here]]
*945 Enrollment in English Tracks
by School and Race:
Grade 10, 1986-87
[[Image here]]
Enrollment in Math Tracks
by School and Race:
Grade 10, 1986-87
[[Image here]]
*946 [[Image here]]
Racial Composition of High School Vocational Tracks 1986-1987
[[Image here]]
Note. Percents might not total to 100 because Race = “Other” was not included.
Note. Totals (total vocational, non-vocational, and total school) include only those 10th and 12th grade students included in the districts’ 1986-1987 CAP test data files.
The court further finds that the RSD was well aware of the disproportionate enrollments, particularly with the clustering of minority students in low ability and low track classes. This fact is confirmed by the testimony of Superintendent William Bowen and by Mr. Nathaniel Martin,
In regard to tracking and steering practices in the elementary schools and beyond, *947 Superintendent William Bowen’s testimony is indeed revealing. He stated:
[S]omewhere in our school system, I think it probably starts when reading groups are formed, some decisions are made about tracking [of minority students] that need to be reviewed.... It looks to me as an observer that once you get into a particular track, or sometimes I refer to them as tubes, it’s very difficult to get out of them.
Bowen Dep. at 110-111.
Mr. Bowen served as a teacher at Auburn High School in the early 1960’s, as a counsel- or at Guilford High School for ten years, as principal at East High School for eleven years, and at the time of his deposition, was the superintendent of schools. When Mr. Bowen was at Auburn, the school had remedial, regular and honors tracks. The honors level was relatively more white in its composition than the total composition of the school. The remedial level was relatively more African-American. The regular track was not easily identifiable in racial terms, according to Mr. Bowen. Most African-American students tended to be either in the remedial or regular track. In Mr. Bowen’s opinion, the students in the remedial track did not get more help in any quantitative way. The school administration did not expect that the students in the remedial track would be able to improve and move on to any of the regular tracks. If a student was placed in a remedial track in seventh grade, that student probably would stay in that track throughout the rest of his or her junior and senior high years. Occasionally Mr. Bowen would notice minority students who he believed had a level of ability inconsistent with their being in the remedial tracks. These observations were based upon such matters as speaking skills, competence, self respect and, sometimes, writing skills. Mr. Bowen indicated that he, himself, often made an effort to try to move these students into higher track classes, but he would receive resistance from the student’s counselors. Mr. Bowen at times, however, was able to move a student from one track to another track.
When Mr. Bowen went to East High School in the early 1970’s, he observed essentially the same phenomena. This bothered him so much that after he had been at East for approximately seven years, around the year 1980, he undertook, as East’s principal, to eliminate the remedial track classes in English and history.
[I]t was my observation that if you were in remedial English, you were with the same remedial kids all day. If you were in one remedial class, you were in everything remedial .... You were even in the same PE because that’s the way the schedule worked. Everybody in school knew where you were, and all the kids that were in this situation all knew each other. It was an identifiable group, and they were dissatisfied with their lot.
Id. at 117.
Remedial English and history were eliminated by Mr. Bowen. After he left, however, East High School reinstituted the remedial tracks. The court finds, based upon Mr. Bowen’s testimony, that there was no other high school in Rockford during the 1970’s or early 1980’s that undertook to eliminate basic courses or otherwise to address racially disparate tracking practices.
Mr. Nathaniel Martin worked in the RSD for the past twenty years. He was the first African-American principal of a secondary school in Rockford and in 1981, became the first African-American person appointed principal of a predominately white school. In April 1993, he became the director of secondary education. Mr. Martin testified extensively about what he had seen in the Rockford school system regarding tracking and steering practices. He related his observations from his experience at Flynn Elementary School in the 1980’s. He estimated that 75% of the African-American students enrolled at Flynn were in the basic or lower track and the rest were in the regular track. He stated that he could recall no African-American student enrolled in the honors track. He believed that the African-American students were perceived as a discipline problem and once this perception occurred, the students were tracked lower in their abilities. The African-American students *948 were more likely to be seen as discipline problems than were the white students.
Mr. Martin confirmed Mr. Bowen’s observation that once an individual was tracked in the Rockford school system, there was little movement and very little interaction between the tracks. Mr. Martin was of the opinion that the tracking system at Flynn was similar to the other RSD’s tracking systems. Mr. Martin described the system as “a system of apartheid.”
Nathaniel Martin engaged in approximately fifty to sixty conversations with high level administrators regarding the discriminatory effects of the tracking system. He was told by the then superintendent of schools that the tracking system could not be eliminated because it would upset the teaching staff and because the community would not buy into elimination of tracking. The court finds it clear that the RSD had substantial notice and intimate knowledge of the racial disparities found within its system.
The fact that white students were in honors classes and minorities were in basic classes did not mean there was intentional institutional discrimination, however. The white students of Rockford could have been innately smarter than the minority students in Rockford. Accordingly, Dr. Oakes had to address the issue of intentional discrimination.
In her analysis, the first question that Dr. Oakes asked regarding intent was whether the RSD used valid and objective measures in assigning students to ability groups. Dr. Oakes found that the measures used by the RSD were either invalid or, at the very best, had highly questionable validity for the purposes for which they were used. The tests were described by Dr. Oakes as outmoded and she largely discredited them.
The tests that were used by the Rockford School system as the basis for its tracking system were tests that were generally not recommended by their publishers to be used for class placement. The tests were not, in fact, intelligence tests. The tests did not measure a child’s critical thinking ability, such as problem solving or applying knowledge in new situations. The tests measured a very narrow range of a child’s knowledge and skills at one point in time.[5]
The court finds that not only were the standardized tests for class placement inaccurate, they were culturally biased and did not fairly measure the capacities of minority children. Dr. Oakes summed up the finding of the court when she stated:
[T]he measures used in the Rockford system did not represent a sound, valid or objective enactment of the theory, the theory of ability grouping and tracking.
Oakes Test., Tr. at 888.
Further, the court finds that the Rockford School District knew, or reasonably should have known based upon the information and literature that was available, that the measures it was using were not valid.
This conclusion, however, does not end the inquiry. This is still, as has been repeatedly brought to the court’s attention, an intentional discrimination lawsuit. Simply because the RSD set up a tracking system that worked to the disadvantage of minority students and that system was based upon a measuring standard and methodology that was invalid, does not mean the RSD intended to discriminate against minority students. The possibility exists that the RSD may have just incompetently administered its tracking system. As a matter of fact, incompetency seems to be one of the main defenses offered by this school district.
As a result, Dr. Oakes then asked the next question: Did the RSD use these measures to narrow the range of ability among students and groups so that instruction could be appropriately targeted at homogeneous levels of ability that comprised each group? In other words, did it use this allegedly objective standard to do what it said it was trying to do? The court finds that the District did not.
*949 At Eisenhower Middle School in 1988 and 1990, the reading comprehension scores of eighth graders enrolled in the basic history course ranged from the first to the seventy-second national percentile. At Lincoln Junior High School in 1988 and 1990, the math achievement scores of the eighth graders in honors science ranged from the thirty-sixth to the ninety-ninth percentile. At Guilford High School, during the same period of time, tenth graders enrolled in the slow college prep track courses had math seorés that ranged from the first to the ninety-ninth percentile. The actual data relied upon by Dr. Oakes is found in the charts and tables below. The court finds that the matters contained in those tables are true and correct and are adopted as specific findings of this court. This data shows, and the record is replete with situations where, there were students (usually white) who scored below the national mean and who were still placed in honors classes and, incredibly, there were students (usually minority) who scored in the ninety-ninth percentile who were placed in basic classes.
*950 Reading Achievement NP Ranges in Grade 5 Gifted v. Non-Gifted Classes Quartlles 1986-1987
[[Image here]]
Hie graph indicates tbit nudenti in the gifted reading program «coced between the 60th percentile and the 99lh percentile. Ihe RSD*s sated criteria for placement in the sifted reading program was a score of 90% or higher. Oakes, Test., It*, at 892. Graph is based on two daises of fifth grade students at one un-named school in the RSD during 3986-87.
National Percentile Range - 0 to 100%
Each vertical column suggests one entire student population. Each vertical box within the column equals a quartfle. (25 percent of that population of students scored within each one of the boxes.)
The dots or zeroes located underneath the vertical column indicate outliers. Outliers represent individual students, or ««-11 groups of students, that bad extreme scores not induded In the quartfle boxes. This is done so that one or two Individual acores do not distort the over-all quartfle box.
*951 [[Image here]]
[[Image here]]
Hie graph depicts student placement in trade eight English classes at West Middle School. -The placement is baaed upon reading achievement scores. The graph shows that students in the honor» track scored from the 40th percentile to the 99th percentile. The USD's stated criteria for enrollment in hooors English wet a score of 85 ⅜ or higher.
Students in die regular English track scored from about the 10th percentile to die 90th percentile. Student* in the basic English track •cored from'the bottom of the scale to the 75th percentile.
*952 Reading Achievement NP Ranges in Grade 8 Social Studies Tracks-Lincoln Middle School by Quartiles 1989-1990
[[Image here]]
The graph depict* Modem* reading achievement enrolled in trade eight hooon Social Studio track «cored from approximately tbe 60th percentile to the 99th percentile. Student* in tbe regular track «cored front about the 5th percentile to the 95th percentile. Student* in tbe Italic Engliih track «cored from approximately the 5th percentile to the 60 percentile.
"Particularly «trüdng hete again b that tbe regular track «pan* almoat the entire achievement range, and tbe low track again extend* into well over 50 percent" Oaks, Tr., Tr. at 594.
*953 Math Achievement NP Ranges in Grade 8 Science Tracks—Flinn Middie School by Quartiles 1989-1990
[[Image here]]
The graph depicts students ms* achievement enrolled in trade eight honon Science track «cored from the 50th percentile to the 99th perccntHe. Student! In the regular Science truck «cored bum about the 5th percentile to the 99th percentile. Student! in the buic Science truck «cored from the bottom of the «cale to about the 60 percentile.
A* the graph depict*, there are «ludent* in the basic truck who scored higher than students «rito are in the honon truck.
*954 Math Achievement NP Ranges in Grade 10 Science Tracks--West Senior High School by Quartiles 1986-1987
[[Image here]]
TI* graph ^shows that there’s almost no difference that all three levels — honors, regular, and basic - span nearly the entire range of achievement And here there's virtually no difference between the average scores of the honors and the regular track. Oakes, Test, Tr. at*96.
*955 Math Achievement NP Ranges in Grade 10 Mathematics Tracks-West Senior High School by Quartiles 1986-1987
[[Image here]]
*956 4.1/4.2-7
Math Achievement NP Ranges in Grade 10 Science Tracks-Aubum Senior High School by Quartiles 1986-1987
[[Image here]]
*957 Reading Achievement NP Ranges in Grade IQ English Tracks-West Senior High School by Quartiles 1986-1987
[[Image here]]
*958 The RSD did not track students objectively. The RSD did not narrow the range of student achievement to justify the targeting of curriculum and instruction to groups of students who were similar. Students at all levels of ability were found in nearly all classes. In fact, the grouping that was done by the RSD was not homogenous or achievement grouping. The tracking system was an arbitrary system where children were placed into rigid tracks. The court further finds that the Rockford school system consistently used test scores that did not relate to or match the class in which the students were being grouped.
The court also specifically finds that once a child was ability grouped in the RSD it was very difficult or almost impossible to change ability groups. Mr. Bowen called these groups “tubes” and referred to the fact that the initial placement of a child by ability grouping set the child on a course, or put him in a tube, from which he was unlikely to emerge at any time during his contact with the RSD. This conclusion was enforced by the curriculum guide of Jefferson High School in 1988-89 which stated:
English, social studies, mathematics, and science offer different difficulty levels of the same subject. The most difficult are labeled accelerated or honors, and the least difficult fundamental or basic. Every attempt is made to properly place students upon their entry into Jefferson High School, and it is rare that a student is moved from one level to another.
The RSD set up a rigid tracking placement program. Once a student was labeled as being basic, low level or honors, the student maintained that label from kindergarten through twelfth grade.
In addition, the court finds that a low level or basic ability grouping would deprive students of the opportunity for various educational experiences, particularly in* the mathematics and science field. If a child did not take algebra in the eighth grade, for example, he or she had no chance of taking calculus before completing his or her education in the RSD. In mathematics and science there was a system of prerequisite courses that meant that only the honors students in the lower grades could take certain courses in high school. Dr. Oakes described this system as:
[T]he most rigid system I have ever seen. It is the only instance where I’ve seen a written policy that specifies such a complex and multi-layered process that the student has to go through if there is a sense that the student has been misplaced.
Oakes Test, Tr. at 914-915.
Dr. Oakes also examined the relationship between the way the District used its measurements of achievement in placing students in groups and the rigidity of that grouping system in maintaining disproportionate class assignment. Dr. Oakes made several complex analyses. The court will not repeat all of those analyses. The syllogism is, however, quite easily restated. Most of the honors programs in the RSD were dominated by white students. Most of the basic programs were dominated by minority students. The placement of these students was by allegedly objective standardized tests. The tests were of questionable value as far as being used for this purpose and were probably culturally biased. Leaving that aside, the Rockford School District did not objectively use this testing procedure. A African-American student scoring well on the test did not have the same placement opportunities as a similar scoring white student. A white student scoring poorly on the test had more opportunities than a similar scoring African-American student. A white student scoring well on these tests was virtually guaranteed opportunities that high scoring blacks were denied.
Rockford—04/15/93—10
5. Did the way the district used scores for placement and/or the rigidity of the grouping system contribute to racially disproportionate class assignments?
5.1. Within the wide, overlapping ranges of achievement among Rockford’s tracks and class ability levels, there are clear patterns of racial bias in class placements at the elementary, junior, and senior high levels. The result was that groups of higher track students whose scores fell within a range that would *959 qualify them for participation in either a higher or lower track (i.e., their scores were the same as students in the lower track) were consistently “whiter” than groups of students whose scores fell within that same range but were placed in the lower track. (See attached figures showing percentages of black students in overlapping ranges of track levels.)
5.2. At the elementary and junior high level, in particular, black students whose achievement scores qualified them for two or more tracks were far more likely to be placed in the lower than the higher track for which they qualified. For example, one would expect the representation ratio for students whose scores “qualified” them for either a higher or lower track to be 1.00. However, racial differences in representation in tracks were such that Black students had considerably lower representation ratios and whites considerably higher. (See attached table.) At the elementary level, this is exemplified by comparing the placements of similarly scoring Black and white students in Gifted and non-Gifted classes. Here, we find that the representation ratio in the 2nd grade Gifted classes for Black students whose scores qualified them for either the Gifted or regular class was .75 for math and .84 for reading (considerably lower than what would be normally expected). In contrast, their representation ratio in the non-gifted class was 1.02 slightly larger than expected. Whites in the same achievement range had a representation ratio of 1.04 and 1.01 in the gifted classes and 1.00 in the non-gifted classes, as would be expected. Even so, these ratios for 2nd graders are conservative, and undoubtedly inflated for Blacks, given the inclusion in our analysis of the separate, minority “pilot” gifted program at Barbour. More striking, at grade 5, none of the Black students whose reading and/or math achievement matched those of gifted white students were placed in gifted classes at King.
Similar, striking patterns are found at the junior high school level. (See attached table.) For example, at West, the representation ratio in the 10th grade honors English classes for Black students whose scores qualified them for either the honors or regular course was .50 (only half what would be normally expected). In contrast, their representation ratio in the regular track was 1.32, considerably greater than expected. In contrast whites in the same achievement range had a representation ratio of 1.21 in the honors course, and only .87 in the regular course. This pattern of lower than expected representation ratios in higher tracks for qualifying Black students and higher than expected ratios in the lower track classes for which they qualified was found in 37 of the 39 instances that were examined (i.e., in every subject area at every middle school in 1989-1990—the exceptions were found in science at Lincoln and in social studies at West). In contrast, qualifying White students were represented in higher tracks at expected or greater than expected ratios in 33 of 37 instances that were examined, and had ratios of representation in low tracks that were greater than expected in only 4 of the 37 instances. (Note: The smaller number of minority students and the larger number of classes in which they were dispersed made these representation ratios analyses unreliable at the senior high school. Small numbers of Hispanics also prevented drawing conclusions from these analyses at either the. junior or senior high schools level.)
5.3. Other analyses underscore Rockford’s racial bias in placement, beyond what would be expected by group differences in group achievement levels. In a number of cases, high track classes included exceptionally low scoring white students, but this was rarely the case for Blacks. Conversely, quite high scoring Blacks were often excluded from high track classes and, were often found, instead, in low track classes. Again, this was seldom the case for whites. For example, at both Jefferson and Guilford high schools in 1987, none of the Black *960 students who scored in the top quartile (75-99 NP) on the CAP reading comprehension test were placed in high track English, compared with about 40% of top quartile whites who were enrolled in the high track. In contrast, at both these two schools and at West, a small fraction of white students who scored in the bottom quartile (1-25 NP) were in high track classes, while no similarly scoring Blacks were so placed. At East and Auburn, while some top-quartile Blacks were placed in Honors English, nearly twice as many top-scoring Blacks at East were in the Basic class. West High also placed a proportion of its top-quartile Black students in Basie English; no low scoring whites were so placed. Similar patterns are found in other subjects at the high schools. See attached figures.
At the junior highs, other specific examples are striking. For example, at Eisenhower, the range of reading comprehension scores among 8th graders enrolled in Basic English classes was from the 1st to the 72nd National Percentile. Of these, ten students scored above the national - average of 50 NP. Six of the highest scoring, above average students were Black, including the highest achieving student in the class. One other of the above average students was Hispanic.
All of these analyses support the conclusion that Rockford’s placement practices skewed enrollments in favor of whites over and above that which can be explained by measured achievement.
Supporting Data and Analyses
Percentage of students in overlapped range of qualifying achievement scores in regular & gifted grade 5— 1986-1987—by race (black, Hispanic, & white) and school—See attached figures.
New analyses of the percentage of students in overlapped range of qualifying achievement scores in junior high
. school basic, regular, honors (or accelerated), and gifted courses in English & mathematics—1989-90—grade 8 by race (black, Hispanic, & white) & school. . (Computed pairwise—e.g., compare percentage of “overlap” students by race (black, Hispanic, & white) in basic and regular; then regular and honors, etc.)
New analyses of the percentage of students in overlapped range of qualifying achievement scores in high school basic, regular, honors (or accelerated), and gifted English and Science courses—1986-1987 grade 10 by race (black, Hispanic, & white) & school (Computed pairwise)
New analyses of the percentage of students in overlapped range of qualifying achievement scores in 4 types of high school math courses: a) non-college-bound math (basic, general, consumer, & business) b) slow-track college-bound math (Fund of Alg 1A-B; Fund of Algebra 2A-B), c) regular college bound (Geometry 1-2), d) fast-track college-bound (Honors Geometry, Intermediate Algebra, Algebra 3) by race (black, Hispanic, & white) & school (Computed pairwise)
*961 EISENHOWER MIDDLE SCHOOL-1989-1990 ENGLISH-GRADE 8
Ranges of Student Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
NTBS Achievement Score Ranges in 8th Grade Course Options (tracks)
[[Image here]]
Honors/reguiar overlapping qualifying score range *50-99 NP
% of overlapping range in honors level comprised of black students* 5 %
% of overlapping range in regular level comprised of black students* 6%
Rcgular/basic overlapping qualifying score range *1-72 NP
% of overlapping range in regular level comprised of black students* %
% of overlapping range in basic level comprised of black students* 56%
Honors/basic overlapping qualifying score range *50*72 NP
% of overlapping range in honors level comprised of black students* 5%
% of overlapping range in basic level comprised of black students* 60%
Note: 6 of 7 highest scorers in basic class are black, including die top scoring student at 72 NP
Note: Some of the percentaje* on this figure and those that foUow (5.1-2-15) have been adjusted subtly from those presented in the March 9 report to make them consistent with the data presented in Tables 5.1-16,17, and 18. Otantes in these percentages result from new analyses performed subsequent to closely the data at UCLA and eliminating ambiguous or partially missing cases.
*962 EISENHOWER MIDDLE SCHOOL-1989-1990 HISTORY-GRADE 8
Ranges of Student Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
NTBS Achievement Score Ranges in 8th Grade Course Options (tracks)
[[Image here]]
Honors/regular overlapping qualifying score range *64-99 NP
% of overlapping Tange in honors level comprised of black students* 3%
% of overlapping range in regular level comprised of black students* 5%
Regular/basic overlapping qualifying score range *1-75 NP
% of overlapping range in regular level comprised of black students* 20%
% of overlapping range in basic level comprised of black students* 44%
Honors/basic overlapping qualifying score range *64-75
% of overlapping range in honors level comprised of black students* 0%
% of overlapping range in basic level comprised of black students* 1%
*963 EISENHOWER MIDDLE SCHOOL-1989-1990 MATH-GRADE 8
Ruges of Studeat Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ruges
NTBS Achievement Score Ruges in 8tb Grade Course Options (tracks) Gifted/Algebra/Honors Math A (Regular) Math B (Basic)
[[Image here]]
Honors/regular overlapping qualifying score range =76-98 NP
% of overlapping range in honors level comprised of black students=3 %
% of overlapping range in regular level comprised of black students* 6%
Regular/basic overlapping qualifying score range =3-67 NP
% of overlapping range in regular level comprised of black students^ 31 %
% of overlapping range in basic level comprised of black students* 49%
*964 FLINN MIDDLE SCHOOL-1989-1990 HISTORY-GRADE 8
Ranges of Student Achievement in Counes at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
NTBS Achievement Score Ranges in 8th Grade Course Options (tracks)
[[Image here]]
Honors/regular overlapping qualifying score range -28-99 NP
% of overlapping range in honon level comprised of black students- 8%
% of overlapping range in regular level comprised of black students- 17%
Regular/basic overlapping qualifying score range -1-53 NP
% of overlapping range in regular level comprised of black students- 24%
% of overlapping range in basic level comprised of black students- 25 %
Honors/basic overlapping qualifying score range -28-53 NP
% of overlapping range in honon level comprised of black students- 16%
% of overlapping range in basic level comprised of black students- 20%
*965 FLINN MIDDLE SCHOOL-1989-1990 ENGLISH-GRADE 8
Ranges of Student Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
NTBS Achievement Score Ranges in 8th Grade Course Options (tracks)
[[Image here]]
Honors/regular overlapping qualifying score range *47-95 NP
% of overlapping range in honors level comprised of black students* 10%
% of overlapping range in regular level comprised of black students* 1J%
Regular/basic overlapping qualifying score range * 1-53 NP
% of overlapping range in regular level comprised of black students* 24%
% of overlapping range in basic level comprised of black students*
Honors/basic overlapping qualifying score range *47-53
% of overlapping range in honors level comprised of black students* 0%
% of overlapping range in basic level comprised of black students* 0%
*966 Oakes
WEST MIDDLE SCHOOL-1989-1990 ENGLJSH-GRADE 8
Ranges of Student Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
NTBS Achievement Score Ranges in 8th Grade Course Options (tracks)
[[Image here]]
Honors/regular overlapping qualifying score range *tt-95 NP
% of overlapping range in honors level comprised of black students** II %
% of overlapping range in regular level comprised of black students = J?*
Regular/basic overlapping qualifying score range -1-47 NP (note: outlier <¡¡¡ 64% in basic)
% of overlapping range in regular level comprised of black students** 42%
% of overlapping range in basic level comprised of black students» 50%
Honors/b'sic overlapping qualifying score range «31-42
% of overlapping range in honors level comprised of black students» 0%
% of overlapping range in basic level comprised of black students» 20%
*967 LINCOLN MIDDLE SCHOOL-1989-1990 SCIENCE-GRADE 8
Ranges of Student Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
NTBS Math Score Ranges in 8th Grade Course Options (tracks)
[[Image here]]
Honors/regular overlapping qualifying score range «36-99
% of overlapping range in honors level comprised of black students™ 3 %
% of overlapping range in regular level comprised of black students™ 11%
Regular/basic overlapping qualifying score range ™ 1-62 NP
% of overlapping range in regular level comprised of black students™ 19%
% of overlapping range in basic level comprised of black students™ 21 %
Honors/basic overlapping qualifying score range “36-62 NP
% of overlapping range in honors level comprised of black students™ 33 %
% of overlapping range in basic level comprised of black students™ 67%
*968 LINCOLN MIDDLE SCHOOL--19S9-199Q SCIENCE-GRADE 8
Ruges of Student Achievement in Courses it Different Track Levels Overlap in Qualifying Ruges Between Track Levels Racial Composition of Overlapping Achievement Ruges
NTBS Math Score Ruges in 8tfa Grade Course Options (tracks)
[[Image here]]
Honors/regular overlapping qualifying score range =36-99
% of overlapping ruge in honors level comprised of black students» 3%
X of overlapping range in regular level comprised of black students» 11X
Regular/basic overlapping qualifying score range =1-62 NP
X of overlapping range in regular level comprised of black students» 19X
X of overlapping range in basic level comprised of black students» 21X
Honors/basic overlapping qualifying score range »36-62 NP
X of overlapping range in honors level comprised of black students» 33 X
X of overlapping range in basic level comprised of black students» 67%
*969 p. 1 of 2
GUILFORD HIGH SCHOOL-1986-1987 MATH-GRADE 10
Ranges of Student Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
CAP Achievement Score Ranges in 10th Grade Course Options (tracks)
[[Image here]]
Geometry/Fund Alg 2 overlapping qualifying score range -26-96 NP
S of overlapping range in geometry comprised of black students- 0%
S of overlapping range in Fund algebra 2 comprised of black students- 8%
Geometry/Fund Alg 1 overlapping qualifying score range -26-99 NP
% of overlapping range in geometry comprised of black students- OS
S of overlapping range in Fund algebra 1 comprised of black students— 10S
Geometry/Non College overlapping qualifying score range -26-99 NP
% of overlapping range in geometry comprised of black students- OS
% of overlapping range in Non College comprised of black students- 44S
*970 Oakes
p. 2 of 2
Fund Alg 2/Fund Alg 1/Non College overlapping qualifying score range *1-99 NP
% of overlapping range in Fund algebra 2 comprised of black students * 8%
% of overlapping range in Fund algebra 1 comprised of black students* 10%
% of overlapping range in Non College comprised of black students* 49%
*971 WEST HIGH SCHOOL-1986-1987 SCIENCE-GRADE 10
Ranges of Student Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
CAP Achievement Score Ranges in 10th Grade Course Options (tracks)
[[Image here]]
Honors/regular overlapping qualifying score range * 16-96
% of overlapping range in honors level comprised of black students= 7%
% of overlapping range in regular level comprised of black students = 27 %
Regular/basic overlapping qualifying score range *1-67 NP
% of overlapping range in regular level comprised of black students* 38%
% of overlapping range in basic level comprised of black students* 58%
Honors/basic overlapping qualifying score range * 16-67 NP
% of overlapping range in honors level comprised of black students* 10%
% of overlapping range in basic level comprised of black students* 53%
*972 AUBURN HIGH SCHOOL-1986-1987 ENGLISH-GRADE 10
Ranges of Student Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
CAP Achievement Score Ranges in 10th Grade Course Options (tracks)
[[Image here]]
Honors/regular overlapping qualifying score range —36-99 NP
% of overlapping range in honors level comprised of black students- 17%
% of overlapping range in regular level comprised of black students- 28%
Regular/basic overlapping qualifying score range —1-99 NP
% of overlapping range in regular level comprised of black students- 36%
% of overlapping range in basic level comprised of black students- 58%
Honors/basic overlapping qualifying seme range -36-99
% of overlapping range in honors level comprised of black students- 17%
% of overlapping range in basic level comprised of black students- 47%
Note: 4 students in the basic level scored in the 99 NP; 3 of these students were black.
*973 WEST HIGH SCHOOL-1986-1987 U.S. HISTORY-GRADE 10
Ranges of Student Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
CAP Achievement Score Ranges in 10th Grade Course Options (tracks)
[[Image here]]
High/regular overlapping qualifying score range «36-93
% of overlapping range in high level comprised of black students =* 7%
% of overlapping range in regular level comprised of black students =* 38⅞
Note: U.S. History Seminar (high) enrolled 1 white student who. scored in the 7 NP (an outlier not included in the range).
*974 EAST HIGH SCHOOL-1986-1987 ENGLISR-GRADE 10
Ranges of Student Achievement in Courses at Different Track Levels Overlap in Qualifying Ranges Between Track Levels Racial Composition of Overlapping Achievement Ranges
CAP Achievement Score Ranges in 10th Grade Course Options (tracks)
[[Image here]]
Honors/regular overlapping qualifying score range *31-99 NP
% of overlapping range in honors level comprised of black students* 5%
% of overlapping range in regular level comprised of black students* 29%
Regular/basic overlapping qualifying score range * 1-66 NP
% of overlapping range in regular level comprised of black students* 20%
% of overlapping range in basic level comprised of black students* 41 %
⅝1⅛1 »|.⅛|1⅝|1|1⅜⅛1|—⅝ -IK
stf«-kw(>(«pi>honors level comprised of black students* 17%
% of overlapping range in basic level comprised of black students* 41 %
Note: 1 black student in the basic level scored 99 NP (outlier not counted in the compudon of score range).
*975 Racial Composition of English Overlaps and English Tracks by School
Grade 8
1989-1990
[[Image here]]
Racial Composition of Math Overlaps and Math Tracks by School
Grade 8
1989-1990
[[Image here]]
*976 [[Image here]]
Racial Composition of Math Overlaps and Math Tracks by School
Grade 10
1986-1987
[[Image here]]
*977 Representation Ratios for Qualifying Scores (NTBS National Percentiles; and Gifted Program Elementary Schools 1986-87
[[Image here]]
Representation Ratios for Qualifying Scores (NTBS National Percentile) and Tracks
Middle Schools, Grade 8, 1989-90
[[Image here]]
Note: For Blacks assigned to Track 1, the representation ratio is the proportion of Blacks in Track 1 divided by the proportion of Blacks in the Tracks 1 and 2 overlap. Similar meanings apply for Whites and Hispanics and for the other Tracks. If the representation ratio equals 1.0, then that group is represented in that Track in exact proportion to the group’s representation in the overlap. Thus, if race is not relevant, we expect these representation ratios to be close to 1.0. A representation ratio less than 1.0 indicates under representation in that Track. A representation ratio greater than 1.0 indicates owerrepresentation in that Track.

Instructions On How To Interpret The Following Distribution Graphs

The following exhibits graphically represent English class track placements matched against reading achievement scores and Science class track placements matched against math achievement scores for RSD high schools during the years 1986-1987.
The first two exhibits in the next sequence, pages 979 and 80, show the distribution for Jefferson High School. The first page shows the top two quartiles of reading achievement. The top row of boxes represent the students who scored in quartile 1. There is a small “Q-l” located on the side of the top row of boxes. Quartile 1 represents students scoring between the 75th and 99th percentile. The box on the left side of the page represents black students. The box on the right side represents white students. The numbers on the vertical axis of each box indicate the percentage of the total population scoring within each quartile. The numbers along the horizontal axis of each box (1, 2, 3) are the various tracks. One represents the accelerated or honors track, two represents the average or regular track and three represents the basic of low track.
Page 979 shows that 100 percent of the black students enrolled in Jefferson High School, grade 10, English classes, who scored in quartile 1 (box, upper left) were placed in *978 the regular or average track classes. Looking at the comparable group of white students, you see that approximately 40 percent of the white students scoring in quartile 1 (box, upper right) were placed in the accelerated or honors track classes. Sixty percent of the white students scoring in quartile 1 were placed in the average or regular track, and a very small fraction of top scoring white students were placed in the lower or basic track.
Page 980 shows the placement of black and white students who scored in quartile 3 and 4.
These exhibits:
[U]underscore[ ] that there was a racial bias in Rockford’s placement practices beyond what would be expected by group differences in achievement levels. In a number of cases, high track classes included exceptionally low scoring white students, but this was rarely the case for blacks. Conversely, quite high scoring black students were often excluded from high track classes and were found instead in low track classes, and again this exclusion of high achieving whites from the high tracks was seldom the case.
Oakes, Trans., Tr. at 944.
*979 Grade 10 English Track Distribution of Reading Achievement Quartiles by Race
Jefferson Senior High School» 198<S-1987
[[Image here]]
Note: lshonors or accelerated track; 2=regular or average track; 3*basic or low track
*980 Grade 10 English Track Distribution of Reading Achievement Quartiles by Race (con't)
Jefferson Senior High School-1986-1987
[[Image here]]
Note: l=honors or accelerated track; 2=regular or average track; 3=basic or low track
*981 Grade 10 English Track Distribution of Reading Achievement Quartiles by Race
Guilford Senior High School-1986-1987
[[Image here]]
Note: l»honors or accelerated track; 2>regular or average track; 3«basic or low track
*982 Grade 10 English Track Distribution of Reading Achievement Quartiles by Race (con't)
Guilford Senior High School-1986-1987
[[Image here]]
Note: lshonon or accelerated track; ¿«regular or average track; 3»basic or low track
*983 Grade 10 English Track Distribution of Reading Achievement Quartiles by Race
East Senior High School-1986-1987
[[Image here]]
Note: 1-honors or accelerated track; ^regular or average track; 3*basic or low track
*984 Grade 10 English Track Distribution of Reading Achievement Quartiles by Race (con't)
East Senior High School--1986-1987
[[Image here]]
Note: 1-honors or accelerated track; 2*regular or average track; 3-basic or low track
*985 Grade 10 English Track Distribution of Reading Achievement Quartiies by Race
West Senior High SchooI-1986-1987
[[Image here]]
Note: 1 «honors or accelerated track; ^regular or average track; 3=basic or low track
*986 Grade 10 English Track Distribution of Reading Achievement Quartiles by Race (con’t)
West Senior High School—1986*1987
[[Image here]]
Note: lshonors or accelerated track; 2*regular or average track; 3=basic or low track
*987 Grade 10 English Track Distribution of Reading Achievement Quartiles by Race
Auburn Senior High School—1986-1987
[[Image here]]
Note: 1-honors or accelerated track; 2-regular or average track; 3-basic or low track
*988 Grade 10 English Track Distribution of Reading Achievement Quartiles by Race (con't)
Auburn Senior High School-1986-1987
[[Image here]]
Note: lshonors or accelerated trade; 2*regular or average track; 3*basic or low track
*989 Grade 10 Science Track Distribution of Math Achievement Quartiles by Race
East Senior High School-1986-1987
[[Image here]]
Note: l-honors or accelerated track; 2»regular or average track; 3=basic or low track
*990 Grade 10 Science Track Distribution of Math Achievement Quartiles by Race (con't)
East Senior High School-1986-1987
[[Image here]]
Note: lshonors or accelerated track; 2»regular or average track; 3=baslc or low trade
*991 Grade 10 Science Track Distribution of Math Achievement Quartiles by Race
West Senior High School-1986-1987
[[Image here]]
Note: 1-honors or accelerated track; 2=regular or average track; 3-basic or low track
*992 Grade 10 Science Track Distribution of Math Achievement Quartiles by Race (con't)
West Senior High School—1986-1987
[[Image here]]
Note: l*honors or accelerated track; 2=regular or average track; 3»baslc or low track
*993 Grade 10 Science Track Distribution of Math Achievement Quartiles by Race
Guilford Senior High School—1986-1987
[[Image here]]
Note: lshonon or accelerated track; >regular or average track; 3*basic or low track
*994 Grade 10 Science Track Distribution of Math Achievement Quartiles by Race (cori’t)
Guilford Senior High School--1986-1987
[[Image here]]
Note: 1-honors or accelerated track; 2*regular or average track; 3* basic or low track
*995 Grade 10 Science Track Distribution of Math Achievement Quartiles by Race
Auburn Senior High School—1986-1987
[[Image here]]
Note: l=honors or accelerated track; 2=regular or average track; 3=basic or low track
*996 Grade 10 Science Track Distribution of Math Achievement Quartiles by Race (con't)
Auburn Senior High School—1986-1987
[[Image here]]
Note: l=honors or accelerated track; 2=regular or average track; 3=basic or low trade
*997 Grade 10 Science Track Distribution of Math Achievement Quartiles by Race
Jefferson Senior High School—1986-1987
[[Image here]]
Note: l=honors or accelerated track; 2=reguiar or average track; 3=basic or low track
*998 Grade 10 Science Track Distribution of Math Achievement Quartiles by Race (con't)
Jefferson Senior High School—1986-1987
[[Image here]]
Note: l=honors or accelerated track; 2=regular or average track; 3=basic or low track
*999 The foregoing graphs and charts demonstrate that in all schools and in all subject areas race contributed to class assignment and track placement. African-American students who qualified for two or more tracks above the level at which they were placed, were placed in the lower track rather than in the higher tracks, a track they had little or no chance of ever leaving.
All of this data shows that the RSD placement practices skewed enrollment in favor of whites. Mr. Bowen’s testimony indicated that he knew since the 1960’s that minority students had a level of ability that was inconsistent with their being in the remedial tracks into which they were placed. Further, the numbers and the patterns were obvious to anyone who observed or participated in the school system.
The tracking system used by the RSD did not remedy differences or ameliorate disparities in achievement among racial groups, nor did it function to move students out of the low level track or move minority children into the high level track. The ability grouping used by the RSD, therefore, cannot be justified as an attempt to target minority students with the hope of advancing them to higher achievement levels. The grouping practices used created racially identifiable classrooms, provided unequal opportunities to learn and served no remedial function for minority students. These practices did not even enable minority students to sustain their position relative to white students in the district achievement hierarchy.
Dr. Oakes expressed her opinion, and this court agrees and does hereby find, that there was a pattern of intentional system-wide discrimination against African-American and Latino students in the RSD. The RSD and the people who operated the RSD knew about it, understood what was happening and even, at times, exerted some effort to correct it. All attempts to correct the situation were short-lived and, in the court’s opinion, woefully inadequate.

CONCLUSIONS OF LAW

The basic principle governing this case is that governmental authorities may not intentionally segregate or discriminate against minority students because of their race. Keyes v. School District No. 1, 413 U.S. 189, 213-14, 93 S.Ct. 2686, 2700, 37 L.Ed.2d 548 (1973); United States v. Yonkers Bd. of Educ., 624 F.Supp. 1276 (S.D.N.Y.1985), aff'd, 837 F.2d 1181 (2nd Cir.1987), cert. denied, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). This principle derives from the Equal Protection Clause, that provides that “no State ... shall deny to any person within its jurisdiction the equal protection of the laws.” The Equal Protection Clause requires State and local governments to treat similarly situated groups of persons in a similar fashion when classifying people to receive particular benefits and burdens. Hooper v. Bernalillo County Assessor, 472 U.S. 612, 618, 105 S.Ct. 2862, 2866, 86 L.Ed.2d 487 (1985). In considering the degree of racial imbalance in a school system, courts have considered African-Americans and Hispanics as a group when there is evidence that both groups were victims of discrimination. See Keyes, 413 U.S. at 197-98, 93 S.Ct. at 2692; Yonkers, 837 F.2d at 1226; Hart v. Community School Bd. of Educ., New York School Dist. No. 21, 383 F.Supp. 699, 733 (E.D.N.Y.1974), aff'd, 512 F.2d 37, 45 n. 10 (2nd Cir.1975).
The conduct of individual employees of a school district is relevant in determining the district’s liability, even if the conduct was not taken pursuant to a formal policy of the district. Yonkers, 624 F.Supp. at 1447 n. 112. Imposing liability in these circumstances comports with the general rule that a municipality may be held liable for the unconstitutional acts of its employees in circumstances where there is a continuing widespread pattern of such conduct. See, e.g., Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1480-81 (11th Cir.1991); Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir.1987), cert. denied, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). Accordingly, liability in a case such as this is not predicated on an isolated instance of unauthorized discriminatory conduct against an individual victim but on the district’s conduct in the face of a pattern of discriminatory acts and omissions over time. Id. See Turpin v. Mailet, 619 F.2d 196 (2nd Cir.), cert. denied, *1000 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); Owens v. Haas, 601 F.2d 1242 (2nd Cir.), cert. denied, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).
In school desegregation cases, courts have frequently addressed claims that minority students were not afforded an equal educational opportunity. See Yonkers, 624 F.Supp. at 1530; Berry v. School Dist. of Cty. of Benton Harbor, 442 F.Supp. 1280, 1306 (W.D.Mich.1977); Morgan v. Hennigan, 379 F.Supp. 410, 463 (D.Mass.1974); Oliver v. Kalamazoo Bd. of Educ., 368 F.Supp. 143, 176 (W.D.Mich.1973); Spangler v. Pasadena Cty. Bd. of Educ., 311 F.Supp. 501, 524 (C.D.Cal.1970); Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.), aff'd, 408 F.2d 175 (D.C.Cir.1969) (en banc). Aside from any other considerations, the constitutional rights of minority students are violated when intentional State conduct results in a lower quality education for minority students than that provided to majority students. See id. This rule applies not only to instances where the government conduct has initially brought about the unequal conditions, but also in circumstances where responsible officials have failed to eliminate inequalities with respect to matters within their continuing charge. Price v. Denison Indep. School Dist., 694 F.2d 334, 371 (5th Cir.1982); Yonkers, 624 F.Supp. at 1430.
Disparities in curricula may also deny an equal educational opportunity to minority students. See, e.g., Yonkers, 624 F.Supp. at 1530; Oliver, 368 F.Supp. at 175 (students at a minority junior high school deprived of the variety of course offerings available at white junior high schools); Berry, 442 F.Supp. at 1305 (“new math” taught in white schools but “old math” taught in African-American schools). Tracking practices not only contribute to segregated conditions but may also deny to minority students the same educational opportunities afforded to majority students. Yonkers, 624 F.Supp. at 1445; Berry, 442 F.Supp. at 1306; Spangler, 311 F.Supp. at 519; Hobson, 269 F.Supp. at 443. Tracking denies minority students equal educational opportunity in circumstances where the classifications employed do not adequately reflect students’ abilities and where students are locked into a single track of curriculum. See Hobson, 269 F.Supp. at 513. Moreover, teachers acting under frequently false assumptions from test scores are prone to treat these students in such a way that the students’ performance conforms to the teachers’ low expectations. Id. at 514. Thus, certain tracking systems amount to unlawful discrimination against students whose educational opportunities are limited on the assumption that they are incapable of doing more. Id.
In examining a tracking or ability grouping program, a court should scrutinize the principles underlying the program as well as the procedures and standards for making grouping assignments. See Spangler, 311 F.Supp. at 519-20 (segregated grouping assignments resulted from racially discriminatory “intelligence” tests, misguided assumptions by teachers and counselors about the abilities of African-American students and the effects of white parents’ intervention in the placement process) cf. Vaughns v. Bd. of Educ. of Prince George’s County, 758 F.2d 983, 992 (4th Cir.1985) (county adopted alternative means of selecting students for gifted programs because of possible cultural bias inherent in standardized testing). One important factor in evaluating an ability grouping program is whether the program, once sufficiently established, is effective in overcoming the problems it was designed to address. See United States v. Gadsden Co. School Dist., 572 F.2d 1049, 1052 (5th Cir.1978). In this regard, movement of students between ability groups provides a crucial indication: if ability grouping is providing all students with better educational opportunities, there should be movement of students from the lower sections to higher sections. Id.; see also, Quarles v. Oxford Municipal Separate School Dist., 868 F.2d 750, 755 (5th Cir.1989) (court notes impressive degree of movement among achievement levels by African-American students as well as white students). In an unlawful program, minority students may be locked into achievement groups and fail to move upward over time. cf. Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403, 1419-20 (11th Cir.1985).
*1001 Plaintiffs’ claims require proof of three elements: (1) “segregation or discrimination” (minority students must in fact have experienced either segregated conditions or suffered the effects of discriminatory conduct— or both); (2) “causation” (school authorities must have caused, created or maintained such segregation or discrimination); and (3) “intent” (the conduct of school officials must have been “intentional”). Keyes, 413 U.S. at 213-14, 93 S.Ct. at 2700; Yonkers, 624 F.Supp. at 1378.
The court finds, based upon an application of the facts of this case to the principles of law set forth above, that the RSD intentionally segregated and, therefore, discriminated against its minority students through the use of its ability grouping and tracking practices. The RSD both created this segregation by using invalid testing procedures and employing arcane assumptions~and maintained such segregation by locking minority students into lower-track classes with little or.no hope of ever moving upward. The placement of minority students into lower-track classes was not justified by either the capabilities or the achievements of the students. The RSD tracking practices historically produced racially identifiable, classes and courses. Further, the court finds that the RSD was aware of its practices and the results.

SEGREGATION OF STUDENTS BY RACE WITHIN SCHOOLS

INTRODUCTION

This section addresses the segregation of students within the schools of the RSD. The RSD, in several instances, used student assignment and educational programming to separate students by race within a school. This, pattern was evident in a wide range of purported “desegregation” transfer programs and was equally evident in the manner in which students were assigned to courses and classes within schools.
As described in the section on student assignment, (page 1026, within) when the RSD was first compelled by the Illinois State Board of Education (hereinafter “ISBE”) and the QUE FAC court to engage in desegregation activity, the RSD adopted techniques that did not bring about any real racial interaction. The techniques used included intact busing and part-time programs. Such programs either did not mix students together at all or mixed students for only a few days a year. According to RBE member Colleen Holmbeck, the RSD was preoccupied with “numerical” desegregation as opposed to meaningful and interactive desegregative measures.
At the same time, the RSD began to man-datorily assign African-American/Hispanic students to Eastside white schools. Once there, however, these students were segregated within the schools, either by “ability-grouping” practices or by other aspects of school operations. This pattern of within-school segregation of mandatory transfer students continued through the 1970’s and 1980’s.
When intact busing and part-time programs were rejected by the QUEFAC court and the ISBE in the mid-1970’s, the RSD experimented briefly with both full-site and partial-site programs.[6] The full-site programs included some voluntary measures, such as focus centers and open enrollment. In this context, the RSD’s one-way mandatory busing of African-American students at both the elementary and secondary levels may also be viewed as a full-site program (in theory if not in practice). At the same time in the mid-1970’s, RSD also began experimenting with partial-site voluntary desegregation programs, to which student transfers were attracted by unique educational offerings.
After brief experience with both types of programs, the RSD’s favorite desegregation technique for white students became the'partial-site alternative program, preferably one with academic entrance criteria. Using this technique, groups of white students were placed in predominantly minority schools, but kept in separate programs so that they had little interaction with minority students.' The *1002 essence of this device was to count desegregation solely in terms of the total enrollment of a building, despite the continued separation of the students in that building, both educationally and socially.
The director of the RSD’s Gifted program, Mr. Heideman, captured the essence of this historical policy in a 1990 memorandum to Superintendent Maurice Sullivan. Heideman Memo to Supt. Sullivan, 3/30/90, B507336. He described the policy ' as one “utilizing predominantly white children to attend a high minority impacted building to give the building a percentage balance.” (In 1990, after the policy had been in effect more than a decade, Heideman said it was “no longer acceptable.”) In contrast, the full-site programs, which contemplated some actual mixing’and interaction of students of different races, lost favor with the RSD. Initiatives such as focus centers and open enrollment were strongly de-emphasized and finally phased out in the early 1980’s. From then on, the only desegregation technique used by the RSD for African-American/Hispanic students was mandatory reassignment to white schools. This practice had been used with minority students ever since the Muldoon School closing in 1973.'
In 1988, the long-standing policy of having predominantly white alternative programs was capsulized by the Citizens Ad Hoc Committee, a group appointed by the RSD and staffed by the RSD’s Administrators. The Committee’s final report, submitted in September of 1988, described the policy as follows:
Alternative Programs ... have been the mainstay of District 205 desegregation efforts, in hopes of offering incentives to draw white students to predominately high-minority schools. The only desegregation options offered to minority students are forced busing or special permits.
B24551, B24583. In 1989, the RSD confirmed the Committee’s description in its answer to the Complaint in this case. Defendant stated, in part, that “Defendants admit that almost all minority movement for desegregation is mandatory while virtually all white movement is voluntary in response to special program offerings....” Answer, ¶ 9.5.
Despite their purported “desegregation” purpose, the alternative programs were an abysmal failure in that respect. ■ These programs created virtually all-white enclaves within African-American schools—independent currículums that were totally separate from the regular academic pursuits of these predominantly minority schools. For white parents who wanted an alternative education for their child but not within an integrated setting, this was the. perfect solution. For the Rockford School District, these programs provided a veneer of “desegregation” without the actual results. Children were within the same schools, but not within the same room. All children were in the same building, but for the most part, African-Americans and whites lived separate lives.
The RSD’s operation of partial-site alternative programs in a segregative nature was not necessary or inevitable. Several of these programs actually had some modest mixture of African-American and white students in the late 1970’s. Thereafter, however, the high-status alternative programs were rigidly resegregated by the RSD. This pattern of resegregation continued, and even became more pronounced, through .the 1980’s up to the time of filing of this lawsuit. (The exceptions were a few low-status alternative programs for slow learners and underachievers, which had disproportionately high minority enrollments.)

FINDINGS OF FACT

Within-School Segregation In Mid-1970 “Desegregation Programs”

Intact Busing: The Grade Exchange Plan
The Grade Exchange Plan was-adopted by the RSD in December of 1973 and constituted a conscious exercise in the separation of students within the schools. The Plan provided for exchanging classrooms of students between schools, along with their teachers, with each classroom remaining separate and intact within its receiving school. Bd.Min., 12/18/73, B14192.
The Plan was a system of intact busing in which white students were being sent to sit *1003 in their own classrooms at African-American schools and vice versa. Entire grades were transferred together and were not mixed with students at the receiving school.
A letter from Superintendent Salisbury explained that schools on the Northeast side of Rockford were purposely excluded once the Plan went into effect. Salisbury’s letter highlighted the intact busing situation by explaining the program’s effect at Rolling Green School. The Grade-Exchange Plan called for all fourth grade classes at Rolling Green to be transported to Ellis. Salisbury noted: “In all schools where a grade is identified for transportation, all of the children in that grade are transported. This allows neighborhood[s] and classmates to.stay together. The burden is equally shared.” B2925.
In a federal court brief opposing the Grade Exchange Plan, the REA stated no real interaction would exist among the transported and the resident children because of segregation by classroom. In three of the schools, students would be isolated on separate floors and lunches would be arranged in shifts so that the students would not mingle. REA Brief in QUE FAC, Case No. 70 C 16, B32773. The REA brief further noted that the Plan would actually worsen racial isolation. Moving one or two predominantly African-American classes into an all-white school and keeping them separate would force those African-American students to group together even more. The effect would be to reinforce the idea that minority students are different, identifiable by race and out of place. Id.
In a memorandum opinion dated March 1, 1974, Judge Bauer rejected the Grade Exchange Plan and determined that the Plan was incapable of desegregating classrooms within the schools. Judge Bauer wrote: “[A] school desegregation plan which solely utilizes a grade exchange program- is probably incapable of truly desegregating a school system or a single school. Such a plan in reality creates [segregated] classrooms within a school which is ‘desegregated’ as far as mathematical ratios.” Memorandum Opinion and Order, 3/1/74, • QUEFAC, Case No. 70 C 16, B508043, B508046.
Within-School Segregation Through Part-Time Programs
During March of 1974, the RSD’s Administrative Council recommended Special Interest Centers be housed in existing schools that were operating below capacity. The Centers would not significantly interfere with on-going programs. B32864. By 1975, the Rockford School District began using “Interest Centers” as an avenue toward school desegregation. Like the alleged goals of the Grade Exchange Program, the District claimed that the Interest Centers were educationally sound and were designed to both racially integrate the District and introduce children from the East and West sides of the District. B30599.
Three schools were designated as Interest Centers: Lathrop, Walker and Nelson. These schools served as intensive training centers where children were coursed in a specific discipline, but only for a five or ten day period during the entire school year. Third graders from across the District attended the ten-day Social Studies Interest Center at Lathrop Elementary School. Fourth graders attended the ten-day Language Arts Interest Center at Nelson Elementary School and also attended the five-day Math-Science Interest Center at Walker School. B30618.
' Students were transported to the Interest Centers by buses provided by the District. For students attending the Lathrop and Nelson Interest Centers, a particular school’s fourth grade classes were not split but went as á group. Classes were split, however, for students attending the Walker Interest Center for the stated purpose of achieving “racial balance within the numerical constraints.” Id.; B35680.
Another type of program, the Environmental Education Program, was located at Atwood Park. Children stayed overnight and were educated regarding the outdoors, pollution and the environment. Children conducted experiments and participated in activities that were meant to highlight ecological problems in society. B30674-B30676. Like the Interest Centers, the school was to achieve classroom desegregation of students by mix *1004 ing classrooms of students at the initial orientation stage. B35680. Accordingly, the purpose of the Interest Center and the Environmental Education Program was to integrate students of different races from different schools, but, again, only for a few days each year.
In reality, most classes were transferred to the Interest Centers en masse. The result was that minority classes were placed in an all-white school but kept separate, although the students involved were counted toward the total percentage of students in an integration program. The Environmental Education Program at Atwood Park, for example, was very segregated. Oscar Blackwell was concerned about the unwillingness of the Atwood Park staff and teachers to integrate minority and majority students upon arrival at the facility and throughout the two and one-half day program. As a result, staff members were given multi-cultural awareness training in order to combat insensitivity toward minority students. B35136-B35138. These part-time programs were nothing more than intact busing under a different name.

Segregation Of Minority Transfer students Within Receiving Schools

As the RSD bused minority children to primarily white schools, the minority children were ostracized or frequently kept physically separate from the other students.
High Schools
During deposition, RSD Superintendent William Bowen testified as to the hostile reception that the East High School staff gave to African-American transfer students in the early 1970’s. In 1970, a portion of the West side was moved from the West High School feeder pattern to the East High School feeder pattern. At the same time, ninth grade was added to East High School, formerly a tenth through twelfth grade school. Bowen Dep. at 57, 60.
The Board decided to move boundaries, with little, if any, preparation or planning. East High School had an all white faculty that was used to a white school. Suddenly African-American students were introduced with no faculty preparation. Id. at 60. Bowen testified that the teachers viewed the situation as West High School having trouble with their African-American students and so the students were sent to East High School. Id. at 61.
One result of this perception by the staff at East High School was a disproportionate discipline of African-American students. Such a perception also affected the selection of classes by the counselors, causing a tendency to assign African-American students to remedial classes. The phenomenon was “very pronounced” when Bowen went to East High where there was also a pronounced assignment of white students to the upper level tracks. Id. at 63.
While Bowen was Assistant Principal at East High, objections were voiced by some school staff to the increased presence of African-American students. Bowen reported that some faculty members said they wished the African-American students were not there. Bowen also observed that the school nurse was very uncomfortable and had trouble dealing with African-American students. He noted that the nurse sprayed her office with deodorant when an African-American student left, and wiped off her desk if the student had touched it. Id. at 65.
Elementary Schools
Mr. Keith Wilson, Principal of Bloom Elementary School from 1976 to 1985, testified in his deposition that he was familiar with the practices at his school as well as the practices at other Northeast Quadrant receiving schools in relation to minority transfer students. Bloom School was 100% white through the 1972-73 school year. Over the next three years, the school experienced some minority enrollment beginning with 6% African-American enrollment and then increasing to approximately 15% African-American enrollment. B511482. During his first year at Bloom School in 1976, Wilson had the opportunity to observe the minority transfer students that were mandatorily sent to Bloom. According to Wilson, these African-American students were “there because they were told they had to go there.” In his estimation, these students were angry about *1005 having been mandatorily reassigned to Bloom. Wilson Test., Tr. at 2195-96. Wilson also noted an impact on the educational participation of these students in the school because of their mandatory reassignment. Id. at 2196-97.
Wilson testified that many of the minority transfer students were in Chapter I pull-out programs. As a consequence, they were educated separately from the neighborhood students for significant portions of the school day. Id. at 2187. Furthermore, in talking to parents and staff about the atmosphere at the school, Wilson learned there had been difficulties initially when the African-American students first arrived. The difficulties presented themselves in relation to the receptivity on the part of the school staff and the white neighborhood parents toward the African-American students. Id. at 2179, 2183. In the morning, the African-American students went -directly from the bus into the school. At the end of the school day, they returned directly to the bus. As a result, the transfer students did not interact with the neighborhood students on the playground either before or after school. Id. at 2187.
Ms. Sidella Hughes, a parent and a plaintiff in this lawsuit, is an employee of a State agency charged with the protection of children. In that capacity, she has occasion to visit the RSD schools. In her deposition, Ms. Hughes described conditions at a predominantly white school that was receiving minority transfer students.
The first time I noticed the difference in the way kids [were] treated was when I went to Rolling Green on an investigation and I got there before school started—or when kids were getting off the bus. I was walking in the building. The black kids— the teachers were kind of lined up and black kids went straight in. The kids on the playground kept playing, but the kids off the bus had to go straight into class, in the building ... [The teachers] were standing so that the kids would go straight into the building ... And kids in the playground—the majority of the kids on the playground were white. The majority of the kids on the bus were black.
Hughes Dep. at 27.
Earnestine Kendall, a home school counselor for the RSD, visited the now-closed Kennedy and Haight Schools and observed African-American children being held on their buses until the bell for classes to begin rang. Raul Medrano recalled that during the years he and other Latino students were bused to Whitehead, Gregory and Lincoln schools they would arrive ten to fifteen minutes early and were forced to remain on the bus until classes began. The Latino transfer students had to sit on the bus and watch while neighborhood students played or, in some cases, shouted racial epithets at the students on the bus. In one particular incident, Medrano and others asked the principal at Lincoln if they could exit the bus and socialize with the other students since the weather was nice. The principal denied their request and told them if they did not like his decision, they could walk to school.

Segregation Of Students Within Schools Bg Tracking

The RSD pervasively segregated students within its schools via a system of educational tracking and steering. White students were disproportionately placed in upper-track classes and African-American and Hispanic students were disproportionately placed in lower-track classes. Students in lower-track classes received inferior educational services. The placements were not justified by either the capabilities or achievement levels of the students. This subject is discussed in full in the section on tracking and educational discrimination. See Student Tracking and Ability Grouping. (Supra, Page 940.)

Segregation Of Elementary Bilingual Students

When the RSD’s Bilingual Program began at Barbour School, the curriculum consisted of participants attending classes with regular students for part of the day and attending “pull out” bilingual classes for the rest of the day. This multi-cultural system served well to integrate bilingual students into the school’s student, body. Despite this success, *1006 however, the RSD terminated the pull out program and instituted a full-time bilingual program. Victoria Mayer, a RSD teacher and former bilingual program coordinator, testified that when the pull out program was terminated, bilingual students spent a whole day with the bilingual teacher. The only interaction they had with the regular students at the school was at lunch time and at recess. This subject is discussed in full in the section on bilingual students. See Bilingual Education and Other Educational Discrimination Issues Affecting Hispanics. (Within, page 1184.)

Segregation Of Special Education Students

From the inception of its desegregation activities in 1974, the RSD maintained the policy that Special Education students were “exempt” from desegregation programs. Beginning at least as early as 1980, and continuing through 1989, all Self-Contained Special Education (“SCSE”) classes were located outside the Southwest Quadrant, even though over one-third of the Special Education students resided in the Southwest Quadrant. As such, disproportionate burdens were placed on minority SCSE students who were assigned to non-Southwest schools, while no non-Southwest SCSE students were assigned to Southwest schools. This subject is discussed in full in the section on special education. See Special Education. (Within, page 1192.)

The RSD’s De-Emphasis Of Full-Site Magnet Programs

The Rockford School District de-empha-sized the use of full-site Magnet schools (in which students of different races might interact with one another) in favor of partial-site Alternative Programs that were highly segregated.
May 1972 One-Week Magnet Schools
After the ISBE desegregation rules were adopted in December of 1971, local school districts were required to develop integration plans. On May 18, 1972, RSD Superintendent Salisbury announced that Montague, Ellis and Church Elementary Schools were being designated as “magnet schools” for the Fall of 1972 in order to raise pupil achievement levels and to meet State integration guidelines. Salisbury explained that the enrollment in each of these three schools would include the students who would normally attend the schools, therefore, following the neighborhood school concept. The schools, however, would be changed from closed to open enrollment, meaning that a parent from any other part of the city could choose to send their child to one of these magnet schools. B506211'. The next day, Salisbury added Lincoln Park, Barbour and Dennis Elementary Schools to the list of magnet schools opening in Rockford in the Fall of 1972. B506213.
At that time, the racial composition of these six schools was as follows:
Dennis 90% African-American
Ellis 69% African-American
Montague/King 69% African-American
(King under construction)
Barbour 64% African-American
Lincoln Park 45% African-American
Church ,.22% African-American
On May 26, 1972, Salisbury stated that each magnet school would employ the District’s best teachers and administrators and the best materials and programs. Class sizes would be reduced to a maximum of twenty students. The six magnet schools would also receive additional funding. B506214.
On June 16, 1972, less than one month after originally announcing the magnet school plan, Salisbury said he would no longer refer to the concept as “magnet schools.” “I don’t think that is the best terminology right now. Calling these six schools target schools is a little more accurate.” According to Salisbury, a magnet school was one drawing students from outside its regular boundaries. The six schools identified for special programs and personnel would not have citywide enrollment. B506219. Three weeks later, the Board of Education approved Salisbury’s plan to “attack low achievement” in the six target schools. B506220.
Bloom Focus Center
The former principal at Bloom School, Mr. Keith Wilson, helped create a Focus Center as a voluntary desegregation measure. Wilson Test., Tr. at 2188-91. Through the inter *1007 action of parents, teachers and administrators in developing the educational curriculum, Bloom School became a focal point for voluntary transfers from throughout the city. The actions of the RSD’s Board and Superintendents, however, eventually deprived the school of its diverse transfer base and turned a model program into a re-segregated school.
In 1973, two years before Wilson became Principal at Bloom School, the RSD manda-torily assigned a large number of African-American students to Bloom. These students were sent to Bloom because Muldoon School was being closed. In the two years after Muldoon’s closing, there were incidents of racial tensions at Bloom School, including physical altercations between staff and students.
When Wilson became principal at Bloom, he discovered that the students who were mandatorily transferred tested two to three grade levels below the other students at the school. Racial incidents continued between students and staff. One example Wilson recalled was a janitor who called a student a “nigger” over a dispute in the school lunchroom. Wilson calmed the situation by meeting with the African-American students and discussing their concerns. Id. at 2186. Wilson stated that he worked with parents to provide extra support for low achieving students. Students could get extra help through parental tutors, achievement level based grouping and through participation in the Title I program. Wilson testified that despite low achievement scores and the innovative responses, Bloom School never received any extra funds from the School District to help educate the transfer students or to train staff members.
The initial program at Bloom School became known as the Focus Center. Wilson testified that the program began as a school-initiated community project between parents and teachers. The curriculum concept was to assess each student in reading and math and to develop a program to meet that student’s needs. All of the other subject areas contained an equal mix of children from all ability levels in order to avoid segregation based upon achievement levels. Superintendent Art Johnson originally allowed the program to operate as long as it was open to students from throughout the city. Id. at 2190-91.
Due to its open enrollment policy, the Bloom Focus Center received voluntary transfers from African-American students in the Southwest Quadrant in addition to continuing numbers of African-Americans that were mandatorily assigned, usually fourth through eighth graders. Wilson observed that the African-American students who voluntarily transferred blended into the school nicely. Their level of achievement approximated the level of the white students and both races interacted well in terms of interpersonal relations. The African-American students who were mandatorily assigned, however, did not achieve as well as the other students.
In approximately 1982, the school district changed its transportation policy regarding Bloom School. Previously, any student from the West side was eligible for bus transportation to Bloom. With the change in policy, only students from a certain area on the West side were allowed to attend Bloom School; accordingly, the number of African-American students decreased. The change reverted Bloom back to the mandatory transfer program of the 1970’s. Some students were forced to drop out of the Focus Center program because of the lack of transportation. The central administration of the School District showed a lack of concern regarding the existence of the Focus Center.
Wilson testified that when he first arrived at Bloom, Oscar Blackwell consistently stated that Principals should maintain a racial balance in school enrollments that reflected the number of minorities in the school system. In the early 1980’s, however, once Mr. Blackwell left the Office of Integration, this goal changed dramatically. Communication also declined between Wilson and the Central Office Administrators regarding integration issues. Id. at 2214. Wilson recounted various non-educational reasons why African-American students were mandatorily assigned to various schools during their career. In some instances, African-American students were reassigned from one East side school to another to fill up class size máximums. Wilson *1008 could not remember a single incident where a white student from Bloom School was moved to another school in order to fill up a class size, but he recalled instances when African-American students were placed in Bloom to fill up classes.
Wilson related an incident where an African-American student was mandatorily reassigned from Westview School to Bloom School as a disciplinary assignment based upon a physical altercation at Westview. Wilson noted that this sort of procedure was common knowledge among Principals. Students were mandatorily reassigned and bused in the middle of the school year because of infractions. Wilson stated “we were just kind of a shipping society.” According to Wilson, these policies applied specifically to African-American students. In fact, Wilson told School District Attendance Director, Mr. Mike Driscoll, that he was tired of the busing policy. “I told him that my father paid more attention to shipping his livestock to Chicago than he does about shipping African-American students.”
According to the RSD’s official enrollment reports, during the period that the Focus Center at Bloom was allowed .to recruit voluntary enrollment of African-American students with transportation provided, African-American enrollment at Bloom increased significantly. In 1976, there were thirty-eight African-American students (10%); by 1979 there were ninety-two African-American students (18%). Over the next three years, African-American enrollment declined. In the year that transportation was eliminated, 1982, there were only fifty African-American students (9%). Thereafter, African-American enrollment at Bloom continued to decline and by the Fall of 1988, there were only seventeen African-American students (3%) attending Bloom School. Bloom had again become 94% white enrollment, thereby returning to its early 1970’s status.
Haskell Focus Center
Dr. Robert Greene was Principal of Has-kell School when it was designated as a Focus Center to aid desegregation in the late 1970’s. Haskell School was built in 1959, in the Southwest Quadrant of Rockford. By 1971, Haskell’s African-American student population was 62% and until 1992, the African-American student population remained between 49% and 67%. Dr. Greene was able to increase student achievement scores at Haskell in the late 1970s and the early 1980s through various curriculum innovations, parental involvement and constructive discipline approaches. These improvements, however, were achieved with little or no support from-the RSD.
One example of this lack of support related to the absence of acoustical ceiling tile at Haskell. Teaching in Haskell was like teaching in a steel tank. Dr. Greene stated that, “acoustical ceiling tile was left out as a cost saving measure.” Dr. Greene described the educational impact of this deficiency:
This was a fourth grade teacher that I judged to be a really good dedicated teacher with good rapport with the children and as I sat in her classroom and she asked questions, the noise level of a child squeaking his seat, rolling a pencil across the desk or dropping a book would wipe out the question. Her question reverberated on the floor, ceiling and other four walls, and then when she finally had gotten the ' question through so the children all heard it and waited for an answer, the child’s answer you had the same acoustical rumbling, it was hard to understand the child’s answer. An awful lot of time was wasted in that classroom by the teacher repeating herself to the children and the children having to repeat their answers—and you had to maintain a tighter discipline to maintain the silence necessary to communicate than you would in a normal classroom.
Greene Dep. at 52-53.
Greene repeatedly proposed solutions for this problem and submitted the proposals by letter to the Assistant Superintendent. The proposals were rejected. Finally, Haskell School took action on its own and the students raised money to install acoustical tile in the classrooms, one classroom at a time. The students raised funds by recycling newspapers and selling candy. Classroom ceilings cost $640 a room. Ten to twelve years passed before acoustical ceiling tile had final *1009 ly been installed in all of the classrooms. Id. at 57-58.
Another example of the RSD’s failure to support Haskell School was the RSD’s refusal to provide funds for a library learning center. The only way to build the library learning center at Haskell was for Dr. Greene, some teachers and their spouses and a social worker to do it themselves. Dr. Greene and his group went to buildings being demolished by HUD in order to obtain materials. After obtaining the free materials, Dr. Greene then asked the RSD if its tradesmen could install the materials. He was told that the tradesmen did not have the time. Thus, over the next few weeks, Dr. Greene and his crew proceeded to jackhammer, mortar, carpet, paint and otherwise build the library learning center themselves.
The Haskell Focus Center program was very successful. During the time that the Focus Center operated, achievement scores rose dramatically. Moreover, the Haskell program was a model of integration, with complete and harmonious interaction between African-American and white students. Greene Test., Tr. at 1532-33. The Haskell Focus Center demonstrated that white students were willing to transfer into full-site magnet schools where they were educated together with African-American students. Haskell school went from 70% minority when Dr. Greene became Principal in 1971 to 54% minority in 1980-81.
Through a series of transportation reductions and the ultimate elimination of transportation altogether, white transfer students were deterred from attending Haskell School and their numbers were accordingly reduced. Dr. Greene was told by the RSD to stop recruiting for the program altogether. The RSD further required Dr. Greene to split his time between Haskell School and another school. Consequently, Dr. Greene took early retirement. The RSD dropped the Háskell program entirely in 1985.
The Alternative Middle and Elementary Schools
In 1977, Lincoln Park School was closed as an elementary school. The Rockford Alternative Elementary School (hereinafter “RAES”) and the Rockford Alternative Mid-die School (hereinafter “RAMS”) were placed in the Lincoln Park building as a full-site magnet school. At the time of its closing as a regular school, Lincoln Park was a segregated school with 48% of the total African-American population enrolled. Bd.Min., 5/9/77, B15721. The magnet school opened in the Fall of 1977, with approximately 25% minority enrollment. The RAE S/RAMS maintained desegregated enrollment for the next four years, and in the Fall of 1980, the enrollment was 18% African-American, almost exactly the RSD’s systemwide African-American enrollment at that time. B4068.
In the Fall of 1981, the RSD closed the Lincoln Park building and shut down the full-site magnet school. The RAES program was transferred to Ellis School as a partial-site alternative program. The RAMS program was transferred to Lincoln Middle School as another partial-site alternative program. The next year, the RSD shut down the RAES and the RAMS programs altogether. The successful operation of the RAES and the RAMS as a full-site magnet school belied the notion that white students would not transfer into full-site magnet schools. In the Fall of 1980, 166 white students transferred into RAE S/RAMS at the Lincoln Park building. Id.

Purposeful Creation Of Segregated Partial-Site Alternative Programs

In the mid-1970’s, the RSD began creating a series of partial-site magnet programs, called “alternative programs”, as well as some full-site special programs called “focus centers.” In 1982, the RSD canceled transportation to the focus centers, effectively shutting them down.
The partial-site alternative programs that remained were placed in schools with substantial or predominant minority enrollments for desegregation purposes. This occurred at both the elementary and secondary levels. The RSD, however, set up two sharply different types of alternative programs: High-status programs with academic or other entrance barriers that included the Gifted, CAPA, Montessori and Arts Alternative pro *1010 grams; and low-status programs for “underachievers” and “slow learners,” that included the GIT and CASS Programs. The predominantly white character of the high-status alternative programs was justified on the ground that white enrollment had to be maximized in order to bring down the minority percentage of the total school enrollment. For example, King School in 1986 had an 85% minority regular enrollment and a 95% white Gifted Program enrollment. The total enrollment at King School was thus 55% minority and 45% white.
Over time, these high-status alternative programs became more segregated rather than less. The RSD’s data shows that all of the high-status programs resegregated during the 1980⅛, with one exception, the Arts Alternative Program. This pattern of reseg-regation is detailed for each program in the sections that follow.
The GIT and CASS low-status programs continued with disproportionately high minority enrollments throughout the 1980’s. The RSD created a “minority Gifted Program,” but would not allow the minority students in that program to enter into the all-white Gifted Program, even though the RSD’s Gifted Director stated the minority gifted students were capable of performing in the regular Gifted Program.
The alternative programs became vehicles for emphasizing and reinforcing racial separation. In 1980 an exchange of correspondence between “Mr. U.S. Steele” (Ellis School staff) and Mr. Oscar Blackwell reflected the District’s purposeful creation of predominantly white high-status alternative programs (such as Gifted) and disproportionately minority low-status alternative programs (such as GIT and CASS). Steele-Blackwell Correspondence, 7/10/80, B28743. Mr. Steele’s June 27, 1980 memorandum to Mr. Blackwell expressed “concern and extreme dissatisfaction over the skewed structured selection format” established for the new alternative program at Ellis School. Each class was to contain twelve majority students and three minority students, in effect, to be 80% white. The program was described as one geared for “slow learners.” The composition of the program should have been representative of the entire School District. The memorandum was referring to the CASS Program. The RSD applied the same 80% white enrollment guideline that was applied generally to alternative programs in minority schools.
In his response dated July 10, 1980, Mr. Blackwell reiterated that the RSD’s policy was to make a concerted effort to reduce minority enrollment to a 50% level in those schools that exceeded such a balance. As such, the RSD thought it desirable to admit as many majority students into the program as possible. Mr. Blackwell’s letter goes on to state, however, that because the Ellis program was also designed to assist students who had educational problems, it would be fair and within Board policy to admit students on an “as needed” basis. If a decision was made as to how many minority/majority students were to be admitted, “it would appear that admittance would have to be on an equal basis.” Dr. Tucker, the RSD’s Director of Alternative Programs, received copies of both the memorandum and Mr. Blackwell’s letter. Mr. Blackwell’s letter thus reflected a different enrollment policy for the “slow learner” program (CASS) than was followed for the other alternative programs. CASS opened at Ellis in the Fall of 1980 with a 58% African-American/Hispanic enrollment. B4068.
The divergence between white high-status programs and predominantly African-American low-status programs was strongly apparent in the RSD’s Fall 1980 report of alternative program compositions. Id. That document is reproduced here as Figure 1.
ALTERNATIVE ENROLLMENTS AND MINORITY PERCENTAGES
December 15, 1980
[[Image here]]
*1011 [[Image here]]
The high-status alternative programs had the following African-American/Hispanic enrollments:
Dennis Arts Alternative •«⅜ t-H
Henrietta Montessori 03
King Gifted t-H
Rock River Arts Center t-H t-H
Washington Creative and Performing Arts H CO
Wilson Gifted 00
Auburn Gifted OO
Auburn Performing Arts to t-H
In contrast, the low-status alternative programs had the following African-American/Hispanie enrollments:
Barbour GIT OO
Ellis CASS OO
Froberg GIT 03
Jackson GIT <©
Wilson GIT 03

The Gifted Program

Since the time of its earliest origins, the Gifted Program was not administered equitably throughout the RSD school system.
Early Identification of Centralized Gifted as a Program for White Students
By 1975, the Rockford School District began to develop a centralized gifted program in an attempt to desegregate schools. An alternative school program for seventh and eighth graders was developed at Wilson Mid-die School, which included both basic skills and academically talented programs.
The academically talented program consisted of 110 seventh and eighth graders selected from Wilson and other middle schools in the District. These students were given a three-period block of time during which academic enrichment occurred. The students then participated in another period of individual pupil instruction that was utilized for individual and small group instruction purposes. The intent of the program was to “provide intensive, enriched, academic experiences for 110 students.” B32950.
The Gifted Program was used as an incentive to attract white students to Southwest Quadrant schools. The program was also used to lower the overall percentage of minorities in Wilson School. For example, in 1972-73, minority students comprised 48.6% of the student population at Wilson. In 1974-75, minorities made up 48% of the school’s population. In 1975-76, however, the advent of the Gifted Program, minority percentage at Wilson was projected at 36.9%. The program was used as a means to bring Wilson into compliance with State school integration laws. B32954.
In order to accomplish the goal of reducing the percentage of minorities in certain schools, the Gifted Program, like other alternative programs, had to contain as many *1012 white students as possible. The more white students in the program, the lower the percentage of minorities at the school and the easier it was to allegedly bring the school into compliance. Of the students in the Gifted Program in 1975, 94% were white. B32882. In her affidavit, Ms. Eleanor Brown recalled that when she attended the Gifted Program for seventh and eighth graders during the 1977 and 1978 school years, there were approximately seven African-American students in the entire Gifted Program. Brown Aff. at ¶ 8.
The centralized Gifted Program at Wilson began in 1975. The program effectively created a “school within a school” for white students. Under the guise of integration, the District created a program that lured whites to the Southwest Quadrant for academics while helping students “acquire more knowledge concerning sub-cultures represented by the students.” White students, however, were essentially the only culture represented. B32955. The white students in the program were not “subject to” interaction with the neighborhood students. The District’s own documentation clearly reveals that the goal of this and other “integration” initiatives was to “further the integration of our schools,” not the integration of the classrooms. Such a goal was made clear through within school segregation of the Gifted and Arts Alternative Programs. B32943.
The policy was also understood by teachers and administrators at Wilson. Mr. Curtis Anderson, a former Principal at Wilson, testified that, in his opinion, there were African-American students at Wilson clearly qualified to participate in the Gifted Program. He stated that it was understood, however, that the program was almost exclusively for white students in an effort to keep Wilson School in compliance with State school integration laws. This effort maintained within-school segregation and created no real integration.
Mr. Anderson described the Gifted Program at Wilson.
[Students were selected] based upon recommendations from elementary school teachers. The Gifted Program had very few black students, despite the fact that the number of black students at Wilson was roughly twice that of the percentage of black students in the district. There were many black students that were eligible to participate in the Gifted Program. These black students were comparable to whites in the Gifted Program.
[[Image here]]
Children in the Gifted Program ... were not taught in classes that contained non-program children ... Gifted Program students only had contact with the other students at Wilson School during non-academic settings. Children in the regular and Gifted Programs had different class schedules.
Anderson Dep., Ex. 1, at ¶¶7-10.
Anderson further stated that many African-American students were eligible to participate in the Gifted Program based upon' their performance on tests, grade average and school studies. Very few of the participants in the Gifted Program, however, came from Wilson School. “[T]hey just were not ... sought. In seeking participants in the program ... it was from other Eastside schools ... maybe two or three persons of our own school ... participated in the program. Most of the participants were students from outside the Wilson School.” Although he did not exactly know the process followed in selecting the participants, “I do know that they usually used their performance on tests, you know like reading tests and the other tests. Their general attitude towards school itself ... whether they were ... seemed to like going to school, how they liked it and their willingness to participate and how they get along with teachers and so forth.” Anderson Dep. at 24-26.
The centralized Gifted Program maintained a separate academic curriculum from the other students at Wilson. Students in the program had little, if any contact, with the other students at Wilson. B32952. For example, Ms. Eleanor Brown, a former student in the Gifted Program at Wilson, testified at her deposition regarding field trips taken by students in the Gifted Program as well as others in the school. In response to a question regarding field trips taken by stu *1013 dents not in the Gifted Program, Ms. Brown stated, “[B]asieally I don’t know. We kind of—that’s the point. We did everything pretty much separate.” Brown Dep. at 16. Brown maintained that for gifted students, field trips were often used as an educational tool. With regard to regular education students, however, Brown could not recall “them taking a lot of trips, but they could have, and I don’t know about it. We did everything separate.” Id. at 19.
The Gifted Program at Auburn High School, referred to as “the Academy,” was also segregated from the rest of the school. Ms. Brown testified regarding her attendance in the Academy Program at Auburn: “The Academy students and their classes were separate from the rest of the school. All of our classes, for instance, were at one end of the hall, away from other students and classes. I was frequently teased by other students who were not in the Academy because of the separation of classes.” Brown Aff. at ¶ 10.
Dan Dickover, a white student who attended the Gifted Program at King Elementary School, Wilson School and Auburn High School, testified that there were no sanctioned activities with “the neighborhood students” or the minority students at King. Only two or three minority students were in any of the Gifted Programs that Dickover attended. Gifted students might see the neighborhood students at lunch or recess, but Dickover had no way of getting to know them. He stated, “We were pretty much on our own in the school although we were all students in the school.” Dickover testified that he held stereotypes of minorities that were fostered by this separation. At the time, he didn’t understand that a separated environment was not necessary. Dickover now wishes he would have had the opportunity to approach the minority students comfortably.
The almost all white gifted students at Auburn High School, though kept entirely separate from the other students at Auburn, were included in the entire school’s class ranking system. Additionally, the gifted students had weighted grades. Each grade was given a positive ranking. This meant, for example, that a student at Auburn who was not in the Gifted Program could never become valedictorian, even if that student received straight A’s all through school. Auburn in the early 1980’s was approximately one-third minority.
Another all-white Gifted Program at Auburn, the Creative and Performing Arts (hereinafter “CAPA”) Program, was also problematic. CAPA was given priority for instruments and for the use of the auditorium. In fact, an ethnic choir that Dr. Constance Goode started at Auburn was cancelled by the Principal of Auburn because the facilities and equipment were to be devoted to the CAPA Program. Goode Test., Tr. at 1294-96.
Ms. Melinda Reitman testified that when her son attended the Academy from 1978-1982, she remembered very few, if any, minority students in the program. Ms. Reit-man was an active parent throughout her children’s attendance at Auburn, serving as a board member in the Auburn High Parents Group and frequently volunteering at the school. She recalled that when her daughter, Lisa, attended the Academy from 1981-85, the dearth of minority students was still evident. Ms. Reitman noted that “youngsters who were participants in the alternative programs that were housed at Auburn tended to have little or nothing to do socially with the student body at large” as a result of the separation fostered by the school-within-a-school concept.
Partial Desegregation, Followed by ReSeg-regation, of the Gifted Program, 1977-1986
In the school year 1976-77, the first year for which systemwide data is available, African-American and Hispanic students were grossly under-represented in the RSD’s Gifted Programs. B46722. African-American students comprised 17.2% of the school system, but constituted only 4.7% of students in Gifted Programs. Hispanic students comprised 2.0% of the RSD’s total students, but only 1.2% of Gifted students.
A few years later, the RSD’s Centralized Gifted Program actually achieved a modest level of desegregation at certain schools. A January 1978 memorandum to Superinten *1014 dent Johnson stated that the elementary gifted enrollment at that time (three years after the creation of the program) was 13% minority (16 students out of 128 students). Sys-temwide K-6 enrollment in the 1977-78 school year was 22.7% minority. B28441. According to the RSD’s 1980 Report to the United States Office for Civil Rights, both the secondary-level and elementary-level Gifted Programs at that time had attained about 10% African-American enrollment. Form ED 102 submitted to U.S. Dept, of Education, Office of Civil Rights (OCR), 12/15/80, B32253.
The RSD’s Gifted Programs at the secondary level subsequently became very highly segregated over the next six years. In the middle schools and high schools combined, Gifted Programs declined from 10.6% African-American in 1980 to 2.4% African-American in 1986, with most of this decline occurring in the first two years. See id.; Form ED 102, 12/15/82, B46747; Form 102 Summary, B507563.
At the middle school level, the RSD’s reports to the United States Office for Civil Rights showed the following four-year trend in the composition of the Gifted Program:
[[Image here]]
In 1980, the RSD’s middle schools had 19% overall African-American enrollment, which grew to 21% in 1986. The Hispanic enrollment was 2% in 1980 and increased to 3.5% in 1986.
At the high school level, the Gifted Program began with small African-American and Hispanic percentages in 1980, which became smaller yet over the ensuing years:
[[Image here]]
The RSD’s overall high school enrollment was 18% African-American in 1980, and increased to 20% in 1986. Hispanic enrollment was 2% in 1980, increasing to 2.6% in 1986.
The same trend occurred in the elementary Gifted Programs, as shown below. The Gifted Programs, which were supposed to be the flagship of RSD’s integration efforts, were almost completely resegregated by the RSD as soon as the pressure from the ISBE and from the QUEFAC case subsided. The Gifted Programs, which were the principal source of the purported voluntary movement of white students for integration purposes, were converted to segregated programs within each school. The RSD’s elementary Gifted Program was resegregated from 1980 through 1986. African-American enrollment in Centralized Gifted Programs dropped from 11% in 1980 to 1.3% in 1986. In the same six years, Hispanic enrollment dropped from 3% to 0.7%. Form ED 102, 12/15/80, B32253.
The progressive resegregation of elementary Centralized Gifted Programs is highlighted in the following table:
[[Image here]]
In part, the RSD brought about this resegre-gation of the Gifted Program by establishing the formally separate “minority” Gifted Program in 1986, and placing in that program African-American students who formerly would have been in the regular centralized Gifted Program.
The 1982 report to the Department of Education showed that the elementary Gifted Program at King (one of the two locations of elementary Centralized Gifted Programs), had 11.3% African-American students and 4.6% Hispanic students (22 and 9, respectively, out of 194 minority students). Four years later, however, the King program was only 1.4% African-American and 0.7% Hispanic. In that year, 1986, the separate “minority” Gifted Program was established at Barbour. Thus, while the RSD publicly claimed that the creation of the minority Gifted Program, known as the Pilot Gifted Program, was for the purpose of increasing minority participation in the Gifted Program, the fact is that it actually decreased minority participation in the regular Gifted Program.
*1015 The RSD’s 1987 Report and Personnel Testimony Revealing Gifted Program Segregation
In 1987, the RSD’s Attendance Director, Mr. Mike Driscoll, submitted a report to the Board that depicted the highly segregated nature of both the Gifted Program and the RSD’s other alternative programs. By using a chart form, the report demonstrated that the high-status programs were almost all white, in stark contrast to the racial composition of the rest of the student body in each school. Driscoll Report, B24820.
The “Driscoll Report” on alternative program composition was part of a larger demographic report prepared in the Fall of 1987 for use by the Demographic Study Committee of the Board of Education. D8396; D8401. Driscoll’s data concerning alternative programs was presented in a special meeting in which the Board reviewed the demographic study. Bd. Min., 10/20/87, B20645. The report also received widespread circulation apart from the full demographic study, being reproduced in the 1988 Report of the Ad Hoc Citizens Committee, and being one of the planning documents circulated to Superintendent Swanson and the Board members during the 1989 reorganization process. B24551, B24601.
Driscoll’s report showed that in the 1986-87 school year, the District’s Centralized Gifted Program, for Grades K-12, was 2% African-American, 0.7% Hispanic and 93% white. Id. In that same year, the RSD’s K-12 systemwide enrollment was 21% African-American, 3.7% Hispanic and 72.7% white. More specifically, Driscoll’s report showed that the RSD’s regular elementary Gifted Program was only 1.3% African-American and 0.7% Hispanic. In the entire regular elementary Gifted Program, there were four African-American students and two Hispanic students. Driscoll Report, B24820.
The racial composition of each site of the regular Gifted Program was as follows:
[[Image here]]
At King, the 95% white Gifted Program contrasted with regular enrollment that was 85% minority. At Beyer, the 94% white Gifted Program contrasted with an enrollment that was 32% minority. At Haight, the 96% white Gifted Program contrasted with an enrollment that was 47% minority. In all of these schools, the presence of the virtually all-white Gifted Programs, which were educationally separated from the regular programs in the school, constituted extreme instances of within-school segregation.
Simultaneously, the District operated a formally separate minority Gifted Program at Barbour in Grades 1-3, which included at least 25% African-American students and 9% Hispanic students. Mr. Gary Heideman, Director of the Gifted Programs, testified that, although these Pilot Gifted students were capable of performing acceptably in the regular Gifted Program, they were not permitted to enter the Gifted Program at fourth grade. Heideman Dep. at 41.
According to Driscoll’s report, at the secondary-school level, the Centralized Gifted Program was 2.4% African-American and 0.7% Hispanic. Driscoll Report, B24820. The Grades 7-8 program, located at Wilson, enrolled no African-Americans and only one Hispanic, out of a total of 157 students. This 96% white program contrasted with a regular enrollment at Wilson that was 47% African-American and 3% Hispanic. The high school program, located at Auburn, was 3.8% African-American and 0.7% Hispanic. This 89% white program contrasted with a regular en *1016 rollment at Auburn that was 50% African-American and 3% Hispanic.
Mr. Gary Heideman became Director of the Gifted Program in October 1984. Heide-man Dep. at 3. Heideman acknowledged during his deposition that he had previously stated that “the Gifted Program operated like an exclusive country club for many years.” Id. at 51-52. Prior to his arrival, a student who was in the Gifted Program at the kindergarten level would simply stay in the program all the way through their educational career, without any need to requalify and with very limited opportunity for other students to get into the program at higher grade levels. Id. at 53.
Heideman testified that he worked to eliminate the Gifted Kindergarten Program. He believed it was not possible to accurately assess student capabilities prior to kindergarten entry; Gifted Programs should begin at the first grade level. The Gifted Kindergarten continued in existence, however, until after the First Interim Order was signed in 1989. The RSD’s 1989 interrogatory answers indicated that the Gifted Kindergarten was still in existence in school year 1988-89 at Barbour, with one African-American student and two Hispanic students enrolled, out of a total enrollment of 34 minority students. Id. at 19-20; D10784.
Dr. Harriet Doss-Wnlis, the RSD’s educational equity consultant, testified at trial that the RSD Gifted Program was self-perpetuating and nurtured students who were identified as gifted as early as the first grade. The fact that very few minority students were placed in gifted classes at this early point of their academic careers meant that very few minority students participated in Gifted Programs at the secondary level.
Continuing Segregation of the Gifted Program Up Through 1989
Despite the highly segregated conditions shown by Driscoll’s report and the wide dissemination it received, the RSD took no action to increase participation of African-Ameriean/Hispanic students in the Gifted Program. In the 1988-89 school year, the RSD’s Gifted Programs continued to be highly segregated. The regular elementary Gifted Program was only 2.3% African-American and 1.0% Hispanic. In the entire Grade 4-6 Gifted Program at King, there were no African-American students and only two Hispanic students enrolled. In the Grade 1-3 programs at Haight and Beyer, there were no Hispanic students enrolled in the Gifted Program. D10770. The racial composition of each site of the regular Gifted Program was as follows:
[[Image here]]
Simultaneously, the District operated a formally separate minority Gifted Program at Barbour in Grades 1-3, which included 50% African-American students and 8.9% Hispanic students.
At King, the 96% white Gifted Program contrasted with regular enrollment that was 88% African-American and Hispanic (60.2% African-American, 27.3% Hispanic). At Barbour, the 88% white Gifted Kindergarten contrasted with an enrollment that was 66% African-American and Hispanic. At Beyer, the 95% white Gifted Program contrasted with an enrollment that was 39% minority. At Haight, the 92% white Gifted Program contrasted with an enrollment that was 56% minority. In all of these schools, the presence of the virtually all-white Gifted Programs, which were educationally separated *1017 from the regular programs in the school, constituted extreme instances of within-sehool segregation.
For the secondary-level Gifted Program, information on the Fall 1988 enrollment is not available.'[1] The next year for which information is available is'the Fall of 1989. At that timfe the composition of the Grades 7-8 Gifted Program at West was 2.5% African-American and 1.2% Hispanic. B507433.
Physical Segregation of Gifted from Regular Students Within the Schools
The elementary Gifted students at King and the Arts Alternative students at Ellis were located in separate parts of the schools from the regular neighborhood students. Wells Dep. at 120-121. The students used separate entry doors and separate bathrooms from the regular students. As such, they virtually never came in contact with the neighborhood- students.
Ms. Henrietta Dotson-Williams, a-parent whose child was enrolled in the Gifted Program at King, observed that the program was completely separated from the rest of the school. The gifted children were separated from neighborhood school children for lunch, recess and classes. Dr. Harriett Doss-Willis, the RSD’s education equity consultant, also testified as to-the physical separation of white students in the RSD’s Gifted Program at King Elementary School from the minority .students in “neighborhood school classes.” Dr. Willis observed this same phenomenon of “a school within a school” at Auburn High School in connection with the Gifted high school Program and the Creative and Performing Arts Program. These conditions existed at King and Auburn in 1989.
Ms. Doris Nolan stated that she observed the Gifted Program at King School through her involvement with Career Education. Nolan Dep. at 40-41. She said that “the Gifted children were in one wing [of the building] and the other children were in another. They were not all together.” Id. at 41-42. Similarly, Mr. Dan Dickover, a former King student in the Gifted Program observed that there was little interaction between the gifted and regular students outside of passing each other in the hallways. Finally, Mr. Horace Box, an Auburn High School teacher, stated that the Academy students kept to themselves and the Academy took certain rooms from each department. These rooms became known as the “Academy Rooms.” The Academy students were kept together in English, Science and Math classes; “so in that way you can say it’s a segregation from the rest of the building.” Box Dep. at 16.
Such separation underscored and aggravated the within-school segregation created by the presence of virtually all white alternative programs in schools where the neighborhood population was virtually all African-American. RBE member, Ms. Colleen Holmbeck, expressed her concerns to the Superintendent and the RBE members about the negative effects of the white Gifted Program at King on neighborhood students, but no action was taken with regard to those concerns. Adding to the segregation of the gifted students at Wilson School was school tolerance of isolationist activities. Gifted students would wait on their school buses until the bell rang and then those students would enter the school by a separate door. At lunchtime, the gifted students were allowed to take their lunches and eat in the gifted classrooms instead of the cafeteria. Additionally, the extracurricular activities of the Gifted Program were never offered to the rest of the student body.
The operation of racially identifiable and separate magnet programs within neighborhood schools had negative effects on the neighborhood students. Neighborhood students learned that they were perceived as less capable and, therefore, became less determined, motivated and capable.
The RSD’s Separate “Minority” Gifted Program
In 1986, the District created the Grades 1-3 Pilot Gifted Program. The District’s Gifted Director, Mr. Heideman, described this in his deposition as a “Minority Gifted Program.” In that year enrollment was comprised of 25% African-American and 9% Hispanic students, whereas the regular Gifted Elementary - Program was 1.3% African-American and 0.7% Hispanic. B24820. By *1018 the 1988-89 school year, the Pilot Gifted Program was comprised of 50% African-American and 9% Hispanic enrollment, whereas the regular. Gifted elementary Program was 2.3% African-American and 1% Hispanic. B10769.
At times, the RSD presented to the public combined information from these two programs, suggesting to the public that the Elementary Gifted Program had some level of integration when, in fact, the program consisted of separate and explicitly segregated programs for white students and minority students. The RSD stated in a 1988 report that the “non-traditional” Gifted Program was “started in 1986 to expand the cultural diversification of the Gifted Program.” B46289. According to the same report, the Pilot Gifted Program started in 1986 with Grades 1 and 2 and was “scheduled to feed its fourth grades into a regular program at King School” in 1988.
Despite this purported purpose of the Pilot Gifted Program, the minority students were not allowed into the regular Gifted Program. Mr. Heideman stated that in 1988, both orally and in writing, that he recommended the Pilot Gifted students be admitted into the regular Gifted Program. Heideman said he prepared a memorandum to his supervisor and to the responsible Assistant Superintendent, that stated there were numerous African-American students in the minority Gifted Program who were capable of performing well in the regular Gifted Program. Heide-man had a meeting with those two supervisors during which he presented his memorandum and his recommendation, but the Assistant Superintendent said, brusquely, “We are not going to do that.” No additional explanation was given. Heideman Dep. at 39-40.
As a consequence of the RSD’s failure to fulfill its stated policy that Pilot Gifted students would feed into the regular program at fourth grade, the regular Gifted Program in 1989 (Grades 4-6 located at King) had no African-American students and only two Hispanic students enrolled, out of 182 students in the entire three grades. The Pilot Gifted Program continued to exist until the filing of this lawsuit as a separate, second-class adjunct to the regular Gifted Program. By its treatment of the Pilot Gifted Program, the RSD presented to students, staff and the community a highly invidious and false distinction between white students who were “really gifted” and African-American students who, even at their best, were not capable of being gifted. See D10767-D10771.
The RSD’s “Satellite” Gifted Programs
Although the District’s formal policy was that Gifted Programs were centralized in Westside schools for desegregation purposes, in fact, the District operated widespread “Satellite” Gifted Programs in white schools from 1977 to 1991. The existence of these virtually all-white Satellite Gifted Programs allowed Eastside white students to obtain gifted educational opportunities without having to go to the Centralized Gifted Programs located, for desegregation purposes, west of the river. Form ED 102, submitted to OCR 12/15/82, B46727.
The RSD’s Civil Rights Survey response to the United States Department of Education in December of 1982 reflected the centralized middle school Gifted Program at Wilson (1.2% African-American). B46747. The same report reflected a Satellite Middle School Gifted Program at Eisenhower, which had no African-Americans and no Hispanies enrolled. B46739. Subsequent OCR survey forms submitted in 1984 and 1986, however, reported no Gifted Programs at Eisenhower, even though (as shown below) the program continued to exist at Eisenhower.
The same 1982 Civil Rights Survey response reflected elementary Gifted Programs not only in the centralized locations in minority schools (Beyer and King), but also in fifteen other elementary schools. Fourteen of those fifteen were predominantly white -schools:
Bloom
Brookview
Carlson
Cherry Valley
Conklin
Froberg
Guilford Center
Haight
Hillman
Johnson
Nashold
Rolling Green
Vandercook
Welsh
The Satellite elementary Programs in 1982 had 308 students enrolled and the Centralized Program enrolled 352 students. With *1019 the exception of the Conklin program, the Satellite Programs were devoid of minority participation. Apart from Conklin, the remaining Satellite Programs were only 2.8% African-American and 1%'Hispanic. After reporting the presence of Satellite Programs in both its 1980 and 1982 survey responses to the Office for Civil Rights, beginning in 1984 the RSD filed reports that gave no indication that the Elementary Satellite Programs existed, even though they did.
Gifted Director Heideman testified that when he took over the Gifted Program in 1985, he was “surprised” to learn of the existence of these Satellite Programs. Despite being a Gifted instructor in the Centralized Program at Auburn, he had no knowledge of the existence of these Satellite Programs. Heideman Dep. at 11. Mr. Heide-man also testified that the Satellite Programs received financial support from the RSD’s State Gifted grant, even though this support represented an improper division of funds from the Centralized Gifted Program. Heideman stated that the State Gifted grant funds were earmarked by the State for expenses incurred in the Centralized Gifted Program. Instead, the funds were used in the RSD to provide, in part, equipment, materials and supplies for the Satellite Gifted Programs. Id.
Despite Heideman’s “surprise,” the Satellite Gifted Programs remained in existence until 1991. As late as the 1989-90 school year, the concealment continued. In that year, staff presented a report to the Board that supposedly recited the history and current locations of the Gifted Programs, but that made no mention of the Satellite Programs or thé fact that they were still in existence at that time. B502625.
The concealment operated at the school level as well. At Eisenhower School, a separate budget existed and materials and equipment for the Satellite Gifted Program were surreptitiously purchased without the knowledge of the school Principal. The RSD’s Interrogatory Answers indicate that when the Gifted Program was established in 1977-78, “Satellite Facilities” were part of the program and remained part of the program until the 1990-91- school year when “Satellite Programs [were] dropped.” See B41506. •
Ms. Eleanor Brown testified that the seg-regative effects of the School District’s policy led her to remove her daughter, Neangela, from the Gifted Program at King.
I just wanted her to be able to know everything about her school and the other people that went there, not just the people in the gifted program.... There were always these negatives being taught to the children who were in the gifted program. They always taught them like they were different than the rest of the school, and I know that’s how they felt because when I was there, they did the same thing, so I had firsthand experience, and I didn’t like that. And I didn’t like the fact that when she would see somebody else in the school and she would want to say something to them, it was always, .‘no, you stay over there,’ and the parents saying, ‘yes, because I don’t want my kids with those kids over there,’ and then not being allowed to do anything with them.
E. Brown Dep. at-70.
Ms. Brown further described the physical separation of the students in the Gifted Program from other students at King that she observed during her visits to the school. With regard to the placement of the regular third grade classes at King, Ms. Brown noted, “I actually never really even saw them because I was always at the end of the school where [my daughter] was.... ” She described the end of the school that housed the Gifted Program as being “sectioned off’ from the rest of the school. Id. at 50.
In describing the physical layout of the school with regard to the issue of separation, Ms. Brown stated:
If you go up that stairway, as soon as you turn to your right, that’s where the gifted program classes were. If you just stay on that level and you went to the right, then that’s where the gifted programs were' at. Now if you went up those stairs though and ... you go down a hall and there is a whole other wing. All those classrooms were non-gifted programs.
*1020 Id. at 51. Ms. Brown also stated that physical separation was highlighted by a King School staffer during a tour Ms. Brown took of the school. During the tour, “They said our regular first grade, second grade are there, and they pointed out the other end of the hallway.” Id. at 53. Brown maintained that this separation was prevalent and repeated in every visit that she made to the school. “And every function that I went to, everything was always on one end, so, no, I didn’t see everything that happened at the other end of the school because I only went to one end of the school at all times.” Id. Regarding other non-academic classes such as music and art, Ms. Brown noted that:
[T]hey went by past—they went by past, yes, the other children’s classes ... Music, yes they went to music class down by there, but when they did music productions or anything, they did theirs separate. They learned a different song. They would have one night that they do it, it would be one time they were on the stage, and the rest of the school disappeared.
Id. at 54-56.
Regarding school productions and activities, Ms. Brown observed that they were similarly segregated by gifted students and non-gifted students.
[T]hey actually sang the same song, but they actually split them up ... The regular education kids in the regular classrooms were together, and those who were in gifted were together. And whenever they did anything where they all came together, they still had them, “you stay over here and the other kids stay over there.”
Id. at 57-58.
Ms. Brown further described the interaction between white parents and teachers of the Gifted Program at various functions involving the students. In answering a question regarding the segregation of students, Ms. Brown noted, “Because when I went to a couple of functions, I actually heard parents say, ‘you better not put my kids with those other kids.’ ” In particular she mentioned a function put on by the school PTO:
[T]he night that I actually went and actually saw the performance where the kids were separated, I heard parents say that, but the parents wouldn’t just—what angered me is the parents wouldn’t say the comments just to one another. They would say them to the staff.... But if the parents said, ‘don’t put them together period. I don’t want my kids over there,’ then what you would see is, you students stay on this side; those students stay on that side.... I asked the teacher once about the comments I was getting from the other parents, but the teacher had no response for me. All I heard was a parent say, ‘it should better stay that way,’ and it did.
Id. at 60-61, 66.
Ms. Brown also noted that she felt that the separation of gifted and non-gifted students exacted a psychological toll on the children and that was why she removed her daughter from the program. “Academic-wise, yes, they will say they did it for this reason or that reason, but as far as the children, I think the negative is definitely there emotionally for them, and maybe not for white children but for African-American children.” Id. at 71.
Ms. Susan Belvoir, a parent-plaintiff, testified that in the twelve years she and her children were involved in the Gifted Programs at Rockford, her children never interacted with a minority student. Belvoir Dep. at 13. Similarly, Linda Patterson, a teacher employed by the RSD for the past twenty years, testified that African-American children weren’t encouraged to participate in the Wilson School Gifted Program. Throughout the years, there were very few, if any, African-American students enrolled in the program. Finally, Henrietta Dotson-Williams testified that after a teacher and a school psychologist recommended that her (African-American) son, Clifford, be put in a special behavior program, Ms. Williams decided to have Clifford tested for the Gifted Program. Clifford passed the test and was enrolled in the Gifted Program. No one with the RSD ever suggested that Clifford be tested for the Gifted Program.

The Creative And Performing Arts Program (CAPA)

The CAPA Program exhibited the same pattern of resegregation during the 1980’s as *1021 seen in the Gifted Program. An RSD staff summary gave the following “Historical Perspective” on the CAPA Program:
The program was started in response to success in other cities. It was patterned after the Cincinnati Performing Arts program. CAPA was one of the last alternative programs started, and was not tied as closely to the integration proposal of the ’70s. Middle school grades were the initial part of the program. Grades 4-6 were started in the early 1980’s.
B46291. According to the RSD’s Fall 1980 report on alternative program enrollments, the CAPA Program was a desegregated program. At Washington, Grades 4-8 had a minority enrollment of 30%. At Auburn, Grades 9-12 had a minority enrollment of 15%.
In the 1986-87 school year, enrollment in the CAPA Program at the middle and high school levels included fairly adequate numbers of African-American students, but very few Hispanic students. Over the next five years the African-American enrollment dropped substantially. Driscoll Report, B24820.
In 1986, at the high school level, the CAPA Program at Auburn had an African-American enrollment of 23.6% and a Hispanic enrollment of 1.3%. Detailed grade-by-grade information available for the Fall of 1990, showed the progressive resegregation that was occurring in the high school CAPA Program. That data showed a decline over a four-year period in the number and the percentage of African-American students participating in CAPA:
[[Image here]]
In 1986, at the middle school level, CAPA Grades 4-8 at Wilson had an African-American enrollment of 15.7% and a Hispanic enrollment of 0.4%. The composition of the elementary Creative And Performing Arts (CAPA) Program, in school year 1988-89, (located in Grades 4-6 at Wilson) was as follows:
White 93.6%
African-American 3.6%
Hispanic 2.7%
D10770. By the Fall of 1989, African-American enrollment in the CAPA Middle School Program (Grades 7-8) was down to 12.3%. Hispanic enrollment was down to zero. B507433.
The Fall 1990 grade-by-race data showed a similar trend in the CAPA Grades 4-8 Program. In the Fall of 1990, Grades 6 and 7 each had ten African-American students (about 12% of the enrollment at that grade level), while Grades 4 and 5 each had only three African-American students enrolled. B0066. This data indicated significant declines in the African-American enrollment in the CAPA Program from 1986 through 1990, despite the entry of the First Interim Order in 1989.
The District managed the CAPA entrance process in such a way as to rapidly resegre-gate the program. A historical overview of the Gifted and CAPA Programs indicated that, in 1988, additional criteria were added for CAPA enrollment, including a teacher recommendation and a “creativity questionnaire.” B41506. The RSD created this segregated composition in CAPA even though the criteria for entry were based largely on capability in the performing arts, rather than academic achievement. The educational prerequisite for the program was only a 40th percentile score on a standardized reading test. Once past that threshold, selection was based on auditions judged by program staff (90%) and on “parent observation of traits of creativity” (10%). D10790. The fact that the RSD could operate a Performing Arts Program that was 93.6% white, despite the absence of any significant academic entry obstacle for minority students, shows, in this court’s mind, the segregated nature of the RSD’s high-status alternative programs.
During his deposition, Mr. Gary Heideman was asked about the small minority representation in the CAPA Program. Heideman responded that “selection of students for [the CAPA] Program ... rests upon subjective evaluation.” Heideman Dep. at 56. Heide-man added that he was unable to question the scoring of auditions for the program and *1022 did not have any idea about the number of minority students who tried out for the program. Id.

Montessori

The Montessori Program was another high-status elementary alternative program that was resegregated by the RSD. In the Fall of 1980, the Montessori Program was located at Henrietta School and had a 26% minority enrollment. B4068. By the 1986-87 school year, the Montessori Program at Lathrop School was down to an 11.5% African-American and a 0.9% Hispanic enrollment. In that year, the 88% white program contrasted with a regular enrollment at La-throp which was 38% African-American and 4% Hispanic. Driscoll Report, B24820. In the 1988-89 school year, the Montessori Program (Grades pre-K through 6 at Lathrop) was 89% white, 11% African-American and 0% Hispanic students. The virtually all-white Montessori Program contrasted with the regular enrollment at Lathrop that was 42% minority.
No academic achievement prerequisites for entry for the Montessori Program were enforced. Students were selected based upon teacher observations and interviews. Most applicants were admitted. The mechanism by which the segregated nature of the program was maintained was the prerequisite that a student must have attended a Montessori preschool at age four in order to be admitted into the Montessori kindergarten at age five. No students were allowed to enter the program, at kindergarten or any higher grade, without previous Montessori training. Participation in the RSD’s Montessori preschool at age four required a tuition payment of $1,500. Private Montessori preschools charged comparable tuitions. Additionally, the only entry point was to start one’s child in Montessori preschool more than a year before students normally start public school kindergarten. Ironically, the Montessori Program was originally created about a century ago in Italy as a unique educational model designed specifically for low-income disadvantaged students.
With respect to the RSD’s Montessori Program, Superintendent Sullivan produced, at his deposition, a memorandum from Elementary Director Barbara Lyman that stated, in part, that the District charged $1,500 for its Montessori Preschool Program, a charge “based on the cost of the private [Montessori] schools.” Sullivan Dep., Ex. 2. Attendance at a Montessori preschool (either public or private) was a prerequisite to entry into the Montessori Program at kindergarten. The combined effect of these two requirements was that there was a major economic barrier to participation in the Montessori Program.
Ms. Ardis Cook, a parent, testified about her daughter’s enrollment, or attempt to enroll, into- a Montessori Program at Lathrop School in 1983. Cook Dep. at 41. She testified that “the process to enroll was to get on the waiting list and then they did a test.” Id. at 42. Ms. Cook was one of the first people to sign up on the waiting list. “I took her down to the school. We had an appointment time and then they did an evaluation.” Id. at 43. The applicant waited for the results. “I got a letter saying that while she was appropriate, that she would not be accepted at this time and to try again next year. So I called them when I got the letter.” Id. The letter was signed by someone from the Board office. Id. at 44. Dr. Tucker told Ms. Cook “that the reason why they had the program at Lathrop was to achieve racial balance. Since my child was black, they really didn’t need any more black children at the school.” Id. at 46. “If I still disagreed with it, they gave me the name and phone number of the person that I could appeal it to.” Id.
Ms. Cook further testified that the same person who signed that letter was the person who was in charge of all those programs. Id. at 47.
She tried to tell me that, you know, they get so many children and so many children are appropriate.... I confronted her with the issue that I think that the reason my child didn’t get in because she was black and you already have black children. And the reasons that they had the programs there are because you’re trying to get white children there. And my child should not suffer and not be able to get *1023 into a program that is appropriate for her just because of her race. She agreed with me on that. And said, well, you know, I have to look and review and see what the situation is. I’m not totally sure that that was the exact situation. Let me review it. A week or two weeks later I got a letter saying she was accepted.
[[Image here]]
At that time Montessori only had, besides my daughter, two other African-American children in the program. And it went from preschool up to sixth grade ... Montessori had its own internal program within the school. It was like a private school within the public school. We had our own association. We had our own events. We had our own meetings. They sent a directory of all of the students and their parents and their sibs.
Id. at 47-48.
Ms. Doris Nolan was familiar with the Montessori Alternative Program at Lathrop while she was a teacher there. She taught in one hall and the Montessori Program was in another hall. She testified:
And the children there were kept separate from the children in the other part of the school. And the recognition that the school received was always from the Montessori children, and that’s a fact ... The teachers interact, students did not. The Montessori children were the Montessori children. The regular class was the regular class. [Even at lunchtime] they all sat at their own tables. They were still separated ... Each classroom had their own table.
Nolan Dep. at 45-47.

The Academics Plus Program

The Academics Plus Program at Bloom School was the partial-site remnant of the full-site Focus Center that the District initiated in the late 1970’s. The same pattern of resegregation was exhibited in the Academies Plus Program during the 1980’s. According to District reports, the African-American enrollment in the program declined from 15% in 1980, to 6% in 1986, to 4% in 1988. In the Fall of 1980, the RSD reported the full-site Academics Plus Program at Bloom had 79 African-American students out of a total enrollment of 515, or 15%. B4068. For the 1986-87 school year, the RSD reported the Focus Center had a 12.2% African-American enrollment (29 of 238), and no Hispanic students enrolled. At that time, the regular Bloom enrollment of 312 students was reported as 96% white. Viewing the school as a whole, the African-American enrollment was 5.5%. Driscoll Report, B24821.
Two years later, in 1988, the District reported that all students at Bloom were considered to be part of the Focus Center and that 21 of the 517 students (4.1%) were minority. The official Fall Housing Report for Fall 1988, however, showed 17 African-American students at Bloom, constituting 3.3% of the 517 total enrollment. B10657. In the same year, Hispanic enrollment at Bloom consisted of one student (0.2%).
No academic entrance restrictions existed at Bloom restricting minority entry into the Academics Plus Program. According to the RSD, enrollment was on a first-come, first-serve basis, with no criteria other than parental interest. The District, however, made no effort to recruit minority students and was no longer providing transportation for minority transfers. The Academics Plus Alternative Program was 94% white.

Arts Alternative

The only high-status elementary alternative program operated by the RSD that remained desegregated was the Arts Alternative Program. In the Fall of 1980, the program was located at Dennis School and had an 11% African-American enrollment. B4068.
In the 1986-87 school year, this program had a 21.3% African-American enrollment, mirroring the systemwide K-6 African-American enrollment for that year. Hispanics comprised 1.6% of the program compared to a 4.4% systemwide enrollment for that year. Driscoll Report, B24819. Despite its own mixed enrollment, the Arts Alternative Program existed as a separate 77% white program within Ellis School, in contrast to a regular Ellis enrollment that was 86% African-American. In the 1988-89 school year, *1024 the minority composition of the Arts Alternative Program was 22% African-American and 0.8% Hispanic. Despite its own mixed enrollment for this school year, the Arts Alternative Program existed as a separate 77% white program within Ellis School, in contrast to a regular Ellis enrollment of 85% African-American (163 of 192 students).

Low-Status Alternative Programs

About one-third of the alternative programs in the RSD were low-status programs for “slow learners” or “underachievers”. The low-status programs were established for the same policy reasons as the high-status programs, that is, to locate unique programs in predominantly minority schools where they would attract transfer students in order to desegregate school enrollments. See Alternative Enrollments and Minority Percentages, 12/15/80, B4068; Driscoll Report, B24821; D10747; D10755; D10709; D10581. While the high-status programs were almost exclusively white, the “slow learners” and “underachiever” low-status programs had large proportions of minority students.
The Get It Together (GIT) Program was designed for capable but underachieving students. D10709. The program was a self-contained basic skills program. In the Fall of 1980, the GIT Elementary Program was in two locations. The Barbour location was 14% African-American and 2% Hispanic. The Froberg location was 62% African-American and 4% Hispanic. B4068. In the 1986-87 school year, GIT was located only at Barbour, with 25% African-American and 3% Hispanic students enrolled. B24820. At that time the program contrasted with the regular enrollment at Barbour that was 86% African-American and 7% Hispanic. In the 1988-89 school year, 26% African-American and 6% Hispanic students were enrolled. D10709.
The Career Awareness and Survival Skills (CASS) Program was initiated in the RSD in 1979. The program was designed for “slow learners” who formerly would have qualified for Special Education, but under the new federal guidelines were to be mainstreamed into regular classrooms. Instead, these students were placed into the CASS Program, which was a “self-contained” alternative program. D10747.
■ In the Fall of 1980, CASS was located at Ellis School, and had a 56% African-American enrollment and a 3% Hispanic enrollment. B4068. In 1986-87, the racial composition of the CASS Program was 50% African-American and 0% Hispanic, with similarly-composed classrooms located at both Has-kell and Jackson Schools. B24820. In the 1988-89 school year, the composition of the CASS Program was 60% minority, located at the same two schools. D10747.
The Transition Program was identified by the RSD as an alternative program in its 1989 interrogatory answers. That program was established for students who were perceived to have failed kindergarten, those not ready to enter regular first grade. In the 1988-89 school year, the transition program was located at fourteen elementary schools, five of which were in the Southwest Quadrant. The overall composition of the fourteen sites was 45% African-American and 2% Hispanic.

CONCLUSIONS OF LAW

Intentional conduct that causes segregation within particular schools is the same as intentional conduct resulting in systemwide segregation. Such “internal segregation” is unlawful. Reed v. Rhodes, 607 F.2d 714, 731 (6th Cir.1979); Hobson v. Hansen, 269 F.Supp. 401, 511-14 (D.D.C.1967), aff'd sub nom., Smuck v. Hobson, 408 F.2d 175 (D.C.Cir.1969). As far as the students are concerned, internal segregation may be even more invidious than segregation by schools, since its effects are observable to the students each day. Hart v. Community School Bd. of Educ., New York School Dist. #21, 383 F.Supp. 699, 740 (E.D.N.Y.1974), aff'd, 512 F.2d 37 (2nd Cir.1975).
A school district may not segregate students within a putatively integrated school by educating them in racially imbalanced classes or programs that are separate, isolated and insulated educational units. See Reed, 607 F.2d at 731; United States v. Yonkers Bd. of Educ., 624 F.Supp. 1276, 1460 *1025 (S.D.N.Y.1985), aff'd, 887 F.2d 1181 (2d Cir.1987). Courts have found within-school segregation unlawful in various types of programs, including gifted programs. See, e.g., Spangler v. Pasadena City Bd. of Educ., 311 F.Supp. 501, 519 (C.D.Cal.1970) (special interest programs); Yonkers, 624 F.Supp. at 1445-46 (special education programs and tracked programs); and Hart, 383 F.Supp. at 740.
Tracking and ability grouping are common means of maintaining racial isolation within a putatively desegregated school. See, Hart, 383 F.Supp. at 740; Spangler, 311 F.Supp. at 519. Ability grouping and tracking practices are not unconstitutional per se. See, e.g., Quarles v. Oxford Mun. Separate School Dist., 868 F.2d 750, 753 (5th Cir.1989); Castaneda v. Pickard, 648 F.2d 989, 994 (5th Cir.1981). Rather whether a district may use ability grouping and tracking that has a disparate impact on minorities depends upon: (1) whether the school district is unitary; and (2) whether the program or procedures are tainted by racial discrimination. See, United States v. Gadsden County School Dist., 572 F.2d 1049 (5th Cir.1978); Spangler, 311 F.Supp. at 519. Generally, school districts operating under an affirmative duty to desegregate may use ability grouping or tracking practices only if such practices do not have a racially segregative effect. See e.g., Gadsden County School District, 572 F.2d at 1051-52 (ability grouping system unlawful because it perpetuated past discrimination); Lemon v. Bossier Parish School Bd., 444 F.2d 1400, 1401 (5th Cir.1971) (testing as a basis for assignment to schools prohibited when school district not unitary). No school district may act with segregatory or discriminatory intent in utilizing grouping or tracking practices. See, Georgia State Conf. of Branches of NAACP, 775 F.2d at 1403, 1415-15 (11th Cir.1985); Spangler, 311 F.Supp. at 519.
One important factor in evaluating an ability grouping program is whether the program, once sufficiently established, is effective in overcoming the problems it was designed to address. See Gadsden, 572 F.2d at 1052. In this regard, movement of students between ability groups provides a crucial indication: if ability grouping is providing all students with better educational opportunities, there should be movement of students from the lower sections to higher sections. Id.; see also, Quarles, 868 F.2d at 755 (court notes impressive degree of movement among achievement levels by African-American students as well as white students). In an unlawful program, minority students may be locked into achievement groups and fail to move upward over time. Cf. Georgia State Conference of Branches of NAACP, 775 F.2d at 1419-20.
The practices of screening and steering minority students into particular educational programs are another cause of within school segregation. See e.g., Yonkers, 624 F.Supp. at 1445; Smuck v. Hobson, 408 F.2d 175, 183 (D.C.Cir.1969). “Steering” occurs when minority students receive academic counselling different from that received by white students. Yonkers, 624 F.Supp. at 1445-46. One common form of steering involves advising or encouraging minority students to enroll in a high school’s general program (geared for non-college-bound students) instead of the school’s regular academic program. Id.
“Screening” involves the discriminatory use of procedures and requirements in order to limit minority enrollment in particular programs. Yonkers, 624 F.Supp. at 1448-50. Some of the mechanisms that may be employed to limit minority enrollment in educational programs (and hence increase segregation) are courisélor recommendations, reports on student behavior and educationally imprecise standards and test scores.. Id. Particularly significant is when a school board is aware of the racially disproportionate consequences of the admissions process for a program, but fails to take action to address this condition. Id.
“Intact busing”' is another form of within school segregation. Intact busing is “a classic segregative technique” in which African-American (or white) children are bused away from their neighborhood school to an identifiably opposite-race school. The transfer students are then isolated in classrooms separate from the receiving school’s student population. Higgins v. Bd. of Education of *1026 Grand Rapids, 508 F.2d 779, 787 (6th Cir.1974); Berry v. School Dist. of Benton Harbor, 442 F.Supp. 1280, 1306 (W.D.Mich.1977). Intact busing serves to “convert integrative opportunities to racially segregative nightmares for the children involved.” Reed v. Rhodes, 455 F.Supp. 546, 563 (N.D.Ohio 1978). Intact busing not only is a constitutional violation, but also constitutes strong evidence of discriminatory intent. See Reed, 455 F.Supp. at 563; Berry, 442 F.Supp. at 1306; Armstrong v. O’Connell, 451 F.Supp. 817, 836-844 (E.D.Wis.1978).
Based upon the foregoing, the court 'finds that on repeated occasions, the RSD engaged in intentional conduct causing the unlawful segregation of students by race within schools. The RSD engaged in a series of purported “desegregation” transfer programs. Among the proposed and implemented “desegregation programs” promoting within-school segregation were:
The Grade Exchange Plan, which was in reality a system of intact busing with white students being sent to their own classrooms at black schools and vice-versa;
Special Interest Centers, in which minority classes were often placed in an all-white school for a few days a year, kept separate, and then counted into the total percentage of students in an “integration” program; and
Partial-site Alternative Programs, which consisted of high-status identifiably white programs such as Gifted, CAPA and Montessori, and low-status identifiably minority programs such as GIT and CASS.
On many occasions during the 1970’s and the 1980’s, minority students bused to majority schools were unlawfully separated in receiving schools for purposes of instruction, lunch and recess. The RSD unlawfully segregated and stigmatized minority special education students by isolating predominantly minority self-contained special education programs within non-Southwest Quadrant schools. Similarly, the RSD’s partial-site alternative programs caused within-school segregation by creating virtually all-white enclaves of independent curricula that were totally separate from the regular academic pursuits of the predominantly African-American schools in which they were housed.
The centralized Gifted Program initiated at Wilson School in 1975 unlawfully created a segregated “school within a school” for white students. The design and use of the Gifted Program at Wilson as a program almost exclusively for white students led to within-school segregation. The Gifted Program at Auburn High School was similarly segregated from the rest of the school. During the 1980’s the Gifted Programs, which were the principal source of movement of white students for integration purposes, were maintained as bastions of unlawful within-school segregation. Despite the RSD’s knowledge of these highly segregated conditions, the RSD failed to take any action whatsoever to increase participation of minority students in the Gifted Programs.
Additionally, the creation of a “Minority Gifted Program” was an unlawful and explicitly segregative act. The “satellite” Gifted Programs were also conceived and operated on an unlawfully discriminatory basis. The court further finds that the RSD unlawfully resegregated the CAPA Program, the Montessori Program, and the Academics Plus Program during the 1980’s. In contrast to the identifiably white high-status alternative programs operated by the RSD, the RSD operated alternative programs for “slow learners” or “underachievers” that were low-status and identifiably minority.
Accordingly, the court concludes as a matter of law, that the RSD engaged in intentional and purposeful discrimination in regard to the operation of the District’s purported desegregation programs, tracking system, Bilingual Education Program, magnet school program and its various alternative educational programs. This intentional conduct resulted in systemwide segregation. The stigmatizing effect on the students is considered by this court to be a cruel act perpetuated by the RSD on its students.

STUDENT ASSIGNMENT

INTRODUCTION

The Rockford School District consistently gerrymandered school attendance area *1027 boundaries in order to separate majority children from minority children. The RSD located new schools in geographic areas so as to insure that the schools would be racially-identifiable white. When the RSD closed a school, it reassigned students so that majority children would attend racially-identifiable white schools and minority children would attend racially-identifiable minority schools. This School District has a long history of using racial considerations when drawing school boundaries and making student assignments.
Over a period of time, the RSD has been under pressure from a variety of sources, including the Federal courts, to change its practice of isolating minority students. The documentary and testimonial evidence depict a District resistant to changes that would alleviate the patterns of racial isolation. The limited changes that were made tended to place a disparate burden upon the minority population.
The following findings are divided into three interdependent parts. The first part addresses student assignment and school boundaries prior to the influence of the QUEFAC lawsuit and the ISBE investigation. Part two focuses on the QUEFAC lawsuit and the ISBE investigation. Part three examines actions of the School District subsequent to the QUEFAC lawsuit and the ISBE investigation.

FINDINGS OF FACT

Student Assignment and School Boundaries Prior to the QUEFAC Lawsuit and the ISBE Investigation

Student Assignment in the Late 1950’s and Early 1960’s
The Rockford School District’s secondary school boundaries did not change from 1953 to 1963. In 1953, the RSD maintained two high schools, East High School, serving all of the students east of the Rock River, and West High School, serving all the students west of the Rock River. See School' Boundary Descriptions, 1950/51-1957/58, D23614. The RSD maintained four middle schools: Lincoln Park, Roosevelt, Lincoln and Washington. Between 1953 and 1962, none of the school boundaries crossed the Rock River. Id.
In 1962, the RSD considered some changes in school boundaries. On July 9, 1962, Samuel L. Dean, Jr., an African-American attorney in Rockford, wrote a letter to the RBE. Mr. Dean, at that time, was chair of a group called “Future Outlook League.” Mr. Dean and his group knew that the Board was contemplating moving the school boundaries in the southwest section of the city to the east, from the Rock River to Kishwaukeé Street. As such, minority students in. this area would be sent west to schools in the Southwest Quadrant. In his letter, Mr. Dean stated:
This will mean a concentration of Negro students in the Washington Junior High School and West High School and then almost complete elimination of them from Jefferson Junior High School and East High School. We feel, that in view of the fact that these schools have been fairly evenly integrated in the past, such a move would be very undesirable for the colored population of Rockford. The pattern of segregated schools is one that is highly frowned upon by the negro citizens in any of the northern cities where this practice occurs. It leads to inferior teachers, overcrowding, and all of the many of the ills concurrent with segregated education. This matter has been successfully attacked in the federal court by the citizens of New Rochelle, New York last year and has repeatedly been under attack in the City of Chicago during the current year.
Bd.Min., 7/9/62, B8632.
In 1963, the RSD enlarged the boundary for the two Westside secondary schools by approving the boundary change discussed in Mr. Dean’s letter. Attendance Boundaries, 1961, D23618. The effect was to increase the concentrations of African-Americans in' both of the Southwest Quadrant secondary schools and to increase the percentage of whites in the southeast quadrant secondary schools.
The RSD made other changes in attendance area boundaries in 1963. The only two integrated elementary schools on the east side of the Rock River were affected. These *1028 schools housed more than 50% of the RSD’s total population of African-American students. The students located in the area in the south half of Kishwaukee Street, 6% African-American, were assigned to Washington, a Westside African-American junior high school, and to West High School, a Westside integrated high school. Students in Hall School, 10% African-American in 1960 and 22% African-American in 1967, were given the option of attending either West or East High Schools. The 1963 boundary for Washington Junior High School included the following area east of the Rock River: Following Keith Creek southeast to Kishwaukee Street, south on center of Kish-waukee Street to Blackhawk Park Avenue, west on center of Blackhawk Park Avenue to Magnolia, south on Magnolia (including both sides) to Quaker Road, west on Quaker Road to the Rock River. Much of the Southwest Quadrant area on the west side of the Rock River was also included.
The boundary of West High School was the area west of the river plus the eastside portion of Washington Junior High School area. Students in the area bounded by Y Boulevard, Longwood Street, East State Street and the Rock River, essentially the students in the Hall School area on the east side of the Rock River in downtown Rockford, also had the option of choosing either East or West High Schools.
In 1965, the following additional attendance zones that crossed the Rock River were established:
The Hall and Kishwaukee Districts on the east side of the river, south to Keith Creek, which later became the boundary between Kishwaukee and Beyer when Beyer was built later in the 1960’s, were in the East High School zone as it was east of the Rock River.
Students entering seventh grade living on the east side of the river, west of North Longwood or Kishwaukee Street from Y Boulevard and Keith Creek, could choose either Washington or Roosevelt Junior High and West High School on the West-side or choose Lincoln Junior High School and East High School on the Eastside.
Students from grades seven through twelve who were already enrolled in a Westside or Eastside secondary school and who moved into this area, were required to continue in the school where they were enrolled.
Students new to the district who moved into this area were allowed to choose either Westside or Eastside secondary schools.
Students in the area to the north, bounded by North Second Street, Spring Creek Road, Park View Avenue and Sinnissippi Park, were allowed to choose to go to the Westside schools, Walker, Roosevelt and West, although they were in the Guilford High School District.
RSD Attendance Boundaries, 1965, D23634; Boundary Maps and Student Placement Tables, 2/1/91, B37931. In 1960 and 1967 respectively, Kishwaukee School was 6% and 11% African-American and Hall School was 10% and 22% African-American. In 1966, the Sinnissippi Park area, bounded by North Second Street, Spring Creek Road, Parkview Avenue and Sinnissippi Park, was eliminated and was made exclusively a part of the Guil-ford High School District. RSD Attendance Boundaries, 1966, D23652.
Attempts By Superintendent McIntosh to Re-Assign Students
In March of 1959, Superintendent McIntosh proposed reassigning students from the Kishwaukee (6% African-American in 1960) and Alpine (all white in 1960) elementary districts in the Southeast Quadrant to Washington Junior High School in the Southwest Quadrant. Washington was then a racially-identifiable junior high school with 22% African-American students and had the heaviest concentration of minority students of any secondary school in the RSD at the time. The reassignment proposal was based upon the Superintendent’s desire to better utilize building capacity. The RSD received protests' against the proposal from white parents in the two Eastside districts and the proposal was subsequently withdrawn. See Bd.Mins., 3/9/59, B7115; 3/23/59, B7121; 4/13/59, B7151; 10/26/59, B7434; PPC Report, B505857.
*1029 In April of 1959, parents from the all white Summerdale elementary district in the Northwest Quadrant outside of the RSD, protested the proposed reassignment of their children to Wilson Junior High School. Wilson was located in the west end of the Southwest Quadrant and had a population of 7% African-American students in 1960. The same parents also protested the proposed reassignment to the adjacent, and soon to be opened, Auburn High School from the areas of assignment, Roosevelt Junior High School in the Southwest Quadrant with a population of 1% African-American students in 1960, and West High School in the same general area as Roosevelt with a 5% African-American student population. The RSD withdrew the plan to transfer these students as a result of the protests. Bd.Mins., 4/16/59, B7133; 4/13/59, B7151.
In November of 1959, Superintendent McIntosh proposed changes in the secondary school boundaries in order to address overcrowding on the Eastside at the all white Lincoln Junior High and at East High School, having a 1% African-American stu-' dent population. The schools were on double shifts because of overcrowding. Superintendent McIntosh proposed that ninth graders from schools outside of the RSD be transferred from Lincoln Junior High to Wilson Junior High. He also proposed that all other out-of-district ninth, tenth and eleventh graders be sent to either Wilson Junior High or West High School in the near Northwest, with a 5% African-American student population, instead of East High School. Superintendent McIntosh’s proposal generated petitions and protests from hundreds of white parents of children from outside of the RSD who were or would be attending RSD secondary schools. Bd.Mins., 11/9/59, B7470; 12/14/59, B7480; 12/28/59, B7502. With the exception of the Lincoln Park School area to the west of the RSD, no school zone had more than a 1% African-American student population that was outside of the RSD and was sending students to RSD schools.
Superintendent McIntosh responded to the parent protests by stating that granting the requests of these parents would result in 2800 students at East High School and the continuation of double shifts. East High School has a capacity of 1768 students. He further noted:
1. That second shift students at East High were frequently unable to engage in extracurricular activities;
2. That the East High faculty was overburdened; and
3. That Auburn was scheduled to be opened in 1960 and must be used to relieve overcrowding.
Superintendent McIntosh further noted that continued overcrowding might jeopardize the accreditation of the involved schools by the State authorities. Nonetheless, the RBE decided that the parents of children residing in the Northeast Quadrant outside of the RSD could choose to continue to send their children to Eastside schools or could choose to send their children to Westside schools.[7] Bd. Min., 2/28/59, B7502.
In December of 1961, in anticipation of the opening of the new Guilford High School in the far Northeast Quadrant of Rockford in the 1962-63 school year, students who were to be in ninth grade at Lincoln Junior High and who lived north of Rural Street were given the option of attending either Lincoln Junior High or Guilford High Schools. Bd. Min., 12/11/61, B8377; Attendance Boundaries, 1963, D23618. Even though the West-side facilities of West High School and Roosevelt Junior High School had excess capacity and even though West and Roosevelt were close to the homes of these students, the students were not given the option of attending West or Roosevelt. No parents protested this move by the RSD. The students in question were predominantly or exclusively white.
In September of 1963, Superintendent McIntosh reported to the RBE that all four *1030 RSD high schools and the two Eastside junior high schools were over capacity. The three Westside junior high schools, however, were not overcrowded. Further, the West-side high schools, particularly Auburn, were much less crowded than the Eastside high schools. Nevertheless, in the 1960’s, the RSD engaged in no attempt to send white children from white Eastside schools to the available openings in the Westside secondary schools. Such was the case even though many of the white students living east of the Rock River were closer to the Westside secondary schools than to the Eastside secondary schools where they were assigned.
On September 9, 1963, RBE member Clifford Carlson suggested shifting students from Guilford High School to Auburn High School in order to alleviate overcrowding at Guilford. Although Auburn was the furthest west of the RSD’s high schools, it was closer to some of the elementary attendance areas on the east side of the Rock River, which fed into Guilford, than Guilford High School itself. Bd.Min., 9/9/63, B9170. The Guilford High School attendance area included all of central Rockford on the east side of the river, including the Bloom, Jackson, Hall, Wight, Turner, Nelson, Hallstrom, Highland and the northern half of Kishwaukee Elementary Districts. The students living in the Jackson, Hall, Wight Kishwaukee, and Turner attendance areas, as well as others, lived closer to Auburn High School than to Guilford. Attendance Boundary Map, 1967-68, B38708. In spite of this fact, and Board Member Carlson’s suggestion, the RSD never mandatorily assigned students in these areas to Auburn High School or to any other Westside secondary school.
Assignment of Northeast Quadrant Students to Guilford Rather Than West High School
In March of 1964, in a further effort to deal with the overcrowding of Eastside schools, Superintendent McIntosh announced that students in the Northeast Quadrant, living west of Parkview Avenue and north of Rural Street in the northwest portion of the Northeast Quadrant, would attend West High School rather than Guilford High School. This area included the Bloom Elementary School attendance area. At the time, West High was between 5% and 12% African-American and Guilford was all white. Most of the reassigned students were white. Many parents objected, even though these two schools were roughly equal distance from the area in question.
In response to the parental opposition, Superintendent McIntosh announced a delay in the implementation of his decision until the 1965-66 school year in order to determine if an addition could be built at Guilford High. Bd.Min., 3/9/64, B10564. The addition to Guilford School was, in fact, built in 1965 and opened in 1966. No further action was taken by the RBE with regard to the involuntary transfer of Northeast Quadrant white children to the Westside African-American or integrated schools. This failure to transfer white students in response to parental pressure furthered the segregation of the RSD’s secondary schools.
Conversion of Jefferson Junior High School to a Senior High School
•By the middle of the 1960’s, it was clear to the RBE that even with the newly opened fourth high school, a need for additional high school capacity existed. The RBE began to consider the conversion of one of the junior high schools into a senior high school. Washington Junior High School had fewer students than its capacity and was located in the Southwest Quadrant, the part of the RSD furthest from any existing high school. Washington Junior High also had by far the largest percentage of African-American students of any secondary school in the RSD with an African-American population of 22% in 1960 and 50% in 1967. PPC Report at 74, B505856. Washington would, therefore, have been a logical choice to convert to a high school.
The conversion of Washington to a senior high school was considered by the RBE in 1964. The Board decided against such a move for the purported reason that there were not enough students in Washington’s existing attendance area. Bd.Mins., 11/13/64, B10489; 12/7/64, B10519. This reason made no practical sense because the attendance area of Washington could easily have been expanded across the Rock River in order to *1031 include additional students. The additional students, however, would have been white students, who would thus have attended an African-American school. Instead, the District decided to convert Jefferson Junior High School, on the Southeast side, into a senior high school and to assign it an attendance area entirely east of the river. The plan went into effect in 1971, and Jefferson High School remained at that location until a new Jefferson High School was built in 1978, located farther south in the Southeast Quadrant.
When Jefferson opened as a high school in 1971, it had a 6% African-American student population. The District-wide high school population at the time was 10% African-American. Washington Junior High School, which had been renamed Washington Community School, had a 52% African-American student population. The RSD’s decision to convert Jefferson to a high school rather than Washington and make it an “Eastside school” furthered the segregation of the RSD secondary schools.
West Side Elementary School Boundaries—Late 1950’s-Early 1960’s
During the 1950’s, two elementary school areas were located on the west bank of the Rock River between the Walker School attendance area, beginning at Guard Street, and the Montague School attendance area, beginning at Kent Creek. The two Westside schools were Garrison on the north, and Franklin on the south. The basic boundaries of the Garrison School area were Benderwirt, King and Reynolds Streets on the north, Main and Guard Streets on the northeast, the Rock River on the southeast, Whitman Street on the south and Kilburn Avenue on the west. Franklin School was immediately to the south, bounded by Kent Creek on the west and south. Attendance Boundaries, 1950-51, D23604.
By the late 1950’s, a growing number of African-Americans were residing in the Franklin School area, which area encompassed the southern border of the Summer-dale School area, and the west part of the Garrison School area, adjacent to the eastern boundary of Church School, which remained all white. In 1959, the RSD built Haskell School in this part of the city, and drew attendance boundary lines that included all of the African-Americans living in the area of Summerdale, Garrison and the northern part of Franklin. The boundary lines of the new Haskell School were Auburn and Roekton, south on Roekton to Garfield, east on Garfield to Ridge Avenue, south on Ridge Avenue, extended to Fisher Avenue and Court Street, west on Fisher Avenue to Acorn Street, west on Acorn to Kilburn and north on Kilburn to Roekton. Bd.Min., 3/9/59, B7117.
In 1960, as a result of these boundaries, Church and Summerdale schools had a 100% white student population, Garrison had a 3% African-American student population and the newly opened Haskell School was racially identifiable African-American with a 23% African-American population.
In 1963 and in 1966, the boundaries of Haskell School were expanded. Attendance Boundaries, 1963, D23626; 1966, D23651; Student Assignment Boundary Map, 1967-68, B38708. As a result of this expansion of the Haskell School attendance area, by 1967, Church School and Summerdale School remained all white, Garrison School’s African-American population decreased to 1% and Haskell’s population increased to 37% African-American.
This gerrymandering of boundaries furthered the segregation of the RSD’s West-side elementary schools. Although it was surrounded on three sides by schools with substantial African-American student populations in 1967 (Haskell, 37% African-American; Ellis, 50% African-American; and McIntosh, 20% African-American), Church School did not receive its first African-American student until 1968. In 1968, when Mr. Alfred Brewington and his family moved into the newly constructed Fairgrounds Valley Housing Development, on the east side of Kent Creek, Mr. Brewington, an African-American, sent his daughter to Church School.
Refusal to Reassign Students to Balance School Utilization in 1965
In 1965, the RBE appointed Dr. Thomas H. Shaheen as the new Superintendent of the *1032 RSD. Bd.Mins., 11/8/65, B10875; 7/12/65, B11166. Within the first six months of his superintendency, the new superintendent had to deal with the problem of overcrowding in many of the RSD’s schools.
In January of 1966, Superintendent Sha-heen suggested to the RBE that class sizes in the various schools be balanced either by renting additional space or by transporting students to less crowded schools. Bd.Min., 11/7/66, B11244. At the time, the RBE was building two new elementary schools, McIntosh in the west end of the Southwest Quadrant, in between Wilson Junior High School and Church Elementary School (a part of town that had a sizeable African-American community) and Swan Hillman, in the far southeast corner of the Southeast Quadrant (an all white area). Superintendent Shaheen recommended that, if these two new schools were not opened by Fall 1966, students from overcrowded schools in those áreas be transported to other schools with available capacity. The RBE rejected the Superintendent’s recommendation. Instead, the Board decided that the students who would be attending McIntosh and Swan Hillman would be kept together and housed in emergency areas in the presently existing school buildings or in rented facilities^ rather than being transported to other schools. The RBE’s sole African-American member, Marcella Harris, voted against this decision.
The RBE also approved moving sixth grade students from the areas' adjacent to McIntosh School to a new addition being built at Wilson Junior High School. The schools adjacent to McIntosh were Ellis, Henrietta and Church. At the time, Ellis was 50% African-American and Henrietta 66% African-American. Church School was all white. Bd.Min., 2/7/66, B11252. The refusal to accept Superintendent Shaheen’s recommendation to shift students to ease overcrowding, except within a predominantly African-American area, furthered segregation in RSD elementary schools.
Assignment of Morris Kennedy and Nas-hold Ninth Graders From School District 125 to Auburn High School
In April of 1967, the RBE proposed assigning ninth graders from School District 125, south of Rockford District 205 on the east side of the Rock River, to Auburn High School. District 125 was one of the districts in the consolidated School District 211, which was the elementary school district outside of the RSD that used RSD secondary schools'. The proposal was designed to lessen the serious overcrowding ' of Guilford High School. District 125 was almost exclusively white. The two schools involved were Nas-hold and Morris Kennedy. Auburn High, on the west end of the Southwest Quadrant, was 15% African-American in 1967.
On May 22, 1967, the RBE decided to implement the proposal to send District 125 ninth graders to Auburn, but also appointed a committee to study the situation for possible reconsideration in the 1968-69 school year. Bd.Min., 5/22/67, B11530.’ In 1970, the decision was reversed. The Board stated a policy that all student assignment would be done on “a neighborhood school basis” and that there would be no cross-town busing. Bd.Min., 4/28/69, B12128; 5/12/69, B12149; RSD Student Assignment Data and Boundary Map, 2/1/71, B37933. Accordingly, the ninth grade students were sent a farther distance to attend high school at 99% white, overcrowded (161% of CDB), Guilford High, starting in the 1970-71 school year.
“Rockford Team” 1967 Integration Proposals
In the Spring of 1967, Superintendent Sha-heen, two board members and a group of Rockford citizens attended an integration workshop in Chicago conducted by Dr. Ar-min Beck, a leader in urban education in the late 1960’s; Following this workshop, in June of 1967, this team of people, “the Rockford Team”, issued and presented to the RBE a report entitled “Abstract Rockford Team” that contained the team’s views on urban education. See T. Shaheen Test., Tr. at 29.
The report stated that compensatory programs used to counteract the negative influences of racial isolation achieved “little or nothing in comparison to the effects achieved by integration.” Noted barriers in the white community to the resolution of civil rights problems in Rockford included: a high level *1033 of affluence and a “highly sophisticated procedure of smothering emerging Negro leadership in the benevolent paternalism of the white power structure.” Noted barriers to school desegregation in the RSD included the lack of a policy statement by the RBE and the lack of transportation provided by the RSD.
Specifically, the Rockford Team described their concern in regard to racial isolation if Franklin School, having a 41% African-American student population, was demolished and its students were sent to nearby Haskell, Garrison and Ellis Schools. Haskell and Ellis Schools had growing minority populations. An addition was also planned for predominantly white Garrison and Walker Schools. The Rockford Team suggested that the addition to Ellis be postponed and consideration be given to increasing the size of the additions at Garrison and Walker in order to send Franklin students to Haskell, Garrison and Walker so as to minimize racial isolation.
Contrary to the Rockford Team’s suggestion, in 1969, the RSD built additions onto Ellis, Haskell and Walker. The RSD not only proceeded with the addition to Ellis, but also purchased Muldoon School in 1971 in order to handle the overflow of students. : In 1971, also contrary to- the Rockford Team’s suggestion, the RSD closed Franklin School and sent its student population, 55% African-American, to two predominantly African-American schools, Haskell School, which went from 62% African-American to 64% African-American in 1971-72, and Ellis School, which went from 65% African-American to 69% African-American in 1971-72.
In addition, the Rockford Team made suggestions with regard to student assignment in the then current and soon to be built middle schools. The .first suggestion was to convert segregated, low achievement Washington Junior High School to a ninth grade Center and simultaneously convert white, high achievement Lincoln Junior High School and Jefferson Junior High School into seventh and eighth grade Centers. The second suggestion was to remove existing high-achievers in Roosevelt Junior High School and pair Roosevelt students with the to-be-built high-achieving Eisenhower students in order to achieve racial and achievement balance. The third suggestion was to pair the high achieving students from Roosevelt with the low achieving Wilson Junior High School students in order to form the attendance area for the new John F. Kennedy Jr. School.
The RBE did not follow any of these suggestions, but instead opened up the two new junior high schools as all-white schools serving their neighborhood populations. The refusal of the RBE to implement the suggestions of the “Rockford Team” and its above described actions furthered the segregation of the RSD.
The Pupil Placement Committee (PPC)
In August and September of 1967, the RBE and Superintendent Shaheen formed the Pupil Placement Committee (hereinafter “PPC”) to study the issues of student achievement, racial and socioeconomic balance in the schools and attendance boundaries as well as other issues related to student assignment, with particular regard to the planned expansion of RSD schools. Bd. Min., 9/11/67, B11625; T. Shaheen Test., Tr. at 41. When Superintendent Shaheen first visited the RSD before he was hired, he saw that there were tremendous disparities in the quality of schools and the quality of teaching among and within the schools of Rockford. Throughout Dr. Shaheen’s superintendency, he observed a strong correlation between school quality and student achievement levels and the location of the school, that is, on the east or the west of the Rock River. School quality and student achievement levels tended to be better on the east side of the Rock River. Dr. Shaheen observed that African-American students had lower achievement results. The PPC Report reported that there were academic imbalances in the RSD schools, with the African-American and poor schools showing, the lowest achievement levels.
Two Rockford clergy, Rev. William Collins and Rev. Leon Riley, were appointed co-chairs of the PPC. Rev. William Collins was appointed as a chair of the PPC because the PPC studied “volatile” and sensitive issues in the Rockford community. A member of the *1034 clergy was thought to be an effective person to speak about the issues of low achievement in the Rockford schools and racial disparities. Collins Dep. at 20-22.
Robert Kufalk was a principal at Washington Junior High School and was appointed coordinator of the PPC. Mr. Kufalk testified that race was the primary issue covered in the Committee’s Report; however, because of community sensitivity, the members of the Committee determined to couch the Report more in terms of socioeconomic/educational issues. In this manner, it was hoped that the Report would be more favorably received by the Rockford community and the RBE.
The PPC members were selected by the RBE from a broad cross section of the Rockford community. The PPC met at least once a month for approximately one and one-half years. The PPC first examined a report on racial isolation in the United States printed by the Commission on Civil Rights and a study of the RSD by a RSD teacher, which showed that teachers in the low income areas in the RSD were not as well prepared as those in wealthier parts of the District. Collins Dep. at 20-22. The formation of the PPC was endorsed by the Rockford Human Relations Commission in a statement which said that there was de facto racial and economic segregation in the RSD, that led to insensitivity, underachievement and increased tensions.
In October of 1967, Superintendent Sha-heen stated that one of the major problems in the RSD was the need for racial integration in the schools. The Southwest Quadrant was the lowest income area in the RSD. The PPC studied the schools in the Southwest Quadrant and found a great disparity between those schools and the rest of the district in terms of achievement levels. The PPC then tried to correlate those disparities with racial, economic and family factors. Id. at 29. On November 27, 1967, the PPC issued a progress report indicating that preliminary findings revealed a possible correlation between racial and socioeconomic make up of schools and academic achievement. Bd.Min., 11/27/67, B11683.
On March 25, 1968, the PPC issued its Report to the RSD. In its Report, the PPC noted a high correlation among the eighteen elementary schools and two secondary schools, all of which were in or near the Southwest Quadrant, that were “underachieving” that is, ranking below the fiftieth percentile on national standardized tests. PPC Report, 1968, B505856. The factors that had a high degree of correlation at these schools were: below average achievement, below, average family income, high mobility of student body, low percentage of professional and managerial employment of parents and adults, high percentage of African-American enrollment and negative vote on school referendums. The PPC found that:
While negro enrollment increased by 166% over the past seven years, the percentage of additional schools which showed some negro enrollment only increased by 22%. The result has been an increasing concentration of an ever larger number of negro students into a very few schools.

Id.

In 1960, four elementary schools had an African-American enrollment in excess of 30%, and in 1967, there were ten such schools in the RSD. Also in 1960, one elementary school had an African-American enrollment of over 50%, and in 1967, there were five such schools. Twenty percent of the increase in enrollment in the last seven years was African-American. African-Americans increased from 6% of the student body in 1960 to 10% in 1967. Id. This data shows that there was an increasing concentration of an increasing number of African-Americans into a very few schools.
The PPC went on to state: “The compact and contiguous nature of the area which contains [these correlating factors] ... reflects a trend toward the increasing isolation of such groups of people from the rest of the community.” Id. The PPC also found that “[a]ll schools with more than 30% negro enrollment were also schools with below average achievement scores.” Id. The PPC reported to the RBE that the low achieving students in the RSD came overwhelmingly from the Southwest Quadrant, which was defined by the PPC as Eleventh Street on the east and Auburn Street on the north. This area *1035 contained most of the African-American population in Rockford and generally had low socioeconomic status.
As stated previously, the PPC reported that, although the RSD as a whole scored above the national average on standardized tests, eighteen elementary schools had achievement test scores far below the nation-
al average. Those schools and their percentage of African-American student population in 1967 were as follows:
School African-American
Barbour 47%
Dennis 91%
Ellis 50%
Franklin 41%
Hah 22%
Haskell 37%
Henrietta 66%
Kishwaukee 11%
Lathrop
Lincoln Park 40%
McIntosh 20%
Montague 70%
Riverdahl 1%
Rock River 45%
Stiles 0%
Turner 0%
Wight 0%
Id. In 1967, the elementary school population of the RSD was 11.4% African-rAmeri-can. One all white school just outside of the Southwest Quadrant also scored below the national average on standardized tests, Whig Hill, in the Northwest Quadrant. Id. By 1978, the RSD had turned Whig Hill into a racially identifiable African-American school by busing in African-American students from a satellite attendance area near Dennis and Ellis Schools.
Of the eighteen underachieving elementary schools noted in the PPC Report, those that were racially identifiable African-American schools, that is, had a student population of 26.4% or more African-American, had lower standardized test scores than did either the integrated or the racially identifiable white schools. Ten of the eighteen schools had more than 15% of the District-wide elementary average of African-American students and were racially identifiable African-American: Dennis, Montague, Lathrop, Henrietta, Ellis, Barbour, Rock River, Franklin, Lincoln Park and Haskell. Three of the schools were integrated, that is, were between 5.7% and 26.4% African-American: Hall, McIntosh, and Kishwaukee. Five of the schools had less than half of the District-wide elementary average of African-American students and were racially identifiable white schools with less than 5.7% African-American students: Riverdahl, Stiles, Wight, Whig Hill and Turner.
One of the measures employed by the PPC to express student achievement levels was grade equivalency, that is, how far ahead or behind in terms of years of progress each school’s students were in comparison with national averages. Of the eighteen low-achieving schools, the African-American schools averaged .41 years behind the national average, the integrated schools averaged .27 years behind the national average and the white schools averaged .20 years behind the national average.
The PPC also found that the two secondary schools had achievement test scores be-: low the national average, Wilson Junior High with 22% African-American students in 1967, and Washington Junior High with 50% African-American students in 1967. These were the only two secondary schools in the Rockford School District at the time that had more African-Americans than the district-wide percentage in the secondary school population (8.6%).
Further, the PPC found that while African-Americans in the RSD had increased 166% since 1960, the percentage of schools that showed an increase in African-American enrollment only increased by 22% over the same time period.- Therefore, a dramatic increase in the segregation and concentration of African-Americans in the RSD schools occurred.
The PPC also examined families living in areas along school district borderlines between high-achieving and low-achieving schools. The PPC found that families in those areas were usually people of similar economic backgrounds and were generally racially mixed. The only distinguishing factor among the families was that their children attended different schools. The PPC found that the children of those families who *1036 went to low-achieving schools achieved poorly and the children of those families who attended high-achieving schools achieved well. Collins Dep. at 35. Therefore, the PPC recommended drawing new school boundary lines that would have an enrollment of 70% high-achievers. The RSD, however, did not adopt this recommendation by the PPC and continued its adherence to neighborhood school boundaries. Id. at 38^40, 64.
On October 28, 1968, the RBE received a letter from the PPC asking that the RSD adopt a policy on pupil placement based upon the findings in the PPC’s report. Board Members Marcella Harris and Dr. Robert Taylor moved that the PPC be instructed to prepare a plan for the placement of pupils within the elementary and secondary schools of the RSD. The plan was to be designed in such a way as to assure as equitable a balance of achievement as possible in each school. The plan was also to include recommendations as to how to balance achievement levels in new schools to be constructed. The motion was tabled and then defeated on November 11, 1968.
At the October 28th meeting, the RBE noted that the Illinois School Code required the RBE to provide equal education to all of its students. After the meeting, RBE Member Dr. Robert Taylor stated that the concept of neighborhood schools would have to be considerably altered in order to achieve what the PPC has been asked to do. Accordingly, the RBE specifically noted that the PPC’s recommendations were to be subject to the RBE’s approval. Bd.Min., 10/28/68, B11983; see Bd.Min., 11/11/68, B12010.
On November 11, 1968, the Board considered a student assignment policy based upon a PPC Report recommending that students be reassigned to different schools in order to obtain an achievement balance. Approximately 200 people attended the meeting. Prior to the meeting, the RBE received many letters opposing the busing of students. Many speakers at the meeting, including a representative of the Rockford Jewish Community Council, Delridge Hunter, who was also President of the West Side Community Organization (WESCO), Eugene Horwath of Responsible Citizens for Quality Education and others, urged the RBE to establish a policy that would solve the problem of under achievement even if it did not meet with complete popular approval. The RBE, on a 3-2 vote, voted down the PPC student assignment recommendations. Voting in the minority were RBE member Marcella Harris, the only African-American Board Member, and Dr. Robert Taylor. Bd.Mins., 12/7/69, B12037; 12/9/68, B12013; 12/11/68, B12010. An “achievement balance” would have necessarily resulted in a greater degree of racial integration. In connection with the PPC Report, Marcella Harris was told by another RBE Member: “Well, Marcella, you have to remember that sometimes the minority just has to wait until the majority is ready to settle things.” Harris Test., Tr. at 656.
On January 27, 1969, at a meeting attended by 600 people, the RBE received recommendations from Reverend Collins on behalf of the PPC that it reassign students to achieve racial and achievement integration in the RSD’s schools. The RBE also received a minority report from PPC member Robert P. Kennedy calling for “compensatory education” rather than school integration. Rev. Collins, the PPC Co-Chair, stated that he was unaware of the existence of a minority report until the day it was presented. Collins Dep. at 68.
The RBE added new members to the PPC between the time the PPC studies were conducted and the time the PPC made their recommendations. The new members did not dissent from the PPC recommendations at PPC meetings. PPC member Kennedy had earlier accepted the recommendations of the PPC, but on the day of the presentation of the PPC’s Report to the RBE, Mr. Kennedy presented his own “minority report.” The “compensatory education” approach recommended by the minority report called for teaching in the schools by achievement level rather than by reassignment of students. The RBE adopted neither the majority nor the minority report.
The Middle Schools Proposal
In January of 1969, the RBE also received a report from Dr. John Swanson, then principal of Guilford High School, and a committee *1037 of RSD administrators and supervisors. The report called for the conversion of the RSD to a “middle school” structure. Available classroom space would thereby be filled by shifting student attendance assignments in order to make better use of currently available building and classroom space without regard to “neighborhood schools.” The middle school proposal would also allow centralized restructuring that would improve racial and student achievement integration. See Bd.Mins., 1/13/69, B1201S; 1/27/69, B12043; 4/14/69, B12108. Assistant School Superintendent for Instruction, Dr. Herbert B. Smith, also recommended that the RSD employ the middle school concept instead of using junior high schools in its structure. Middle schools involved the grouping of grades six through eight, with four-year high schools. Prior to that date, the RSD always employed the junior high school, grades seven-eight-nine system. The change was recommended in order to better utilize classroom space.
The proposal for middle schools was part of a more generalized restructuring proposal that included: the integration of students by student achievement levels; the assignment of students from newly constructed housing projects in Rockford to any school the District believed appropriate; and the location of new schools in specific areas in order to improve racial integration, with specific reference to the two new junior high schools that were scheduled to be built, Eisenhower and John Kennedy. If adopted, the proposal was said to be designed to save the District $11 million as opposed to maintaining the status quo. See B505960.
The middle school proposal, as well as the general restructuring, would also improve racial balance by phasing toward a system where there would be four high schools and four middle schools that would be expanded over a five year period along with the construction of additional elementary schools. The result would be roughly comparable capacities in each of the secondary schools, city-wide distribution of pupils and greater integration, both academically and racially. Id.; T. Shaheen Test., Tr. at 59-63.
In response to the middle school/general restructuring proposal, Dr. Shaheen wrote a memo to the RBE. T. Shaheen Memo to RBE, 2/10/69, B505949. In his memo, Dr. Shaheen emphasized that the integration of schools was a critically important national goal. Dr. Shaheen stated that the 1969-70 school year was an opportune time to take initiative to comply with desegregation laws due to the -findings contained in the PPC report, the middle school proposal, the availability of new construction in the RSD and the tremendous competition for school monies. Dr. Shaheen argued in his memo that taking no action would compound the segregation problem.
Dr. Shaheen’s memo also related findings made by educational researchers, including:
School achievement in urban America would not improve without economic and ethnic integration;
Failure to achieve such integration could result in the enlargement of the urban ghetto;
The most expensive cost to a school district in terms of the placement of children, is a system of rigid and fixed boundary lines, which was illustrated at that time by problems at Johnson School in the RSD. (Johnson, 100% white in 1970, was overcrowded and a failure to adjust boundary lines to solve that overcrowding would have resulted in expenses for added teachers and/or rooms.);
Compensatory education is extremely expensive;
Integration results in better achievement for low-achievers; and
Integration does not result in lower achievement for high achievers.
Dr. Shaheen supported the proposals in Dr. Swanson’s plan because the plan complied with desegregation laws, provided school assignment changes for a comparatively small number of students and maintained the neighborhood school for most students while recognizing the need to balance achievement levels, and saved millions of dollars. Id.
On February 25,1969, the RBE gave qualified approval to the middle school proposal, subject to reviewing specific maps to be sub *1038 mitted defining the secondary districts and the feeder patterns involved. A RBE Member expressed his opposition to making the new Eisenhower and Kennedy Middle Schools racially balanced and related to Dr. Shaheen that he hoped Shaheen “never put those African-Americans over in the Eisenhower School.” T. Shaheen Test., Tr. at 91.
On April 14, 1969, the RBE approved the middle school proposal along with- a policy that restructuring should take into consideration the prevention of segregation by race, color and nationality. However, in June 1970, a newly elected School Board voted to cancel the middle school proposal before it began.
The Veritas, REA and the RSD Principals’ 1970 Redistricting Proposals
In 1970, Bill Page, the former principal of Stiles School and the head of the RSD’s Community Open Schools Program, spoke to the Board and recommended that the RSD cross the Rock River when selecting schools to which students would be assigned, thus eliminating racial imbalance. Data was available showing that all high schools in the district could be integrated if there was simply some reassignment between Guilford and West High School students changing places. Bd.Min., 1/12/70, B12435; Veritas, 1/70, B505153.
Mr. Page was also the Chair of Veritas, a newsletter published by the Rockford Schoolmasters, Inc., a conglomeration of RSD educators. Page Test., Tr. at 594. The January, 1970 issue of Veritas contained various proposals regarding school redistricting from the members of Veritas, the REA and the “Principal’s Proposal”—a proposal developed by RSD principals. The Veritas group, the REA and the RSD principals all agreed that the proposals developed by the RSD Administration and approved by the RBE fell short of sincerely meeting the needs of the RSD’s students. The Principal’s Proposal suggested immediately implementing an orientation program directed toward human relations, a program that had been suggested three years previously by the PPC. The Principal’s Proposal also stated that the District must deal with the problem of racial isolation. Id. at 596; Veritas, 1/70, B505153.
The REA Proposal suggested “complete and total integration of all Rockford Schools” with no school having a minority population of more than 20%. The foundation of the REA Proposal was the pairing of elementary schools[8] for the purpose of insuring racial and achievement level integration. Id. The advantages of school pairings were said to be the mixing of achievement levels in order to raise, not only educational achievement levels for all, but to expand understanding of different cultures. Id.
The Veritas proposal was designed to balance racial populations throughout the high schools in the RSD. The most important feature of the Veritas plan was that it drew high school districts that ignored the Rock River. Unlike virtually all other RSD boundary maps, the map drawn by the Veri-tas staff contained high school boundaries that crossed the Rock River. Page Test., Tr. at 597. The Veritas plan also involved elementary school pairing that concentrated on achievement level mixing. The drafters of the Veritas plan did not use the term “racial mixing” because, in Rockford, “it was not looked upon favorably to racially mix schools.” Accordingly, the drafters thought that if the elementary schools were paired by achievement levels, the schools would automatically become racially mixed. The RBE did not take action on Mr. Page’s proposals to cross the Rock River in districting the RSD or on the proposals of the REA, the RSD Principals, or the members of Veritas. Id. at 603.
New School Construction in 1969-71
In November of 1967, the RBE received approval through a tax referendum for new school construction. Additions' were built in 1968-69 at Vandercook, Hillman, Garrison, Ellis, Walker, Gregory, McIntosh, Nelson and Rolling Green Schools. In 1968, Beyer School was built by the RSD and in 1969-70, Carlson and Haight Schools were built. In *1039 addition, the RSD built and opened JF. Kennedy Junior High School in September of 1970 and Eisenhower Junior High School in 1971.
In 1971, the Area Vocational Center, a new construction, was opened. According to Dr. Shaheen, no attention whatsoever was given to attempting to further racial integration, lessen racial segregation or integrate students of different achievement levels in the different parts of the RSD in the planning or selecting of locations for these additions and new facilities. Shaheen Letter to U.S. Dept, of Justice, 6/13/69, D23510-D23529.
1969 Elementary School Attendance Area Boundary Changes and Reassignments
On July 10, 1969, the RBE approved a number of boundary changes that were recommended by Superintendent Shaheen in order to adjust capacity in light of the construction of additions to schools and in order to deal with overcrowding. The following findings detail these boundary changes.
First, the north boundary of West View School in the Northeast Quadrant was moved south from the City limits to Riverside Boulevard, transferring eighty to ninety children from the West View District (0% African-American) to Elmwood School (less than 1% African-American), about two miles away. In light of the increased distance to school, the RSD agreed to provide transportation for these students.
Next, the boundaries of Garrison, Haskell, Church, McIntosh and Ellis Schools were adjusted. The RBE had recently completed additions on Garrison, McIntosh and Ellis Schools. All of these schools were in the west end section of the Southwest Quadrant of Rockford.
Third, the Garrison School attendance area was expanded to include four blocks that were formerly part of the Haskell School zone immediately to the south and west. This transferred about 110 former Haskell students to Garrison and made space for approximately the same number of students from the Fairgrounds Valley Housing Development in the area to attend Haskell School. The percentages of African-American student populations in these schools were Garrison 0% and Haskell 44% in 1968-69 and Garrison 11% and Haskell 62% in 1970-71.[9]
Fourth, the boundaries of McIntosh School were increased to include portions of the former Church and Ellis School attendance areas. Fifth, the boundary between Church and McIntosh Schools was moved three blocks east, transferring about seventeen City blocks into the McIntosh school zone. This boundary change transferred about seventy elementary school children from Church to McIntosh, creating sufficient space in Church School to accommodate students from the Fairgrounds Housing Development.
Sixth, the boundary between Ellis and McIntosh School was adjusted in the southeast corner of the McIntosh area and the northwest corner of the Ellis area to allow for the transfer of about 95 students from Ellis to McIntosh. The African-American student percentages were as follows:
% African- % African-
American American
School 1968-69 1970-71 •'
Church 4% 17%
Ellis 36% 65%
McIntosh 28% 35%
All of these schools were in an area of a growing percentage of African-American population at the time. In addition, in 1970, the RSD canceled the busing of Fairground students to Walker School and returned them to Ellis following the 1970-71 year.
Also in July of 1969, the RSD made several more changes. In the Southeast Quadrant, along the Rock River, the southern portion of the Kishwaukee area, which later became the Beyer School area, had, since 1963, been included in the Washington Junior High and West High attendance areas. The RSD transferred all fifth and sixth grade students from this portion of the Kishwaukee School area to Washington Junior High for sixth and seventh grade. (The students were already in the Washington zone for junior high purposes.) All of the fifth grade students from Franklin School, which was on the west side of the Rock River in downtown Rockford and which had the southern half of its zone *1040 already in the Washington Junior High attendance zone, were transferred to Washington for sixth grade.
Although many students in both of these zones lived more than 1.5 miles from Washington Junior High School, the Board made no provision for transportation as was provided for the .West View School students. The percentages of African-American students in the schools in 1968-69 were: Franklin, 45%; Kishwaukee 20%; and Washington, 66%. In 1970-71, those percentages were: Franklin, 55%; Kishwaukee, 25%; and Washington, 52%.
The RSD reassigned all sixth grade students in the Alpine and Gregory School attendance areas, on the far east portion of the Southeast Quadrant, to seventh grade at Gregory School because of an addition to that school. Sixth grade students from Van-dercook School, in the extreme southeast corner of the Southeast Quadrant, were transferred to the seventh grade at Buckbee School, about one and one-half miles away. The percentages of African-Americans in these schools in 1968-69 and 1970-71, respectively, were as follows: Alpine, 1% and 1%; Gregory, 0% and.5%; Buckbee, no data for 1968-69 and 0%; and Vandercook, 0% and 0%.
Student assignments in the Southeast Quadrant were also changed. Sixth graders from Rock River Elementary School were transferred to Lincoln Junior High School for seventh grade. Sixth graders from Riv-erdahl were transferred to Morris Kennedy School for seventh grade. This decision, however, was reversed by the RBE in June of 1970. The percentages of African-Americans in the student populations in these schools in the year 1968-69 were: Riverdahl, 2%; Morris Kennedy, data unavailable for 1968-69; Rock River, 40%; and Lincoln Junior High, 1%. Bd.Min., 7/10/69, B12216; Boundary Change/Attendance Data, B45764; B45753; B45755; B45749.
The RSD district-wide percentages of African-American elementary students were 15% in 1968-69 and 12% in 1970-71. This decrease was due to the interim annexation by the RSD of a number of white elementary schools. The above boundary changes and reassignments in 1969 maintained and increased segregation in the RSD.
Walker and Carlson Busing of Public Housing Children
On July 10, 1969, the RBE voted 4^-2 to send about 150 African-American students from two public housing projects to elementary schools outside of their neighborhoods. Bd.Min., 7/10/69. The purpose of this reassignment was to integrate schools and reduce overcrowding.
Approximately 100 students from the public housing development of Jane Adams Village in the Southeast Quadrant of Rockford, the Kishwaukee Elementary School area, were to be transported to the newly-constructed Carlson School in the Northeast Quadrant. About fifty students from the Fairgrounds Valley Housing Development, in the area of Haskell, Church, Ellis and Franklin Schools, were to be transported to Walker School, located south of the Rockford Country Club Golf Course, predominantly in the Northwest Quadrant along the Rock River in the National Avenue area of Rockford. The RBE provided transportation for these students. Id.
The students were sent to their respective new schools for the 1969-70 school year. In April of 1970, a new School Board was elected with three members from the Community Education Committee.[10] Later that same month, the RBE began to reconsider these pilot student reassignment projects. Marcella Harris, testified that she visited Carlson School on several occasions and observed that the program was highly successful.
On June 1, 1970, the Fairgrounds Valley parents sent a petition to the RBE asking that their children be allowed to remain at Walker School for the following year. Bd. Min., 6/1/70, B12632. On June 22, 1970, the RBE, with one dissent, voted to discontinue *1041 the busing program, to Carlson School and return the children to the neighborhood-schools for the 1970-71 school year and to discontinue the Walker School Busing Program after the 1970-71 school year. The reason given for the additional year of the Walker School Busing Program was that there was not enough space in the neighborhood schools for the children living at Fairgrounds Valley. The children from the Jane Adams Housing Project were returned - to their home school, Kishwaukee. In 1969, Kishwaukee was 20% African-American. In 1970-71, the year in which the Jane Adams children were returned to Kishwaukee, the school was approximately 25% African-American and had more African-American students than in any year thereafter. Kish-waukee School was enrolled at 147% of capacity. Kishwaukee was built in 1921 and no additions were ever put on the school.
Carlson was built in 1970. After the removal of the Jane Adams children, Carlson was at only 91% of its capacity and was 98% white. The RBE’s decision to remove these children from Carlson School and assign them to Kishwaukee segregated both schools and submitted these children to grossly overcrowded conditions in an extremely old facility.
On January 25,1971, the RBE determined that at the end of that school year the students from Fairgrounds Valley would be transferred from Walker to Ellis and Mul-doon Schools. Muldoon was an old, previously closed, Catholic girls’ school, that had recently been purchased from the Archdiocese of Rockford. Muldoon was opened as a RSD school for only one year before it was closed down and its students dispersed to several different schools throughout the RSD. During the 1971-72 school year, grades one through three were located at Ellis and grades four through six were located at Mul-doon. In the prior school year, 1970-71, Ellis was overcrowded at 109% of its capacity and had a 65% African-American student population. For the 1971-72 school year, with the temporary use of Muldoon School, the crowding was somewhat alleviated, but both Ellis and Muldoon had African-American student populations of 69% and 70%, respectively. Walker School, on the other hand, was under capacity in both years. After the removal of the Fairgrounds Valley students, Walker School went from being 90% white to being 99% white. Bd.Min., 1/25/71, B12953.
Muldoon School was purchased by the RSD in 1971, because the RBE had decided to transfer the Fairgrounds Valley Housing Development students from Walker back to Ellis, but Ellis was overcrowded. The boundary of Ellis School was less than 1.5 miles from Walker School. The RBE’s decision to remove these students from Walker and assign them to Ellis and Muldoon increased segregation at all schools and submitted the African-American students to overcrowded and substandard conditions.
Construction of John F. Kennedy and Eisenhower Junior High Schools
In the late 1960’s, Rockford had five junior high schools, three on the-west side of the Rock River (Wilson, Roosevelt and Washing-, ton) and two on the east side of the Rock River (Lincoln and Jefferson). All five schools were generally in the central or southern area of the city. The northernmost junior high school at that time was Roosevelt, which was a few blocks south of Auburn Street on the west side. The two new junior high schools that were constructed in 1970 and 1971 were John F. Kennedy on the northwest side and Eisenhower on the northeast side. Both of these schools were located significantly farther to the north than any of the preexisting junior high schools. In 1971, Jefferson Junior High School was closed and Morris Kennedy Elementary was converted to a junior high school in essentially the same general area on the southeast side.
In 1967-68, the African-American percentages at the junior high schools were as follows:
Wilson 22%
Roosevelt 8%
Washington 50%
Lincoln 0%
Jefferson 5%.
Eisenhower Junior High was opened as a 99.65% white school' and John F. Kennedy Junior High was opened as a 99.34% white *1042 junior high. The preexisting junior high schools had the following African-American populations in 1971-72:
Wilson 38%
Roosevelt 18%
Washington 54%
Morris Kennedy (formerly Jefferson) 8%.
The RSD was 8-10% African-American in 1967-68 and was 12% African-American in 1971-72.
Morris Kennedy was a temporary replacement for Jefferson Junior High School. At the end of the 1977-78 school year, Morris Kennedy was closed, and replaced the following year by Flinn Junior High School on the southeast side. Flinn Junior High opened with fifty-seven African-American students. There were forty-one African-American students at Morris Kennedy when it closed. Flinn opened with 1095 white students while Morris Kennedy had 518 white students when it closed. Flinn opened with an African-American student population of 4.68% and Morris Kennedy closed with a 7% African-American student population.
From 1978 through 1989, Flinn School was never more than 8% African-American. ' In the 1977-78 school year, Lincoln had 98Ó whites and the following year it had 627 whites. The 350 white students were transferred to Flinn, thereby greatly increasing the white percentage and decreasing the African-American percentage at Flinn.
In February of 1969, Superintendent Thomas Shaheen warned the RBE that if the two new junior high schools that were scheduled to be built were to be given student assignment areas on the “neighborhood school concept,” they would .further racial isolation of the schools. Again Superintendent Shaheen’s report received no action by the RBE.
On January 13, 1969, Rev. William Collins on behalf of the PPC urged the RBE not to use the so-called “neighborhood school” basis of assignment for the new junior high school. Rev. Collins predicted that building these two middle schools in the northern portions of Rockford would create two high-achieving white middle schools. The detrimental effect of the placement of these middle schools would be to draw off higher-achieving students into these new schools, which would then negatively impact the achievement levels of the middle schools in the middle portion of Rockford, Roosevelt and Lincoln, and result in Washington and Wilson becoming the lowest achieving middle schools in Rockford. He further predicted that it would lead to further deterioration of the neighborhoods served by Roosevelt, Wilson, and Washington Junior High Schools. B2840-B2845. Despite all data and warning to the contrary, the two middle schools both opened up as all-white middle schools serving their “neighborhood” populations.
Proposals in 1966-67 to Close Old Schools in the Central Rockford Area
Many of the west side African-American and integrated schools in the late 1960’s and early 1970’s, were both overcrowded and in poor condition. In October of 1966, Superintendent Shaheen recommended the closing of Garrison, Montague and Hall schools because of extremely bad conditions at these schools. All of these schools were located in central Rockford, along the Rock River.
Garrison (1% African-American in 1967) and Montague (70% African-American in 1967) were on the west side of the Rock River and Hall (22% African-American in 1967) was on the east side of the Rock River in the downtown Rockford area. B506071; B21810. Garrison was a school that bordered on an area of the city containing a large African-American population. By 1967, school officials had been recommending that Garrison be torn down for thirty years. Garrison was the oldest school in the RSD, having been built in 1887. B502575. The immediately adjacent school to the south along the Rock River was Haskell, which was 37% African-American in 1967.
In 1966, Superintendent Shaheen appointed a citizen’s committee to review the facilities needs of the RSD. In January of 1967, the committee recommended the destruction and replacement of Church, Ellis, Garrison and Montague Schools. Church, like Garrison, was a boundary school between the African-American and white communities on the Westside. In 1967, Church was all white, in *1043 spite of the fact that it was surrounded on three sides by schools with large concentrations of African-American students: Haskell, to the east, was 37% African-American; Ellis, to the south, was 50% African-American; and newly opened McIntosh, to the west, was 20% African-American. The area on the north side of Church School was outside of the City of Rockford and contained the Whig Hill School District, which was all white. Bd. Min., 12/3/67, B11448.
The closing of white boundary schools would logically have forced integration of the white students with African-American students in the adjoining attendance areas. This was especially true in the case of Church School, where all of the surrounding schools within the district had significant numbers of African-American students. Along these same lines, the prospect of closing schools such as Montague or Ellis, with sizeable African-American populations, would pose the question of where to send the African-American students. In spite of long standing and numerous recommendations to close Church, Ellis, Garrison and Montague Schools, the RSD did not close Garrison until 1989. Montague School was closed in 1971. Church and Ellis Schools remain open.
Closing of Hall School
Hall School, in downtown Rockford on the east side of the Rock River, had an enrollment of 207 students and was 22% African-American in 1967. PPC Report, 1968, B505856. Immediately to the east of Hall was Jackson School, which was under capacity with 459 students and was 98% white in 1967. South of Hall was Kishwaukee School. Kishwaukee was an overcrowded school with 11% African-American students in 1967.
In 1970, when Hall School was closed, the RSD’s Attendance Director, Betty Thro, recommended putting all of Hall’s Kindergarten through fifth grade students in Jackson School and one sixth grade in Nelson School, a 0-1% African-American school to the south of Jackson. RSD Memo, B45716. Instead, all of Hall School’s attendance area, except for sixteen blocks on the south end which were nearest the Kishwaukee area and the heavily African-American Jane Adams Village Housing Development in the Kishwau-kee attendance zone, was incorporated into Jackson School.
The African-Americans in the old Hall School attendance area lived predominantly on the south end, in the area of Jane Adams Village. Those students were placed into Kishwaukee School. As a result of only receiving the white students from Hall School, Jackson remained 98% white in 1970-71.
In 1968, the Kishwaukee area was split in half by the construction of Beyer School to the south of Kishwaukee. As a result of the addition of . the south fringe of the Hall area and the subtraction of the Beyer’s School area to the south, by 1970-71, Kishwaukee remained over crowded at 147% of its capacity and was 25% African-American.
Beyer School had an attendance area carved out of the south half of the former Kishwaukee School area and was 14% African-American in 1970-71. By dividing the Hall School area as it did, the RSD maintained Jackson School as a racially-identifiable white school and confined a significant percentage of the African-American students who lived on the east side of the Rock River to three districts: Kishwaukee, Beyer and Rock River.
Closing of Montague School
Montague School, across the Rock River from Kishwaukee and in the Southwest Quadrant, was 22% African-American in 1967. PPc Report, B505856. Montague remained open until 1971. In the 1970-71 school year, Montague had an enrollment of 221 students and was 69% African-American.
In the Fall of 1971, the RBE considered sending the Montague fifth grade students to Washington Middle School, a racially identifiable African-American school in the Southwest Quadrant. Bd.Min., 11/1/71, B12924. Instead, the RBE rented space at St. Peter and St. Paul School, one block south of Washington. Bd.Min., 12/5/71, B12957. The RSD was under considerable pressure to move these students because Montague School was not in compliance with the State Fire Code. Bd.Min., 2/22/71, B12991. Substantial community pressure existed to bus the Montague students to an existing public *1044 school with capacity rather than moving the children to St. Peter and St. Paul School.
On February 16, 1971, approximately twenty Montague elementary students were removed from their classes by their parents and taken to Carlson Elementary School where the parents asked that their children be enrolled. Carlson School had available capacity since the Jane Adams Housing Project students, who had previously been bused there, had been sent back to Kishwaukee School by the RBE. Bd.Min., 7/10/69, B12223. The students were not allowed to enroll at Carlson because they did not have the permission of the RBE.
At its February meeting, the RBE heard from the West Side Community Organization (hereinafter “WESCO”), the Montague School staff, Grant Schneider, the Area 4 Chair of the RSD, Rosa Stamps of the Concerned Parents of Montague School and others that the Montague students should be immediately moved to the then empty Page Park School northwest of Rockford. Despite the unsafe conditions at Montague and despite community concern, the RBE found that Montague was adequate to continue to house students for another four months, until the end of the school year. Bd.Min., 2/22/71, B12993.
In response to the RBE’s refusal to remove these mostly African-American children from what was believed to be a dangerous facility, the parents and students began a boycott of the school. See Bd.Min., 3/8/71, B13013. On March 4, 1971, the parents agreed to end the boycott and return their children to school. Id. On March 8, 1971 the RBE agreed to transport Montague students to Page Park School for the remainder of the school year. Parents of these students were also given the option of transporting their children themselves to Barbour (52% African-American), Beyer (14% African-American) or Kishwaukee (25% African-American) schools. Barbour was adjacent to the old Montague School area to the west, and Kishwaukee and Beyer were immediately across the Rock River to the east. No other options were offered. Id.
In the 1971-72 school year, ninety-six of the Montague students, 85% of them African-American, were bused to Page Park. Beyer School received students from Montague School and increased its student population from 14% African-American to 33% African-American. Barbour School also received students from Montague and increased its student population from 52% African-American to 64% African-American. Kishwaukee, which was grossly overcrowded in the 1970-71 school year, received no Montague students. Carlson School, where the Montague parents wished to send their children, also received no students from Montague and continued to operate well under capacity at a student population of 98% white. The reassignments of Montague students furthered segregation in the RSD’s elementary schools.
Construction of Martin Luther King School
In October of 1971, the RBE began to take bids for the construction of a new school at the site of the old Montague School. Bd. Min., 10/11/71, B13146. In 1972, Martin Luther King School was opened on the site of the old Montague School. In the 1972-73 school year, King School had 275 students, 84% of whom were African-American. No consideration was given to a boundary adjustment or any other measure to diminish this level of segregation at the new King School.
Marcella Harris, believed that the RBE’s goal was to tear down Montague School, preserve the land and rebuild on that site to maintain an all-African-American neighborhood school. Ms. Harris suggested that the RBE not rebuild on that site because growth in that neighborhood, as proved by census track analysis, was not feasible. Ms. Harris recommended examining other areas in which to build another elementary school.
Ms. Harris specifically recommended to the RBE that they create a magnet school in the downtown area to avoid further isolation and segregation of minority students. She had looked at a vacated department store that could have been restored. The location was accessible to all avenues of the community and was close to public transportation. Ms. Harris discussed the idea with the RBE *1045 and with the Superintendent. Ms. Harris’ proposal was never implemented. Harris Test., Tr. at 637-640.
The RBE’s failure to choose an option like the magnet school idea proposed by Marcella Harris in favor of building what they knew would be a racially-identifiable and isolated African-American school furthered segregation in the RSD. The court notes that there was testimony that some members of the African-American community wanted King School to be constructed on the Montague site.
Closing of Franklin School
In 1971, at the same time that the RSD closed Montague School, the RBE also closed the school immediately north of Montague, Franklin School. Id. at 637; Bd.Min., 1/25/71, B12956. The Franklin attendance area was in the Southwest Quadrant on the west bank of the Rock River, between the Montague and Haskell areas. Immediately across the Rock River from Franklin, on the east side of the river, were the Kishwaukee and Jackson School areas. In its last year of operation, 1970-71, Franklin had 198 students, 55% of them were African-American. Although Kishwaukee School was badly overcrowded, Jackson School was operating well under capacity.
In 1971-72, Jackson was 109 students below its capacity of 544. Jackson School was also 99.31% white, having one Asian, two Hispanic students and no African-Americans in its student body of 435. The furthest parts of the Franklin School attendance area were less than 1.5 miles from Jackson School. Even if all of the Franklin students had been assigned to Jackson School, and all of those students actually attended Jackson, Jackson School would have operated at only 116% of its capacity, a level of operation that was common in the RSD for many Eastside and some Westside elementary- schools. In fact, at least seven RSD elementary schools were above 116% of their CDB capacity in 1971-72.[11] Jackson School would have become integrated with the addition of the Franklin students.
The Franklin attendance area, in the center of the city, was connected to the Eastside of the city by three major bridges across the Rock River: Chestnut StreeVWalnut Street, State Street and Jefferson Street. Attendance Boundary Maps, 1967-68, B38708; 1971-71, B38719. Students from that area could easily have attended Jackson School. The RSD, however, did not transfer any of the Franklin students to Jackson, but rather divided them between two neighboring predominantly African-American schools.
Haskell School, to the north of Franklin School, received the northern quarter of the Franklin attendance area, and went from a 62% African-American student population to a 64% African-American student population in 1971-72. The remainder of the Franklin students were assigned to Ellis School, the area immediately to the west. Ellis School went from 65% African-American student population to 69% African-American student population from 1970-71 to 1971-72.
In the same year, Ellis not only underwent expansion to include the Franklin attendance area, but was also split into two locations with the temporary addition of Muldoon School in the 1971-72 school year, and the return of the African-American students from the Fairgrounds Valley Housing Development who had previously been bused to Walker School as part of the Walker-Carlson busing program. The RSD thereby increased segregation in two African-American schools rather than integrate an equally available white school.
Packing of White Schools to Maintain Segregation in the 1970’s and 1980’s
Throughout the 1970’s and early 1980’s, the RSD engaged in a pattern of overcrowding white children into racially-identifiable white schools. These schools would have had racial balances closer to the district-wide average if their boundaries had been adjusted to balance their utilization.
Three Northeast Quadrant racially-identifiable white schools were over capacity. Bell *1046 Elementary School, a far northeast school, had a CDB capacity of 145. From 1971 to 1978, Bell never had more than one minority student (one African-American student in two years and one Native American in two years). From 1970 to 1974, Bell School had no minority students whatsoever. • From 1971 to 1979, Bell School operated at or greater than 123% of capacity. In the 1979-80 school year, Bell School enrolled three minority students, one Native American, one African-American and one Hispanic and Bell’s capacity dropped to 112%. In the 1980-81 school year, Bell had seven African-Americans and two Asians and Bell’s capacity dropped to 105%. The school was then closed, even though it was still operating over capacity at 105%. During the same years, the three neighboring elementary schools, Spring Creek, Brookview and Guil-ford Center, were all under capacity and were integrated or had a significant minority population as a result of the busing of African-American students from Muldoon School.
Carlson, the furthest north of the Northeast side schools, operated between 112% and 128% of its CDB capacity of 446 from 1973 through 1978. During that time, the African-American student population at Carlson increased from 1% to 7%. During the 1977-78 school year, 19% of the RSD’s elementary students were African-American. During the same years,.the neighboring elementary school, Spring Creek, was integrated due to African-American students being bused in from the Muldoon area. Spring Creek School operated at the following capacity levels:
Spring Creek Enrollment
1973-74 84% of CDB
1974-75 87% of CDB
1975-76 82% of CDB
1976-77 77% of CDB
1977-78 70% of CDB.
Spring Creek had sufficient capacity to take all of the “excess” students from Carlson. In the 1977-78 school year, Carlson was 7% African-American and its capacity dropped to 92%. Thereafter, Carlson’s capacity continued to decline while at the same time the percentage of African-American students attending Carlson rose.
Highland Elementary School, in the mid-Northeast Quadrant, operated at between 105% to 163% of its CDB capacity of 373 until fourteen African-American students arrived in 1975-76. The African-American students were Muldoon closing students. Prior to that, Highland was almost completely white with only two African-American students in 1970-71 and in 1971-72. During the same time, the two nearest elementary schools, Bloom and Johnson, which had substantial numbers of African-American students bused in from the Muldoon attendance area after 1972, had excess capacity. In the 1975-76 school year, Highland School dropped below its CDB capacity. The addition of twenty more African-American students raised Highland slightly above its CDB capacity the following year, but capacity dropped steadily thereafter as African-American enrollment increased. Highland School was closed after the 1980-81 school year with its student body at almost 16% African-American.
Riverdahl Elementary School, in the south central portion of the Southeast side near the Rock River, was operated over capacity from 1970 to 1976. Riverdahl had a minority student population of between 4 and 12% from 1970 to 1989, although it was 12% minority for only one year in 1977-78. Riverdahl’s minority enrollment significantly decreased from 1977 until 1989 when Riverdahl closed for two years. Riverdahl reopened in 1991-92 with a Hispanic student population of 42% and an African-American student population of 3%. Riverdahl was located very near to Rock River School, also in the Southeast Quadrant which was approximately 30% African-American since 1970 and always had excess capacity. White students were assigned to Riverdahl despite its over-crowded condition in order to preserve segregation from 1970 to 1976.
In the early and mid 1970’s, both Northeast Quadrant junior high schools, Eisenhower and Lincoln, operated in excess of CDB capacity. Eisenhower Junior High School, the farther north and east of the two, operated in excess of its CDB capacity from 1972 to *1047 1977. Eisenhower was integrated in the 1976-77 school year and has operated below its capacity ever since.
Lincoln Junior High School, just north of the line dividing the Northeast and Southeast Quadrants, was operated as much as 138% over its CDB capacity of 1244 students from 1970 to 1977. Lincoln was integrated in the 1977-78 school year and has been operated under capacity ever since, dropping down to 58% of capacity in 1988-89. All four of the Westside junior high schools operated under capacity during the same years and with substantially higher minority populations. Some of the Eastside students assigned to Eisenhower and Lincoln during those years lived closer to Roosevelt and Washington Junior High schools.
Guilford High School was operated as much as 167% in excess of its CDB capacity of 1713 from 1970 to 1982. Guilford became integrated in the 1980-81 school year and was under CDB capacity two years later, essentially remaining integrated and at or below CDB capacity ever since.
During the same time, until the 1978-79 school year, the Guilford attendance zone included most of the Northeast Quadrant and wrapped around the far East and Southeast portion of Rockford, to include the essentially all white Southeast Quadrant elementary districts of White Swan, Cherry Valley, Vander-cook and Sky View. These schools were closer to the Southeast Quadrant high schools, Jefferson and East, both of which had larger percentages of African-American students than the other high schools in the RSD. The furthest south elementary school, Sky View, was 9.2 miles from its assigned high school of Guilford. The RBE was apparently willing to bus white students 9.2 miles to attend a white high school, but were unwilling to reassign white students east of the Rock River to much closer schools just west of the Rock River.
Two high schools were located on the Southeast side, East High School, which was just below the line dividing the Northeast and Southeast Quadrants (Charles Street west of Alpine Road), and Jefferson High School, to the south at two locations (before and after 1978). East High was operated over capacity from 1970 to 1990, going as high as 167%. East was integrated in the 1971-72 school year by the mandatory assignment of African-American students from the west side in the Barbour, King and La-throp attendance areas. The Westside students assigned to East High were not provided transportation by the RSD.
Jefferson High School operated over capacity at all times from 1970 until the new school was built. In the 1974-75 school year, Jefferson had a African-American population of 10% and wavered above and below the integration line until it became racially identifiable white with an African-American population of between 6 and 8% from 1974 until 1989. When the new high school was built in 1978, Jefferson had a capacity of 2500 students.
The new Jefferson High School was always under-capacity. The attendance area for the new Jefferson High School never included any area west of the Rock River, despite being racially-identifiable and under-capacity. RSD Boundary Maps, 1978-79, B38728; 1984-85, B38699. Nearby East High School had twice as many African-American students and was over-capacity and desegregated for twenty years.
Closing of Morris Kennedy Elementary School in 1971
Morris Kennedy Elementary School was close to Rock River, Riverdahl and Peterson Elementary Schools. Morris Kennedy was closed and converted to a junior high school after the 1970-71 school year and its elementary students were reassigned. At the time Morris Kennedy was closed, it was 10% African-American, 69 students out of a total student population of 723.
Even though the nearest elementary schools were Rock River, Peterson and Riv-erdahl, the African-American students from Morris Kennedy were sent to schools that already had significant numbers of African-American students: Rock River Elementary and Beyer Elementary Schools. Beyer Elementary School was farther from Morris Kennedy than Peterson and Riverdahl. Peterson and Riverdahl, however, were almost all-white schools. Riverdahl and Peterson *1048 remained racially identifiable and isolated white schools as a result of the African-American students from Morris Kennedy being sent to other schools.
Beyer Elementary School went from being an integrated school with a 14% African-American student population in 1970-71, to being a segregated African-American school with a 33% African-American student population in 1971-72. Beyer School had 15% more African-American students than the district-wide average of African-American students for the next decade. Rock River Elementary School remained a segregated African-American school with 36% African-American students in 1970-71 and 38% African-American students in 1971-72, after receiving more African-American students following the closing of Morris Kennedy School. The RSD’s reassignment of Morris Kennedy elementary students created and maintained segregated schools in the 1970’s.
Packing of African-American Schools to Maintain Segregation
In the early 1970’s, the RSD’s elementary school enrollménts were decreasing. In 1970, twenty-five schools were under their CDB capacity. In 1972-73, thirty-six schools were under their CDB capacity.
In 1972-73, eleven racially-identifiable African-American elementary schools existed. Those schools were Dennis, King, Ellis, Henrietta, Lathrop, Barbour,- Haskell, Lincoln Park, Rock River, Beyer and McIntosh. Only three of those schools, Lathrop, Rock River and Beyer, had excess capacity. Only one of those schools, Lathrop, was west of the Rock River.
In the same year, Rockford had four integrated elementary • schools, Freeman, Church, Garrison and Kishwaukee. Church, Garrison and Kishwaukee had excess CDB capacity. The remaining forty-one elementary schools in the RSD had less than 6.75% African-American students. Only fifteen did not have excess capacity.
In the 1972-73 school year, 73% of the racially-identifiable African-American elementary schools, 89% of 'the Westside elementary schools, 25% of the integrated schools and 35% of the racially-identifiable white schools were filled to or were over capacity. The elementary schools that contained the overwhelming majority of African-American students in the RSD were: Barbour, King, Ellis, Henrietta, Dennis, Haskell, Lincoln Park and McIntosh. All these schools were together in a compact, contiguous area of the Southwest Quadrant. The schools were surrounded by a ring of schools to the north, east and west that were racially-identifiable white or integrated and that had excess capacity: Stiles, Whig Hill, Church, Garrison, Jackson, Wight, Kishwau-kee and Welsh. On the south, the circle around these schools was completed by two racially-identifiable African-American schools that also had excess capacity, Beyer and Lathrop. During this period, the RSD crowded African-American students into Southwest Quadrant schools and failed to make reasonable alterations to boundary lines in order to distribute these African-American students to adjacent, racially-identifiable white and integrated schools with excess capacity. RSD Attendance Boundary Map, 1971-72, B38719; QUEFAC Executive Committee Min., 1/11/75, B504567.

Student Assignment and School Boundaries During the QUEFAC Lawsuit and the ISBE Investigation

In March of 1970, a lawsuit was filed against the Rockford Board of Education by the Equal Education for All Children Committee. Plaintiffs charged that the RBE racially discriminated with regard to the boundary changes in the RSD. Other groups that joined as plaintiffs were the Rockford Chapter of the National Council of Negro Women, the Parent Advisory Board of the Wilson Open School Program, Rockford School Masters, Inc., a group of local educators, the Washington Community School Advisory Board, the Westside Community Organization, a group known as “The Committee” and more than one hundred school district residents. In April of 1973, West End Cares About Rockford Environment (WE CARE) joined the pending lawsuit.
In 1971, one year after the filing of the lawsuit, Quality Education For All Children Committee (hereinafter “QUEFAC”), the *1049 State of Illinois put the Rockford Board of Education on notice that Rockford had to begin equalizing educational opportunities in all of the Rockford public schools. Report of Regional Director of State of Illinois Office of the Superintendent of Public Instruction, 3/12/71, B37542. Shortly after that, the Illinois Office of Public Instruction adopted compulsory State school desegregation guidelines. ISBE Rules Establishing Requirements and Procedures for the Elimination or Prevention of Racial Segregation in Schools, 9/2/72, (ISBE Rules), B501029. School districts in Illinois were asked by the State to file a report by January 2, 1972 indicating the racial composition of their schools and the efforts that had been made toward racial balance. Superintendent Salisbury indicated that he would not file a report until he received a formal request from the State. B506190.
The formal request came in December of 1971, along with State desegregation guidelines. The desegregation guidelines put forth by the State provided that a school was racially segregated if its pupils or staff failed to reflect, within fifteen percent, the proportions of such students and staff in the district as a whole at the grade levels maintained. See ISBE Rules, B501025. Any school district found by the State to be racially segregated would be required to submit a plan for comprehensive integration.
According to State guidelines, the plan had to be developed with the involvement of community representations, minorities, students and teachers. Burdens of the plan were to be borne by majorities and minorities alike and students could not be racially segregated within an integrated school. Id. In May of 1972, Superintendent Salisbury announced that Montague, Ellis, Church, Lincoln Park, Barbour and Dennis Elementary Schools would be designated as magnet schools in a Rockford School District integration plan. Each of these schools was located in the Southwest Quadrant and had African-American enrollments of 22.37% to 90.22%. Superintendent Salisbury stated that one of the features of “magnet” schools would be that the schools would have open enrollment, meaning that any student from anywhere in the school district could choose to attend one of those schools. The magnet school program evolved into what was eventually called the “target school” proposal as put forth by Superintendent Salisbury in May of 1972.
On July 10, 1972, the RBE approved the target school program in order to give six RSD schools additional help, including additional funds, teacher aides and money for extra materials, in order to overcome low achievement. B508267-B508270; B508822-B508825. The six schools were Lincoln Park, Dennis, Ellis, Barbour, Church and Montague. The purpose of the target school was to provide compensatory education to low-achieving schools as opposed to bringing students into the schools from other areas of the district. The net result was that the program had no effect on desegregation.
In July of 1974, the RSD received a report indicating that the target schools were not improving and that the school test scores were below the city-wide average achievement levels. B31159-B31173. After this report, the RBE made the following changes in an effort to improve to the target school program:
1. Gave $100 to the petty cash fund of each school;
2. Provided $2 per student for field trips;
3. Set up a swimming program at the Y;
4. Provided each school with two teacher aides;
5. Provided each school with in-service training seminars; and
6. Set up an advisory council.
Bd.Min., 9/9/74, B14557. Little or.no improvement in the academic achievement levels in the six target schools resulted from these changes.
In September of 1972, the State of Illinois informed the RSD that it had not met the school desegregation guidelines set forth- by the ISBE and directed the RSD to immediately develop a comprehensive desegregation plan. The State found that:
Buildings erected and boundaries changed since 1964 have increased, rather than decreased the rising minority enrollment per *1050 centages in non-compliance- attendance centers.
Vakalis Letter to Salisbury, 9/12/72, B500582. The RBE met and discussed the directive from the State. The Board set up a Citizens’ Committee to develop a comprehensive desegregation plan. Bd.Min., 9/25/72, B13533-B13535; Walhout Test., Tr. at 379.
The Community Desegregation Committee
The Rockford Board of Education formed the Community Desegregation Committee (hereinafter “CDC”) by selecting fifteen different groups of organizations, representing a cross-section of the community. Walhout Test., Tr. at 379. In January of 1973, the RBE requested that the CDC consider a proposal to have a 0% to 25% minority enrollment in each school in the RSD. In other words, the RBE requested guidelines that would indicate that any school with under a 25% minority population would still be in conformity with the desegregation plan. Id. at 383. The RBE was all white at the time of that request. Since the RSD had slightly less than a 15% minority student population, the 0-25% range would have technically been legal under the State guidelines. Under the 0-25% plan, all-white schools would not have been required to integrate. Additionally, the 0-25% plan would have involved much greater movement by minority students than by white students.
The CDC eventually rejected the RBE’s proposal and instead recommended a minority population range of 7%-21%, thereby requiring integration in all schools. The Board, in turn, rejected the CDC proposal and proposed a plan that set no numerical goals for minority student populations.
In April of 1973, after extensive thought, planning and dedication from hundreds of Rockford’s concerned citizens, the CDC presented to the RBE a desegregation plan that would take place in two phases, the end result being that by the end of the 1974-75 school year all RSD schools would reflect the minority population of the district plus or minus 7%, that is, 7-21% Phase I was to take place from April 1, 1973 through September of 1973. Phase II was to take place from September of 1973 through June of 1975.
Along with the two-phased plan, the CDC recommended to the RBE that all future decisions involving boundary changes, closing of schools, construction of new schools and the like, be done with the primary consideration of maintaining an integrated school system throughout the schools. The CDC also suggested that the Board seriously consider establishing a School Board elected by geographic districts rather than the single, RSD-wide electoral district that was being used.
In 1973, an Illinois Institute of Technology Research (hereinafter “IITR”) computer study reported that, if the RSD were to comply with the 7-21% minority enrollment guideline, some reassignment of high school students would be necessary. The study determined that, if the 7-21% minority population range was instituted, the racial percentage in RSD high schools would be affected in the following manner:
1. Auburn High School would go from 30.6% minority in the 1972-73 school year to 20% minority.
2. East High School would go from 9.6% minority to 7% minority.
3. Guilford High School would go from .6% minority to 7% minority.
4. Jefferson High School would go from 6.7% minority to 8% minority.
5. West High School would go from 15.5% minority to 14% minority.
See M. Dickover Test., Tr. at 549.
In April of 1973, the RBE presented its desegregation plan to the ISBE, rejecting the detailed plan formulated by the CDC. RBE Plan, 4/26/73, B500511-B500514; M. Dickover Test., Tr. at 560; Walhout Test., Tr. at 387. The RBE plan was very general, had no timetable, did not require any specific minority enrollment percentage guidelines and had no mandatory reassignment provisions. The RBE adopted a three-page document listing objectives, “the plan” and administrative recommendations.
The plan consisted of fourteen one-sentence “points” as follows:
1. An administrative staff member to oversee and implement the plan;
*1051 2. Immediate development and implementation of extensive programs for in-serviee training of staff at all levels throughout the entire district to be evaluated and expanded on a long-term basis;
3. ' The establishment of at least three magnet schools during the 1973-74 school year, with transportation to be provided for students over 1.5 miles from school;
4. Seek all Federal and State funding;
5. Changes in boundaries and the use of school pairings to prevent minority isolation using IITR and other attendance data, taking care that such changes did not continue the isolation of children from low income families;
6. Active recruitment of minority personnel and integration of personnel throughout the RSD;
7. Encourage and facilitate open enrollment for minority students into all schools in the majority areas with available space and for majority students into all schools in the minority areas with available space, as well as develop
(a) a supportive community-wide program to promote such open enrollment and provide transportation for families involved; and
(b) opportunities for open enrollment were to be available only from May 1, 1973 to June 1, 1973 and then closed;
8. Request the cooperation of the City Counsel, the Rockford Housing Authority, the Winnebago County Housing Authority, the Rockford Human Relations Commission, the Winnebago County Board, the Township Board and the Real Estate Board in improving the implementation of the city open housing law;
9. Pay the transportation charges for those students riding Rockford mass transit for students willing to change schools in order to aid in desegregation;
10. Consider desegregation a priority whenever new construction of buildings was planned;
11. Review and evaluate the IITR study;
12. Closing of schools where the schools were not adequate for normal school operation. Such buildings might be used for special purposes;
13. Institute an improved comprehensive achievement testing program to better determine achievement levels of Rockford schools. Tests were to evaluate items such as self image, citizenship and attitudes as well as reading, writing and arithmetic;
14. Voluntary plan for the desegregation of the schools subject to continuous evaluation by the administration and the RBE throughout its usage.
RBE Plan, 4/26/73, B500511-B500514.
Judge Bauer, in August of 1973, rejected the RBE plan, describing it as inadequate. Judge Bauer stated:
From the facts set forth above, there appears to be problems of underachievers ... poor facilities and supplies in certain schools in the RSD.... The present School Board’s voluntary desegregation plan and its other programs did not seem to be adequately meeting and solving these problems.
Quality Education for All Children, Inc. v. School Board., Etc., 362 F.Supp. 985, 1000-1002 (N.D.Ill.1973).
Closing of Muldoon School and Clustering
In the early 1970’s, the RBE developed two specific actions as part of the Board’s overall desegregation plan. Both of these specific actions resulted in mandatory busing, even though the RBE had stated several times its opposition to mandatory busing. The mandatory busing that was required was required of minority students.
The first action involved the closing of Muldoon Elementary School in the Southwest Quadrant. Muldoon was closed in 1972. Muldoon area students were bused to four elementary schools in the Northeast Quadrant of Rockford. Driscoll Report, B24820; Blackwell Letter, 10/1/80, B28891. In 1971- *1052 72, Muldoon was 70% minority. The four schools and their racial percentages in 1971-72 were Spring Creek, 99% white, Bloom, 100% white, Johnson, 100% white, and Guil-ford Center, 96% white.
David Hauman, one of the two RBE members who had voted against the Board’s plan, wrote an editorial in a Rockford newspaper. In his editorial, Mr. Hauman said:
I believe that the implications of this discrepancy are very evident. The Board displays a great deal of concern about the potential busing of majority students; it doesn’t display nearly as much concern about busing minority students. This is a flagrant violation of Section 5.6 of the [ISBE] guidelines which say that the inconvenience or burdens occasioned by desegregation should be shared by all and not borne disproportionately by pupils and parents of racially identified groups.
Rockford Register Star, 5/5/78, B506260.
A document prepared by the RSD showed that by 1980, the Muldoon neighborhood children were attending nineteen different schools throughout the RSD, their neighborhood school never having been replaced. B28891. As the court has pointed out many times, throughout the history of the RSD, there has never been mandatory busing of students from Eastside schools to Westside schools.
The second action consisted of clustering student enrollments among Conklin, 100% white, Haskell, 63% African-American, and Haight, 96% white, Elementary Schools on the Northwest side and exchanging some students between Whitehead, 100% white, and Rock River, 42.52% African-American, on the Southeast side. This plan left the schools on the Southwest side, which were racially-identifiable minority, and the racially-identifiable white schools, totally unaffected. A comprehensive clustering plan was never implemented in the RSD.
Reassignment of Lincoln Park Sixth Grade and Use of Portable Classrooms
In June of 1973, sixth grade students in predominantly African-American Lincoln Park Elementary School were told that because of overcrowding, they must transfer to either Stiles Elementary, John F. Kennedy Middle or Wilson Middle Schools. In 1972-73, Lincoln Park was at 114% of its capacity with 532 students. Less than one month later, on July 23, 1973, the RBE approved a motion to move portable classrooms to Bell and Vandercook Schools, all-white schools in the Northeast Quadrant, in order to solve overcrowding at those schools. Bd.Min., 7/23/73, B13961, B13973. Boundary lines were not adjusted to reassign students from overcapacity Bell and Vandercook Schools to nearby schools that were under capacity, such as Spring Creek and Thompson.
Of the twenty-eight portable classrooms installed by the RSD, only six of them were placed in Southwest Quadrant schools. Three were at Auburn, one was at Haskell in 1972, one at Henrietta in 1975 and one at West in 1972. Three more were put in the Northwest Quadrant at Welsh, one in 1972 and two in 1975. The rest were at Eastside schools, in predominantly white areas. B44226.
Noncompliance With The ISBE Rules in September of 1973
In September of 1973, thirteen schools in Rockford were still not in compliance with State desegregation guidelines. These schools were:
School Quadrant African-American
Barbour Southwest 70%
Beyer Southeast 37%
Dennis Southwest 92%
Ellis Southwest 80%
Haskell Southwest 63%
Henrietta Southwest 72%
Lathrop Southwest 76%
Lincoln Park Southwest 56%
McIntosh Southwest 41%
King Southwest
Rock River Southeast 43%
Washington Southwest 62%
Wilson Southwest
Six schools experienced increased percentages of minorities from 1972 to 1973: Barbour, Ellis, Lathrop, Lincoln Park, Rock River and Washington.
1973 QUEFAC Proceedings
In May of 1973, the attorney for the QUE-FAC plaintiffs sought an injunction to keep the RBE from implementing the voluntary *1053 desegregation plan that the RBE had proposed in lieu of the CDC plan. See Quality Education, 362 F.Supp. 985. In August of 1973, Judge William J. Bauer denied Plaintiffs’ petition for a TRO that sought to restrain the RBE from “carrying forward on a plan known as the Voluntary Desegregation Plan” that had been approved on April 30, 1973. Judge Bauer also rejected the voluntary desegregation plan and stated that if an acceptable plan was not developed by February of 1974, he would reconsider issuing the TRO. Id.
From 1973 to 1976, the RBE did not submit plans to the State Board of Education. Instead, the RSD’s desegregation activities were monitored by the Federal court in the QUEFAC proceedings. The State of Illinois participated in the QUEFAC case as amicus curiae.
In July of 1973, twelve witnesses testified for Plaintiffs in the QUEFAC ease. The testimony revealed that 85% of minority elementary students and 96% of minority elementary teachers were clustered in twelve elementary schools. This did not comply with State desegregation guidelines. Further, 75% of minority middle school students and 75% of minority middle school faculty were clustered in the two middle schools, also not in compliance with State guidelines. Schools on the Westside of the city were inferior to those on the largely white, East-side. At that time, the School Board was all white with no minority representation.
Grade Exchange Plan
In 1973, in response to pressure from the State and the court, the RBE developed the Grade Exchange Plan. Under this plan, whole classrooms of students in the upper elementary grades would be bused to schools outside their neighborhoods in an “exchange” with other schools in order to “substantially reduce the percentage of minority students in non-compliance schools in Rockford.” B36190. Only thirty of the sixty-eight schools in the Rockford School District were to participate in the exchange, including four middle schools. Only two of the ten elementary schools in the Northeast Quadrant were affected by the plan, whereas 55% of the Southwest Quadrant schools were affected. Twenty-eight regular elementary schools were unaffected by the plan, only four of which were in the Southwest Quadrant. The plan was to be implemented in September of 1974. The Rockford School District knew that the Grade Exchange Plan placed extra burdens on minority schools and that the elementary schools in the Northeast Quadrant of Rockford were purposely excluded from the Grade Exchange Plan. Nevertheless, the plan was adopted by the RBE in a 4-3 vote on December 18, 1973.
The plan was the subject of a great deal of public debate. In January of 1974, 200 people attended an RBE meeting to voice their opposition to the Grade Exchange Plan. On January 4, 1974, pursuant to the mandate of the court’s Memorandum Opinion and Order dated August 16, 1973, the RBE submitted the Grade Exchange Plan to the Federal Court. One month later, on February 4, 1974, the REA filed comments in opposition to the Grade Exchange Plan to Judge Bauer. The REA noted that the Grade Exchange Plan did nothing more than create segregated classrooms within desegregated schools. The REA stated that the plan provided for the wholesale transportation of classrooms that would then be kept intact in the new receiving school.
The REA outlined its objections to the plan in a brief to the court. First, the plan did not attempt to cure racial isolation among teachers and students in the schools. Nearly 85% of the students in the school system would be unaffected by the Plan. Even in the few affected schools, no real interaction would exist among the transported students because of segregation by classroom. In three of the schools, students would be isolated on separate floors and lunches would be arranged in shifts so that students would not mingle. Nothing in the Grade Exchange Plan was directed at reducing the achievement lag of minority students. Finally, the Grade Exchange Plan did not address the problem of boundary fines of the Rockford schools.
On February 2,1974, John Schade, a member of the RBE, testified before the United States Senate about desegregation in Rockford. Mr. Schade testified that the RBE was *1054 vehemently opposed to any “forced busing” or “redistribution of school children to accomplish equalization of achievement, social or racial desegregation or for any other reason.” Mr. Schade further testified that for several years pressure was exerted on the Board for a busing program, but that the Rockford Board of Education had resisted this pressure from a past superintendent of the Rockford schools and a vocal militant minority in the city. Mr. Schade stated that the RBE was subjected to a form of harassment by way of the QUEFAC federal lawsuit filed in federal court.
On March 1, 1974, Judge Bauer issued a memorandum opinion and order rejecting the RBE’s Grade Exchange Plan. See B32698. Judge Bauer stated that after carefully examining the plan, as well as the comments and criticisms of the parties, it appeared evident that there should be a more extensive factual and statistical analysis of the proposed plan by the parties. Further, alternative measures that would not necessarily involve forced busing or such an extensive use of busing should be explored. Judge Bauer recommended that the School District keep in mind certain points:
1. Busing should only be utilized when all other remedial measures appear impractical and ineffective.
2. Gerrymandering to achieve school desegregation is permissible.
3. The Grade Exchange Plan was incapable of desegregating classrooms within the schools.
Judge Bauer also stated that, “All things being equal it might well be desirable to assign pupils to schools nearest their homes but, all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation.” Judge Bauer declined to become an activist, but directed that the School District formulate its own plan and deliver it to the court by April 1, 1974.
REA Intervention in the QUEFAC Litigation
In February of 1974, the REA filed a petition to intervene in the QUEFAC case. In March of 1974, the REA presented to the RBE their recommendations for an integration plan. The REA made the following recommendations to the RBE:
1. Maintain the five existing high schools with suggested boundary changes in order to curtail heavy concentrations of minority groups in any one area;
2. Establish middle school attendance centers in each high school area. The REA recommended utilizing the following middle schools: Wilson, John F. Kennedy, Washington, Eisenhower, Lincoln and Roosevelt. Marsh Elementary School would be maintained with the elimination of its middle school program and Beyer would be established as a middle school.
3. Establish a plan to emphasize elementary level parental involvement, transportation and minority enrollment.
The REA’s plan was to divide the city into three elementary attendance zones in order to guarantee adequate minority enrollments and to minimize transportation needs. Within each attendance zone, a community advisory council would be established. A minimum number of Interest Centers within each attendance zone would also be established. Minority enrollment would be guaranteed by altering the enrollment process. The plan further provided that all elementary schools would establish a minority/majority percentage enrollment and that an opportunity would be given to each student to attend any elementary school in his/her attendance zone. Parents would thus be provided with a choice from among six schools in which to enroll their child.
If the plan submitted by the REA had been adopted, it would have resulted in the five high schools having a minority enrollment range of 10.2% to 32.2% due to boundary changes. Middle schools would have reflected a minority enrollment range of 10%-30% and elementary schools would have reflected a range of 17%-20%. REA Plan, B32712. The REA’s plan closely resembled the plan proposed by the CDC. The REA plan, however, was rejected by Judge Bauer.
*1055 The QUEFAC Plan
In March of 1974, the QUEFAC plaintiffs also submitted an integration plan to Judge Bauer. This plan had the following features:
1. The QUEFAC plaintiffs endorsed the REA’s plan of three elementary zones that would consist of a Southern zone, a Middle zone, arid a Northern zone. The minority percentage in the Southern zone would be 6.3%. The minority percentage in the Middle zone would be 17%. The Northern zone would have a minority percentage of 17.31%.
2. The middle schools would be divided in a similar fashion between a Southern, Middle, and Northern zone. Ml sixth graders would be placed in middle schools.
3. The Southern zone of the District’s high schools would be served by Jefferson High School, the Middle zone by East and West High Schools and the Northern zone by Auburn and Guilford High Schools.
The RBE presented its revised plan to Judge Bauer on April 1, 1974 as ordered. The plan provided for elementary Special Interest Centers to be attended by students in grades three through six, but for only five to fifteen days of the school year. Interest Center themes would include reading, language, arts, science and mathematics, social studies, environmental education, health and safety and living arts. The open enrollment policy would be maintained and further voluntary transfers encouraged.
The Board also proposed retaining all current alternative schools and establishing new ones. The Board again brought up the concept of target schools and proposed establishing magnet schools in future years. The Southeast Quadrant of the city would be provided with a middle school to replace the antiquated Morris Kennedy building. More white students would be assigned to Wilson Middle School and minority students would be encouraged to transfer from Wilson.
The Board also proposed establishing an alternative high school at the ninth grade level for the 1976-76 school year, using its best efforts to encourage voluntary transfers, boundary changes and the building of a new high school to reheve overcrowding at East and Jefferson. The Board would encourage more minority students to attend Guilford with fewer attending Auburn. RSD Report, 3/26/74, B32812.
June 1974 QUEFAC Ruling
On June 27, 1974, Judge Bauer issued a memorandum opinion and order in the'QUE-FAC case giving his opinion on the various desegregation proposals before him, including the plans of the RSD, the REA, and the QUEFAC plaintiffs. As to the RSD’s plan, Judge Bauer pointed out that the vast majority of the plan involved student participation in Special Interest Centers that only provided integration one-twelfth of the time. Judge Bauer stated that, although the Special Interest Centers may be both educationally attractive and sound, he was not convinced that they were the best means of sufficiently integrating the RSD. Judge Bauer also indicated that the RSD’s plan failed to adequately state what, if any, mandatory busing would be required if a voluntary system did not work.
Judge Bauer then evaluated the REA plan. The court indicated that the REA’s plan called for mandatory busing without an adequate showing of need. The REA’s plan was said to be vague and absent the necessary details. Judge Bauer criticized the Community Advisory Counsel that would choose the one school of the six schools that a child desired to attend by luck of the draw. The court feared that the advisory counsel would be nothing more than a mini-school board, thereby potentially violating State law. Economic feasibility was also a problem with the REA plan.
In evaluating the QUEFAC plaintiffs’ plan, the court stated that the QUEFAC plan relied heavily on the REA plan, and, therefore, the court’s evaluation of the REA plan applied to the Plaintiffs’ plan. As such, the court also rejected this plan.
The final conclusion of the court was that none of the three plans submitted were sufficiently developed or documented to be deemed an acceptable and ultimate plan for school desegregation in the RSD. Judge *1056 Bauer emphasized that he was desirous of an integrated school system. However, such a desire did not mean, and could not mean, that every school be an integrated unit. More importantly, the school system must be a genuinely integrated one with equal educational opportunities provided to all students.
Judge Bauer then sent the parties back to further develop, delineate, amend and study their respective plans in light of his principles and comments. Judge Bauer also said that, since he was entering no plan of his own, the RBE would be allowed to go ahead and implement its 1974-75 school desegregation plan, thereby providing empirical insight into what effect the different programs under the RBE’s plan had on the problem of minority isolation. The parties were to report back to Judge Bauer on March 1, 1975 with new plans. QUEFAC, 70 C 16, Memorandum Opinion and Order, Bauer, J., 6/27/74, B31078.
Interest Center Implementation
The ruling by Judge Bauer in June of 1974 allowed the implementation of the Interest Center Program. The Interest Center Program was the product of poor planning by the RSD administration and was simply ineffective. The RSD staff had difficulty determining how many days the interest centers should operate. Further, by the time transportation problems were taken into consideration, a limited number of hours during the day were left that students could spend at the Centers. At a staff meeting in July of 1974, Steve Olejnik suggested that teachers conduct educational activities on the bus in order to make up for the shorter day. Staff Meeting Report, 7/1/74, B31576.
The Interest Center Program was not successful either educationally or as an integration tool and, therefore, did nothing to further integration in the RSD. Most of the time entire classes were transferred into the Interest Center. Blackwell Memo, 9/3/75, B35678. The result was that minority classes were placed in an all-white school, kept separate and the students involved would be counted into the total percentage of students in an integration program. The Special Interest Centers were used to boost the enrollment figures for integration compliance purposes.
In 1975, the RSD Director of Attendance reported to the RSD Superintendent that 28% of the K-12 enrollment in the RSD was involved in the integration program. Most of that 28%, however, were comprised of students taking part in the Special Interest Program. The participation constituted only five to fifteen school days per year. Accordingly, in 1975, only 6% of the elementary population was involved in any full-time integration program and 275 of these students were mandatorily reassigned African-American students. B. Thro (Dir. of Attendance) Memo to Johnson, 9/15/75, B37957. In the Fall of 1975, the Director of Integration authored a memorandum that revealed that the Interest Center concept had failed to work. In a document entitled “Plans for Desegregation for District 205, Long-Range Objectives and Goals,” Mr. Oscar Blackwell recommended closing the Interest Centers and opening up centers that would receive students for a full nine months. Blackwell Memo to RBE, 11/13/75, B32910.
The RSD’s Knowledge of Successful Integration Efforts
A review of the documents found in the files of the Director of Integration, Oscar Blackwell, shows that the RSD was well aware of various desegregation plans from around the country that were successful. The RSD had the United States Commission on Civil Rights report detailing the school desegregation efforts in Wichita, Kansas. The RSD had the State of Wisconsin’s published manual, which was really a case study of the Oregon Middle School in Wisconsin. The RSD had a report on the program at the Battle Creek, Michigan Public School System. The RSD had a report on the Berkeley, California School System. The RSD had a study on the desegregation program in Evanston, Illinois. The RSD had a study on stability of racial mix in Illinois schools. The RSD had studies of the Morristown, New Jersey Plan and the Pontiac, Michigan Desegregation Plan. The RSD also had a study of the Houston, Texas Magnet School Program.
*1057 Based upon this, the court finds that the Rockford Board of Education knew that reassignment of students was an integral part of most successful desegregation plans around the country, and intentionally refused to mandatorily reassign,, or “bus” white students to achieve integration.
The RSD 1975 Integration Plan
In February of 1975, the RBE prepared and presented to Judge Bauer and the ISBE its “Recommendations for Student Housing in 1975-76 and Proposals for the Integration of the Rockford RSD #205.” B31159-B31173. The plan recommended “open enrollment” and “voluntary transfer” policies. The plan further recommended that the Special Interest Centers at Nelson and Walker Elementary Schools be .continued and expanded by bringing in third grade students for a Social Studies Interest Center at La-throp School. The outdoor environmental education program would continue for all fifth and sixth grade students, which they would attend for two and one-half days per school year. The Latham Park Alternative School and the Haight Arts Alternative School would be retained and expanded. A pre-school program for students aged 3^1 would be established at Dennis School.
The Board also proposed the consideration of two new alternative schools, one being a 4-R school emphasizing reading, writing, arithmetic and responsible citizenship and the other being an academically gifted school. Under the plan, the target school concept would continue to be expanded. The plan also utilized the “four school plus concept,” which involved the combining of resources of four schools.
The proposals for, the elementary schools included a statement that the RBE believed that the minority percentage of students attending Bloom, Guilford Center, Johnson and Spring Creek had “increased substantially” and, therefore, some of these minority students should be transferred to Brookview and Fairview Schools. Id. Bloom, Guilford Center, Johnson and Spring Creek received the Muldoon School closing minority students since 1973. In the 1974-75 year, the African-American percentages at these schools were:
Bloom: 16%
Guilford Center: 21%
Johnson: 9%
Spring Creek: 13%
The system-wide minority enrollment at the time was 18% African-American. As such, these schools could have minority enrollments up to 33% and still be considered integrated.
At the time that the RBE was proposing the transfer of African-American students from a Northeast Quadrant .elementary school with 9% minority students, the RSD had elementary schools in the Southwest Quadrant with minority percentages as high as 92%. Nevertheless, the Board’s proposal in this regard went into effect. In the 1975-76 school year, Fairview School gained fourteen minority students, bringing their minority student population up to 4.42%. Brook-view gained thirty-two minority students bringing Brookview’s minority enrollment up to 8.13%. At the same time, Bloom, Guilford Center, Johnson and Spring Creek-lost an aggregate total of twenty-one minority students. Some of those students, who were still remnants of the Muldoon School closing, were now being mandatorily reassigned to six ■ different elementary schools and some were attending their third different elementary school in four years. Another recommendation contained in the elementary school section of the RSD’s 1975 plan was the reopening of Argyle School in order to relieve overcrowding in the far Northeast at all-white Bell School.
The February 1975 plan contained the following recommendations for secondary schools: maintain the open enrollment policy; establish a Special Interest Center for seventh and eighth grade students at Wilson; expand the Freeman Alternative School; establish a Fine Arts Alternative School for seventh and eighth grade students; and develop the 4-R School and the Academically Gifted School for middle schools as well as elementary schools. The proposal for the high school included: maintain the open enrollment; apply for funds to build the new senior high school at 35th Street and Samuelson Road (far south, near the Rock River); and consider the two new alternative schools *1058 for the high schools as well. Id. The February 1975 plan submitted by the RBE contained many provisions and ideas that were utilized by the Board in the past.
Mandatory Assignment of African-American Students From Satellite Attendance Zones
In the late 1970⅛ and early 1980’s the RSD attempted to integrate racially-identifiable white schools by creating satellite attendance zones. Under this plan, African-American students were mandatorily bused to white schools. The white schools became the so-called “neighborhood schools” assigned to African-American satellite attendance zones. Consequently, students in a satellite attendance zone were required to travel distances of four to seven miles in order to attend their “neighborhood school.”
In 1977-78, for example, part of the Northwest Quadrant Whig Hill Elementary School’s attendance zone was located over four and one-half miles away in the Southwest Quadrant in what had previously been part of the Dennis School area. RSD Boundary Map, 1977-78, B38728. As a result of these Southwest Quadrant students becoming part of Whig Hill’s attendance zone, Whig Hill’s minority percentage went from 6% in 1976-77 to 49% in 1977-78 and Whig Hill became a racially-identifiable African-American school.
When Whig Hill was closed in 1980-81, students from the Whig Hill satellite attendance zone were then sent even farther north to Haight Elementary School and to Conklin Elementary School. RSD Boundary Map, 1981-82, B38709; RBE Memo, 9/19/81, B46539. This action changed Haight School from an integrated school in 1980-81 (16% African-American) to a racially-identifiable African-American school in 1981-82 (42% African-American). The action changed Conk-lin School from 15% African-American to 27% African-American in 1981-82.
Additionally, the Whig HiH/Haight/Conklin Southwest Quadrant satellite attendance zone became a satellite attendance zone for John F. Kennedy Middle School. RSD Boundary Maps, 1978-79, B38728; 1981-82, B38709. If these students were not a satellite attendance zone, they would have attended Wilson Middle School, less than one mile away. Instead, the students were bused over four and one-half miles to a middle school in the Northwest Quadrant.
The western part of the attendance area of Haskell Elementary School, a Southwest Quadrant, 55% African-American school, became a satellite attendance zone in the 1980-81 school year. The attendance area became a satellite attendance zone, first, for White Swan School in the Northeast Quadrant and, then, for Brookview School in the Northeast Quadrant, in an attempt to integrate those schools. RSD Boundary Map, 1981-82, B38709; RBE Memo, 8/13/80, B28978. White Swan was eight and one-half miles and Brookview was seven miles from the Haskell School attendance area. When the Haskell satellite attendance zone was added to White Swan School, its minority student percentage went from 6% African-American to 22% African-American. After the Haskell satellite attendance zone was changed to become a part of Brookview School, White Swan’s minority percentage dropped down to 1% African-American in 1981-82. Brookview School went from a minority student percentage of 10% in 1980-81 to 24% in 1981-82. The Haskell satellite zone students-were removed from White Swan in 1981 and sent to Brook-view in order to make room for white students from the recently closed Argyle and Bell Schools.
Open Enrollment Policies
Most of the desegregation plans proposed by the RBE, including the 1975 Plan, continued the RBE’s open enrollment policies. The RSD’s open enrollment policies began around 1972. In of May, 1972, Superintendent Salisbury announced that several Southwest Quadrant, African-American schools would be designated as magnet schools, meaning that they would have open enrollment. Any student in Rockford could enroll in a magnet school. The magnet school proposal, however, was not implemented in 1972.
In 1973, after the RBE rejected the CDC’s plan, it submitted its own plan to the QUE-FAC court. The primary focus of this plan was open enrollment. Open enrollment meant that any student could enroll in any *1059 school within the RSD, as long as the transfer improved the school’s racial balance. In Rockford, however, most schools in the Southwest Quadrant were academically inferior to the schools in the Northeast Quadrant as well as most schools in the Southeast Quadrant. Not surprisingly, therefore, there were few, if any, voluntary transfers of Northeast or Southeast Quadrant students into Southwest Quadrant schools. In September of 1974, only 47 of the 636 students (7%) in the RSD taking advantage of the open enrollment program were white. RSD Memo, 5 Year Student Enrollment Projections, 9/1/74, B38448. In 1975, only 3% of the open enrollment students were white. Desegregation Progress Report, 2/3/75, B31345. Integration Director Blackwell indicated that 1108 African-American students were transferred to achieve integration. In contrast, the number of white students transferred was only 142, a ratio of almost 7.8 to 1. Blackwell Letter to H. Will, Rockford NAACP, 11/10/75, B23364. Some of these African-American students had been manda-torily reassigned as a result of school closings or overcrowding.
In September of 1974, the policy of the RSD with regard to open enrollment was that a transfer would only be granted when:
1. The transfer would contribute to the desegregation of the RSD; and
2. Space was available within the school requested.
In addition, new transfers were permitted for each semester and all transfers remained in effect until the end of the school year. The transfer option was closed on October 1, 1974, and each semester thereafter, on the 14th calendar day following the opening day of the new semester. Thro/Blackwell Memo to Johnson, 9/18/74, B37547.
Many problems with the open enrollment program existed. In October of 1974, John Wyeth, Assistant Superintendent in Charge of Operations, outlined these problems in a letter to Oscar Blackwell. Students who volunteered for desegregation but who had an early class schedule, had to provide their own transportation without reimbursement from the RSD. Minority students who volunteered to go to a middle or high school for desegregation purposes but whose classes started late in the school day, were unable to finish school by noon, thereby precluding them from obtaining an afternoon-evening job. Desegregation volunteers had to start school at a later time in order to take part in the desegregation program. As a result, students were withdrawing from the desegregation program because of an inability to receive transportation or the lack of a free lunch program. Wyeth (Supt. in Charge of Operations) Memo to Blackwell, 10/2/74, B33228.
In 1975, the open enrollment policy became even more restrictive by limiting a student’s transportation options. That year, the stated policy regarding open enrollment was that transfers would be granted only when the following criteria were met:
1. The transfer aided in the integration of the RSD.
2. Space was available in the school and grade requested.
3. The student lived where a bus route already existed in order to provide transportation without additional expense to the RSD. Otherwise, the student or his/her parents would provide transportation.
Thro/Blaekwell Memo to Johnson, 8/28/75, B37547-B37551. The number of open enrollment transfers was, therefore, reduced due to the constriction of available transportation. In the first year the open enrollment program was put into effect, 1973-74, there were only 194 voluntary transfers. In the 1974-75 school year, the number of voluntary transfers increased to 559 students. In the 1975-76 school year, the number fell to 393. Johnson Memo to Thro, 12/8/75, B32880.
As early as 1976, the ISBE noted that disparate applications in the transportation policies for open enrollment resulted in discrimination against minority students. The ISBE found that: “There is reason to believe that [open enrollment] transfers were cut off for some schools before they had reached even the average percentage of minority students.” For example, one African-American student, Lavern Tammy Brown, was denied a transfer from Beyer School (43.27% African-American in 1975-76) to Eisenhower Middle *1060 School (predominantly white). The stated reason for the denial was that “the transfer would not aid in the integration of our RSD.” Eisenhower Middle School at that time had only 10.04% minority students.
In 1976, the RSD Director of Attendance told a parent that minority students living in the East High area would no longer be allowed to transfer to Guilford because they were aiding integration by attending East. See E. Simon Letter to ISBE, 8/31/76, B27055. At the time, Guilford High School had only a 5% minority student population and East had a 14.3% minority student population. At the same time, the Muldoon School closing students, who had been man-datorily reassigned to the Guilford High School attendance zone elementary schools, were being denied enrollment at Guilford High School as they became ready for high school. This situation remained in effect until the 1979-80 school year.
The court finds that there were students who used the open enrollment policy to transfer into a different elementary schools and found that the restrictive transportation policy forced them to abandon their new school and return to their neighborhood school. Further, the court finds that the RSD failed to take steps that would have assured that teachers and administrators were prepared to handle the influx of open enrollment students into their schools. Many educational difficulties arose as many of the transferring students went from low-achieving schools into higher-achieving schools. The RSD teachers and staff were not trained to handle these difficulties.
In addition, the court finds that the open enrollment program as administered by the Rockford School District was ineffective as a desegregation tool. A lack of quality education in the African-American schools existed, causing a lack of desire on the part of white students to transfer into those schools. Inadequate transportation was provided, particularly for the minority students. Finally, many minority students who transferred into an elementary school were not allowed to attend the middle and high schools for which that elementary school was to be the natural feeder.
1975 Status Report on Integration
Shortly after the 1975 recommendations were submitted by the RBE to Judge Bauer, Superintendent Johnson and Integration Director Blackwell submitted a memorandum to the RBE detailing the status of the RSD in relation to their integration efforts. The status report revealed that severe problems with racial isolation continued in the RSD. The report revealed that, although some previously all-white schools in the Northeast Quadrant had increased minority student percentages, the Southwest Quadrant had not been helped quantitatively or qualitatively by any of the desegregation programs. The primary reason why Northeast Quadrant schools experienced increased minority student percentages was because minority students either were mandatorily reassigned away from their neighborhood schools or because a few minority students took advantage of open enrollment and traveled to white, Northeast Quadrant schools.
The report further indicated that integration achieved through voluntary transfers of minority students to some majority schools significantly raised the minority percentage in those schools to acceptable levels. These majority schools and the African-American and total minority student percentages in the 1974-75 school year were as follows:
School
Guilford High School
John F. Kennedy Middle t—( 1—1
Guilford Center Od OQ
Hillman Elementary
Spring Creek Elementary H
Welsh Elementary H
Eisenhower Middle
Bloom Elementary t-H H
Haight Elementary t-H H
Marsh Middle
Summerdale Elementary i—i r-i
West View Elementary
*1061 Johnson/Blackwell Memo to RBE, 3/7/75, B30549. Of these twelve schools, three (Guilford Center, Spring Creek and Bloom) had increased minority student percentages only because of the mandatory reassignment of Westside minority students whose neighborhood school was closed and not rebuilt. At the time of this report, forty-five of Rockford’s fifty-nine elementary schools were not within the 7-21% minority student percentage range. Thirty-three schools had less than a 5.3% minority student population and twelve schools had greater than a 32.5% minority student population. Additionally, five of the seven middle schools and two of the high schools were racially-identifiable.
Statistical data for the percentage of underachieving students in non-compliance schools revealed that the continued racial isolation of minority students in the Southwest Quadrant had severe negative effects on the students’ education. In the African-American elementary schools, the percentage of underachievers was very high. Underachiever was defined for ESEA[12] Title I purposes as a student whose performance is at least 6 months behind where he or she should be based upon the student’s actual grade or grade equivalent. The report contained the following data:
School African-American % of Students that are “Title I underachievers”
Barbour 24%
*Beyer 29%
Church 25%
Dennis 92% 62%
Ellis 75% 40%
Haskell 64.5% 64%
*Kishwaukee 15% 37%
Lathrop 73% 36%
Lincoln Park 54% 51%
McIntosh 45% 34%
*Rock River 47%
*=Southeast Quadrant school; all others were southwest.
The average percentage of students who were underachievers in the African-American schools was 41%. B31159-B31173; Desegregation Status Report, 3/7/75, B30549. The report further indicated that there were 13,117 students participating in the desegregation plan in the 1974-75 school year, out of a total student population of 37,291. Of those 13,117 students, 7,045 were participating in the Special Interest Centers. Accordingly, more than half of the students participating in the desegregation plan only participated for ten to fifteen days per year.
The 13,117 students also included 4,665 students who were enrolled at target schools. The target schools were African-American schools that were given extra funds in an attempt to raise student achievement levels at those schools. Students in the alternative Bicultural and Bilingual programs were also included as participating in the integration program. As such, only 1049 students were really participating in some form of desegregation. Of the 1049 remaining students, 636 of those students were transferring into different schools under the open enrollment policy and 413 students were enrolled in alternative schools. Therefore, only approximately 3.6% of the total student population were participating in integration efforts.
The RSD’s Refusal to Comply With The ISBE’s 1976 Rules
After the 1975 plan was submitted to Judge Bauer, most of Rockford School District’s integration plans were submitted directly to the ISBE. After 1975, the district court assumed a very passive role in the lawsuit and the case was eventually dismissed, without prejudice, in 1981.
In 1976 the ISBE issued new desegregation rules and guidelines. The new rules were essentially the same as the rules drafted by the State of Illinois in 1971. The rules mandated that each and every school authority adopt and maintain pupil assignment practices and personnel hiring and assignment policies that eliminate and prevent segregation in schools. If a school was found to be in non-conformance, the school authorities for that district had to prepare a comprehensive plan to correct the specified deficiencies. In preparing the plan, school authorities *1062 were required to inform parents and other citizens of the pending issues and involve them in the planning. The rules prohibited school authorities from adopting or maintaining pupil groupings or classification practices that resulted in racial segregation of pupils within schools for a substantial portion of the school day. A district that refused to comply with the rules could be denied Federal funds. ISBE Rules, B25740-B25753.
In December of 1976, Dr. Harry Darland, a Member of the RBE, voiced his opposition to the State rules by arguing that, “To bus even one child against his parents’ will would be unconstitutional and un-American.” At the same time, the RBE was mandatorily busing African-American students to numerous schools against their parents’ wishes due to the lack of a neighborhood school and due to overcrowding. Additionally, the creation of the satellite attendance zones created in minority areas resulted in the mandatory busing of minority students.
On March 2, 1976, the RBE was informed by the ISBE that the RSD was in noncompliance with the new ISBE rules. The reasons stated by the ISBE for the RSD’s non-compliance were:
1. In September of 1972, the RSD was notified that one or more of its schools were segregated under the then existing rules and they were directed, at that time, to submit a desegregation plan;
2. The RSD requested and was granted additional time by the State to develop a plan;
3. Technical assistance was made available by the educational opportunity staff of the ISBE; and
4. The RSD then submitted a plan which was unacceptable and no acceptable plan was ever submitted, nor did the RSD take steps which did, in fact, substantially desegregate the schools under its control.
The ISBE also indicated that the RSD’s system of desegregation placed undue burdens on minority children. These burdens followed a rather simple pattern: majority students were only moved voluntarily, but minority students were mandatorily reassigned to majority schools. As a result, the ■ISBE put the RSD on probationary status, the precursor to cutting off Federal funding. The RSD could remove itself from probationary status by submitting an acceptable desegregation plan to the ISBE. ISBE Letter to Johnson, 3/2/76, B25731-B25732.
Alternative School Programs: Failures, Disparate Burdens and Benefits
In 1975, the RSD began to propose the development of alternative programs to be housed in high-minority schools in an attempt to attract majority students into those schools so as to improve racial balance. Pri- or to this time, some alternative programs were operating, but they had little impact on the educational community and involved very few students.
Then, in 1975, the alternative center program began to receive increased emphasis in an attempt to draw white students voluntarily into high-minority schools. In June of 1975, a proposal was developed to house two alternative programs in Wilson Middle School, 37.36% minority. One of the programs would be for academically talented or “gifted” seventh and eighth grade students, and the other would focus on anthropology.
In August, Oscar Blackwell made a statement that “the only way to get the majority students to transfer to minority schools is to have offerings the majority students want that are not available in their home schools.” The RSD thus developed a desegregation approach providing special programs and resources to white students that were generally not provided, or were less available, to minority students. When the open enrollment program began in 1973 and minority students started volunteering to transfer, the RSD had not expressed a concern with the need to entice minority students to transfer to white schools. The schools that the minority students were transferring to on the Eastside already had educational opportunities that their home schools simply did not have.
In March of 1976, a plan to designate thirteen elementary schools as Special Focus *1063 Centers was developed by the RBE. The schools and programs were:
School African-American Program
Whitehead 0% Arts Focus
Walker 1% Math/Science
McIntosh 45% Math
Conklin 8% Math Awareness/PhyEd
Nelson 2% Language Arts
Beyer 43% Language Arts
Lathrop 73% Social Studies
Haskell 60% Environmental Ed.
Kishwaukee 15% Instrumental Music
Whig Hill 4% Academics Plus/Vocal Music
Gregory School 2% Academics Plus
Rolling Green 0% Academics Plus, Math, Language Arts
Fairview 4% Community Resources
The policy proposed that if a student lived in the neighborhood attendance area of the Focus Center and was already attending that school, priority would be given to those students who wished to remain in their neighborhood school, but only if integration would be served by the student remaining there. The proposal met with disapproval from some Southwest Quadrant parents.
The RBE then proposed a new group of schools designated as Special Focus Centers were:
School % African-American Program
Second Language, Kindergarten King 05
Second Language, Grades 1-5 Barbour Ü1
Social Studies, Career Awareness, Grades 1-5 Lathrop <1
Gifted, Grades 1-3 Ellis
Science and Math, Grades 1-6 Walker
Urban environment, Grades 3-5 Haskell
Reading, Grades 1-3 Henrietta
Math Awareness/PhyEd, Grades 1-5 Conklin
Academics Plus, Grades 4-5 Lincoln Park CR
Environmental Awareness/Pre-School Family Plan Grades K-4 Dennis -3
Academics Plus/Vocal Music, Grades 1-6 Whig Hill cR
Instrumental Music, Grades 1-6 Kishwaukee cR
Arts, Grades 1-6 Rock River ^
Law, Grades 1-6 Whitehead O
Language Arts, Grades 1-6 Nelson cR
Academics Plus/Swimming, Grades 1-6 Rolling Green ^
Bd.Min., 4/12/76, B15282.
By June of 1976, the student enrollment at the Focus Centers had fallen far short of the goal. A survey taken of teachers in relation to the alternative programs indicated that some teachers were unhappy with the planning of the alternative programs. The survey was intended to assess staff involvement in the implementation and development of *1064 the Focus Centers. The responses revealed a general lack of understanding as to what the Focus Centers were about and indicated a great deal of confusion at some schools. In short, the RBE made an inadequate attempt to involve teachers, parents or the community in the development of the Focus Center Programs even though the RBE possessed information and publications that stressed the importance of the involvement of these sectors in order to assure success of the desegregation program. Participation of these sectors was also required by the ISBE rules.
In the Summer of 1977, the RSD hired recruiters to recruit students into some of the alternative programs. The recruitment focus was on recruiting majority students into programs at minority schools.
In February of 1979, the RSD established rules and practices regarding the Focus Centers. The ethnic composition of the entire school that was housing a Focus Center and/or an alternative program was to reflect the District’s student population. Accordingly, a student would not be admitted into the program if the student’s presence did not help the ethnic composition of, not just the program, but the entire school. Rules Regulating Recruitment for Focus Centers, 2/22/79, B23469. Nevertheless, for some of the gifted alternative programs and Focus Centers, the recruitment efforts focused almost exclusively on majority students.
Some Focus Centers were predominately white but were operated in predominately African-American schools. The RSD considered these schools to be integrated because of the aggregate racial composition of the Focus Center and the regular school program. In other words, the school was classified as integrated if the entire school population, the neighborhood students combined with the alternative program students, were taken into consideration. For example, in 1979, Dennis Elementary School had a general student population that was 65% minority, but the Arts Alternative Program at Dennis School was 14% minority. The presence of the alternative program at Dennis allowed Dennis School to report an overall minority student percentage of 36%. Michaely (Dennis Principal) Memo to Johnson, 4/9/79, B29416.
Some, if not most, of the alternative program students were kept separate from the regular student population. The gifted students at King, for example, were kept separate from the regular students at King School. The “regular” student population was high minority. The gifted program at King was almost all-white. Due to the policy that a student was not allowed to enroll in an alternative program if the student did not aid integration, the RSD often denied entrance to African-American students because the alternative programs were located in schools that were already racially-identifiable African-American. As such, the alternative program and its attendant policies and practices segregated classrooms within schools and perpetuated tracking by keeping minority students in lower-achieving classes.
The RBE Equity Consultant, Dr. Harriet Doss Willis, testified that she observed such conditions in 1992. Dr. Willis indicated that it was her professional opinion that all of her observations in relation to the conditions would have existed prior to the filing of the lawsuit in 1989. Willis Test., Tr. at 160-169. At King School, for example, Dr. Willis observed very few minority students in the gifted classes. The gifted classes were physically separated from the “regular” classrooms. This practice was said to have been going on for many years. Additionally, the principal at King Elementary, when giving Dr. Willis a tour of the school, referred to the separate classes as the “gifted classes” and the “neighborhood school classes.” Dr. Willis observed that the “neighborhood school classes” were almost all minority and the “gifted classes” were almost all white. Dr. Willis described such a phenomenon as a “school within a school.” The court finds that the RSD intentionally operated segregated white classes in several minority schools. The classes were operated in such a manner that the white students would have very little, if any, contact with the minority neighborhood students.
Dr. Willis also observed this same phenomenon in the high school gifted program at Auburn High School. Id. at 163. Again, the *1065 Auburn program was an alternative program composed of mostly white students that was operated in a school that had a high minority population. The court finds that the presence of separate, gifted, predominately white programs in a high minority school had a negative effect on minority students. Further, the court was shown instances where a minority student was not allowed to enter into an alternative program and transfer from his or her neighborhood school because it did not aid integration efforts. The alternative programs were meant to be white programs. The court finds that the policies and practices of the segregated alternative schools contributed to a segregated school system of segregated classrooms within allegedly desegregated schools.
1976 RSD Integration Plans
On March 31, 1976, the RBE submitted another new desegregation plan to the ISBE. This plan provided for continued open enrollment, consolidated and expanded alternative schools, establishment of full-time Special Focus Centers, anticipated changed community enrollment patterns and involvement of parents in all planning and implementation.
On the elementary school level, the plan called for the maintenance of open enrollment, the expansion of Alternative Programs, where possible, the creation of Academics Plus Schools, the establishment of full-time Focus Centers, the creation of options where two or more schools could establish special programs, the cooperation with day care centers, the exemption of Special Education and Bilingual students and the examination of boundary line changes. In addition, a proposal was developed to continue moving sixth graders from Lincoln Park, Conklin and West View to attend John F. Kennedy Middle School and to utilize certain schools to receive Ellis attendance area students.
The 1976 plan proposed essentially the same things for the Middle Schools. The plan further proposed a specific boundary change to house the sixth grade students from Welsh, Church and Haskell Schools at Roosevelt Middle School and to house sixth grade students from Barbour, Lathrop and King Schools at Washington Middle School. The high school proposal was also essentially the same as the elementary school proposal. Plan for Continued School Integration, 1976-79, 3/29/76, B33915.
ISBE Finding of Noncompliance
The RSD’s 1976 plan did not conform to the guidelines of the Illinois State Board of Education and, as such, was found to be unacceptable by the ISBE. The ISBE stated that the primary deficiency of the plan was the lack of a mandatory desegregation plan as previously required by the State. Other deficiencies noted in the plan were that the open enrollment policy involved primarily one way transfer of minority students to majority schools; the alternative programs had uneven success; the Special Interest Centers were not to be considered in a plan if they were not full-time; and the timetable submitted by the RSD to have 50% minority enrollment reduced by 1979-80, was inadequate to produce meaningful desegregation within a reasonable time period.
The ISBE also stressed that a district that had 39,000 students and a minority population of only 19% should find it relatively easy to desegregate. The ISBE then gave the RBE sixty days to submit amendments to the plan. Further, the ISBE stated that, if the RBE was unwilling to' comply with this request, the ISBE would have no alternative but to place the RSD on probationary recognition status, which would be the step prior to the ISBE recommending that Federal funds to the RSD be cut off. Cronin (ISBE)—Johnson Correspondence, B25618; B34730.
In April of 1976, the RBE responded to the ISBE’s finding of non-compliance. The RBE denied that the District was in noncompliance with State rules. Further, the RBE argued that because the RSD was still essentially under Federal court jurisdiction, the RSD was going to submit plans that were acceptable to the court. The RBE also objected to the State rules establishing requirements and procedures for integration. The RBE claimed that the ISBE has no power to set forth racial quotas for attendance in schools. Additionally, the RBE argued that the rules adopted by the ISBE failed to provide proper due process, were arbitrary, *1066 unreasonable and capricious and invaded the provinces of individual Boards of Education. RBE Response, 4/1/76, B500299.
In May of 1976, the QUEFAC plaintiffs filed their comments with the Federal court on the RSD’s 1976 desegregation plan. The QUEFAC plaintiffs believed that the Board’s státed goal of reduction of minority isolation to 50% in three years fell far short of meeting any constitutional test of equality or opportunity for all RSD students. The plaintiffs also commented that totally voluntary measures simply did not work in Rockford. The plaintiffs further stated that they could not believe that majority parents were going to choose a Focus Center Program in different Quadrants of the RSD over continuing their students in high-achieving neighborhood schools. The plaintiffs also criticized the building of the new high school noting that it really would do nothing to improve racial balance at the high school level in Rockford. B25585.
The REA’s response to the desegregation plan stated that the RSD’s plans to build a new high school to replace Jefferson High School would not reduce overcrowding or aid integration. The REA criticized the voluntary transfer program as being inadequate and objected to the inclusion of the students moved from Muldoon School and Lincoln Park School in the voluntary transfer figures, contending that the transfers were involuntary transfers. The REA, however, favored the alternative schools program and indicated that Focus Centers could be educationally sound if there was involvement of staff and parents and if the centers were upgraded. The REA criticized the Board on its failure to provide teacher in-service training. B25500.
In response to the ISBE’s request that the 1976 desegregation plan be modified, the RBE decided to house alternative programs in the more heavily minority-impacted schools. Bd.Min., 4/21/76, B15282. As previously described, however, alternative programs simply created a “school within a school” and did nothing to further integration.
In June of 1976, a letter was sent to the ISBE from the Superintendent of the RSD informing the ISBE that the RSD could not meet its stated goal of reducing minority enrollment in all schools to 50% or less minority by January of 1977. The RSD pushed back the date to achieve this goal to September of 1977. Johnson Letter to Cronin, 6/16/76, B25477. In July, after the ISBE disapproved of the RBE’s plan, the RBE again amended its school desegregation plan reducing the number of Special Focus Centers from sixteen to eight. B500397. In August, the ISBE once again cited the RSD for its failure to develop an acceptable desegregation plan. The ISBE filed an interim report with the Federal court detailing the RSD’s failures. Cronin Letter to Johnson, 8/2/76, B25474.
In October of 1976, the ISBE formally evaluated the RBE’s plan. The ISBE found that the plan provided no realistic indication that the proposed voluntary plan would ever achieve the goals of desegregation. The ISBA further found that the Focus Centers did not affect the schools with the largest minority population. Many schools were completely left out of the desegregation plan. Finally, the ISBE noted that the RBE had failed to consider an alternate plan if the voluntary plan did not succeed. ISBE Evaluation, 10/1/76, B500351.
October 1976 Revised Integration Plan
In October of 1976, the RSD presented yet another desegregation plan to the ISBE. The plan stated that the RSD was going to need another two years to meet State rules and requirements for the elimination of racial segregation. The plan revolved around voluntary movements and transfers of students. The October 15, 1976 revised RSD integration plan listed the following schools as having more than 50% minority enrollment: Washington Middle School, 72%; Barbour, 86%; Beyer, 51%; Dennis, 93%; Ellis, 79%; Haskell, 65%; Henrietta, 70%; King, 91%; Lathrop, 73%; and Lincoln Park, 52%. The plan called for a reduction of these minority enrollments and stated that this would take at least another year. Revised School Integration Plan, 10/13/76, B25454.
In January of 1977, Superintendent Johnson made his report to the Members of the *1067 RBE, listing ten schools in the Southwest Quadrant that had over 50% minority enrollment. The schools were Washington, 72.2%; Barbour, 86.2%; Beyer, 50.8%; Dennis, 92.-8%; Ellis, 79.2%; Haskell, 64.9%; Henrietta, 69.9%; King, 91.4%; Lathrop, 73%; and Lincoln Park, 51.8%. Superintendent Johnson made the following findings and desegregation proposals. As of the Fall of 1977, fifteen schools had minority enrollments less than 7.7% minority and were thus not in compliance with the ISBE’s guidelines. Fourteen of the fifteen were Eastside schools. Superintendent Johnson proposed pairing certain schools with African-American schools and reassigning the students in each pair to reduce racial imbalance. For example, to solve the 86.2% minority population problem at Barbour, Superintendent Johnson proposed pairing Barbour with Evergreen, another school in the Southwest Quadrant that in the 1976-77 school year had 9.96% African-American students. Another proposal was the pairing of Dennis, 87% African-American, and Stiles, 13% African-American in the 1976-77 school year, both elementary schools in the Southwest Quadrant, and only one mile apart from each other. Johnson Memo to RBE, 1/10/77, B37961.
1977 ISBE Finding of Noncompliance and Probationary Sanction
On March 10, 1977, shortly after this plan was approved by the RBE, the ISBE wrote to Superintendent Johnson regarding the RSD’s continued failure to meaningfully desegregate their schools despite their continued promises to do so. The ISBE noted that the RBE had committed to having all schools, except Barbour, King and Washington, with a 50% or less minority enrollment by September of 1977. The ISBE’s figures indicated that no school that had over 50% minority during the 1975-76 school year had dropped below 50% for the 1976-77 school year. In fact, six schools had increased in minority percentage and one school had increased to over 50% minority. The 50% minority figure was a target that the RBE had set for itself and 50% minority was not in compliance with State rules as they existed.
The ISBE also criticized all of plans of the RBE as being either not detailed enough or not doing anything to truly desegregate the schools. The ISBE informed the RBE that the RBE was in violation of the Armstrong Act and the State Board of Education Rules and, therefore, the RSD was placed on probation as of March 10, 1977. Cronin Letter to Johnson, 3/10/77, B500275.
May 1977 Integration Plan
On May 9, 1977, the RBE tried once again and sent a revised desegregation plan to the ISBE. The revised plan provided that the following schools with over 50% minority enrollment would have their minority enrollment percentage reduced to less than 50%: Barbour, Beyer, Dennis, Ellis, Haskell, King, Lathrop and Lincoln Park. The revised plan excepted Henrietta School (70% minority) and Washington Junior High (70% minority) from the 50% goal. This plan was divided into two phases, the second phase being a back-up plan that involved involuntary measures in case Phase I failed.
Phase I included the following:
Relocate bilingual programs from Barbour (60% African-American and 76% minority) and King (77% African-American and 91% minority) to Whitehead (99% white);
Shift Blackhawk Day Care Center students from Beyer (50% African-American) to another school;
Concentrate recruitment efforts on bringing majority students into high-minority schools;
Relocate alternative schools located at La- • tham Park (20% African-American) and Freeman Schools to Lincoln Park School (48% African-American);
Open Haskell (60% African-American) and Bloom (10% African-American, 89% white) as Academics Plus Centers;
Establish a gifted program at King;
Close Riverside (0% African-American) and transfer students to Lathrop (73% African-American) ;
Expand the Washington Middle Rainbow Alternative Program (Washington was 63% African-American);
House sixth grade students from Riverside (0% African-American), Evergreen (10% African-American), King, Barbour and La- *1068 throp Schools in Washington Middle School, Continue Focus Centers at Rock River (36% African-American), Conklin (17% African-American), Walker (95% white) and Kishwaukee (16% African-American); and
Invite Nelson (10% African-American) and Lathrop alternative programs to participate in Academics Plus Center at Haskell or Bloom.
The RBE reserved the right to assign attendance centers for day care students. The plan also called for the expansion of current alternative programs in order to raise minority enrollment to 30%. Open enrollment would be continued under the Plan and Alpine, Freeman, Latham Park, Lincoln Park and Riverside Schools would be closed.
Phase II provided for the following: Pair Stiles and Dennis Schools by housing K-3 in Stiles and 4-6 in Dennis; change boundary lines between Haskell (60% African-American) and Jackson (2% African-American); pair King (63% African-American) and Kish-waukee (16% African-American); and redis-triet secondary school boundaries when the new Jefferson High School opened. Bd.Min., 5/9/77, B15721.
On May 23, 1977, the ISBE wrote to Superintendent Johnson notifying Mr. Johnson that the desegregation plan submitted by the RSD on May 9, 1977 was temporarily approved by the State Board of Education. The approval of the plan expired in March of 1978, at which time the RSD’s minority percentages, and other pertinent information, would be re-examined by the State. Cronin Letter to Johnson, 5/23/77, B500269. On June 13,1977, Oscar Blackwell recommended that the pairing of Dennis and Stiles Schools occur in Phase I instead of Phase II. The plan was changed per his recommendation.
Revisions of the May 1977 Plan
Shortly after the ISBE’s temporary approval was granted, the RBE began changing its desegregation plan in response to the dissatisfaction of parents of students at majority schools affected by the plan. At a meeting on August 8,1977 the RBE received a petition containing more than 685 signatures of citizens opposed to “nonvoluntary” busing. A speaker on behalf of the residents of the Stiles attendance area spoke in opposition to “nonvoluntary” busing of students for integration purposes. In August of 1977, the RBE approved changes in the plan to eliminate the busing of Stiles School (white) students to Dennis School (African-American). The RBE’s minutes of August, 1977 indicated that Stiles School would continue to house K-6, but Dennis School would house only Pre-K-3. The RSD, however, continued to bus grades 4-6 students from Dennis School to Stiles School.
The original plan involved two-way busing of both Stiles and Dennis students. The change, of course, burdened the African-American students, placing them in a nonvo-luntary situation, and protected the white students.
At the same time, the RSD received a petition from parents of Evergreen School (89% white) students protesting the transfer of their students. Phase I of the plan called for the transfer of sixth-grade Evergreen students to Washington Junior High School, which was predominantly African-American. In response to the petition, the RBE said it had made a mistake and that this transfer was only meant to be part of Phase II. Bd.Min., 6/13/77, B15735. The Evergreen School students were removed from the plan in June of 1977. B39277.
In the late 1970⅛, the RBE established a remedial program at Barbour School (79% African-American in 1977-78). In September of 1977, the RBE established the GIT (Get It Together) Program for sixth grade students at Barbour School and sent the regular sixth grade students to Washington’ Middle School. Bd.Min., 9/26/77, B15883. In April of 1979, the RBE expanded the GIT program to include all of grades four through six, and sent the regular fourth, fifth and sixth grade students to Whitehead, Rolling Green, Hillman and Vandercook Schools on the Eastside of Rockford. Bd.Min., 4/23/79, B16387; see also, 1989 Reorganization Plan § 2.13, B509184. The result was that African-American students from Barbour School were mandatorily assigned to racially-identi *1069 fiable white Eastside schools. The RSD’s “integration” programs thus placed disproportionate burdens on African-American students.
The changes that occurred in the RSD were the result of the mandatory shifting of African-American students. As to white students, the RSD’s position was to provide special educational services that would attract white students to voluntarily transfer into the raeially-identifiable minority schools. When the RBE first established the GIT program and sent the regular sixth grade students to Washington Middle School, eighty-nine additional white students came to Barbour in the 1978-79 school year and fifty-six African-American students left. In a similar situation in 1969, the RBE rejected a middle school plan that would have required white sixth grade students to attend a middle school as opposed to continuing in elementary school. When the GIT program was expanded and even more minority students sent away from their neighborhood school in 1980-81, Barbour lost forty-two more African-American students and gained nine white students.
By October of 1977, a total of twenty-eight elementary schools, one middle school and one high school were still out of compliance with State guidelines. Thirteen schools had minority percentages that were more than 16% higher than the total minority student population of the District and seventeen schools had minority percentages that were more than 16% lower than the total minority student population the District.
Construction of New Jefferson High School
By the 1977-78 school year, the Westside high schools, Auburn and West, were near their CDB capacities. The Eastside high schools were well in excess of their CDB capacities: East High, 138% of CDB capacity; Guilford High, 167% of CDB capacity; and Jefferson High, 177% of CDB capacity. This overcrowding intensified following the decision of the RBE to mandatorily assign mandatory Westside attendance zones to the Eastside high schools in an effort to integrate Eastside schools. In 1971, the area west of the Rock River and south of Loomis Street was assigned to East High School. RSD Boundary Map, 1971-72, B38719. This continued through the 1980’s. By 1978, the area west of the Rock River, between Kent Creek and Jefferson Street was assigned to Guilford High School. RSD Boundary Map, 1978-79, B38728. This also continued through the 1980’s. The western part of the Haskell Elementary School attendance area was assigned to White Swan and then to Brookview Schools. RSD Boundary Map, 1981-82, B38709. Muldoon closing students went east, to East and Guilford High Schools.
During 1978? the RBE considered balancing secondary enrollment by redrawing boundaries and splitting grades among the various high schools and middle schools. Instead, the RBE decided to construct a new high school on the far south part of the Southeast Quadrant and move the excess enrollment from the other Eastside high schools to this new school, Jefferson High School. All of the plans involved moving substantial numbers of mostly white students from Guilford and East High Schools to Auburn and West High Schools, except the plan calling for the construction of Jefferson High School.
In the mid to late 1970’s and throughout the 1980’s, student population at all of Rockford’s high schools declined along with the RSD’s total enrollment. Instead of drawing new attendance zones to balance attendance and decrease overcrowding, the RSD insisted upon building Jefferson High School in the Southeast Quadrant and drew boundaries that assigned all students east of the Rock River to the three Eastside high schools. These boundaries, to a large extent, maintained the racial imbalances that previously existed. The racial and capacity percentages at the five high schools were as follows:
*1070 High School Percentage of African-Americans_Percentage of Capacity
_1977-78_1978-79_1977-78_1978-79
Auburn 37%_32%_102%_107%
East_14%_15%_149%_133%
Guilford 7%_9%_167%_136%
Jefferson 9%_8%_177%_96%
West_19%21%105%100%
As a result of the actions of the RBE, for the next ten years the following situation existed: Auburn remained 30-36% African-American and operated at or under capacity. East remained 15-22% African-American and well over capacity. Guilford remained 10-15% African-American and essentially at or under capacity after 1982. Jefferson remained 6-8% African-American and well under capacity until West cldfeed as a high school in 1989. The two high schools on the Westside were maintained racially-identifiably African-American and relatively underutilized. East High School was integrated and badly overcrowded. Guilford and Jefferson were maintained as white and underutilized.
Throughout the 1970’s and the 1980’s the RSD refused to transfer white Eastside high school students to schools west of the Rock River for integration purposes. Jefferson and Guilford High Schools were kept predominantly white, first by packing whites into these schools and then by integrating and packing students into East High School. B38039-B38047.
Noncompliance With The ISBE Rules in The Late 1970’s
In January of 1978, the RBE projected that every school, except two, would have a minority enrollment of under 36% in the 1978-79 school year. The two exceptions, Barbour and Washington, were projected to have minority enrollments of under 50%. B33904. In the plans for continued school integration dated January 30, 1978, the RBE put a “moratorium” on enrollment at the non-complying schools in Rockford. If a family moved after June 9, 1978, and the enrollment of their child in the nearest school did not aid integration, the child would be sent to another school.
In February of 1978, the ISBE gave the RSD another year to bring all of its schools into compliance with State desegregation guidelines. In the 1978-79 school year, nineteen of Rockford’s sixty-eight schools were outside the ± 15% guidelines of the ISBE. Barbour School had a minority enrollment of 63%, Washington had a minority enrollment of 65% and eleven elementary schools still had minority enrollments over 36%, going as high as 73% at Ellis School.
Under the ISBE’s conditioned monitoring of the RBE’s desegregation plan, the RBE was required to submit a progress report to the ISBE in March of 1979. In February of 1979, Superintendent Johnson wrote to the ISBE requesting an extension for submission of their progress report and integration plan for 1979. Superintendent Johnson requested the extension because of bad weather which he claimed had delayed the evaluation of the desegregation program.
In June of 1979, the ISBE informed the RSD that an extension of its “6.1” waiver had been granted until January, 1980. The waiver allowed the RSD to continue receiving government funding despite its being found in non-compliance with the ISBE’s rules and regulations. The basis for and conditions of this extension were:
1. The RSD had achieved a greater measure of desegregation since the RBE’s resolution in June of 1976 but progress had been considerably less than projected;
2. If the voluntary plans then underway did not achieve the 1979-80 projected enrollments by January, 1980, the Dis *1071 trict would be directed to develop and implement other desegregation measures not dependent on pupil or parent choice; and
3. During the interim period, Integration staff and other staff were directed to work closely with the RSD to further its desegregation efforts including an expanded staff in-service program.
ISBE Letter to Jonson, 6/18/79, B500240. Enrollment data for the 1979-80 school year showed that eleven elementary schools were out of compliance with the ISBE rules because their minority student enrollment was too high. Seventeen elementary schools were out of compliance with the ISBE rules for having a minority student enrollment that was too low. Included in these figures were five Southwest Quadrant schools (high minority schools) that fell further out of compliance from 1978-79 to 1979-80. Those schools were Church, Haskell, Henrietta, Lathrop and McIntosh.
In November of 1979, Superintendent Johnson presented desegregation proposals to the RBE that involved the busing of minority students in an effort to reduce minority enrollment at certain schools. One of the proposals involved moving the Fairgrounds Housing Development students out of Church School (50.5% minority) to reduce Church’s minority enrollment. Another proposal suggested the busing of Champion Court and Concord Commons public housing development students “to a convenient school where their presence would not adversely affect the racial balance.” Johnson Memo to RBE, 11/13/79, B500240.
The ISBE 1980 Finding of RSD Noncompliance
In January of 1980, the ISBE, by a 15-0. vote, found the RSD’s desegregation plan inadequate and directed the RSD to amend the plan to include involuntary measures for the 1980-81 school year. Shortly after this, Dr. Cronin of the ISBE wrote to Superintendent Johnson directing the RSD to develop and implement an amendment to its desegregation plan that called for affirmative acts that were not dependent on pupil or parent choice for the 1980-81 school year. Dr. Cronin explained that this action was taken by the ISBE because the RSD had not achieved the level of desegregation expected by the State and by the RSD itself. Of the thirteen schools that the RSD projected decreased minority enrollment, only two met the RSD’s projections.
The RSD Defiance of The ISBE Rules— Opposition to Student Assignment Goals
The RBE challenged the ISBE’s authority and the RBE’s legal obligations to follow the dictates of the ISBE. In April of 1980, the RBE dropped its numerical integration goals. The RBE deleted from its policy statement a commitment to work toward a minority enrollment of 50% or less in each school, stating that the RSD would “oppose any set quotas for the purpose of integration.” The RBE then pledged to achieve integration through the use of alternative schools, open enrollment and adjustment of school boundaries, feeder patterns and school closings. Bd.Min., 4/17/80, B16718. A review of RSD’s student housing data revealed that there was virtually no progress in desegregating African-American schools on Rockford’s West-side between 1977 and 1981. B37928-B37942.
Disparate Burdens on African-American Students By Continuing Mandatory Assignment to Eastside Schools
Throughout the 1970’s and the 1980’s, the RSD mandatorily bused Southwest Quadrant students away from their “neighborhood” schools to schools east of the Rock River in an effort to desegregate majority white schools. The busing of Northeast and Southeast Quadrant students to schools on the Westside of Rockford, however, was voluntary. The RBE allegedly had a policy against forced busing for the purposes of integration. A member of the RBE once stated: “We shouldn’t move students around to achieve racial balance.” The court finds, however, that the RBE’s opposition to mandatory busing and mandatory integration measures was applicable only to white students.
In March of 1980, Superintendent Johnson made various integration proposals that affected white schools. The proposals included closing Evergreen School (83% white), Ar *1072 gyle (99% white) and Highland School (86% white). B4198-B4229. One month later, these proposals were rejected by the RBE. Bd.Min., 4/28/80, B35526.
On April 28, 1980, the RBE adopted the following desegregation plan: fourth, fifth, and sixth grade Barbour students were reassigned to schools in the Northeast and Southeast Quadrants in order to make room for an expanded GIT program at Barbour. A RSD document entitled “Mandatory Busing” revealed that a total of 218 Barbour School students were bused from Barbour to Hillman, Nashold, Rolling Green and Van-dercook Schools, all in the Southeast Quadrant, during the 1985-86 school year. B46710. The elementary and middle school components of the Creative and Performing Arts (CAPA) program were combined by transferring the Ellis School CAPA fourth through sixth grade students to Washington Junior High. In order to make room for these new CAPA students, the sixth grade Barbour students were removed from Washington and reassigned to Eastside schools. By the 1985-86 school year, a total of 329 students from Ellis School were mandatorily bused to six different schools in the following Quadrants: Bloom, Northeast; Carlson, Northeast; Jackson, Northeast; Spring Creek, Northeast; Welsh, Northwest; and Westview, Northwest. Id. The boundaries of Haskell School were changed so that some of the Haskell students were sent to nine Northeast area schools that already were receiving students from the Westside. Bd. Min., 4/28/80,- B35526. Three of these four decisions involved the mandatory reassignment of students from African-American, Southwest Quadrant schools, to schools east of the Rock River. The court finds that the RBE was well aware of complaints and protests from minority parents that one-way busing was unfair and that in fact, the RBE had a policy against busing. The policy was enforced only for the protection of white neighborhood students.
In September of 1980, RBE Member Dr. Harry Darland filed a lawsuit against the ISBE requesting that the ISBE be permanently restrained and enjoined from enforcing its rules establishing requirements and procedures for the elimination and prevention of racial segregation in RSD schools. Further, in 1980, the Haskell School attendance boundaries were changed requiring approximately half of the pupils living west of Kilburn Avenue, just three blocks west of Haskell School, to ride buses to Eastside schools. This change affected fifty to sixty African-American students. These African-American students were sent to White Swan School on the far Eastside of Rockford, about seven miles from the area where these students lived. See B509184. Students from Haskell were not given the option of attending any other neighborhood school. RBE Memo, 8/17/80, B4073. White Swan’s minority percentage thus went from 5.64% African-American to 22.31% African-American. As a result of complaints from parents of students at White Swan School, the Haskell transfer students were at White Swan for only one year.
The year after the Haskell students were transferred into White Swan, Argyle and Bell Schools were closed. White students from Argyle and Bell were reassigned to White Swan and the African-American Has-kell students were removed from White Swan. B509184. White Swan’s minority percentage dropped dramatically down to .56% African-American, 5% lower than it was before the Haskell busing. Thus, White Swan was integrated and subsequently re-segregated within two successive school years.
In 1981, the African-American students from the west part of the Haskell School attendance area were bused to Brookview School in the Northeast Quadrant with a 89% white and 10% African-American enrollment. RSD Attendance Map, 1981-82, B28709. This assignment remained in effect until the 1989 Reorganization Plan. From the 1980-81 to the 1981-82 school year, Brookview’s African-American percentage increased from 10% to 24%. Brookview School was approximately five miles from the west part of the Haskell School area. The net result of the reassignment of the Haskell area students was to reduce Haskell’s minority percentage enrollment by less than 6%, bringing that enrollment to just under 50%. The court *1073 finds that this busing imposed a substantial burden on the Haskell students who were forced to travel long distances to a new school, only to be taken out of that school one year later and “reassigned” to another new and distant school. The court further finds that this type of disparate impact and burden placed on minority students was not an isolated incident.
In the 1980-81 school year, a RSD analysis was performed in order to determine the number of neighborhood students attending their neighborhood schools. A review of this document revealed that in the racially-identifiable African-American schools in the Southwest Quadrant, only 64.56% of the neighborhood students were attending their neighborhood school. For example, only 195 of Barbour’s 442 neighborhood attendance area students actually attended Barbour School. The other 247 students were bused to other schools. In contrast, in the racially^ identifiable white schools in the Southwest Quadrant, 94.5% of the neighborhood students were enrolled in their neighborhood schools. In the Northwest, Northeast and Southeast Quadrants combined, an average of 91.58% of neighborhood students were attending their “neighborhood” schools. Further, a RSD document revealed that in the 1988-89 school year, all of the 2100 students who were mandatorily reassigned out of their neighborhood came from the predominantly minority Southwest Quadrant. Accordingly, the court finds that the RSD’s claimed policy of “neighborhood schools” was, in reality, applicable only to white students in white neighborhoods.

Student Assignment and School Boundaries Subsequent to the QUEFAC Lawsuit and the ISBE Investigation

In March of 1981, the RBE passed a resolution regarding school integration. The resolution was presented by Board Member Dr. Harry Darland. The resolution stated that, because a State Appellate Court decision on the East Aurora School District 131 declared the ISBE rules unreasonable, arbitrary and void, the RSD would no longer comply with the rules and regulations of the ISBE. - The RSD would operate according to its own integration policies. B36704.
In 1972, when the RSD was first asked to comply with the ISBE rules, approximately 90% of the RSD’s students attended racially-identifiable elementary schools. In 1972, 93% of the RSD’s elementary schools were racially-identifiable. By 1980, after the QUEFAC litigation and following pressure from the ISBE to desegregate RSD schools, the number of students attending racially-identifiable elementary schools was approximately 50%. After the section of the ISBE rules that set numerical student population requirements was declared invalid and the RBE eliminated its own numerical goals, the percentage of students in racially-identifiable elementary schools began to climb. By 1987, approximately 65% of the students in the RSD were attending racially-identifiable elementary schools and 56% of the RSD’s elementary schools were racially identifiable.
After the ISBE lost its power in relation to the RSD and after the QUEFAC suit was dismissed without. prejudice in 1981, the RBE undertook a series of actions that had the effect of isolating the minority students in the RSD. These actions included the dismantling of alternative programs, the restricting of transportation options for students and the closing of schools and the redrawing of school boundaries. All of these actions had a segregative effect on the RSD’s schools.
1980 Student Reassignments and Closing of Schools.
A RSD administrative task force report on future RSD building needs was presented to the RBE on March 10, 1980. Bd.Min., 3/10/80, B16678. The report named twelve schools recommended for further analysis to determine whether they should be closed. Those schools included Whitehead, Beyer, Nelson, Peterson, Fairview, Argyle, Sum-merdale, Lathrop and Evergreen Elementary Schools. Also named for possible closure were Roosevelt, John F. Kennedy and Washington Middle Schools. Id.
On December 8,1980, the RBE received a report from Northern Illinois University consultants hired to study buildings and facilities in the RSD. This report proposed closing *1074 eleven schools in the 1981-82 school year. Bd.Min., 12/8/80, B16921. Those schools were Gunsolas, Highland, Wight, Henrietta, Bell, Argyle, White Hill, Peterson, Washington Middle School, Roosevelt Middle School and Lincoln Park School.
On February 9, 1981, the RBE received a study RSD staff had prepared of all school buildings in the district. Bd.Min., 2/9/81, B16955. This document was entitled the “Rockford Public Schools Individual Building Analysis.” Individual Building Analysis (IBA), 2/9/81, B29808. The staff’s report stated that “[i]n analyzing each building our committee used 13 components which were initially given equal ranking.” Id. One of the thirteen components that appeared in the staff committee report was the concept of de jure segregation. The report explained that “[t]his factor takes into account whether reassignment of students due to a school closing could have de jure segregation implications, thus limiting the board’s ability to reassign students to the closest school.” Id.
With regard to Dennis School, the RSD staff report stated that “[a] change in boundaries to accommodate strictly a neighborhood population could result in de jure segregation.” In 1983, and again in 1989, the RBE approved boundary changes to accommodate a neighborhood population with the result that Dennis School became more segregated. In the 1982-83 school year, Dennis was 31% African-American and in the 1983-84 school year, Dennis was 57% African-American.
With regard to Ellis School, the RSD staff report stated that “Returning grades 4-6 could result in de jure segregation.” In 1989, the “Muldoon” grades 4-6 were returned to Ellis School, causing Ellis’ minority population to increase from 59.08% African-American to 92.08% African-American. Additionally, the Arts Alternative Program was removed from Ellis and sent to Washington. As a result, Ellis’ white student population dropped to 17 in 1989-90 from 127 in 1988-89.
With regard to Henrietta School, the RSD staff report stated that “[r]eassignment of students must avoid de jure segregation.” In the 1980-81 school year, Henrietta School was racially-identifiably African-American with a 63% minority enrollment. In the 1981-82 school year, Henrietta was closed and students were reassigned to Dennis, McIntosh and Haight Schools. Dennis School’s African-American population rose to 32%. Haight School’s African-American student population increased from 16% to 42%. McIntosh School’s minority population increased from 45% to 53%.
With regard to Whig Hill, the RSD staff report stated that “[rjeassignment of students must avoid de jure segregation.” In 1981, Whig Hill was closed and its 44% African-American students were reassigned to Haight School, which then became racially-identifiable African-American, going from 16% to 42% African-American, and to Conk-lin School, which went from 15% African-American to 27% African-American.
In the 1980-81 school year, Gunsolas School, in the Southeast Quadrant, was 93% white. When Gunsolas closed, its students were transferred to adjacent racially-identifiable white or integrated schools, New Milford, Sky View and Froberg. B46632. As a result of the addition of white students from Gunsolas, Froberg School went from being an integrated school at 19% African-American in 1980-81, to 3% African-American in 1981-82. The GIT program at Froberg was removed, also resulting in an increased majority student population. Bd.Min., 3/9/81, B16975. In an attempt to accommodate the Froberg GIT students, the GIT programs at Jackson and Barbour Schools were expanded.
In the 1980-81 school year, Argyle and Bell Schools were 98% and 95% white respectively. When these schools closed, the students were reassigned to nearby Spring Creek, Guilford Center and White Swan Schools. B46630. Haskell students were removed from White Swan, resulting in White Swan going from 22% African-American to 98% white.
In the 1980-81 school year, Peterson School was 88% white. The Peterson School attendance area was divided into four areas and its students were sent to Beyer, Hallst-rom, Nashold and Rock River Schools. B46628. Beyer School, with a 41% African- *1075 American student population, received thirty-one additional African-American students in 1981-82 and Rock River School, "with a 41% African-American student population, received eleven additional African-American students. In contrast, Nashold School, with 5% African-American student population, received only two additional African-American students and Hallstrom School, with only a 5% African-American student population, received no new African-American students.
One week after receiving the staffs building study that indicated certain actions could result in de jure segregation, the RBE approved school closings and reassignments that, according to the report, could result in de jure segregation. In an open meeting approximately one month later, parents spoke to the RBE about the proposed school closings. Darlene Hanna, a Roosevelt School parent who later became an RBE member, discussed the disadvantages of closing Roosevelt Middle School and noted that Roosevelt was a naturally integrated school. Bd.Min., 1/26/81, B16951. The Roosevelt School boundaries ran from the Rock River on the east to Central on the west, Jefferson Street on the south and West Riverside on the North. Roosevelt’s enrollment was integrated every year from 1970 through 1981. In its own Building Analysis, the RBE recognized and pointed out the value of natural integration in its discussion in relation to Lincoln Middle School. The elementary schools that naturally fed into Roosevelt were: Church (47.12% African-American), Garrison (25.23% African-American), Walker (19.35% African-American), Haskell (49.39% African-American), Welsh (19% African-American), Summerdale (28% African-American), West View (15.03% African-American) and Conklin (15.20% African-American). These feeder schools were mainly integrated schools.
In the 1980-81 school year, Roosevelt Middle School had an integrated student population of 27.53% African-American. The Roosevelt attendance area residents also had a diverse socioeconomic make-up. The Fairgrounds Park Housing Project (low-income) and the National Avenue District (high-income) were both contained within its boundaries. Roosevelt School was located in an area with dense population, had the largest number of students in its feeder schools, had one of the lowest costs to run per year of any RSD secondary school, was the only school in the area projected to increase enrollment over the next five years, was located within walking distance of community resources and was a school where students could stay after school for extracurricular activities. Id. Despite all these advantages, on February 18, 1981, the RBE approved the closing of Roosevelt Middle School. Bd.Min., 2/18/81, B16967, B16971.
The RBE also closed Washington Middle School, located in the Southwest Quadrant. Id. Washington Middle School was a raeially-identifiable African-American school and, in the 1980-81 school year, had a 47.5% African-American student population. By closing Roosevelt and Washington Middle Schools, the RBE closed the only naturally integrated middle school and the most heavily populated minority middle school. The closing of these two schools left the Southwest Quadrant without any middle or secondary school south of State Street and west of the Rock River.
Integration Efforts of the RBE in 1981
According to one RBE Member, the level of the RSD’s commitment to integrative programs declined after the withdrawal of the ISBE. Unless outside pressure was present, the RBE undertook no steps in an effort to desegregate Rockford schools. In 1981, Rockford was released from the pressure of the ISBE and the United States District Court.
On February 18, 1981, the following policies were approved by the RBE:
1. Operating costs in the alternative education programs were cut.
2. All alternative program bus riders were charged for the actual cost of transportation to such programs except those families who qualified under the RSD’s free lunch program.
3. The position of Director of Integration was eliminated. All funds that were realized from the sale of closed school properties were used for construction *1076 in the attendance areas of Argyle, Bell and Guilford Center (Northeast) and Cherry Valley, Gunsolas and Vander-cook (far Southeast). The attendance areas of these schools were almost completely white.
Bd.Min., 2/18/81, B16967; Walhout Test., Tr. at 420-421. In the 1981-82 school year, eight Southwest Quadrant elementary schools were racially-identifiable African-American. Those schools and their African-American student enrollment were:
Ellis 63%
Church 54%
McIntosh 53%
Haskell 52%
Barbour 50%
Lathrop 47%
Haight 42%
King 37%.
1983 School Closings
In late 1982, eleven more schools were under consideration by the RSD for possible closure. These schools were Westview, Haight, Dennis, Evergreen or King, Guilford Center, Fairview, Garrison, Whitehead and Stiles, Cherry Valley and New Milford. B47879. Further closings were ruled out in the Northwest area where Whig Hill and Henrietta Schools were closed and in the inner Southeast area where Turner, Peterson and Wight Schools were closed. A savings of close to $2 million was projected to result from these closings. See B506492.
Evergreen School was closed in 1983 and its students were reassigned to Lathrop and New Milford. Lathrop’s African-American percentage went from 47% to 38% and New Milford remained all white. The Evergreen students east of the Rock River were sent to New Milford, also east of the Rock River. Guilford Center was also closed in 1983 and its students were reassigned to Brookview. Brookview School’s African-American percentage decreased from 22% to 16%. Fair-view School was closed in 1983 and its students were reassigned to Johnson School, lowering Johnson’s minority percentage from 13% to 6%. Fairview students were also reassigned to Rolling Green School, decreasing its minority percentage from 18% to 16%.
Garrison School’s old building was closed in 1983, but its new addition remained open. Garrison’s fourth through sixth grade students were reassigned to Walker and Haskell Schools. As a result, Walker’s African-American student population decreased from 13% to 7% and Haskell’s African-American student population increased from 57% to 63%. Garrison changed from a 27% African-American student population to an 18% African-American enrollment.
Skyview School, which was all white, was closed in 1983 and its students were reassigned to New Milford School, also all white, and to Froberg School. Froberg was 3% African-American in the 1982-83 school year. As a result of the reassignment, Froberg School became 1% African-American in the 1983-84 school year.
The RSD report also proposed closing Cherry Valley School, that was 99% white, and reassigning its students to Hillman School, that was 25% African-American. Cherry Valley, however, was not closed. Further, the RSD proposed closing Stiles School and reassigning its students to Dennis School. B47879. Stiles was previously 99% white; however, since 1973, Stiles had a 12-32% African-American student population due to the busing of African-American students from Dennis. In the 1982-83 school year, Stiles was 26% African-American, with 57 African-Americans in its student population of 223. Dennis was a school with a student population in excess of 90% African-American. Since 1975, Dennis had an increased percentage of whites as a result of receiving white students from the former Lincoln School area to the north. B509184. In the 1982-83 school year, Dennis was 31% African-American. Stiles was ultimately left open.
The only other school that experienced a big change in enrollment in the 1982-83 school year was Whitehead, which resegre-gated from 19.08% African-American to 3.39% African-American. The RBE approved wing closings at Whitehead School, Garrison School and Fairview School. Bd. Min., 3/28/83, B17558, B17561. As a result of these wing closings, Whitehead School lost only 17% of its white students. In contrast, *1077 Whitehead lost 88% of its African-American students. Similarly, Garrison School lost 53% of its white students, but lost 72% of its African-American students due to wing closings. An examination of minority percentage changes in schools during the 1983-84 school year, revealed that the percentage of non-minority students enrolled in racially-identifiable white schools increased slightly as did the percentage of African-American students enrolled in racially-identifiable African-American schools.
In its 1981 Individual Building Analysis, the RSD administrators warned that the closing of certain schools and the reassignment of those students to nearby schools resulting in segregation, would constitute de jure segregation. IBA, B29808. The following closings and reassignments were violative of this warning: Closing Evergreen and sending students to New Milford; closing Guilford Center and sending students to Brookview; closing Fairview and sending students to Johnson; closing Garrison and sending white students to Walker and African-American students to Haskell; closing Skyview and sending students to New Milford and Froberg; and expanding Dennis’ boundaries, thereby increasing its racial isolation. The net result of these school and wing closings was that eight schools became substantially more racially isolated, three schools were allowed to remain racially and geographically isolated from the rest of the RSD and many other schools throughout the RSD experienced resegregative enrollment changes. The court finds that the RSD knew that these closures constituted de jure segregation.
Dismantling of Alternative Programs
After the State of Illinois and the Federal court allowed the Rockford Board of Education to proceed without scrutiny, the RBE began to dismantle the alternative programs. In 1981, free transportation and teachers for the full-site programs were canceled, thus effectively eliminating the programs. See, infra, Inequitable Access to Transportation. Additionally, free transportation was eliminated for all students in the secondary schools grades seven through twelve. RBE Letter to Parents, 4/81, B46529. Transportation to some of the alternative programs was also canceled. After the free transportation was canceled, the number of RSD students participating in the desegregation program decreased dramatically. In the 1980-81 school year, 674 students were participating in integration transfers. By the 1981-82 school year, that number had dropped to 277. B4069; B46711.
In March, 1981, the RBE decided to close Lincoln Park Elementary School. Lincoln Park was a full site magnet school that housed the Rockford Alternative Middle School (RAMS) and the Rockford Alternative Elementary School (RAES) programs. Bd. Min., 3/9/81, B16975. The RAMS program was to be moved from Lincoln Park to Lincoln Middle School and the RAES program was to be moved to Ellis School. Id. The RAMS and RAES programs were integrated magnet school programs. Subsequently, despite community protest, the RBE decided to discontinue the RAMS program. Bd.Min., 6/14/82, B17348.
By the 1988-89 school year, the year in which the RSD passed the Reorganization Plan that triggered this lawsuit, the mandatory one-way busing of African-American students was still underway in various schools and the burden of any remaining integration efforts was being borne exclusively by minorities. The RSD schools continued to be severely segregated. After twenty years of desegregation efforts in the Rockford School District, six schools had more than 50% minority enrollment, 63% of the elementary schools were racially-identifiable and 33% of the middle and high schools were racially-identifiable.

CONCLUSIONS OF LAW

Generally, courts hearing liability claims avoid finding that some magical percentage of variance in a school’s population from the racial composition of the district as a whole makes a school racially imbalanced. Some courts have explicitly held that it is unnecessary to find that specific schools are segregated or to set a precise numerical ratio that designates a school as segregated or integrated. Armstrong v. Brennan, 539 F.2d 625, 633 (7th Cir.1976), vacated and remand *1078 ed, 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977), on remand Armstrong v. O’Connell, 451 F.Supp. 817 (E.D.Wis.1978), on remand 463 F.Supp. 1295 (E.D.Wis.1979); Arthur v. Nyquist, 415 F.Supp. 904, 912 n. 9 (W.D.N.Y.1976), aff'd on reconsideration, 429 F.Supp. 206 (W.D.N.Y.1977), aff'd in part and rev’d in part on other grounds, 573 F.2d 134 (2nd Cir.), cert. denied, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978). A rigid mathematical formula would arguably conflict with the dictates of Keyes that factors other than the composition of a school’s student body, “such as the racial and ethnic composition of faculty and staff, and the community and administration attitudes toward the school, must be taken into consideration.” Keyes v. School Dist. No. 1, Denver Colorada, 413 U.S. 189, 196, 93 S.Ct. 2686, 2691, 37 L.Ed.2d 548 (1973) (emphasis added); see also, Oliver v. Kalamazoo Bd. of Educ., 368 F.Sup 143, 153 (W.D.Mich.1976), aff'd 508 F.2d 178 (6th Cir.1974), cert. denied 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975); NAACP v. Lansing Bd. of Educ., 429 F.Supp. 583, 592, aff'd 559 F.2d 1042 (6th Cir.), cert. denied, 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977) and aff'd, 571 F.2d 582 (6th Cir.), cert. denied 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 1150 (1978).
This does not suggest, however, that student enrollment figures do not play a central role in desegregation cases. Typically the evidence in desegregation cases includes vast historical data showing enrollment by race in the school district and in its individual schools. Based upon the circumstances of the ease, the court then makes findings that highlight: (1) the percentage deviation between the minority enrollment in particular schools and the minority population of the district as a whole; and (2) the existence and number of virtual one-race schools in the district. See, e.g., United States v. Yonkers, 624 F.Supp. 1276, 1386 (S.D.N.Y.1985), aff'd, 837 F.2d 1181 (2d Cir.1987) (64% of district’s white students attended schools with at least 90% white students, while 28% of the minority students were enrolled in schools with at least 80% minority enrollment); Lansing, 429 F.Supp. at 609 (in a system in which 18,800 students attended 48 elementary schools and 79% of the- students were white and 21% minority, two elementary schools were 85% minority and a third 49% minority); Morgan, 379 F.Supp. at 424 (in a system of 96,000 students, in which 61% of the students were white and 39% minority, 84% of the white students attended schools that were more than 80% white and 62% of the African-American students attended schools more than 70% African-American); Oliver, 368 F.Supp. at 153 (in a system of 29 elementary schools in which 16.1% of the elementary students were African-American, 92.3% of African-American children went to five schools).
In considering the degree of segregation in student assignments, courts frequently rely upon expert testimony that identifies particular schools as racially imbalanced based upon a certain percentage deviation between the proportion of minority enrollment in a given school and that in the whole district. See, Higgins v. Bd. of Educ. of Grand Rapids, 508 F.2d 779, 787 n. 12 (6th Cir.1974) (15% is a commonly accepted guideline); Penick v. Columbus Bd. of Educ., 429 F.Supp. 229 (S.D. Ohio 1977) (5% variation). Although these analyses do not provide a talismanic mathematical formula for racial identifiability, Price v. Denison Indep. School Dist., 694 F.2d 334 (5th Cir.1983), such formulas serve as a “rough gauge which is a useful reference point when examining particular schools.” Columbus, 429 F.Supp. at 268-69. Based upon this type of statistical evidence, and with appropriate reference to conditions in the other areas noted in Keyes, a court may then conclude that the district’s schools are “racially imbalanced” or “raeially-identifiable.”

Conduct Contributing to Racially Identifiable Schools

In cases involving non-statutory dual school systems, courts have cited a wide range of acts and omissions by school boards that have caused or maintained segregation in student assignment. The court finds that the Rockford School District engaged in a pattern of unlawful acts and omissions involving the conduct noted below that caused and maintained segregation in its schools.
*1079 Boundary Changes and Attendance Zones
In most desegregation cases, courts have noted instances in which the defendant school district developed boundaries and attendance zones in such a manner that racial segregation in school assignments resulted. See Yonkers, 624 F.Supp. at 1430, 1526-27; Reed v. Rhodes, 455 F.Supp. 546, 558 (N.D. Ohio 1978), aff'd in part and remanded in part on other grounds, 607 F.2d 714 (6th Cir.1979), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); Berry v. School Dist. of Benton Harbor, 442 F.Supp. 1280, 1312-17 (W.D.Mich.1977); Lansing, 429 F.Supp. at 596; Penick v. Columbus Bd. of Educ., 429 F.Supp. 229, 245-46 (S.D.Ohio 1977), aff'd in part and remanded in part on other grounds, 583 F.2d 787 (6th Cir.1978), aff'd, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); Arthur v. Nyquist, 415 F.Supp. at 924, 934-36; Amos v. Bd. of School Directors of City of Milwaukee, 408 F.Supp. 765, 783-84 (E.D.Wis.), aff'd, Armstrong v. Brennan, 539 F.2d 625 (7th Cir.1976), vacated and remanded on other grounds, 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977); Morgan, 379 F.Supp. at 438; Oliver, 368 F.Supp. at 167; Booker v. Special School Dist. No. 1, Minneapolis, Minn., 351 F.Supp. 799, 804 (D.Minn.1972); Johnson v. San Francisco Unified School Dist., 339 F.Supp. 1315, 1336, 1341 (N.D.Cal.1971), vacated on other grounds, 500 F.2d 349 (9th Cir.1974); United States v. Bd. of School Commissioners of Indianapolis, 332 F.Supp. 655, 666-67 (S.D.Ind.1971); Spangler v. Pasadena City Bd. of Educ., 311 F.Supp. 501, 509-10 (C.D.Cal.1970); United States v. School Dist. 151 of Cook County, 286 F.Supp. 786, 798 (N.D.Ill.1968), aff'd, 404 F.2d 1125 (7th Cir.1969), cert. denied, 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971).
The court finds that the Rockford Board of Education gerrymandered school attendance area boundaries in order to create and maintain a separate school system based upon race. The RSD’s alleged policy of maintaining neighborhood schools was, in fact, a policy of maintaining neighborhood white schools. Minority students simply did not have the same rights as majority students in the RSD.
Manipulating Feeder Patterns
In many schools districts, high school attendance is determined by feeder patterns geared to schools rather than to geographical areas. Thus, manipulation of these feeder patterns to perpetuate or increase segregation has the same effect as manipulating attendance zones boundaries. See Berry, 442 F.Supp. at 1310; Morgan, 379 F.Supp. at 442-48. The court finds that the Rockford School District consistently and intentionally manipulated school feeder patterns in order to maintain segregation in its schools.
Optional Attendance Zones and Open Enrollment
In some desegregation cases, courts have found that the defendant school districts contributed to segregative conditions by employing optional attendance zones or open enrollment policies by means of which students were permitted to attend one of two or more schools. See United States v. School Dist. of Omaha, 521 F.2d 530, 540-43 (8th Cir.), cert. denied, 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975); Oliver v. Michigan St. Bd. of Educ., 508 F.2d 178, 183-84 (6th Cir.1974); Brinkman v. Gilligan, 503 F.2d 684, 695-696 (6th Cir.1974); Penick, 429 F.Supp. at 245-46; Arthur, 415 F.Supp. at 924, 939-41; Armstrong, 408 F.Supp. at 812; Morgan, 379 F.Supp. at 449; Booker, 351 F.Supp. at 804; Board of School Commissioners of Indianapolis, 332 F.Supp. at 668. The predictable result of giving majority or minority students the option of attending predominantly white or African-American schools is student choices that create or intensify segregation in school enrollments. Id.
The court finds that, the Rockford School District consistently and intentionally maintained an open enrollment policy that contributed nothing to the desegregation of its schools. The open enrollment policy benefited majority students through the use of alternative programs while, at the same time, burdened minority students through mandatory one-way busing.
Construction of New Schools
Courts commonly cite a school board’s seg-regative building placement decisions as contributing to segregation in student assign *1080 ments. See Omaha, 521 F.2d at 543; Reed, 455 F.Supp. at 561; Berry, 442 F.Supp. at 1326-27; Penick, 429 F.Supp. at 241-42; Armstrong, 408 F.Supp. at 788; Morgan, 379 F.Supp. at 428-31; Oliver, 368 F.Supp. at 170; Johnson, 339 F.Supp. at 1337, 1341. The placement of school facilities on particular sites is an action with a singular capacity to promote either integration or maintain segregation. Reed, 455 F.Supp. at 561; Booker, 351 F.Supp. at 804; School Dist. 151 of Cook County, 286 F.Supp. at 798. In Keyes, the United States Supreme Court condemned “the practice of building a school ... to a certain size and in a certain location, with conscious knowledge that it would be a segregated school.” 413 U.S. at 201-02, 93 S.Ct. at 2694. Other courts have similarly found that situating schools, “under the guise of pursuing a neighborhood school policy ... so that these schools were segregated on the very day they opened their doors,” represents “positive action to aggravate segregation.” Soria v. Oxnard School Dist., 386 F.Supp. 539, 543 (C.D.Cal.1974); Lansing, 429 F.Supp. at 622.
The court finds that when the RSD built a new school, boundaries were gerrymandered in order to continue to isolate minority populations. Further, the Rockford School District’s decisions as to the location of new schools were made in such a way as to promote and retain segregation. Minority students bore a disproportionate burden in relation to transportation as a result of these decisions.
School Closings and the Assignment or Reassignment of Students
When faced with the need to close a school or to reassign students because of overcrowding or other similar factors, school districts are often presented with an opportunity to make either segregative or integrative student assignments. A school district’s consistent choice of the more segregative option is evidence of unlawful conduct. See Yonkers, 624 F.Supp. at 1528; Reed, 455 F.Supp. at 560-61; Berry, 442 F.Supp. at 1313-15.
School closings can increase segregation if a district assigns students to other schools in a racially segregative manner. See Reed, 455 F.Supp. at 563; Berry, 442 F.Supp. at 1304. In some cases, school authorities have closed schools that appeared likely to become naturally integrated through changes in neighborhood residential patterns. Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 21, 91 S.Ct. 1267, 1278-79, 28 L.Ed.2d 554 (1971); Oliver, 368 F.Supp. at 164. This action has sometimes been accompanied by a decision to build new schools in outlying regions farthest from the minority population center so as to maintain the separation of the races with a minimum departure from the formal principles of “neighborhood schools.” Swann, 402 U.S. at 21, 91 S.Ct. at 1278-79. Such a policy does more than just skew the short-run racial composition of the student body of the new school; the policy may well promote segregated residential patterns that, when combined with “neighborhood zoning,” further lock the school system into the mold of segregation of the races. Id.
The court finds that when the RSD closed a school, it consistently reassigned the affected students in such a way that the white students went to raeially-identifiable white schools and the African-American students went to raeially-identifiable African-American schools. As such, the RSD maintained the segregative nature of its school district.
Additions to Existing Schools
Along these same lines, each decision concerning additions to existing schools offers a school district the option of locating the addition either to promote or alleviate racial segregation. For example, the decision to build an addition onto a school that is 100% African-American is a decision to increase the number of African-American students enrolled in that particular school. Accordingly, courts have frequently held that decisions to add to existing schools impermissibly contributed to segregation in student enrollments. See Reed, 455 F.Supp. at 562; Berry, 442 F.Supp. at 1310-12; Oliver, 368 F.Supp. at 173; Booker, 351 F.Supp. at 803; Johnson, 339 F.Supp. at 1318; Board of School Commissioners of Indianapolis, 332 F.Supp. at 667; Spangler, 311 F.Supp. at 517. The courts finds that the Rockford School District consistently and intentionally constructed additions to its facilities in such a way as *1081 to promote and maintain segregation within its school system.
Manipulation of School Capacity
In some instances, school districts have manipulated school capacities as a means of effecting racial segregation. See Reed, 455 F.Supp. at 565; Morgan, 379 F.Supp. at 426-27; Spangler, 311 F.Supp. at 518. School districts have permitted African-American schools to operate at overcapacity rather than transfer or reassign minority students to white schools or have operated white schools at overcapacity in order to avoid sending white students to African-American schools. Id., see, also, United States v. Texas Educ. Agency, 600 F.2d 518, 522 (5th Cir.1979). The court finds that the RSD operated its majority schools at overcapacity levels in order to avoid the transfer of majority students to racially-identifiable minority schools. The RSD engaged in such actions consistently and intentionally.
Special Transfers and Transfer Policies
In many cases, defendant school boards have employed transfer policies in order to perpetuate school segregation. One common technique is the use of special transfers to allow white students to avoid attending predominantly African-American schools. This device has an obvious segregative effect on student enrollments. See Omaha, 521 F.2d at 539—40; Reed, 455 F.Supp. at 566; Lansing, 429 F.Supp. at 597-601; Armstrong, 408 F.Supp. at 791-94, 819; Morgan, 379 F.Supp. at 473-74; Spangler, 311 F.Supp. at 520. Another segregative transfer technique is to limit African-American transfers to white schools by imposing various conditions on such transfers. See Berry, 442 F.Supp. at 1312 (no transfer granted if likely to lead to further transfers). When the foreseeable effect of a transfer policy is to increase the racial identifiability of schools with large minority enrollments, the policy strongly indicates segregative intent. NAACP v. Lansing Bd. of Educ., 559 F.2d 1042, 1051 (6th Cir.1977); Armstrong, 451 F.Supp. at 856-57; Berry, 442 F.Supp. at 1313.
The court finds that the RSD permitted special transfers for majority students whose parents requested such transfers. The RSD engaged in such action even when the transfer had a negative integration effect on the schools involved. Such a policy in the RSD had the effect of maintaining racially-identifiable schools.
Finally, the court finds that the RSD was aware of desegregation proposals that would have brought about the easy and swift integration of the Rockford School District. The proposals were all rejected. Any desegregation programs adopted by the RSD burdened only minority students and set up a benefit program for white students. The primary method used by the RBE to desegregate its schools was the mandatory transfer of minority students and the voluntary transfer of white students through the provision of special programs. When pressured by the State of Illinois and the United States District Court throughout most of the 1970’s, the RBE used delay tactics in order to avoid compliance with the dictates of the United States Constitution and the rules and regulations of the ISBE.

FACILITIES AND EQUIPMENT DISPARITIES

INTRODUCTION

Children of all races should have equivalent facilities, equipment and supplies. Children should have an equal opportunity to learn. The RSD, however, did not provide equivalent facilities, equipment or supplies to the racially-identifiable minority schools. Minority students and their teachers, at various times, had little support equipment, an insufficient number of textbooks (which were often dated) and a constant drought of supplies. Further, the record shows that minority students were taught in older, and at times poorly maintained buildings. The RSD also maintained a private gifts policy that contributed to the disparity between the races.

FINDINGS OF FACT

Systemwide Disparities In Facilities And EMS
Systemwide disparities in facilities and in equipment, materials and supplies (hereinafter “EMS”) between predominantly minority *1082 and predominantly majority schools existed during the past two decades. Educators and administrators in the RSD, and former members of the School Board itself, testified as to the disparities between the predominantly minority and the predominantly majority schools in the District. Their testimony supports the objective data derived from the RSD and third-party studies. This combination of RSD documents and witness testimony provide an in-depth look at facilities and EMS disparities at particular points in time over the past two decades.
Data Demonstrating Systemwide Disparities
At the RBE meeting of February 28,1970, Superintendent Shaheen submitted a report indicating that there existed a considerable imbalance and uneven distribution of school equipment throughout the District at that time. Bd.Min., 2/23/70, B0012479. In light of these disparities among schools with regard to equipment, Dr. Shaheen recommended to the RBE that equipment and supplies be balanced among the schools in Rockford as much as possible. He recommended that such balancing be achieved by transfers of equipment where there was sizable imbalance and/or by additional purchases of equipment where balance can be readily achieved. Such a balancing was never performed.
In 1973-74, the RSD prepared a report entitled “1973-74 Elementary School Facilities.” • B48233, B48263-B48575. Under Section C of that report, data was presented regarding physical systems (cooling systems, lighting, interior maintenance, exterior maintenance, and ground maintenance) in each of the elementary schools. Evaluation of this data revealed disparities between African-American schools and white schools. Chart 1 shows the mean ranking of the physical systems by school type (African-American, integrated, white), ranked on a scale of 1 to 4, with 1 being the lowest and 4 being the highest. African-American schools had a mean ranking with regard to physical systems of 2.45. Integrated schools had a mean of 2.51, and white schools a mean of 2.57.
Chart 1
1973-74 Elementary School Facilities
[[Image here]]
The First Interim Order in this case, dated July 1989, required the RSD to perform a detailed evaluation of the physical condition and educational equipment of the Southwest *1083 Quadrant elementary schools. On January 2, 1990, Defendant filed a twenty-seven page Facilities and Equipment Evaluation, prepared by Jim Olson, District Supervisor of Buildings and Grounds. This report provided information on the number of various types of equipment allocated to each RSD elementary school. Facilities and Equipment Evaluation, B0509071. The RSD’s data revealed that African-American schools had close to 40% less equipment than white schools.
Table 1 gives a detailed breakdown of the allocation of equipment by racial composition of the schools. Since the three categories of schools contained different numbers of schools, the pieces of equipment per school is evaluated. While there is some variation, the African-Americans schools tended to have the lowest per school allocation, with either integrated or white schools having the highest allocation of equipment. The magnitude of this difference is illustrated in the last column of the table, which shows the ratio of the white per school allocation to the African-American per school allocation. On most of the items, the ratio is greater than 1, indicating that the white schools had a greater number of pieces of equipment per school.
Table 1: Per School Equipment Allocation, by School Racial Composition.
[[Image here]]
*1084 [[Image here]]
Table 2 summarizes the information contained in Table 1 by collapsing the various types of equipment into four categories: student equipment, teacher equipment, miscellaneous equipment and computer equipment. Table 2 shows that strong disparities existed in how equipment was allocated to schools of different racial composition. Specifically, African-American schools had close to 30% less equipment than did all schools in the system (151.43 pieces compared to 208.97 pieces) and close to 40% less equipment than did white schools (151.43 pieces compared to 243.85 pieces).
Figure 1 is a graph depicting these relationships. Figures 2 through 5 illustrate the relationship between number of pieces of equipment allocated (for the four categories of equipment) and the percentage of African-American students in school.[13] Overall, for each category of equipment, as the percentage of African-American students in the school increased, the number of pieces of equipment allocated to the school declined. The advantage of these graphs is that the schools are not grouped (i.e., “African-American”, “integrated”, “white”) and, therefore, the full strength of the relationship between pieces of equipment and percentage of African-American students is conveyed.
*1085 [[Image here]]
*1086 [[Image here]]
*1087 [[Image here]]
*1088 [[Image here]]
*1089 [[Image here]]
*1090 The equipment disparities revealed by Defendant’s January 2, 1990 Facilities and Equipment Evaluation were known to the School District through an annual equipment inventory process conducted by the District. The Facilities and Equipment Evaluation states that the District maintained permanent inventory lists that were utilized annually to inventory equipment in various schools and District facilities. Facilities and Equipment Evaluation at 14-17, B509071. This process was coordinated by the Director of Purchasing. Permanent inventory forms were sent out annually to each school for correction and verification. These permanent inventory forms required item-by-item identification of any equipment that was received through Federal funds of any kind. The annual forms also called for comments on the condition of the equipment. Looking at the data, then, one could determine the usefulness of the equipment in each school.
John Costello, former RSD principal who was retained by the RSD in 1989 to close ten schools, testified that inventory lists for the years immediately prior to the filing of this lawsuit were unavailable because they were not retained in original form. Costello Dep. at 14. Defendant’s failure to produce pre-lawsuit inventory lists makes precise evaluation of equipment allocation to African-American schools at the time this suit was filed impossible. However, even Defendant’s post-lawsuit equipment evaluations, performed after some remedial measures were taken, showed strong disparities in equipment allocation.
Witness Testimony
Former Board member Carl Towns testified that when he became a Board member he performed a purposeful series of school visits to determine conditions in the schools. In his opinion, pervasive differences in EMS and in the curriculum being offered in the various schools existed. Towns Dep. at 25-26, 30. Dr. Robert Greene, former Haskell School principal, also testified that there were widespread disparities in EMS among the elementary schools. Greene Dep. at 79-84.
Eloise Beal taught both as a substitute teacher and as a full-time instructor. As a substitute, Beal taught in schools all over the district. During her tenure as a full-time teacher Beal taught at Church School and at Barbour School. Both Church and Barbour are Southwest Quadrant schools. Beal testified as to the disparities in facilities and equipment between East and West side schools. Beal noticed that East side schools had
[Everything teachers need to do their job ... everything seemed to be in shape much better than the classrooms on the west side ... it was just more advanced, everything was. Everything [on the East side] seemed to be[,] in [a] certifiable sense, just about a hundred percent ... And I’m saying that the east side seemed to be more prepared in the classroom ... They had plenty things to—seemingly to work with. There were times that we didn’t have materials to work with ... The east side schools, the ones that I worked in, had really nice stuff.
Beal Dep. at 13-25.
Ms. Beal went on to testify about the shortage of textbooks in the schools on the West side. She told of pushing desks together and having multiple students reading from the same book. She testified as to shortages of materials of all kinds, including art supplies, visual aids and workbooks:
We didn’t have ... workbooks for the children ... I have erased work in workbooks that children had done so the other children coming after, so they would have them, [to] do the same type of work, until these fingers were sore at the end of the day.
Beal Dep. at 31.
The students themselves were well aware of these disparities. One former student, Pat Redmond, went from McIntosh Elementary School, located in the Southwest Quadrant, to Eisenhower Middle School, located in the Northeast Quadrant. He noticed that everything at Eisenhower was basically brand new. He testified that he had newer books and more resources and facilities, and further testified that Eisenhower was “nice and neat.” Redmond Dep. at 7.
*1091 Marcella Harris, the first African-American member of the School Board, visited numerous African-American schools on the West side of the city during her years as a Board member (1965-1970). She found these schools to be so overcrowded that “the kids reminded [her] of sardines packed in a can.” Harris Test., Tr. at 640. In one African-American school, a converted coal bin was being used as an adjunct classroom. The restroom facilities and water fountains were “abominable” and “unfit for human use.” The pathways to the schools were littered with glass, rubble and garbage. In contrast, the older schools on the East side were well-maintained and fully operational.
Nathaniel Martin, a teacher and a principal in the RSD for twenty-eight years, observed pervasive disparities in the educational materials and equipment available at majority schools as opposed to minority schools. When Martin was part of a North Central accreditation team, he visited Eisenhower Middle School and observed a wealth of high technology equipment and books. In contrast, Washington Middle School, where Martin was principal, had insufficient numbers of books, books with outdated copyrights and a lack of high technology equipment. The distribution of discretionary funds to schools favored by the RSD’s superintendents and assistant superintendents contributed to the disparities in equipment and materials between majority and minority schools. While Martin was principal at Washington Middle School, his requests for discretionary funds were repeatedly turned down by the RSD’s administrators.
Hiram Gregory Luna, a former member of the School Desegregation Committee, visited a number of elementary schools on the East and West sides of Rockford. He remembers the schools being “worlds apart.” Similarly, Sandra Glaspie, the current assistant principal at East High School and an employee of the Rockford School District for twenty years, noticed disparities of supplies and books between East and West side schools.
Michael Bozym was a teacher at the Royal Avenue Annex. From 1968-1970, the Annex housed fifth and sixth grade students from Ellis and Church Schools. The Annex was located in the Southwest Quadrant. Bozym remembers visiting Walker School on the East side. Walker was carpeted, had a full library and a media center. Bozym testified as to how surprised he was at the differences between Walker and the Annex where he taught. “I felt like a country kid in the big city looking at the buildings.” Bozym Dep. at 17-18. The Annex did not have a library. As a result, teachers would put all of the school’s books on a cart and roll it from room to room. As many as four students would need to share a book and no one could check the books out. Walker, in contrast, had a librarian, a library and many books. The whole environment at Walker was completely different from the Royal Avenue Annex. At Walker the environment “was inviting and it shaped behavior ... in a positive way for those children who were comfortable there.” Id. at 19-23.
Dr. Thomas Shaheen, Superintendent of Schools from 1965-1970, observed that achievement levels and the quality of facilities correlated with the race of the student body. African-American students tended to have lower academic results and their schools were of poorer quality. Dr. Shaheen stated that the imbalances in equipment from school to school in the RSD was a substantial problem during his time as Superintendent. Access to equipment was dependent on where a child went to school. For example, parent organizations in some sections of Rockford could raise several thousands of dollars in one weekend to buy needed equipment. The poorer sections of Rockford, however, were in greater need for equipment and less able to raise additional funds. During his tenure, Dr. Shaheen informed the RSD that it was the obligation of the RSD to make sure that equipment and materials were available universally. Allowing the maintenance of a system that let wealthier schools have more equipment and materials was something he could not support. T. Shaheen Test., Tr. at 56-57.
Joanne Shaheen testified that when a white school needed something, it was pro *1092 vided. For example, Maud Johnson School, a white school on the East side, had much more equipment than Henrietta School in the Southwest Quadrant. The parent organizations as well as RSD funding contributed to these disparities. Dr. Shaheen had aggressively tried to change the parental giving policy but was unable to do so. J. Shaheen Test., Tr. at 50.
Dr. Connie Goode, an African-American employee of the RSD, refused to send her children to their neighborhood school, Ellis, because the school was in very poor condition, the school was dirty and she didn’t believe that the principal would be sensitive to the needs of her children. Dr. Goode also described the condition of educational materials and supplies that were available at Washington Middle School (in the Southwest Quadrant) in the 1960’s. The books that were available were outdated and there was a lack of equipment in the science laboratory. Goode Test., Tr. at 1314.
Disparity Examples At Individual Schools
Individual school histories over a twenty year period highlight the systemwide facilities and equipment disparities detailed above. Montague School, located in the Southwest Quadrant, was 69% African-American in 1970-71. The RSD was under pressure to move the Montague students because Montague School was not in compliance with State fire codes. The State Fire Safety Code required minimum safety standards in all public schools as of 1964. In 1964, the year of the Code’s enactment, the RSD unsuccessfully sued the State of Illinois in an attempt to have the Code declared unconstitutional. The conditions at Montague School were so bad that parents, teachers and community residents asked the Board to close Montague because they believed it was unsafe for the building to be occupied. On February 16, 1971, approximately twenty-five Montague elementary students were removed from their classes by their parents and taken to Carlson Elementary School, where the parents asked that their children be enrolled. Available space existed at Carlson since the Jane Adams Housing Project children, who had previously been bused there, were sent back to Kishwaukee School by the RSD.
Despite the unsafe conditions at Montague, the RSD found that Montague was adequate to continue to house children for another four months, until the end of the school year. In February of 1971, following the RSD’s decision, the RSD heard from the West Side Community Organization (WESCO), the Montague School staff, Grant Schneider who was the Area 4 Chair of the RSD, Rosa Stamps of the Concerned Parents of Montague School and others that the Montague students should be immediately moved to the then empty Page Park School, northwest of Rockford. The RSD continued to refuse to relocate the Montague students until the end of the year.
In mid-February 1971, in response to the RSD’s refusal to remove these mostly African-American children from what was believed to be a dangerous facility, the parents and students began a boycott of the school. On March 4, 1971, the parents agreed to end the boycott and return their children to school. On March 8, 1971, the RSD agreed to transport the Montague children to Page Park School for the remainder of the school year.
Mary E. Williams, a former teacher in both the Winnebago County and Rockford Public Schools from 1953 until 1982, testified regarding Montague School:
I was hired at Montague Elementary School, which was part of the City of Rockford public school system. I was very sad about going to Montague because it was nothing like Nashold. Nashold was a new school and very modern. Montague, on the other hand, was a much older structure. The school was very dark and dingy and did not have the modern conveniences of Nashold. I worked at Montague for two days before the School District informed me of an opening at Peterson Elementary School. Because of the condition of the school, I was happy to leave Montague and I stayed at Peterson for 25 years until the school was closed after the 1981-82 school year.
Mary Williams Aff. at ¶¶ 7-8:
*1093 During her deposition, Williams elaborated on the differences between Nashold and Montague. With regard to Nashold, she noted “the modern conveniences” of the facility.
We had a wonderful library at Nashold, complete library. We had nice, clean modern bathrooms, visual aids, you know, with the maps and whatever. And nice window lighting and ceiling lighting and everything. It was just modern and it was just nice. Montague didn’t have that. I remember when I first went down in the basement to take my children to the bathroom and I remember the steps creaking. I said, oh, my goodness, this is like going down in a dungeon, creaking to take them to the bathroom. And it was dark down there.
Mary Williams Dep. at 9.
Prior to its closing in 1973, Muldoon School, a predominantly African-American school in the Southwest Quadrant, was in dire need of renovation. Muldoon was an old, previously closed Catholic girls’ school, that was purchased by the RSD and operated for only one year, housing 4th, 5th and 6th grade children from Ellis. In response to parent protests, the RSD allocated a small sum of money for repair work for the school year 1972-73.
Haskell School (approximately 60% African-American from 1970 through 1988) suffered significant adverse effects from facilities conditions, which the School Board and Central Office refused to correct despite repeated pleas from the Haskell principal. These conditions were described by the principal, Dr. Robert Greene, in a paper he presented to the Illinois Principals’ Association in October 1983, and were amplified in Dr. Greene’s deposition testimony. Dr. Greene further testified that the conditions of these facilities had a significant negative impact on the educational process in the school. BH1860.
When the original seven room Haskell School was built in 1959, the building already had a significant minority enrollment. Pupil Placement Committee data for 1960 showed that the school had 23% African-American students. This percentage increased to 37% in 1967. By 1970, the enrollment was 62% African-American. Building additions in 1962 and 1966 expanded the building to twenty-one classrooms and consumed nearly all of the land surrounding this building, leaving no playground. Id. All three sections of Haskell, built in three different years, lacked acoustical treatment of any kind (except in the office area). The building had tile floors, prestressed concrete ceilings and steel Venetian blinds at the windows. Acoustical treatment was lacking not only in the classrooms, but also in the gym and lunchroom. BH1861. Dr. Greene testified that Haskell was like “teaching inside a steel tank.” The lack of acoustical treatment made it very difficult for children to hear teacher questions and for teachers to hear student answers. This seriously undermined the educational process. Dr. Greene testified that as soon as he became principal in 1971, he submitted a report to the Superintendent requesting installation of acoustical ceilings in all of the classrooms with carpeting, where feasible. BH1862. Dr. Greene stated that the School Board and the Central Office were unresponsive. Despite his constant pressure for the next twelve years, nothing was ever done by the District to correct this condition, with one exception. In the late 1970’s the District did put acoustical ceilings in a couple of the classrooms.
Dr. Greene further testified that once he realized the District would not fix this condition at Haskell, he and the students began a laborious process of raising funds by collecting old newspapers and selling them to trash dealers. Through this process, Dr. Greene and the students were able to raise a few dollars each year and to put acoustical ceilings in one or two classrooms per year. Twelve years passed before all of the Haskell classrooms had acoustical ceilings. According to Dr. Greene, the actual cost of acoustical ceilings was relatively small. The problem could have been solved with a relatively small expenditure on the part of the District.
With respect to the lack of a playground, Dr. Greene testified that this caused “the feeling of claustrophobia, overcrowding and *1094 excessive noise level in the building....” Dr. Greene stated he felt like “he had been handed the keys to a nice, clean, sanitized prison for 500 children serving 7 hour per day terms. A 4-year campaign by the principal and teachers with significant help from the news media finally overcame the bureaucratic buck passing and inertia.” BH1861. A city block adjacent to the school was finally acquired, primarily through the assistance of the City and the Park District and Congressman John Anderson. In 1976, a four-acre playground was opened at Haskell School.
Dr. Greene’s testimony shows thát the RSD itself was either an obstacle or, at best, a passive participant in obtaining this playground. Dr. Greene stated that without the relationships developed during his four-year term as County Superintendent of Schools (1967-1971), it would not have been possible to get the playground for Haskell. Greene Dep. at 44-50. Dr. Greene’s report states that:
[T]he preceding Principal and Parents Teacher Organization had petitioned the School Board in 1967 for a playground, but the School Board’s $24-million building program in 1969-71 failed to allocate any funds for Haskell School. This inaction continued despite a 1969 City-County Planning Commission Study that noted a high density of young children in the Has-kell area and the need for a school-neighborhood playground, and despite a 1970 Park District application for federal revenue sharing funds for a Haskell playground.
BH1860.
A second facilities deficiency identified by Dr. Greene upon becoming principal in 1971 was the need for a library/learning center. Dr. Greene made this need known in his report- to the Superintendent’s Office that year. BH1862. Dr. Greene testified during his deposition that he and parents made repeated efforts to get the library/leaming center, but the District would not provide it. He stated that in his visits to Eastside schools, he saw that all of them had such facilities. Dr. Greene believed the School Board would not have failed to respond to a request from an Eastside school for such a facility. Greene Dep. at 61-62, 65-66. Dr. Greene testified that eventually he was able to get the library/learning center built at Haskell. The library/learning center was built, however, by going to downtown buildings that were being demolished for the new Metro Centre and salvaging used drywall and other building materials during the demolition. Dr. Greene then took those back to Haskell where they were installed by a combination of parents and moonlighting District tradesmen (who worked without knowledge of their Central Office supervisors). Id. at 67-72; Bd.Min. 8/14/72, B13458.
The RSD’s Private Gifts Policy Contributed To EMS Disparities
For twenty-five years, the RSD consistently operated in a manner that allowed parent gifts and other private gifts to provide a much better educational experience for white students than for minority students. Schools serving middle and upper income students received more gifts from their PTA’s, PTO’s and other third-parties, than schools serving lower income students. Accordingly, the schools serving middle and upper income students had far more equipment, materials and supplies.
This problem was constantly recognized in RSD documents. Beginning with Superintendent Shaheen, who asked that the policy allowing gifts to individual schools be changed, through the QUEFAC/ISBE years and right up to the 1989 Reorganization Plan, which explicitly recognized the “inequities created by parent gifts,” RSD at no time took any significant corrective action. In fact, the RSD’s policy with regard to “Gifts, Grants and Bequests” gave the Board (and the Superintendent in consultation with the Board) complete discretion to accept or reject private gifts to the District. The Board also had complete discretion as to the purpose and allocation of such gifts to the schools.
Further, the RSD exercised discretion over reallocating property from closed schools. With regard to partial school closings and changes in building utilization due *1095 to decline and/or shifts in enrollment, the RSD formulated a policy “that gifted property remain[ed] in the building so long as the use of that property remain[ed] appropriate.” The policy also was, however, that the Board “reserve[d] the authority to control the placement or disposition of such property.” Bd. Policy, 5/85, B44168; Bd. Policy, 9/8/87, B44169. During a board meeting held on February 23, 1981, when the RSD adopted a plan for several school closings, the RSD responded to a question raised as to the disposition of gifts from PTO and PTA organizations in schools to be closed, that it was Board policy that such gifts become the property of the school district and that they be placed where they were needed. Bd.Min., 2/23/81, B16973. The Board did, in fact, follow its own policy and exercised complete control and discretion over the re-allocation of gifts and PTO funds from schools closed in 1981.[14]
Despite the Board’s admitted authority to control the allocation of gifts, the Board always opted (with the exception of closed schools) to allow the donors to decide where the gifts would go. A review of board minutes showed that the RSD accepted gifts as a regular part of each meeting. The Board minutes constituted the record of the gift and contained the value assigned to the gift by the donor. In most cases, the donor designated which school received the gift. Defendant’s Response to Interrogatories, 1992-4, No. 6.
In 1987, Michael Williams, a Board member, raised the issue of private gift inequities before the Board. Williams expressed the concern that the Northeast Quadrant parents supported a private school system within the public school system and that it appeared the donor parents exerted substantial control over those schools. The RSD. did nothing in response to Williams’ concerns.
At a Board meeting on November 27,1967, Superintendent Shaheen recommended to the Board a “gifts to school” policy that would allow the District, rather than the PTA’s, PTO’s or other donors, to determine in what manner and for which schools the gifts be used. Dr. Shaheen recommended that whenever gifts were offered by an individual or organization to the District, the Board be the one to determine the propriety of the acceptance of such gifts. Dr. Shaheen also believed that the Board should not accept gifts with restrictions on their use. Any gift presented should become the exclusive property of the RSD and should be used for whatever purpose the administration of the school deemed appropriate. Dr. Shaheen subsequently withdrew his recommendation after the Board heard discussion on the recommended policy from members of the Booster Club of all four high schools and from parents of elementary school children. Thus, the Board did not adopt the suggested policy. Bd.Min., 11/27/67, B11683.
The Board’s policy of allowing donors to determine the allocation of gifts resulted in some schools receiving substantially more in terms of equipment and supplies than other schools. The allocation of gifts, in turn, depended on the ability of PTA’s and PTO’s to raise money. Former Wilson Middle School Principal Curtis Anderson testified that there were “some schools where the PTO’s were able to raise much more money to provide help to their schools ... than some of the parents in the poorer school districts ... [T]he need for those who were able to provide additional funds was not probably as great as the need for other schools that could *1096 not provide additional funds to get school supplies.” Anderson Dep. at 32-33.
Accordingly, the court finds that the RSD was well aware that inequities were caused by disproportionate PTO contributions to schools in wealthier neighborhoods. An examination of Board Minutes reveals significant disparities by Quadrant in gifts received: [15]
a. The percentage of gifts going to elementary schools, listed by Quadrant, for the time period 1967-88 are: Southeast 47%, Northwest 21%, Northeast 21%, and Southwest 11%.
b. The percentage of gifts going to middle schools, listed by Quadrant for the time period 1967-1988 are: Northeast 53%, Southeast 24%, Northwest 22%, and Southwest .6%.
e. The percentage of gifts going to high schools, listed by Quadrant for the time period 1967-1988 are: Northeast 54%, Southeast 29%, and Northwest and Southwest 17%.
Elementary Schools
[[Image here]]
[[Image here]]
*1097 [[Image here]]
[[Image here]]

CONCLUSIONS OF LAW

The maintenance of unequal school facilities, equipment and educational materials denies minority students an equal educational opportunity. Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971); Green v. County School Bd., 391 U.S. 430, 435, 88 S.Ct. 1689, 1692-93, 20 L.Ed.2d 716 (1968). In some instances, the quality of the school facilities, equipment and materials may cause a school to be racially identifiable. See, Berry v. School Dist. of Benton Harbor, 442 F.Supp. 1280, 1303-1306 (W.D.Mich.1977) (African-American schools older, operated at higher percentage of capacity and had poorer physical conditions, educational materials and library facilities); United States v. Yonkers Bd. of Educ., 624 F.Supp. 1276, 1431-34 (S.D.N.Y.1985), aff'd, 837 F.2d 1181 (2nd Cir.1987), cert. denied, 487 U.S. 1251, 109 S.Ct. 14, 101 L.Ed.2d 964 (1988) (minority schools lacked playground and recreational space and suffered from lack of classroom space, limited instructional areas for educational specialists and inferior facility conditions); Oliver v. Kalamazoo Bd. of Educ., 368 F.Supp. 143, 174-76 (W.D.Mich.1973) (minority schools were older, substandard and unsafe).
The court finds that the RSD’s policies and practices with regard to facilities and the provision of equipment, materials and supplies to schools within the RSD caused great disparities in the quality of education between minority and predominantly white schools. System-wide disparities in facilities, equipment, materials and supplies between minority and predominantly white schools is unlawful. Such policies and practices of the RSD clearly indicate intentional discrimination.

*1098
THE 1989 REORGANIZATION PLAN

INTRODUCTION

On February 28, 1989, the RSD adopted an extensive plan for changes in District operations entitled “Together Toward a Brighter Tomorrow.” This plan, together with the explanatory and implementation documents generated by the RSD, is referred to in this section as the “Reorganization Plan” or “Plan.”
The Reorganization Plan resegregated the District’s elementary schools, closed naturally-integrated West High School and several African-American elementary schools, and imposed extreme disparate burdens and educational disadvantages upon minority students. The Plan triggered this litigation.
This section examines the Reorganization Plan and the circumstances of its consideration and adoption by the RSD. Particular aspects and impacts of the Reorganization Plan include: the consequences for elementary schools; the availability of a non-segre-gative alternative for elementary student assignment; effects on secondary schools, especially in the closing of West High; and the large net increase in transportation, despite a stated goal to reduce transportation.
Many aspects of the Reorganization Plan were never implemented. For the purposes of this opinion, the court has evaluated the Plan in terms of the consequences that Defendant RSD had anticipated at the time of the Plan’s adoption, as reflected in enrollment and program projections issued on February 28, 1989 (or developed between that date and May 11, 1989, the date the Complaint in this lawsuit was filed). Similarly, any actions taken by the RSD staff to ameliorate the impact of the Plan after the Complaint in this case was filed are not considered by the court.
The RSD enrollment projections explained the impact of the Plan in terms of “% minority,” that is, the combined percentage of all minorities in a school. No breakdowns by separate race/ethnic categories were performed. Accordingly, while most data in this order are presented for African-Americans and Hispanics separately, the particular findings in this section are based upon the District’s “% minority” data. The court finds this to be a reasonably close approximation of African-American-plus-Hispanic enrollment, since only 3% of the Fall 1988 enrollment in the RSD was Asian and Native American. In the analysis of resegregative impact, however, the District’s “% minority” data was converted into African-American-plus-Hispanic data, by subtracting from the minority enrollment at each school the number of Asian and Native American students enrolled in that school in the Fall 1988.
Finally, this section employs the definition of desegregation used elsewhere in this Order. A school is “racially-identifiable minority” if the relevant enrollment percentage exceeds the systemwide average by more than fifteen percentage points. A school is “ra-eially-identifiable white” if its minority enrollment percentage is less than 50% of the systemwide average.

FINDINGS OF FACT

The Extent Of Segregation In The School Sgstem Prior To The Reorganization Plan

In 1988-89 school year, the overall African-American/Hispanie percentage of enrollment at the elementary level was 25.7%. Accordingly, a desegregated school in 1988-89 had a population ranging from 12.9% to 40.7% African-American/Hispanic. Based upon the total enrollment in each school, the RSD had the following distribution of elementary schools:
[[Image here]]
Racially-identifiable white CO o
Desegregated CO 00
26% Racially-identifiable minority
100% Total
*1099 At that time, the percentage of elementary students attending each type of school was as follows:
African-American/ Hispamc WMte Students Students
Racially-identifiable
wMte l§
Desegregated 03
57% 16% Racially-identifiable minority
B509103; D8388.
At the secondary level in 1988-89, the overall Airican-American/Hispanie percentage was 24.9%, yielding a desegregation range of 12.4% to 39.9%. On that basis, six of the ten middle and high schools in the system were desegregated. The remaining four were each within 3% of the desegregation range. Id. In large part, this level of desegregation was achieved through the mandatory reassignment of minority students to non-Southwest schools and through the voluntary transfer of white students to alternative programs located in predominantly minority schools. B509110; B509125; D8388. The RSD admitted in its 1989 Answer that “almost all minority movement for desegregation [was] mandatory, while virtually all white movement [was] voluntary in response to special program offerings.” Complaint and Answer at ¶ 9.3.

The January Version Of The 1989 Reorganization Plan

On January 24, 1989, Interim Superintendent Swanson recommended and the Board of Education promulgated, the first version of the Reorganization Plan (hereinafter the “January Plan”). “[T]he primary rationale for the Plan was to reduce expenditures to offset projected future-year operating deficits.” Id. at ¶ 14. The January version of the Plan estimated costs savings of approximately $6.47 million, enough to offset the RSD’s deficit projection for 1989-90. Much of the costs savings was derived from steps such as closing swimming pools and staff reductions. B509142.
One provision of the Plan terminated the elementary mandatory assignment system then in effect. Complaint and Answer at ¶ 16.1. The January version of this provision read as follows:

2.12 Draw elementary school boundaries to enable all elementary students to attend schools in the general area of their homes.

This will facilitate parental involvement in the education of their children; reduce the need for transportation; and encourage the use of schools as neighborhood centers. Students will be allowed to transfer for purposes of desegregation and participation in alternative programs.
Id. Thus, the January version of the Plan relocated all or most of the desegregative alternative programs from schools in the Southwest Quadrant to schools in the Northeast and Southeast Quadrants. B509149.
The January plan also proposed closing six elementary schools, two of which were in the Southwest Quadrant, Garrison and Barbour. No schools in the Northeast Quadrant were to be closed. January Plan at 5, B509136. Three other Southwest elementary schools were to be partially closed through split-grade pairs (further explained below). Id. at 6, B509137. The January Plan also closed West High School, a naturally integrated school in a contiguous residential area that produced a racial mix of students reasonably approximating the systemwide racial proportions. In addition, the January Plan redrew the boundaries of the remaining secondary schools in such a manner that Westside students were mandatorily assigned to Eastside secondary schools. This provision stated:

2.18 Design secondary school boundaries which create racial and socio-economic diversity and optimum enrollment in each school; and make the high school boundaries identical with their underlying middle schools.

This boundary pattern abandons the traditional eastside-westside pattern; provides natural diversity among students in each secondary school; equalizes the enrollments in the schools; more equitably shares the need to be transported among majority and minority students; and pairs *1100 each middle school with a high school for improved articulation. Displaced seniors may remain in their current high school but bus transportation will not be provided.

Id.

Although the RSD’s stated purpose for the Plan was to reduce expenditures, no cost savings were projected by the Plan either from returning to neighborhood elementary schools or from relocating the alternative programs. The January version of the Plan was tentatively approved by the Board of Education and issued for public comment, by a 6-1 vote with the African-American member of the Board, Michael Williams, in opposition.

The Revised February 1989 Reorganization Plan

The January Plan evoked extensive public reaction, including criticism of its various proposals. In particular, the proposed closing of West High School aroused intense protest from the neighborhood where that school was located. Northwest side parents formed the “Save West High Committee” for the purpose of opposing the closing of West High School. Within two weeks, the Save West High Committee presented the Board with 12,000 signatures in opposition to the closing of West High. D11845-D12286. Rockford’s Mayor, John McNamara, also publicly opposed the closing of West High School. See D13853.
In the face of community opposition, Superintendent Swanson and the Board sought to keep the West High building open. In reviewing alternatives to closing West High, the District’s administrative leadership recommended that Auburn High School be closed. In his February 8, 1989 memorandum to the Board entitled “Modifications to Original Recommendations,” Superintendent Swanson stated in an addendum:
After hearing the concerns of city officials and the business community, I feel we may not have given sufficient consideration to the impact on the West High business and residential neighborhood. I am suggesting that West High remain open and Auburn High School be closed.
B509177.
Within three weeks of its original decision to close West High School, the District promulgated, on February 14, 1989, a Modified Reorganization Plan that, among, other things, rescinded the closing of West High School. This version of the Plan was also issued for public comment by a 6-1 vote, with the minority member of the Board in opposition. In the RBE minutes of the February 14, 1989 meeting, under a section entitled: “Modifications to Previously Recommended Changes in District Operations,” it was noted that “a discussion took place regarding the equality of the revised recommendations ... [and] the effects the revised plan would have on the elementary children on the West side.” Bd.Min., 2/14/89, B21642.
In the Revised Plan of February 14th, the Board rejected Superintendent Swanson’s recommendation to keep West High open and close Auburn High instead. The Board opted, rather, to keep the West High building open by converting it to a middle school. In doing so, the Board adopted measures -that, through a domino effect, placed burdens upon the minority students in the Southwest Quadrant. Summary of Modifications of Original Plan, 2/14/89, B509157; Confer Dep. at 59. Those measures included:
The West High building became a middle school rather than a high school. To keep the West building open, Defendants removed the GIT, Gifted and Grades 4-8 CAPA students from Wilson, located in the Southwest Quadrant.
Wilson was converted to a Grades 3-6 elementary school.
Three additional elementary schools, surrounding Wilson in the Southwest Quadrant, were closed: Church, Stiles and Ellis.
Two additional split grade structures (K-2) were established at McIntosh and Dennis, feeding into Wilson.
*1101 Wilson was projected by Defendants to have 1227 students, more than twice as large as any previous elementary school in the system, and four times the size of the average elementary school in the District.
Wilson, and its feeder K-2 schools, Dennis and McIntosh, were all projected by Defendants to have 80% minority enrollment.
The Board’s decision to close an additional three Southwest side elementary schools was made despite the fact that the Southwest side schools already lacked needed space. Lack of space on the Southwest side was evidenced by the fact that the District’s stated justification for moving, under the January plan, all alternative schools out of the Westside schools was lack of space. Driscoll Dep. at 170. Lack of space on the Southwest side was further evidenced by District staff warnings in early February that even under the January Plan, which closed four Southwest side elementary schools as opposed to seven under the February Plan, the Southwest side schools would lack space. Lyman Memo to Sullivan, 2/3/89, D5940.
The Board’s decision to convert West High School to a middle school and to close an additional three Southwest side elementary schools was made with a projected minimal cost savings of $336,000. February 14 Plan at 12, B509190. The Board’s decision to create a large elementary school at Wilson, however, was made despite the lack of any advanced planning as to the effects of such a huge elementary school.
In the Plan’s February 14th version, the RSD had dropped from the language of the Plan the stated justification that neighborhood elementary boundaries would “reduce the need for transportation” and the justification that the new secondary boundaries would “abandon the traditional Eastside-Westside pattern” and “more equitably share the need to be transported among majority and minority students.” All of these phrases contained in the January Plan were missing in both versions of the February Plan. Compare B509137 with B609163 and B509184.
The adverse and disproportionate impact of the revised February 14th Reorganization Plan upon the minority community evoked substantial protest from that community. On February 23,1989, the District received a written objection from the group “Citizens for Educational and Social Equality” (CEASE) to the February Reorganization Plan. D11784. The group presented the District with detailed data showing that the new Plan would place substantial additional mandatory reassignment burdens on West-side students, most of them minority, beyond the substantial disproportionate burdens that already existed. The group’s data showed that under the new Plan, at the high school level, there would be a net student movement from West to East of 733 students, compared to a net student movement from East to West of no students. This constituted additional mandatory reassignment in excess of any current West to East busing. Similarly, at the middle school level, the group’s figures showed that there would be a net student movement from West to East of 441 students, compared to a net student movement from East to West of no students. Once again, this was in excess of any current West to East busing. CEASE concluded that the Board’s February Plan slated the minority students to “bare the brunt of the student disruption.” In addition, the group warned the District that the February Plan “exhibits a callous disregard for a large portion of hard-working, tax-paying and voting citizens of the City of Rockford.” D11789.
On February 21, 1989, Rockford Mayor John McNamara urged Superintendent Swanson to withdraw the Board’s decision to close three additional Southwest side elementary schools and create a large elementary school with a large attendance at Wilson. Mayor McNamara stated that: “[This plan] is contrary, or appears contrary, to the Board’s stated policy of neighborhood elementary schools. It is straining the concept of ‘neighborhood’ to the limit to consider this area, from the River to Meridian Road, the Wilson attendance area, as an expanded neighborhood.” McNamara Letter to Swanson, 2/21/89, D11298. The Mayor further stated that, by closing neighborhood schools on the Southwest side, the Plan would nega *1102 tively impact the minority community in the Southwest Quadrant and would leave the parents of minority students feeling increasingly distrustful of the Rockford school authorities. Finally, Mayor McNamara wrote that the cost savings of converting West to a middle school with an attendant closing of three additional Southwest side elementary schools was not substantial enough to justify such action.
Following presentation of the February 14th revised reorganization plan, Board member Wham testified that a significant number of minority parents disagreed with the school closing plans for the Southwest side. The parents also objected to creation of the Wilson mega-school. Wham 1989 Dep. at 25. Nevertheless, the Board of Education refused to modify the Plan and reaffirmed the Plan by a 6-1 vote on February 28, 1989. Again, the only minority member of the Board opposed the Plan.

The Deliberative Process In Adopting The 1989 Plan Was Seriously Deficient

Superintendent Sullivan reviewed the 1989 Reorganization Plan. During trial, he expressed his professional opinion that:
a. The Plan was adopted on the basis of an insufficient quantity of data to make decisions of that magnitude.
b. The quality of data was bad. The financial projection was based on unwarranted negative assumptions that overstated the size of the deficit.
c. The demographic projections contained unwarranted assumptions about decreases in student enrollments.
d. For changes of that magnitude, the deliberative process which the District went through was inadequate. For example, the measures were adopted without adequate planning information.
Sullivan Test., Tr. at 3170-80.
In the Board’s minutes of its February 14th meeting, it states: “Dr. Swanson said that the selection of the schools to be closed had nothing to do with the quality of educational programs in those schools, but involved primarily location and size.” Bd.Min., 2/14/89, B21642; D21129.
Board Member Jo Minor warned the other members of the Board that the Plan would cause resegregation of the schools. Others also made this warning. On December 8, 1988, a report from the elementary school Principals conveyed to Superintendent Swanson the responses of the Elementary School Principals to Swanson’s Summary of the 1988 Ad Hoc Committee Report. D0079. In response to the comment in Superintendent Swanson’s memorandum to the staff that “assignment of students to schools is made without determining impact on integration requirements,” the elementary Principals’ responses showed an interesting variation by Quadrant:
a. The response from the Southeast Quadrant was “agreement.”
b. The response from the Northwest Quadrant was “integration must be a consideration.”
c. The response from the Southwest Quadrant was: “it is unadvisable to assume that political assignments can be made without considering integration.”
Id. The warnings, nevertheless, went unheeded.

The Effects Of The Reorganization Plan On the RSD Elementary Schools

The 1989 Reorganization Plan showed a resegregative effect in terms of the enrollment compositions of the individual schools and in terms of the increased percentage of both minority students and majority students assigned to raeially-identifiable schools. The RSD adopted measures for individual schools that the District, itself, had identified as constituting de jure segregation. The creation of the so-called “mega schools” resegregated minority students into huge warehouse-type schools. The Plan promised, but did not deliver, educational improvement measures for minority students. The Plan also re-segregated the schools by sharply restricting voluntary transfer opportunities. Disproportionate burdens were imposed on Southwest Quadrant minority students by the 1989 school closings. The Plan furthered segregation of the RSD’s special education students. *1103 Finally, desegregative, non-burdensome alternatives were readily available to the RSD, making the segregative and disproportionate burdens imposed unnecessary. Each of these effects is discussed in detail below.
The Reorganization Plan Resegregated The District’s Elementary Schools And Students In Terms Of School Enrollments
The resegregation that the 1989 Reorganization Plan created at the elementary level was evident both in terms of individual schools and systemwide segregation proportions. Since the 1989 Plan never went into effect, its racial impact must be measured from the only available document that projects the effect of the Plan. “School Data 1989-90” was issued by the RSD simultaneously with adoption of the Plan on February 28, 1989. B509149; D8388. The percentage minority data from that document has been converted into African-American-plus-Hispanic data.
Resegregation of Southwest Quadrant Students
Had the Reorganization Plan gone into effect, students in several Southwest Quadrant elementary schools would have experienced massive resegregation. The following table shows the percentage of African-Amer-iean/Hispanie students in certain schools existing in 1988-89, and compares that percentage to the percentage of African-American/Hispanic students in the school the students would have attended under the Plan.
[[Image here]]
+ 24% Dennis 00 xo
+ 19% Ellis 05 CD
+ 14% King IQ ^
+ 14% McIntosh 0⅞ CD
+ 40% Stiles 00 fc~ CO
B509103 and B509191.
Resegregation of Non-Southwest Schools
Many non-Southwest schools resegregated in the opposite direction with precipitous drops in minority enrollment under the Reorganization Plan. Most of these, shown in boldface, changed into racially-identifiable white schools.
[[Image here]]
Brookview 13% Wo
Carlson 17% 6%
Conklin 49% 11%
Haight 47% 11%
Hillman 29% 11%
Jackson 21% 13%
Nashold 13% 5%
Rolling Green 15% 7%
Yandercook 22% 6%[16]
Walker 46% 17% I
Westview 26% 17% I
Whitehead 23% 13% I

Id.

Conklin and Haight went from racially-identifiable minority status to racially-identifiable white status. These Northwest *1104 schools, originally white, were assigned so many mandatory African-American transfers in the 1980’s that they became racially-identifiable minority schools. Under the 1989 Plan, African-American students were removed from both schools, and Haight was closed with its white students assigned to Conklin.
Systemwide Resegregation of African-American/Hispanic Elementary Students
The resegregation was also apparent in terms of the increased proportion of African-American and Hispanic students who would have attended racially-identifiable, rather than desegregated, elementary schools.
1988-89 % of 1989 Plan % of African-American/ African-American/ Hispanic in: Hispanic in: Change
Racially-identifiable minority + 05 -q to OX pi bo
Desegregated i tO to ox CO 00 c*
Racially-identifiable white + 1—^ p co ^ 05

Id.

Sixteen percent of the RSD’s African-American/Hispanic elementary students were switched from desegregated to segregated settings under the Reorganization Plan. This was a 26% increase in the number of such students in segregated settings. After the Reorganization Plan, 78% of the African-American/Hispanic elementary students would be in segregated settings.
Systemwide Resegregation of White Elementary Students
Similarly, many more white students would have attended racially-identifiable white schools under the 1989 Plan:
1988-89 1989 Plan % of White in: % of White in: Change
Racially-identifiable white + to 05 oc LO i-i
Desegregated I I—[1] co 05 ©4 ^
Racially-identifiable minority I io ⅞0 rH

Id.

The 1989 Plan changed the educational setting for 20% of the RSD’s white elementary students to a racially-identifiable white school. Accordingly, after the Plan, 73% of the RSD’s white elementary students were assigned to segregated schools.

The 1989 Plan Resegregated Schools Bg Adopting Measures That The District Itself Had Identiñed As Constituting De Jure Segregation

Some of the changes adopted by the RSD in the 1989 Reorganization Plan were previously explicitly identified by the RSD staff as constituting de jure segregation.
De Jure Segregation Criterion in 1981 IBA Report
In 1981, a team of the RSD senior staff members presented the Board with a document entitled “Individual Building Analysis” (hereinafter “IBA”). IBA, B4889 (dated 2/9/81). The objective of the IBA was to evaluate each school building in the District “to determine if additional or alternative sites, other than the eleven indicated by the NIU consultants, should be potential candidates for closing in the 1981-82 school year.” IBA at B4890. The staff team evaluated each building in terms of thirteen criteria. One of those criteria was:
De jure segregation: This factor takes into account whether reassignment of students due to a school closing could have de jure segregation implications, thus limiting the Board’s ability to reassign children to the closest school.
The meaning of this definition was elaborated on by the RSD staff in the 1988 report of the Building Subcommittee of the Board of Education Citizens’ Committee. The Sub *1105 committee was appointed to study various school system issues. The Buflding Subcommittee was staffed by the RSD Assistant Superintendent Erickson and Mr. Driscoll, both of whom had served on the 1981 IBA staff team.
The Building Subcommittee Report described the 1981 IBA process and elaborated on the meaning of the de jure segregation criterion by adding a second sentence:
DE JURE SEGREGATION: This factor was rated by taking into account whether closing a school would have de jure segregation implications, thus limiting the Board’s ability to reassign children to the closest school. In other words, if a school were closed, and the closure of the school would contribute to the segregation of students by sending them to the closest school, a school might be more difficult to consider for closure, thus would receive a lower rating. B509082 at B509085. In other words, the RSD recognized in 1981 and again in 1988, that assigning students as a result of school closing in a way that maintained or increased segregation, constituted de jure segregation. The 1981 IBA Report analyzed individual schools. In doing so, the RSD staff identified certain potential actions that met the foregoing criterion and noted other similar actions that would constitute de jure segregation. Each Of these is discussed individually below.
Church School
In 1981, on the page discussing Church School, the IBA staff team included this statement:
COMMENTS: In approving any boundary changes, the Board would need to avoid action which would result in de jure segregation.
IBA at B4900.
In the 1989 Plan, Church, then 83rican-Ameriean/Hispanic, was closed and its students reassigned to the closest remaining school, the Wilson/Melntosh/Dennis complex. The RSD projected that complex to have 80% minority enrollment. February 28 Plan at 5, B509183-B509185; cf. January Plan, B509149; February 14 Plan, B509191. Accordingly, the RSD’s action concerning Church School in its 1989 Plan constituted de jure segregation.
Dennis School
In 1981, on the page discussing Dennis School, the IBA staff team included this statement:
COMMENTS: Population: As the boundaries are now established, the area surrounding Dennis School would not support the capacity of the building. A change in boundaries to accommodate strictly a neighborhood population could result in de jure segregation.
IBA, B4902.
Under the 1989 Plan, the boundaries of Dennis School were changed in order to accommodate a strictly neighborhood population. Students from the Dénnis neighborhood, previously assigned by satellite zones to Haight and Conklin, were reassigned to Dennis. As a consequence, the minority enrollment at Dennis was projected by the RSD to increase from 55% in the Fall of 1988 to 80% under the Reorganization Plan. February 28 Plan at 5, B509183-B509185; cf. January Plan, B509149; February 14 Plan, B509191. Accordingly, the RSD’s action concerning Dennis School in its 1989 Plan constituted de jure segregation.
Stiles School
No comment as to de jure segregation of Stiles School was made in the 1981 IBA report. The school was, however, segregated by the 1989 Reorganization Plan. In the Fall of 1988, Stiles had an enrollment 38% African-American/Hispanic and was a desegregated school. Under the 1989 Plan, Stiles was closed and its students assigned to the Wilson/McIntosh/Dennis complex, projected by the RSD to have 80% minority enrollment. Id. Accordingly, the RSD’s action concerning Stiles School in its 1989 Plan constituted de jure segregation.
Ellis School
In 1981, on the page discussing Ellis School, the IBA staff team included this statement:
Use*—presently a K-3 building.
*1106 COMMENTS: *However, by returning Grades 4-6 could result in de jure segregation.
IBA, B4903.
The 1989 Plan returned Grades 4-6 to the same “neighborhood” assignment as the Ellis Grades K-3 students. Under the Plan, Ellis School was closed and all of its K-6 neighborhood students assigned to the Wilson/McIntosh/Dennis complex, projected by the RSD to be 80% minority. February 28 Plan at 5, B509183-B509185; cf. January Plan, B509149; February 14 Plan, B509191. Previously, the Ellis Grades K-3 students were in a 60% AMcan-American/Hispanic school and the Ellis Grades 4-6 students were assigned to Carlson (17.3% AMcan-American/Hispanic), Jackson (20.9% AMcan-American/Hispanic), Stiles (38.1% AMcan-American/Hispanic), Westview (25.6% AM-can-American/Hispanic), and Welsh (15.7% AMcan-American/Hispanic). D0046. Accordingly, the RSD’s action concerning Ellis School in its 1989 Plan constituted de-jure segregation.
McIntosh School
The minority enrollment at McIntosh was projected to go from 65% in the Fall of 1988 to 80% minority under the 1989 Plan. February 28 Plan at 5, B509183-B509185; cf. January Plan, B509149; February 14 Plan, B509191. This was the consequence of all students from the Church School closing, and a portion of the students from the Ellis School closing, being assigned to McIntosh. Id.
The New Wilson Elementary School
Under the 1989 Plan, a new Grades 3-6 elementary school was created at Wilson, with a projected minority enrollment of 80%. Id. This was the consequence of:
a. The actions described above that re-segregated Dennis, Ellis and Stiles;
b. The closing of Church, Ellis and Stiles; and
c. The assignment of'all Grades 3-6 students from Church, Ellis, Dennis and Stiles to the Wilson building.
Based upon the criteria set forth in the 1981 IBA report, the RSD’s Plan in this regard constituted an act of de jure segregation.
King and Barbour Schools
In 1981, on the page discussing King School, the IBA staff team stated:
COMMENTS: Any future reassignment of students from that neighborhood would have to avoid de jure segregation.
IBA, B4920. While no similar statement was included on the Barbour page (B4893), King and Barbour were situated within a few blocks of one another in the same neighborhood and, as such, the same comment would apply to both schools.
Prior to the 1989 reorganization plan, 222 students from the Barbour neighborhood in Grades 4-6 were assigned to five Eastside elementary schools. B509110. Barbour, through the presence of alternative programs including GIT, enrolled in the Fall of 1988, 60% AMcan-American/Hispanic students. Under the 1989 Plan, Barbour School was closed and all of its K-6 neighborhood students were assigned to the King/Washington complex. The GIT program was removed from the Southwest Quadrant and assigned to Southeast schools. February 28 Plan at 4, 6-7, B509182-B509185; B509149. The projected minority composition of the KingWashington complex was approximately 56% AMcan-American/Hispanic.
The purported level of total-building white enrollment in the KingWashington complex was derived from the presence of the Centralized Gifted program. The Gifted program existed in a totally separate, segregated environment within the buildings it was assigned. Accordingly, King and Barbour neighborhood students were actually assigned to a neighborhood program at the KingWashington complex that would be approximately 80% AMcan-American/Hispanic, while the Gifted program was only 2.3% AM-can-American and 1.0% Hispanic in the Fall of 1988. D10770.
Haskell School
In 1981, on the page discussing Haskell School, the IBA staff team stated:
*1107 COMMENTS: Any reassignment of students would have to avoid de jure segregation.
IBA, B4914.
In 1980, a portion of the Haskell attendance area west of Kilburn Avenue was transferred to an Eastside school for two purposes: to desegregate the Eastside school and to open space at Haskell for a full-site Focus Center called the Four-R program. Subsequently, when the Focus Center at Haskell was discontinued, a partial-site alternative program, CASS, was placed at Has-kell. B46298.
Under the 1989 Reorganization Plan, the area between Kilburn Street and Kent Creek, the satellite zone assigned to Eastside schools, was reassigned to the Haskell attendance area. Plan Attendance Map, B509095 (D4446). As a consequence, the students in the Kilburn-Kent Creek area were reassigned by the RSD from a desegregated school to a segregated African-American/Hispanic school. Accordingly, the RSD’s action concerning Haskell School in its 1989 Plan constituted de jure segregation.
Garrison School
Garrison School received no “de jure segregation” comment in the 1981 IBA report. Under the 1989 Plan, Garrison was closed and its attendance area partitioned. Most of the attendance area was assigned to Walker, which under the 1989 Plan was projected to have a 17% minority enrollment. The western portion of the Garrison attendance area was assigned to Haskell School. Compare Plan Attendance Map, B509095 mth Fall 1988 Attendance Map, B509088. This western portion was adjacent to the Kilburn-Kent Creek satellite zone, which was also reassigned by the 1989 Plan to Haskell School.
Resegregation of Non-Southwest White Schools
The 1989 Reorganization Plan turned many non-Southwest schools into resegregat-ed racially-identifiable white schools by two separate actions:
a. Removing from many non-Southwest schools the African-American and Hispanic students who had previously been assigned to them.
b. Closing certain non-Southwest schools and reassigning their predominantly white enrollments to the closest schools, which were also predominantly white.
The 1981 IBA report stated that it would be an act of de jure segregation to reassign students from a school closing to the closest school, if that action maintained or increased segregation. While the RSD staff only examined the de jure segregation consequences for African-American/Hispanic schools and neighborhoods, the criteria used was equally applicable to white schools and neighborhoods. B29810 (second page of IBA Report, B4890 (omitted in original discovery)).
Under the 1989 Plan, Haight School was closed and its white students were assigned to Conklin. Haight’s Afnean-American/His-panie students assigned were assigned to Dennis/Wilson. Riverdahl School (5% African-American/Hispanie) was closed and a portion of its students were assigned to Fro-berg/New Milford, projected by the RSD to be approximately 5% minority. Hallstrom School (2% African-American/Hispanic in the Fall of 1988) was closed and its students were assigned to Nelson and Whitehead, projected by the RSD to be 16% and 15% minority, respectively. Vandercook School was closed and its neighborhood students were assigned to Hillman (projected 15% minority) and to White Swan/Cherry Valley (projected approximately 5% minority). As such, under the 1989 Reorganization Plan, measures were adopted that contained significant resegrega-tive impacts upon most of the elementary schools in the RSD. The measures violated the criterion of de jure segregation established in the 1981 IBA report and re-articulated by the RSD’s 1988 Citizens’ Building Subcommittee report.

The 1989 Plan Resegregated African-American/Hispanic Students By Placing Them In Huge Warehouse Schools, Without Promised Educational Support

The February 1989 version of the Reorganization Plan created huge elementary *1108 schools at Wilson and Washington. Reorganization Plan at 5-6, B509183-B509184; Enrollment Projections, B509149 and B509191. Wilson was projected to have 1227 students, more than twice the number of students as any previous elementary school in the system, and four times the size of the average elementary school in the District in 1988. Washington was projected to have 876 students, 332 more students than the Plan’s largest white elementary school, Spring Creek.
Both Wilson and Washington were to be elementary schools placed in former middle school buildings, which enabled them to have this unprecedented size. McIntosh was also projected by the Plan to have 649 students, more than 100 students above the size of the largest white elementary school, Spring Creek.
The Plan placed more than 1800 African-American/Hispanie elementary students in one highly segregated complex of schools. The students constituted half of all the African-American and Hispanic elementary students in the RSD. Id.
The Wilson complex was commonly referred to as the “mega-school.” The mega-school’s boundary extended from the Rock River on the east to Meridian Road on the west, spanning the entire Westside. On the other axis, it ran from Montague Street on the south to north of Auburn Street. Plan Attendance Map, B509094. Superintendent Sullivan, who took office after the 1989 Plan had been adopted, expressed his opinion that the mega-school concept at both Wilson and Washington was unwise because the schools were too large. In his view, the concentration of such large numbers of low-income minority students would have had negative educational effects on the students. Sullivan Test., Tr. at 3181. The same concern had previously been raised by the sole minority member of the Board, Michael Williams, but was not addressed by the Board or staff. Williams Test., Tr. at 2381.
Superintendent Bill Bowen testified that he began having reservations the longer he considered the proposed “mega-school” portion of the Reorganization Plan. “[T]he idea that the other schools were closing, early on that didn’t have as much significance, and what those individual schools meant to people. And to take all those children and put them in one huge facility, it really—and a great number of those would be African-American children. And that concentration didn’t look right, start to feel right.” Bowen Test., Tr. at 3370. Bowen further stated, “It started to look like a ghetto.” Id.
The 1989 Plan’s elementary reassignment measures were initially undertaken partly to reduce the need for transportation. The February Plan, however, required extensive transportation within the large “neighborhood” proposed for minority students. As such, in the February 1989 version of the Plan, the phrase “reduce the need for transportation” was deleted by the RSD.
The Wilson mega-school was created by the RSD with little advanced planning as to the educational or social consequences of a 1227 student elementary building or a 2300 student school complex. When asked in discovery in May of 1989 to produce documents concerning advanced planning for the mega-school concept, the RSD produced one memorandum dated February 22,1989, describing telephone interviews conducted by RSD staff with the Principals of two large elementary schools, one in Belvidere (850 students) and one in Maple Park (1034 students). D5941; D5942. When asked for documentation as to the development and implementation of any special educational program in the mega-schools, the RSD produced only three staff memos, totalling five pages. D5947-48, D5949, D5966. The memos show that as late as June 1989, four months after the mega-schools were established, no educational plan dealing with elementary schools made up of 1227 students and 876 racially-concentrated, low-income elementary students existed.
The January Plan proposed to “build two large elementary schools—one in the eastern end of the district and one in the western end—as soon as funds become available.” B509136. In the February Plan, the RSD stated that the Wilson mega-school complex “eliminates the need to build a new elementary school on the far west side.” The Plan retained the proposal to build a large ele *1109 mentary school on the Eastside. B509183-B509184. Furthermore, no funds were allocated in the Plan to provide additional resources or staff to minority students. On February 28, 1989, despite the lack of planning, the questions and the community opposition, the Board rejected a motion by Michael Williams (the only African-American Board member) to delay the vote on the mega-school “for two weeks to allow the administration and Board an opportunity to further explore the impact of this proposal on the community.” Bd.Min., 2/28/89, B214674. Superintendent Swanson urged the Board not to delay a vote, saying that “he was firmly convinced that this would be a model for the 21st century.” Id.

The 1989 Plan Segregated The Schools By Promising, But Not Delivering, Educational Improvement Measures For African-American/Hispanic Students

The first provision of the 1989 Reorganization Plan promised extensive supplemental educational benefits to the newly resegregat-ed African-American/Hispanic elementary schools. Paragraph 1.1 of the January Plan stated:
In elementary schools with a high incidence of educationally and economically disadvantaged students, use regular budget and government funds (Chapters 1 and 2) to provide supplemental support staff and smaller class sizes and to offset the inequities created by gifts from parent organizations.
Early correction of learning deficits will help students experience academic achievement, progress through school at a normal rate and avoid some of the common causes of leaving school prior to graduation. The provision of supplemental materials and human resources ought not be dependent on the economic status of a school’s constituency.
B509179.
Soon after assuming his position as Interim Superintendent, Superintendent Swanson became aware that “there was some discrepancy in the resources provided mainly due to the fact that some areas which have higher economic—parents of higher economic status were able to provide things for their schools that were not available to all schools in the district.” Swanson Dep. at 32-33. No district policy on equalization of resources existed at the time. Id. at 34. According to Superintendent Swanson, the intent of the Reorganization Plan was to “particularly provide the human resources, additional human resources, that [disadvantaged] people needed in terms of support personnel.... The hope was to distribute resources in with an extra emphasis on low-income schools.” Id. at 39.
Not one of the three versions of the 1989 Plan, however, contained any budget allocation to carry out this provision. No specification of schools or program definitions in support of this proposal were provided. See January Plan, B509142; February 14 Plan, B509169; and February 28 Plan, B509190. The lack of such a budget was in contrast to other initiatives undertaken in the Plan. For example, the Dropout Implementation Committee was provided a budget of $75,000 for its initiating recommendations.
Superintendent Swanson admitted that no decision had been made to allocate any specific amount of funding for paragraph 1.1. programs. Swanson Dep. at 43. The only budget item discussed was a $500,000 allocation to schools with disadvantaged students. No specific distribution or implementation plan existed, however, with regard to the expenditure of these funds, being discussed only in general terms. Id. at 45. Similarly, Board member Gage testified that he had seen no proposal that an additional expenditure of funds be made for schools in low achieving areas. Gage Dep. at 73. No discussion between board members was held about providing a specific amount of money to balance inequities. Id. at 76-77.
The Plan also did not provide supplemental educational benefits to the newly resegregat-ed minority elementary schools. Superintendent Sullivan testified that, in his opinion, the Plan would have had a particularly harmful effect on the RSD’s provision of supplementary educational programs such as Art, Music, and Chapter I programs to minority students.

*1110
The 1989 Plan Resegregated the Schools by Sharply Restricting Voluntary Transfer Opportunities

A fundamental characteristic of a non-segregated school system is a voluntary transfer program, the opportunity for any student to elect to attend any other school in the system if the transfer promotes desegregation and space is available. The 1989 Plan adopted a restrictive voluntary transfer policy, limiting the number of white schools to which minority students could transfer. Minority students were allowed to transfer to only five of the twenty-two elementary schools with white enrollment percentages above the system-wide elementary average. This was true even though fifteen of those schools had more than 82% white enrollment and most of them had available space. The RSD established no voluntary transfer program for white students to transfer to minority schools. Reorganization Plan (final version), B509187; School Data 1989-90, B509149; see also, Turrentine Memos, 3/16/89, D8012; 3/17/89, B502492; Swanson Memo, 6/1/89, B503809; RSD Press Release, 4/14/89, B509171; Lyman List of Available Classrooms, 4/4/89, D1108.
In the Reorganization Plan as adopted on February 28, 1989, the RSD issued the following voluntary transfer policy:
Allow minority students to transfer from schools having minority populations exceeding 50% to schools designated by the District. Allow majority students to transfer from schools having majority populations of more than 50% to schools designated by the District.
Transportation Director Patricia Turren-tine sent a memo, dated March 16, 1989, initially establishing the list of schools to receive minority desegregation transfers as follows:
Carlson
Hillman
Rolling Green
Westview
White Swan (K-3)/Cherry Valley (4-6)
The Turrentine memo of March 17, 1989, then modified the list of receiving schools to the following four schools:
Brookview
Rolling Green
Westview
White Swan (K-3)/Cherry Valley (4-6)
Carlson and Hillman were eliminated as receiving schools by the March 17th memo, but those schools did have available classrooms for 1989-90. According to the list of April 4, 1989, prepared by Barbara Lyman, Director of Elementary Education, Carlson had three and Hillman had two available rooms. Carlson was a Northeast Quadrant school that was projected by the District at that time to have 92% white enrollment in the Fall of 1989. Hillman was a Southeast Quadrant school that was projected at that time to have 85% white enrollment in the Fall of 1989-90. School Data 1989-90, B509149.
Ultimately, the transfer policy publicly announced by the District on April 14, 1989, was as follows: Minority students from the King/Washington complex could transfer to White Swan/Cherry Valley or Rolling Green; minority students from the Dennis/McIntosh/Wilson complex could transfer to Rolling Green, Westview or White Swan/Cherry Valley; and minority students from Haskell could transfer to Brookview. The desegregation transfer system thus established by the District for minority elementary students limited their transfer opportunities in the following ways:
Minority students at King/Washington could transfer to only two schools: Rolling Green or the White Swan/Cherry Valley complex.
Minority students at Dennis/McIntosh/Wilson could transfer to only three schools: Rolling Green, Westview and White Swan/Cherry Valley.
Minority students at Haskell could transfer to only one school: Brookview.
The White Swan/Cherry Valley complex was located at the far eastern end of the District, a long distance for minority students. Brookview and Rolling Green were located in the central east portion of the District. Only Westview was located west of the River.
*1111 The restrictions were established even though, at that time, the District projected that fifteen other elementary schools would have white enrollments of 82% or more in the Fall of 1989 and seven of those would have white- enrollments of 92% or more. Such schools included Carlson and Hillman, which had originally been identified as transfer receiving schools and then withdrawn from the list. Id.
No significant measures were in place to desegregate the enrollments of those fifteen white schools. A possible exception was the Alternative Programs at four schools, two of which had been relocated from predominantly African-American schools to predominantly white schools. According to the February 28, 1989 School Data summary, the Alternative Programs at predominantly white schools were as follows:
Bloom Academics Plus
Froberg/New Milford GIT
Jackson CASS
Welsh Academics Plus
The voluntary desegregation transfer policy established by the District in the 1989 Reorganization Plan was not a two-way policy. Thus, while the Reorganization Plan referred to white students transferring from majority white schools to “schools designated by the District,” no action was ever taken by the District to implement this policy. No receiving schools for white transfers were designated and subsequent public announcements referred only to minority students transferring to white schools. See, e.g., RSD Press Release, 4/14/89, B509171.

The 1989 Plan Resegregated The System, By Removing The Alternative Programs From Southwest Elementary Schools

Relocation of Alternative Programs had the effect of reinforcing the segregation of the predominantly African-American schools and of imposing a disproportionate burden on African-American students. While, the previous location of the programs in Southwest Quadrant schools required white students to transfer into predominantly African-American schools west of the river, the new program locations required African-American students to transfer to schools east of the river.
During the 1988-89 school year, the following elementary Alternative Programs were located in Southwest Quadrant predominantly minority schools for the express purpose of contributing to the desegregation of those schools:
King Gifted
Barbour Gifted, GIT
Haskell CASS
Ellis Arts
Lathrop Montessori
The February 28, 1989 Reorganization Plan provided that the RSD would “continue all current Alternative Programs_” However, the “School Data 1989-90” indicated that the following Alternative Programs would be relocated from Southwest Quadrant African-American schools to Eastside majority-white schools:
GIT from Barbour to Froberg/New Milford.
CASS from Haskell to Jackson (where some CASS classrooms were already located).
Arts Alternative from Ellis to Rock River.
According to Board member Fred Wham, “alternative schools were not a big thing with the minority population ... on a priority basis it didn’t seem to be really important to them.” Wham 1989 Dep. at 63-68.
The Plan, As Initially Adopted And Implemented, Created Segregated Academics Plus Alternative Programs
The Reorganization Plan as adopted by the District on February 28, 1989, established a second Academics Plus program at Welsh School, located on the Westside. The original Academics Plus program was at Bloom School on the Eastside. Reorganization Plan, 2/28/89, B509180. In a meeting on March 15,1989, Superintendent Swanson and other senior staff established the policy that “Academics Plus students will be assigned to Bloom if they live on the east side of the river and at Welsh if they live on the west side of the river. Students currently at Bloom living on the west side of the river may continue at Bloom but their siblings and all new applicants must go to the program based on their geographic location.” D8012.
*1112 The effect of these geographical restrictions was that the Academics Plus program at Bloom was virtually all white and the Academics Plus program at Welsh was predominantly minority. On March 28, 1989, the policy for Academics Plus students was changed, so that students could apply for either the Bloom or Welsh program regardless of their residence in the District. Tur-rentine Memo, 3/30/89, B502493.
The Pattern Of Elementary School Closings Imposed Disparate Burdens On Minority Students And Neighborhoods Complete Closures of Schools
The January 1989 version of the Plan proposed closing six elementary schools in various parts of the District, except the Northeast Quadrant. B509135-B509137. The six school closings were distributed as follows:
Northwest 1
Southwest 2
Southeast 3
Northeast 0
Total 6
The February 1989 version of the Plan proposed closing three additional elementary schools: Church, Stiles and Ellis, all in the Southwest Quadrant. Reorganization Plan, B509183.
The closing of the three additional elementary schools generated only $336,000 in savings, according to RSD data. This was only 4.6% of the total savings projected by the February Plan and only one-third of 1% of the District’s 1989-90 budget. Complaint and Answer at ¶¶ 27, 27.2.. Even the small purported cost savings of closing the additional three elementary schools was overstated because it did not take into consideration the offsetting new transportation cost of busing minority students. The February Plan contained other additional cost reductions so that the revised total savings was $7.34 million, $870,000 more than the January Plan. Even without the closing of the three additional elementary schools, the February Plan would have generated $534,000 more in cost reductions than the January Plan. B509190. School closings under the February Plan were as follows:
February Plan Change from January
Northwest 1 0
Southwest 5 +3
Southeast 3 0
Northeast 0 0
Total 9 +3
As a result, the entire burden of additional school closings was placed upon the students in the Southwest minority community.
Partial Closures Through Split Grade Structures
The January version of the Plan would have established split grade structures at four pairs of elementary schools. Schools sharing a split grade structure .had a combined, larger attendance area, with all students in certain grades (e.g., K-2) attending one school and all students in the remaining grades attending the other school. One effect of establishing a split grade structure is comparable to the partial closing of each school: the mandatory reassignment of about half of its students to the other school. Due to the increased distance, in a neighborhood school context this would most likely require some of the students, who would otherwise be able to walk to school, to be transported. Another effect of a split grade structure is the psychological and educational burden on the students who are required to change schools in the middle of their elementary schooling.
Two of the split grade structures were established in the Southwest Quadrant: King-Washington and Stiles-Dennis. This required transportation for some students who otherwise would have been able to walk to,school. The two other pairs were to be at the southeast edge of the District: White Swan/Cherry Valley and Froberg/New Milford, where transportation was already required due to the sparse population in this area.
The February 1989 version of the Plan established an additional split grade structure in Southwest Quadrant schools. Wilson was converted to a Grades 3-6 elementary school and two additional split grade structures, K-2, were established at McIntosh and Dennis, feeding into Wilson. The net result was that 90% of the students in segregated *1113 minority elementary schools were placed in split grade structures and were required to change schools at third grade. The. only exception was Haskell. Only 12% of the other elementary students in the RSD were subject to the burdens of a split grade structure.
The scope of the additional transportation burden that these split grade structures imposed on Southwest students was set forth in an April 1989 memorandum from the Director of Transportation. B502494. Focusing on only one of the split grade complexes, Dennis/Wilson/McIntosh, she stated:
It will take 28 buses to pick up the Dennis/Wilson students. It will take 805 feet, or 2.7 football field lengths to park these buses. This will place children a considerable distance from school when loading and unloading buses. At McIntosh the buses would be lined up from School Street to the exit of the Auburn parking lot. Students will have to walk in the snow since there are no sidewalks. It will also be difficult for the primary students to find their bus with 23 buses at a building.

Id.

Closings and Pairings as a Percentage of Schools in a Quadrant
One other way to view the disproportions imposed by the 1989 Plan’s elementary closings and pairings is to consider the percentage of elementary schools in each Quadrant that was affected by such actions. The disproportion of existing elementary schools closed by the 1989 Plan, by Quadrant, were:
Schools 88-89Closed % Closed
Northwest 6 1 17%
Southwest 10 5 50%
Southeast IV 3 18%
Northeast 6 0 0%
The following chart shows the result when split grade structures, which amount to partial closings, are also considered:
Closed Schools 88-89 or Split % Closed or Split
Northwest 6 1 17%
Southwest 10 8 80%
Southeast 17 7 41%
Northeast 6 0 0%

Under The Plan, The Schools In The Southwest Quadrant Were Overcrowded And No Space Was Available For Special Programs

School closings in the 1989 Plan placed Southwest Quadrant elementary schools at or over capacity. As á result of this action, students in minority schools were deprived of both educational programs routinely provided elsewhere in the District and supplemental educational programs that otherwise were provided in the minority schools.
Set forth below are the Capital Development Board’s capacities and projected enrollments for the 1989-90 school year in minority elementary schools with a projected minimum enrollment of greater than 50%.
School Capacity Projected Enroll. Avail. Capacity
Dennis 439 410 29
Haskell 494 419 75
King 468 507 (39)
McIntosh 623 649 (126)
Washington 728 876 (148)
Wilson 1448 1227 221
The February Plan placed over capacity enrollments at three schools with over 50% minority enrollment. These enrollments excluded Special Education students and no apparent provision was made for the extra classrooms required by Chapter 1 programs. Little or no space was available for such special programs. No allowance was made for the “reduced class size” promised by the Plan for schools with “a high incidence of educationally and economically disadvantaged students.” The RSD failed to properly consider the space needs for Special Education and Federal Chapter 1 programs in the remaining schools in the Southwest Quadrant. Consequently, the educational opportunities available to minority students in the Southwest Quadrant were adversely affected due to the closing of schools and insufficient space in the remaining 'schools.
On February 14, 1989, the RSD staff prepared a listing of the anticipated Fall 1989 location of special programs. 1989-90 Location of Special Programs, 2/24/89, D14149. Of all the special programs in the elementary schools, the only ones scheduled for Southwest Quadrant schools were the Gifted Alternative Program and the Spanish Bilingual Program, both located at King/Washington. *1114 The staff listing indicated that schools that contained either Chapter I or transition classrooms in 1988-89 “may or may not have the programs next year” because of uncertainty about available space. Id. With respect to Chapter I, Elementary Director Lyman notified Superintendent Swanson that “we will not have Chapter I teachers housed in full-size classrooms,” due to space limitations. She said, “This will be a change for the faculty and, in many cases, it may be difficult for them to become accustomed to.” D11077. Further, with respect to special education, Lyman informed Swanson that “we will not have room in each building for Learning Disabled resource teachers to be housed in a full-size classroom.” Id.
The Effects Of The 1989 Reorganization Plan On RSD Secondary Schools The 1988 Level Of Desegregation In the RSD Secondary Schools
High Schools
In the Fall of 1988, the RSD’s overall high school enrollment was 21.46% African-American, meaning that a desegregated school was between 10.7% and 36.5% African-American. Four of the RSD’s high schools were desegregated in 1988:
Auburn 35.3% African-American
East 21.1% African-American
Guilford 15.4% African-American
West 34.9% African-American
One RSD high school was a raeially-identifiable white school:
Jefferson 7.5% African-American On an African-American-plus-Hispanic basis, Auburn was just within the desegregation range and West was just outside the. range.
High School Attendance Areas As Of 1988
Of the five high schools in the RSD, only West High School was a naturally integrated school, that is, a school with an integrated enrollment derived from a reasonably contiguous attendance area around the school. RSD High School Attendance Map, Fall 1988, B509089. East and Guilford High Schools were desegregated by satellite mandatory assignment zones, and Auburn High School was desegregated by the Gifted and CAPA Alternative Programs, in which most of the students were white. Jefferson High School, having none of these attributes, was a raeially-identifiable white school.
In 1988, West High School had a contiguous attendance area bounded by the Rock River, State Street, Central Avenue and Riverside Boulevard. In addition, West had a small satellite zone in the Southwest Quadrant, between Kent Creek and Montague Street. Without this satellite zone, West would have approached the systemwide level of African-American enrollment, that is, would have been a more integrated school. None of West’s students had to be bused to school as none lived more than a mile and a half from the school. In contrast, Jefferson bused 1618 students out of the total student population of 1746. B502836.
Guilford High School was desegregated by a mandatory assignment satellite zone west of the Rock River. This area was bounded roughly by the Rock River, State Street, Central Avenue and Kent Creek. East High School was also desegregated by a satellite zone west of the Rock River, bounded roughly by Montague on the north and west, Ogil-by Road on the south and the Rock River on the east. Jefferson High School had an attendance area at the far Southeast area of Rockford. Lacking any effort at desegregation, Jefferson was a raeially-identifiable white school.
The desegregation of Auburn High School was accomplished largely by the presence of the Gifted and CAPA Alternative Programs. In the Fall of 1986 the component parts of Auburn were comprised as follows:
Gifted 5% African-American/ Hispanic
CAPA 25% African-American/ Hispanic
“No program” 53% African-American/ Hispanic
Total 38% African-American/ Hispanic
B509128. Auburn also had a satellite attendance area in the far Southwest area of the School District, but few students were generated from that area.
*1115 The locations and boundaries of the high schools in the RSD strongly show that the RSD had four centrally located high schools and one remotely-located high school, Jefferson. West, Auburn, East and Guilford were located in areas of relatively dense population. These four schools were also reasonably well-distributed around the populated area of the District. In contrast, Jefferson was located at the far Southeast reaches of the School District, outside the Rockford City limits. No significant residential population was near Jefferson School. The fact that 93% of the students attending Jefferson had to be transported to school by virtue of living more than 1.5 miles from the school underscores this population distribution. No other school even approached that level of required transportation. Even Auburn, with its Gifted and CAPA transfers, had only 51% of its students requiring transportation. B502836.
The 1988 Level of Desegregation in RSD Secondary Schools: Middle Schools
In the Fall of 1988, the desegregation range for middle schools in the RSD was between 10.6% and 36.1% African-American. Three of the middle schools were desegregated in 1988:
Eisenhower 14.3% African-American
Lincoln 28.7% African-American
Wilson 23.3% African-American
One of the middle schools was racially-identifiable white:
Flinn 7.4% African-American
One of the middle schools was racially-identifiable minority:
Kennedy 37.6% African-American
Middle School Attendance Areas As Of 1988
The pattern of middle school attendance areas was quite similar to the high schools. About half of the Southwest middle school students attended Westside schools, Kennedy and Wilson. The other half were assigned by mandatory satellite zones in order to desegregate Eastside schools. The northern portion of the Southwest Quadrant from Auburn Street to State Street, was assigned to Kennedy School. This assignment paralleled the high school level, where students from this same neighborhood went to West. The central portion of the Southwest Quadrant, from State Street to Kent Creek, was assigned to Eisenhower as a satellite zone. This paralleled the assignment at the high school level, where students from this same neighborhood were assigned to Guilford. The southern portion of the Southwest Quadrant, from Kent Creek to Ogilby Road, was assigned as a satellite zone to Lincoln Middle School, on the Eastside. This differed somewhat from the treatment of this neighborhood at the high school level, where it was divided into two satellite zones, one assigned to East High and one to West High. The far southern portion of the Southwest Quadrant was assigned as a satellite zone to Wilson. This paralleled the assignment of this neighborhood at the high school level to Auburn. Finally, the southwestern portion of the Southwest Quadrant was assigned as a satellite zone to Kennedy. This additional satellite zone caused Kennedy to become a racially-identifiable African-American school.
In the 1981 IBA report prepared by RSD’s senior staff, Lincoln Middle School was described as a school whose “location lends itself to natural integration.” IBA, B4889, B4948. Since the IBA report was evaluating buildings for closing, it is reasonable to conclude that the RSD staff considered “natural integration” a factor militating against closing Lincoln Middle School at that time. In its February 1989 Reorganization Plan, the RSD said that its new secondary “boundary pattern provides natural diversity among students.” Reorganization Plan at 6, B509184. While the RSD’s characterization of its new boundaries was incorrect, the statement does show that the RSD recognized and supported the desirability of natural integration as opposed to mandatory desegregation.
Recommendations Of The Ad Hoc Citizens’ Committee
The process of developing the 1989 Reorganization Plan began after Superintendent Swanson and the Board received the report of an Ad Hoc Citizens’ Committee, which was appointed by the Board and studied school system reorganization questions in 1988. See Swanson Memo to RSD Employees, 11/17/88, B503659. After the Committee’s report was *1116 received in October 1988, Interim Superintendent Swanson circulated a summary of the Committee’s report to all district employees. The Committee recommended that, if buildings were closed for the purpose of cost savings, the guidelines should be to close “50% of the excess buildings.” B503662.
The Board’s Goals For The Reorganization Plan And Criteria For School Closings
The first draft stating the goals of the Reorganization Plan was presented by Superintendent Swanson on November 30, 1988. Swanson Memo to Board, 11/30/88, D13271. Goals eight and nine addressed student assignment:
8. Avoid unnatural segregation of racial, ethnic and socio/economic groups;
9. Assign pupils, especially at the lower elementary levels, to neighborhood schools.
The “Goals For Changes In District Operations” actually adopted by the Board on December 21, 1988 changed eight and nine to seven and eight and read as follows:
7. Balance the opportunity to attend neighborhood schools with the goal of racial, ethnic and socio/economic diversity in our schools;
8. Minimize travel time for students, especially at the lower elementary grade levels.
On the same day, the Board adopted its “Criteria For Closing Of Schools”. B35247. Among the significant criteria were operating costs, capital costs and transportation implications. Absent from the list of eleven criteria was any reference to integration/desegregation factors and the impact of a school closing on the surrounding neighborhood. The next day, the Rockford City Council adopted a resolution stating that the School Board should establish an immediate dialogue with the City Department of Community Development “concerning the total economic, social and educational impact of projectéd school building closings upon individual neighborhoods.” D11256. The RSD thus amended its closing criteria adding “impact on neighborhood.” Id. This change was reflected in a letter from Superintendent Swanson to Mayor McNamara, stating that, in response to communications from City officials, “the Board directed the administration to include in its deliberations the impact of a school closing on a neighborhood.” Swanson Letter to McNamara, 1/18/89, B38593.
Information Before The Board In Its Deliberations
The Superintendent and the Board of Education were committed to closing a high school under the Reorganization Plan. The reason put forth was that declining enrollment necessitated such a closing for cost-reduction purposes. In an information packet that Superintendent Swanson assembled and distributed to Board members, several pieces of relevant information were presented. B35229 (dated January 1989). The second page of that packet contained an analysis of the residential distribution of the RSD’s student population. At that time, 41% of the RSD’s students lived west of the Rock River, and 59% lived east of the Rock River. The statistics suggest that, assuming four high schools of equal size, the retention of two high schools west of the Rock River would require 9% of the students to cross the river east to west. The retention of three high schools east of the Rock River, however, would require 16% of the students to cross the river east to west.
The information packet also discussed high school enrollments and capacities and showed that capacity was not a significant factor in selecting a high school for closing. The data showed the actual and projected enrollment of Grades 9-12 as follows:
Actual Fall 1988 7,670
Projected Fall 1989 7,354
Projected Fall 1993 6,829
Projected Fall 1998 7,082
B35232, B35234. Accordingly, in terms of capacity, any of the five high schools could have been closed. In other words, by closing any one high school, any combination of the four remaining high schools would have had enough capacity to handle the projected number of students. The “optimum contract operating size” and the “largest enrollment since 1965” of the five high schools are as follows:
*1117 School Optimum Size Largest Enrollment
Auburn 1,635 2,026
East 2,070 2,886
Guilford 2,020 2,839
Jefferson 2,380 2,380
West 1,765 2,334
Total 9,870 12,465
B35232. In terms of “optimum size”, omitting the largest high school, Jefferson, leaves a total available capacity of 7,490. This exceeds the projected number of students for the Fall of 1989, as well as the projections for 1993 and 1998. Thus, even at “optimum contract operating size,” nothing about school capacities compelled any particular conclusion regarding which high school to close.
The information packet further discussed projected maintenance and repair costs. Estimated Costs of Major Maintenance and Repair Projects, 1987/88—1992/93, B35241. The projected five-year cost for the four high schools was:
Auburn $416,780
East 440,500
Guilford 370,066
Jefferson 564,005
West 266,305
Thus, West High School had the lowest repair cost of all the high schools and Jefferson High School had the highest repair cost. The projected costs savings from closing Jefferson rather than West, for example, would have been $298,000.
Apart from the Superintendent’s information packet, the RSD’s leaders had information on the operating costs of the various high schools. Finally, the RSD had a 1988 report from the North Central Accreditation Association strongly commending the educational program and educational conditions at West High School. As such, there was no educational justification for closing West High School. The school was functioning well. NCA Report, 1988, B1302.
The Administrative Staff’s January 17 Recommendations To The Board
On January 17, 1989, Superintendent Swanson presented recommendations as to the form of the Reorganization Plan to the Board of Education. Swanson Memo to Board, 1/17/89, D3925. The introductory note stated:
The following recommendations represent a consensus of the District-level Administrative Staff; respond to input from persons in all employee classifications and in many community groups; and are based on considerable data produced by staff personnel.
The document set forth the goals of the Administrative - Staff’s recommendations. The first category was “Buildings and Boundaries,” for which three goals were articulated:
Provide optimum enrollment in all schools, Assign elementary students to neighborhood schools, and
Establish secondary school boundaries to attain racial and socio/economie diversity.
Secondary-level integration was, therefore, the compromise for elementary school reseg-regation.
The first recommendation was to “Close West High School.” The articulated reasons were as follows:
West High has the smallest enrollment of the five high schools; has the second smallest capacity; is located in close proximity to Auburn High School; along with East High, is the oldest of the high schools; and is advantageously located for purchase by a commercial or industrial firm.
The Administrative Staffs second recommendation was:
Design secondary school boundaries as corridors across the city east and west with students in the northernmost section attending Eisenhower and Guilford, near north attending Wilson and Auburn, near south attending Lincoln and East, and the southernmost corridor attending Flinn and Jefferson. Vary boundary lines as needed to achieve racial and socio-economic diversity in each school.
This boundary pattern abandons the traditional eastside-westside pattern; provides natural diversity among students in each secondary school; equalizes the enrollments in the schools; allows for greater use of RMTD bus routes; and more equitably shares the *1118 need to be transported among majority and minority students.
This recommendation abandoned the traditional Eastside-Westside pattern and more equitably shared transportation. The boundary plan calling for horizontal districts, would have abandoned the Rock River as a barrier. In one of the four corridors, Eastside students would have been assigned to attend Westside schools, Wilson and Auburn. The number of students so assigned would be increased by the fact that the Administrative Staff also recommended moving the high school alternative programs, Gifted and CAPA, out of Auburn and Wilson to East High School.
Another recommendation of the Administrative Staff dealt with the Rockford Area Career Center:
Convert the Rockford Area Career Center (RACC) into a Special Program Center. RACC has experienced under-utilization since its opening in 1971. High School students have been reluctant to sacrifice the transportation time. Other districts belonging to the Joint Agreement have not been able to fulfill their student allocations.
The January 24 Reorganization Plan
The Administrative Staffs recommendation for two-way, eross-the-River secondary boundaries was not adopted. Just one week later, the RSD publicly issued its January 24th version of the Reorganization Plan, which bore' little resemblance to the secondary boundaries proposed by the Administrative Staff. This version reverted to the RSD’s historical practice of mandatorily assigning Westside satellite zones in order to desegregate Eastside high schools. In the new version, Guilford and Jefferson each had an elongated strip that snaked across the river to encompass pieces of the Southwest Quadrant. East High and Auburn, however, had relatively compact attendance areas under this Plan. One reason was that the high school alternative programs, CAPA and Gifted, were removed from Auburn and, as a result, Auburn had more minority students from the neighborhood. The most distinctive feature of the January 24th Plan was that it returned to mandatory one-way assignment of Westside minority students.
Despite the conceptual difference between the January 17th recommendations of the Administrative Staff, and the January 24th Plan released by the 'RSD, the January 24th Plan took, almost verbatim, the rationale statement presented by the Administrative Staff to justify the now-discarded January 17th recommendations. Thus, the January 24th Plan included each of the following statements that had been in the January 17th Administrative Staff recommendations:
This boundary pattern abandons the traditional Eastside-Westside pattern;
Provides natural diversity among students in each secondary school; and
More equitably shares the need to be transported among majority and minority students.
January Plan at 6, § 2.13, B509137. None of these statements were true in relation to the January 24th Plan. The Plan retained, rather than abandoned, the traditional Eastside-Westside pattern. Diversity was based on mandatory satellite zones rather than on a natural residential basis. Inequity in transportation among majority and minority students was increased and required even more minority students than before to be transported to the Eastside.
The amount of secondary school desegregation projected by the RSD under the January Plan represented only a slight improvement over the preexisting conditions in the Fall of 1988. Auburn would gain a few percent minority and would become a racially-identifiable minority school, with more than 15% minorities above the systemwide average. East would lose half of its minority enrollment, but would be below the system-wide proportion to the same extent, 8%, it had formerly been above that proportion. Guilford’s composition would remain unchanged. Jefferson would become a desegregated school with 33% minority. The range between the highest and lowest minority percentages in the various high schools would be reduced only from 32% to 26%. D13891.
*1119 Another provision of the January 24th Plan represented a significant departure from the January 17th Administrative Staff Plan. The Rockford Area Career Center, rather than becoming a “Special Program Center,” was closed entirely. January Plan at 5, B509136.
Public Reaction To The January Plan
As stated earlier, the proposed closing of West High School aroused intense protest from the community in which that school was located. Northwest side parents formed the “Save West High Committee” for the purpose of opposing the closing of West High School. The Save West High Committee presented the Board with a petition signed by 12,000 persons who opposed the closing of West High.
Rockford’s Mayor, John McNamara, also publicly opposed the closing of West High School. Mayor McNamara stated that “closing West would be a devastation to the city’s west side.” He said: “This area of the city has had to suffer the vacancy of Roosevelt middle school. Now we’re looking at the closing and vacancy of West.” B500613. A few days later, Mayor McNamara reiterated his position: “This is not an emotional reaction,” adding that West was big enough to house the number of students in the area and was in excellent structural condition. “My basic question is why keep schools open that are surrounded by cornfields and close schools surrounded by kids?” B500614-B500616.
In a letter responding to Mayor McNamara’s comments, Superintendent Swanson and Board President Jackie Confer criticized Mayor McNamara for being “publicly confrontational” and suggested that future communications be directly to Superintendent Swanson. The letter to Mayor McNamara threatened that “pressuring the Board publicly may cause a backlash for you.” Swanson-Confer Letter to McNamara, 2/1/89, D13853.
Reconsideration Of The West High Closing
In response to criticism of and objections to the decision to close West High School, Administrative Staff began exploring alterna-fives. One recommendation came from the RSD’s Gifted Director, Mr. Gary Heideman. Mr. Heideman’s major premises included:
1. Failure to maintain two west-side high schools will ultimately result in negative consequences for the community as a whole in later years.
2. The Rockford Area Career Center has never achieved its potential to provide effective career/voeational education for Rockford high school students. This Center should remain open but with major operational and programmatic changes.
B507327. Essentially, Mr. Heideman proposed creating a Jefferson/RACC complex as a vocational magnet high school. His specific comments included:
[Sjeveral factors such as scheduling, student awareness, course availability and transportation have hindered rather than enhanced the availability of RACC offerings.
Beginning in 1989/90, Jefferson and RACC should be viewed as a single facility with the capacity to serve upwards of 3,200 students as Rockford’s newest alternative or focus center school.
A major aspect of the Jefferson complex will be to serve both the academic and vocational training needs of any high school age youngster from throughout the system. Jefferson and RACC will employ all marketing recruitment practices utilized by other alternative programs which have resulted in both popular and appropriate educational programming.
Under this Plan, Auburn High School would retain the Gifted and CAPA programs plus a neighborhood feeder population, with an overall minority enrollment not to exceed 35%.
Mr. Heideman expressed the view that “West High School is an excellent facility which has many flexible sized classrooms and specialty areas such as the small theater.” Mr. Heideman argued that removing the alternative programs and the combining West and Auburn neighborhood students would result in the Westside not having a high school that offered the same level of college prepa *1120 ratory training as other high schools in the District. He recognized that:
[T]he ultimate flaw in the thinking which suggests that the student bodies of Auburn and West be combined lies in the impression this combination makes to anyone residing on the west side or considering residency on the west side. If the only high school within their reach fails to provide a comprehensive program, the only alternatives are not to reside in the area or enter into private education. A “catch-22” based upon a self-fulfilling prophecy will ultimately result in a new set of issues within the next 10 years.
Mr. Heideman recommended keeping West High open and redrawing its boundaries “to encompass the east side of the river, specifically the Guilford High School area along North Alpine Road to Highcrest Road.” The minority population would not exceed 35%. East High School was recommended to be closed because it was “not based in any of the major quadrants of the city.” Guilford was to remain open, with part of its attendance area transferred to West High, and those students replaced with students from East High. Guilford would thus have “a minority population approximating that of the other three remaining high schools.” The primary educational program at Guilford would focus on being a general comprehensive high school with courses ranging from college preparatory to remedial, as in all the other high schools.
The key concepts in Mr. Heideman’s proposal were to desegregate Jefferson High by linking it with RACC as a vocational magnet to attract minority voluntary transfers; keeping Auburn desegregated with alternative programs; keeping West desegregated with the assignment of Northeast white students across the river; and requiring Guil-ford to be a desegregated school with a full range of student population. For the first time minority students, instead of mandatory assignment through satellite zones, would have the opportunity to make voluntary transfers in response to special program offerings. Also, for the first time, Eastside students would be mandatorily assigned across the river to a Westside school. Nothing was presented to the court, however, indicating that Mr. Heideman’s proposal received any serious consideration.
On February 5, 1989, Superintendent Swanson developed a confidential memo proposing modifications to the January 24th Plan. B503737. This was a draft of the document Superintendent Swanson would submit to the Board on February 8th. Modifications included a plan to return CAPA and Academy alternative programs to Westside schools. Also, a proposal was made to convert West High to a middle school building and to close Kennedy, Wilson and Lincoln Middle Schools. As a rationale for this recommendation, Superintendent Swanson said “this may overcrowd the middle schools temporarily ...indicating once again the flexibility of school capacities. The memo further proposed to improve secondary level desegregation: “Modify secondary school boundaries so that all building capacities are used maximally and minority percentages in each school are between 20 and 35%.” B503739.
On February 6, 1989, Deputy Superintendent Bowen sent a memo to the Board members presenting operating cost information for the RSD’S high schools. B503741. The information showed, for example, that the annual utilities costs of operating Jefferson were more than twice those of operating West and that keeping Jefferson open instead of West would cost a projected additional $1 million in utility costs over the next five years. B503742. The custodial and supply costs at Jefferson were also much higher than at West. Keeping Jefferson open instead of West would cost a projected additional $435,000 in this expense category over the next five years. Under the heading of “Major Repairs—Capital Outlay,” the information showed that the projected costs at Jefferson over the next six years would be more than twice those at West. The projected additional five-year cost of keeping Jefferson open instead of West was $338,000.
Mr. Bowen’s information contained a summary page showing five-year projected costs for the items reviewed above plus administrative costs. The additional cost of operating Jefferson as compared to West was:
*1121 Jefferson $5,339,715
West 3,474,037
Cost difference $1,865,678
B503746. Mr. Bowen’s information also calculated annual operating cost on an alternative basis, per square foot. For Jefferson and West the costs were:
Jefferson $2.82 per square foot per year
West 1.84 per square foot per year
Mr. Bowen’s information contained a calculation regarding the number of students transported. Jefferson involved busing by the RSD of 1,901 students, whereas West involved the busing by the RSD of only twenty-two students. At the RSD’s average per-student cost for transportation of $225.54, this represented a cost differential of $423,790 per year. B509341; B509592. Over a five-year period this amounted to $2,118,948 in additional transportation costs to keep Jefferson open instead of West. Mr. Bowen testified that, after considering all of the factors, Jefferson was the school that should have been closed. He maintained that “transportation was more difficult there. It was, as I remember, an energy hog. It was remote.” Bowen Test., Tr. at 3341. Considering the fact that the primary rationale for the Reorganization Plan “was to reduce expenditures to offset projected future-year operating deficits,” the court finds no evidence that anyone paid any attention to the millions of dollars in additional costs that the RSD was incurring by deciding to close West instead of Jefferson.
The RSD documents also give no indication of consideration being given to the significance of the decision to close the Rockford Area Career Center. As Mr. Heideman advocated in his proposal, it would have made sense to keep Jefferson open, despite its remote location and high cost, if it were linked with RACC as a vocational magnet high school in order to attract minority transfers on a voluntary basis. The conception of Jefferson/RACC was also contained in the January 17th Administrative Staff Plan, which recommended converting RACC into a “Special Program Center,” If RACC were closed, however, as the Board decided in the January 24th Plan, then serious reconsideration should have been given regarding the impact of that decision on Jefferson. With RACC gone, and the Board intending to increase the level of desegregation in all remaining high schools, the only way Jefferson could be desegregated was by the mandatory reassignment of large numbers of Southwest minority students to that remote location. Nevertheless, Superintendent Swanson and the Board focused primarily on whether to undo the West closing decision, and close Auburn instead. The alternative of keeping both West and Auburn open and closing Jefferson, as well as other alternatives presented to the RSD from numerous sources, received no serious consideration.
Superintendent Swanson, on a copy of the school closing criteria, inserted handwritten columns, for West and Auburn, containing pluses and minuses as the relative merits of closing one school or the other. B503753. He concluded that West was the preferable school to keep in terms of operating and maintenance costs, “viability for sale or lease,” and “impact on neighborhood”. Keeping Auburn open was preferable, on the other hand, in terms of potential for growth in student enrollment and the number of students required to transfer schools.
In his deliberations, Superintendent Swanson made certain notes. One was that the “northwest has two high schools and two middle schools—28%.” B35230. On the same sheet, Swanson noted “Cornfield argument used when East and Guilford built.” This was a reference to the fact that Jefferson was located so far outside the city that it had been described by Mayor McNamara as being “in the cornfields.” At the same time, however, the RSD was using the “cornfield” argument to justify closing two other schools. With respect to closing Kennedy Middle School, part of the RSD’s stated rationale was that the school “is located in an area of current and future sparse student population....” Reorganization Plan, B509183. With respect to closing Haight Elementary School, the February Plan stated “Haight is located in a sparsely populated area....” Id. Haight and Kennedy were located on the far Northwest side, beyond any population center.
*1122 In a February 8th confidential memorandum, Superintendent Swanson presented to the Board his proposed “Modifications to Original Recommendations.” Swanson Memo to Board, 2/8/89, B508759. In the memo itself, he recommended converting West to a middle school and keeping Auburn open, with the Gifted and CAPA Programs returned there from Eastside schools. Superintendent Swanson wrote an Addendum to the memorandum, which stated:
Addendum
After hearing the concerns of city officials and the business community, I feel we may not have given sufficient consideration to the impact on the West High business and residential neighborhood. I am suggesting that West High remain open and Auburn High School be closed.
In contemplating this change, I urge the Board not to allow the pressures which have been applied by the Mayor and others to affect your objectivity. The important thing is to make the right decision. Changing our recommendations may cause criticism and extend the emotional pressure on us in the short term, but the decision will have long-term consequences for the School District and City. The Board’s credibility will only be enhanced by choosing the more difficult but correct course.
West High is a larger building and has lower operating and maintenance costs, requires less transportation of students, is fully accessible to the handicapped, and has more impact on the viability of the business and residential neighborhood than has Auburn. The continuing presence of Wilson and McIntosh on the site will reduce the negative impact on the neighborhood even if Auburn is closed. The cost savings will be approximately the same. We would be losing a newer building and a three-school complex currently existing.
Addendum to Swanson Memo, id. at B503762.
Of the three schools, Jefferson had by far the highest maintenance cost, the highest utility cost and the highest repair cost. While the cost savings were the same as between closing West or Auburn, closing Jefferson would have saved, over a five year period, $1,876,000 compared to closing West. Closing Jefferson would have saved $1,688,-000 over five years as compared to closing Auburn.
In comparing Auburn and West, Superintendent Swanson said West “requires less transportation of students.” West involved the transportation of only 22 students, whereas Auburn involved the transportation of 836. Jefferson, however, involved the transportation of 1,901 students, at a five-year cost of about $2 million. Swanson also said West “has more impact on the viability of the business and residential neighborhood than has Auburn.” Jefferson, however, was not located in any neighborhood.
The motivation on the RSD’s part was reflected in a memorandum from Superintendent Swanson to Mr. Driscoll on February 8, 1989, directing Mr. Driscoll to prepare new secondary boundaries based on the conversion of West to a middle school. Superintendent Swanson instructed the Attendance Director to “keep minority percentages between 25 and 35%” and to “leave eastside high school boundaries as close as possible to where they are this year.” Swanson Memo to Driscoll, 2/8/89, D10847. Thus, it appears to the court that the RSD was unwilling to assign Eastside students to Westside schools while imposing burdens on minority children in deference to the interests of Eastside majority students.
The RSD’s February Reorganization Plan
The Board did not follow the urging of Superintendent Swanson in his February 8th Addendum. Instead, the Board selected the option of converting West to a middle school. This new approach was publicly revealed in the modified Reorganization Plan released by the Board on February 14, 1989. B509131. This was also the date on which the RSD converted Wilson to a mega-elementary-school and closed several African-American elementary schools. To execute this plan and, at the same time, return the secondary-level alternative programs to the Westside, the RSD promulgated yet another set of secondary-school boundaries. Revised Attendance Map, B509093.
*1123 The removal of the alternative programs from East, after a short stay of only three weeks, left East far below capacity and with a low minority enrollment. Therefore, East was once again assigned a satellite zone from west of the river. In response, and to these considerations, and to fulfill its objective of improving secondary-school desegregation to offset elementary-school resegregation, the RSD again reorganized areas in the Southwest Quadrant. The following findings compare the February 14th secondary boundaries with the pre-Reorganization boundaries existing in the Fall of 1988. Compare B509093 with B509089.
In 1988, the central portion of the Southwest Quadrant was Guilford’s satellite zone. In the February 14th Plan, it became East’s satellite zone. The southern portion of the Southwest Quadrant had previously been assigned as satellite zones to three different schools. One area was assigned to West, one to East, and one to Auburn. In the February 14th Plan, all of these areas became Jefferson’s satellite zone. The northern portion of the Southwest Quadrant, which had been the southern part of West’s attendance area in 1988, became a satellite zone for Guilford High School. Almost all Southwest Quadrant students, everyone south of Auburn Street and east of Central Avenue, were mandatorily assigned to a different high school than before.
Compared to the 1988 boundaries, a very large number of additional Southwest Quadrant high school students were assigned by satellite zone to Eastside high schools. This included:
The former southern one-third of the West attendance area, between Auburn and State, was now assigned to Guilford.
The former West students between Kent Creek and Montague Street, were now assigned to Jefferson.
A few students at the far southwest end of the district who were formerly assigned to Auburn were assigned to Jefferson.
Only a small portion of the Southwest Quadrant, west of Central Avenue between Auburn and Linden, was still permitted to attend high school on the Westside, at Auburn.
In accordance with Superintendent Swanson’s direction to Mr. Driscoll that Eastside high school boundaries be disturbed as little as possible, Guilford’s boundaries east of the river were virtually unchanged. Also, a small portion of Jefferson’s attendance area was assigned to East, but otherwise the boundaries of East and Jefferson remained the same east of the river. Thus, the only Eastside white students required to change schools at the high school level were a few students moving from Jefferson to East. The vast majority of Eastside high school students were undisturbed.
The pattern at the middle school level was very similar. The only difference was due to the fact that in 1988, and prior years, Southwest Quadrant satellite zones at the middle school level did not exactly match those at the high school level. Comparing the Fall of 1988 middle school boundaries to the February 14th boundaries, Southwest middle school students were subjected to the following changes:
The central portion of the Southwest Quadrant, previously assigned to Eisenhower, was switched to Lincoln.
The southern portion of the Southwest Quadrant, previously assigned to Lincoln, was switched to Flinn.
The northern portion of the Southwest Quadrant, previously assigned to Kennedy, was switched to Eisenhower. Another piece of the Southwest Quadrant at the west end, previously assigned to Kennedy, was assigned to the new West Middle School.
Thus, at the middle school level, as at the high school level, virtually every middle school student in the Southwest Quadrant was required to change schools. The number of Southwest Quadrant middle school students required to attend Eastside schools through satellite zone assignments was significantly increased. This increase consisted of the area bounded by Auburn, Central, State and the Rock River, which previously had been assigned to Kennedy. This is the same area that, at the high school level, was reassigned from West to Guilford. On the Eastside, relatively few middle school students were required to change schools. Only *1124 a few small areas shifted between Eisenhower, Lincoln and Flinn.
In the section of the Reorganization Plan stating and explaining its secondary-school boundary policy, the RSD deleted two of the rationale statements that had been present in both the January 17th and January 24th Plans. The deleted statements were:
This boundary pattern abandons the traditional Eastside-Westside pattern;
More equitably shares the need to be transported among majority and minority students. B509163. These rationale statements had their origin in the January 17th Staff Plan, that called for secondary boundaries to be east-west corridors across the city and for some Eastside students to be assigned to Westside schools. The deletion of these rationale statements indicates the RSD knew it was maintaining, rather than abandoning, the traditional Eastside-Westside pattern of mandatory satellite zone assignments. The RSD also knew that the new boundary pattern maintained, and even increased rather than more equitably distributed, the disproportionate transportation burdens on minority students. Compare B509137 with B509163. Prior to adoption of the final Reorganization Plan, the Board was aware of the concerns of the minority community regarding the inequitable burdens and effects of the Plan on minority students. The Board, however, did not address the concerns of the minority community.
Option Zones In The Final February 28 Secondary Boundaries
Despite continuing protest against the decision to close West High School and against the February 14th secondary boundary changes, the RSD finalized its decision on February 28, 1989 with only one significant change. The change was the creation of two optional attendance zones. Bd.Min., 2/28/89, B21674. One option zone on the Eastside, allowed students whom the Plan had transferred from Jefferson/Flinn to EastyLincoln to remain at Jefferson/Flinn if they wished. The affected students were white and this option zone increased the white enrollment percentage at Jefferson. RSD Secondary Schools Attendance Map, B38689 (final revision). The other option zone was established in the Southwest Quadrant, encompassing predominantly African-American/Hispanic students. These students, whom the Plan had assigned to Guilford/Eisenhower, were allowed to attend Auburn/West if they wished to do so. The effect of this change was to increase minority enrollment at Auburn/West and decrease minority enrollment at Guilford/Eisenhower.
As a result of these option zones, the eventual Fall 1989 enrollments in the RSD’s secondary schools were not as racially-balanced as predicted. Before the option zones were adopted, RSD projected that the four high schools would be within a range of 25-29% minority, so that the difference between the highest and lowest minority enrollment would be only four percentage points. School Data 1989-90, 2/24/89, B509150. Due to increased white enrollment at Jefferson and increased minority enrollment at Auburn, the outcome in the Fall of 1989 was a variation of thirteen percentage points between the highest and lowest minority enrollments, three times as large a range as the RSD had projected. The actual high school minority percentages in the Fall of 1989 were as follows:
Auburn 36.4%
East 30.0%
Guilford 28.2%
Jefferson 23.2%
B0033.
The 1989 Plan Promoted Segregated Conditions In Secondary Schools By Eliminating Voluntary Transfer Opportunities For Minority Students
The new voluntary transfer policy under the 1989 Plan provided that minority students could only transfer out of schools having more than 50% minority enrollment. No secondary school under the Plan, however, was projected to have more than 50% minority enrollment and no secondary school in the District’s history ever had more than 50% minority enrollment, with the exception of Washington Middle School in the 1970’s. The effect of this new policy, therefore, was that voluntary transfers by minority students were not permitted at the secondary level. Conversely, white students were permitted *1125 to transfer out of every secondary school because all secondary schools were over 50% white.

CONCLUSIONS OF LAW

School desegregation cases have described the many kinds of unconstitutional conduct which causes or maintains segregation. See, e.g., Reed v. Rhodes, 455 F.Supp. 546 (N.D.Oh.1978), aff'd in part, rev’d in part, 607 F.2d 714 (6th Cir.1979), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). The prime factor to consider in evaluating the Reorganization Plan is that the constitutional rights of minority students are violated when intentional discriminatory conduct results in a lower quality education for minority students than that provided to white students. See United States v. Yonkers Bd. of Educ., 624 F.Supp. 1276, 1530 (S.D.N.Y.1985), aff'd, 837 F.2d 1181 (2d Cir.1987), cert. denied, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988); Morgan v. Hennigan, 379 F.Supp. 410, 463 (D.Mass.1974), aff'd sub nom. Morgan v. Kerrigan, 509 F.2d 580 (1st Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). This is true not only in instances in which school officials initially bring about educational inequalities, but also where school officials fail to eliminate inequalities with respect to matters within their continuing charge. Price v. Denison Indep. School Dist., 694 F.2d 334, 371 (5th Cir.1983).
The 1989 Reorganization Plan was a plan to resegregate Rockford’s elementary schools. The Plan assigned African-American and white students to racially identifiable schools. The February version of the Plan proposed the creation of two huge “warehouse” elementary schools, one at Wilson, projected to have 1227 elementary students, and one at Washington, projected to have 876 elementary students. McIntosh School was close behind the mega-schools with a projected enrollment of 649 elementary students. All of these schools were in the Southwest Quadrant. The mega-schools would have created a ghetto warehouse for minority students. Wilson would have been four times the size of the average elementary school in the District in 1988. The Plan would have placed 1800 African-American and Hispanic elementary students in one highly segregated complex of schools, equivalent to one-half of the District’s minority elementary student population. In contrast, the Plan called for no white elementary school to have an enrollment of over 550 students. The court finds that the 1989 Reorganization Plan would have had a devastating impact on the Rockford School District’s minority community. The impact of this Plan is evidence that the Board intentionally sought to racially isolate minority elementary students in the Rockford School District.
At the secondary education level, the 1989 Reorganization Plan closed the only naturally integrated high school that existed in the District. The Board offered cost savings as the reason for closing West High School. The court finds that reason to be a pretext. Keeping Jefferson and closing West was not cost effective. Instead, it furthered the disparity in burdens placed on African-American students and white students. The court further finds the Plan was adopted with discriminatory intent on the part of Defendant.

EMPLOYMENT DISCRIMINATION

INTRODUCTION

In 1973, the District approved a plan setting forth goals for minority employment. For the past twenty years, RSD has failed to meet those goals. While the minority population of the district has grown, minority staff in certified positions in the School District has remained at approximately 7% from 1974-75 through 1988-89. The District has not effectively recruited- minority applicants, nor has it undertaken steps to remedy under-representation of minorities in upper level positions in the District.

FINDINGS OF FACT

Failure To Meet QUEFAC-Era Hiring Goals And Other Affirmative Action Obligations
The Board, at its regular Board meeting on April 23, 1973, considered and approved the objectives and “overall” plan for desegregating the Rockford schools. The objectives *1126 and overall plan were approved by a vote of 4 to 3, with Members Schade, Seeber, Tucker and Webster voting aye and Members Gus-tafson, Hauman and Heath voting nay. One of the points of the overall plan approved by the Board was that: “The Administration shall actively recruit minority personnel and shall integrate this personnel throughout the district.” Bd.Min., 4/23/73, B0013820-B0013821.
At this meeting, Superintendent Salisbury-presented a desegregation proposal prepared by the RSD’s administrative staff. Included in this proposal was a commitment to integrate the entire staff of the district “as rapidly as possible.” The hiring goal established by this proposal was to achieve a level of minority employment of 15% of employees in all categories employed by the District, including, central administration personnel, administrators, teachers, clerks, secretaries, building engineers, custodians, tradesmen, food service workers and all classifications of paraprofessional personnel. The program set a time frame of three to five years to achieve this goal, and the program was to begin immediately. Adoption of the Superintendent’s proposal was moved by Hauman and seconded by Heath. Id.
A special meeting of the Board of Education was held on April 30, 1973. The Board approved a modified version of the Superintendent’s desegregation proposal by a vote of five to two with Hauman and Heath voting nay. The proposal, as approved, contained the 15% employment goal and the three to five year time table set forth in the original proposal.
In this court’s 1973 opinion in QUEFAC v. School Board of School District #205, 362 F.Supp. 985 (N.D.Ill.1973), it was found that in the 1972-73 school year the RSD employed 1679 school teachers, of whom, 100 or 5.95% were minority teachers. The court further found that 4.74% of all high school teachers were minority teachers, 7.55% of all middle school teachers were minority teachers and 5.63% of all elementary school teachers were minority teachers. The RSD submitted to the court a document, which was marked as group exhibit 15, depicting year by year hiring goals for minority teachers at each school level for the five year period ending with the school year 1977-78. This document reflected a hiring goal of 130 minority teachers at the elementary school level by 1978, 52 middle school minority teachers by 1978 and 73 high school teachers by 1978. Id.
For the 1973-74 school year, the RSD had committed itself to hiring sixteen minority teachers at the elementary school level, six minority teachers at the middle school level and eight minority teachers at the high school level. Dr. George D. Aschenbrenner, who was then the Assistant Superintendent for curriculum and instruction, was assigned the additional duty of insuring that the District meet its minority hiring goals. Bd.Min., 1/22/73, B0013680.
For the 1973-74 school year, the RSD failed to meet its hiring goals. As of June 25, 1973, the District had sent letters of intent to hire only eight minority staff members at the elementary school level, three minority staff members at the middle and high school level combined and five minority staff members for special education. Accordingly, recruitment and hiring for minority staff members for the 1973-74 school year failed to meet the goals established by the District.
During a Board meeting held on September 10, 1973, Dr. Aschenbrenner reported that the RSD had hired only 23 minority professional staff of a total of 178 new hires, which was 13% of new hires. Bd.Min., 9/10/73, B0014066. Specifically, the District achieved only 50% of its goal for elementary school teachers and only 21% of its hiring goal for secondary school teachers. B048599. At that meeting, Dr. Aschenbrenner identified the following recruitment methods for minority staff:
Mailings and follow-up mailings to 58 schools with predominately minority staff; Reliance on current minority staff to provide names of friends; and
Contact with Northern Illinois University to discuss the situation with a placement officer.
Dr. Aschenbrenner stated that the level of minority hiring was “not as high as we would *1127 like it to be,” but that it “represented a substantial increase” over the prior year. Id.
At its meeting of February 12, 1973, the Board received a verbal report from Greg Luna, Chair of the Latin American Committee for Desegregation and a member of the steering committee of the Lay Advisory Committee on Desegregation regarding minority hiring. Mr. Luna recommended that a community advisory panel be established to assist Dr. Aschenbrenner in the recruitment of minority staff. The RSD did not create such a committee. The Board stated that “one of the best means of input is with minority members of our staff.” Bd.Min., 2/21/73, B0013683.
On April 2, 1973, the Board received a report from the Central Committee on Desegregation from its Chair, Lee Shervey. This report recommended that an assistant be appointed for Dr. Aschenbrenner to assist in minority recruitment. Bd.Min. 4/2/73, B001377-B0013782. An assistant was never hired for this purpose. Aschenbrenner Dep., 12/28/92, at 21. Mr. Shervey also recommended that an advisory committee be established for recruitment of new minority staff. Bd.Min., 4/2/73, B001377-B0013782. This recommendation was also not adopted.
Although Dr. Aschenbrenner was charged with the responsibility for minority recruitment, he had no role with respect to recruitment and hiring of faculty. When shown his job description setting forth this duty, Aschenbrenner testified that his only recollection of any role in hiring or recruitment of staff was to sign-off on recommendations from building principals who were responsible for recruitment and hiring. Aschenbren-ner Dep. at 13,16-17. If Dr. Aschenbrenner had any responsibility for recruitment and hiring, it occupied a very small percentage of his time. The initial contacts in hiring was done by individual building principals. Dr. Aschenbrenner’s role was basically to sign-off on their selections. Id. at 20. At the time Dr. Aschenbrenner was assigned responsibility for minority recruitment and hiring, the RSD did not have a director of personnel. The first such director was Thomas Boyer, who began working for the RSD on January 1, 1978. Boyer Dep., 12/29/92, at 9, 12.
At its regular meeting of October 14,1974, the Board adopted a document entitled “Equal Employment Opportunity Policy and Regulations.” Bd.Min., 10/14/74, B0014621. This policy, which was unanimously adopted, provided as follows:

EQUAL EMPLOYMENT OPPORTUNITY POLICY

That the Rockford School District shall at all times give equal employment opportunity to all persons regardless of race, creed, color, sex or national origin.
REGULATIONS TO IMPLEMENT EQUAL EMPLOYMENT OPPORTUNITY POLICY
1. That Equal Employment is a fundamental School Board policy and shall be implemented by Affirmative Action, including goal setting programs with measurements and evaluations thereof, and accountability by administrators and those exercising employment responsibility.
2. Affirmative Action with respect to Equal Employment Opportunity shall be implemented in all employment practice, including (but not limited to) recruitment, hiring, transfer, promotion, training, compensation, benefits, layoff and terminations.
3. All administrative personnel, as well as all of those exercising employment duties, share a responsibility in the Affirmative Action Equal Employment Opportunity Program and performance thereof will be evaluated as in the implementation of other School Board Policies.
At the time of his hire, Mr. Boyer was interviewed by Arthur Johnson, then-Superintendent of the RSD. Mr. Boyer never discussed minority recruitment or hiring with Mr. Johnson despite the District’s commitment to engage in such recruitment and hiring made in the QUEFAC case. Boyer Dep. at 15. Moreover, Mr. Johnson never discussed minority recruitment or hiring with the director of personnel at any time be *1128 tween 1978 and his leaving the RSD in 1984. Id. at 36. Although Mr. Boyer had the responsibility for implementing the RSD’s affirmative action policy, he was never made aware of the District’s pledge regarding minority hiring in the QUEFAC case. Id. at 35. Therefore, he did not incorporate hiring goals or timetables-into any of his affirmative action efforts on behalf of the District. Id.
The RSD maintained data on percentage of minorities in various categories by years. Starting in the 1974-75 school year, this data was compiled manually by. an employee of the personnel department. Id. at 100. These manual compilations reflected the percentage of minorities in three categories: (1) certified staff; (2) non-eertified staff; and (3) total staff, along with numbers of minority and majority employees in those categories. Annual Compilation of Min.Staff, 1974^-75, B041285. A similar document was prepared for each school year thereafter (with the exception of the 1980-81 school year) until the 1984-85 school year, in which the reporting format was changed. See Annual Compilations of Min.Staff, 1975-76, B041190; 1976-77, B041106; 1977-78, B041106; 1978-79, B040949; 1979-80, B040969; 1981-82, B040729; 1982-83, B041666; 1983-84, B040606. Starting in the 1984-85 school year, the reporting format was changed to show minority employment by job category. B040539. The 1984-85 format was utilized until the 1988-89 school year, when the format was again changed. B040286. The format for subsequent years has remained basically the same.
The RSD’s progress in minority hiring may be charted by comparing the statistics from each of these time periods. Following the first format change, the RSD did not report total staff or total professional and non-professional staff in each year. Thus, for the school years 1985-86, 1986-87 and 1987-88, this data does not exist. For the period after 1987-88, it is possible to aggregate the discrete categories of employees listed to reach a number of total employees, total certified employees and total non-certified employees.
The RSD maintained no other data to measure progress in minority employment. For example, the RSD made no effort to code applications by race to determine whether they were attracting a sufficient pool of minority applicants for positions. Boyer Dep. at 58. The RSD also did not evaluate its hiring or recruitment procedures to determine whether these procedures lead to an under-utilization of minority employees. Id. at 135-136.
Using this methodology and eliminating those years for which comparative data do not exist, an evidence summary of minority staff is incorporated herein as follows:
[[Image here]]
*1129 The RSD never met its 1973 goal of 15% employees in all categories of employment. For certified employees, the percentage of minority employees has not changed since the 1974-75 school year, which was the first year following its pledge to this court in QUEFAC that it would achieve those levels of employment for all categories of employees within three to five years.[17] Moreover, within these gross categories of employees, the employment of minorities within the RSD reveals a pattern of uneven minority representation in various occupations. RBE Minority Report, 1988-89, B040286.
In 1988-89 (the school year in which this lawsuit was filed), the RSD employed 3636 employees, 66 less employees than it employed in the first full year following its pledge to achieve minority employment of 15% in all categories of employment. Only 8.6% of the 127 managers (including both central office and school based administrative staff) employed by the RSD were minority; similarly, only 7.0% of the teachers were minority. In the service (or non-certified) occupations, only 3.7% of the clerical employees were minority. The level of overall minority employment of 16.27% in the non-certified occupations was achieved because minorities had representation in other employment categories at high rates. Thus, 30% of the bus drivers were minority', as were 21.1% of aides. In the custodial category, minorities represented 17.6% of all employees; in food service, only 10.3%.
Prior to the filing of this lawsuit, the RSD had no regular plan for aggressively recruiting minority applicants for teaching or other professional positions within the RSD. In 1987-88, after Rockford School Board member Michael Williams raised the issue of the low percentage of minority teachers in the RSD, the RSD hired Constance Lane, a former RSD employee, to “go out on a recruiting expedition, to recruit minority applicants.” Bowen Dep. at 122-123. Ms. Lane visited colleges with significant numbers of African-American education majors. Although Ms. Lane identified thirty-two graduating African-American college students that could have been recruited by the RSD, the RSD hired only four of the students. Prior to this time, the RSD had no regular minority recruitment effort that involved visiting campuses with large minority student enrollment. Id. This recruitment effort did not continue past a single school year. Id. The RSD never had a full-time minority recruitment officer.
Mr. Williams also attempted to get the RBE to address issues relating to its poor minority hiring performance and its lack of an affirmative action policy. Williams raised the following issues with RBE:
(1) the complete absence of minorities in the position of school secretary;
(2) the lack of minority administrators;
(3) the disproportionate assignment of minority employees to West and Southwest side schools; and
(4) the existence of a disproportionate number of minorities in menial jobs.
Williams’ efforts to address these issues met with the response that the RSD already had an affirmative action policy.
At a 1988 RBE meeting, Michael Williams addressed the issue of the lack of minority high school principals and the need to recruit them. The reaction from fellow RBE member Darlene Hanna was that Rockford was “not ready” for an African-American high school principal. Accordingly, no minority candidates were sought for the position of high school principal during Williams’ four and a half year tenure with the RSD.
Mr. Williams also raised the issue of the low percentage of African-American and other minority clerical employees at meetings of the Board. He was referred to Oscar Blackwell, who was responsible for testing potential clerical employees and determining their eligibility for employment. Mr. Williams spoke with Mr. Blackwell in 1987 regarding the underrepresentation of minorities in the clerical work force. He was advised by Mr. *1130 Blackwell that clerical vacancies were filled through word of mouth when a building principal would advise his or her staff that a clerical employee was leaving and that a vacancy would be available. No posting of clerical vacancies or any regularly scheduled testing of potential applicants occurred.
As a result of the discussion between Williams and Blackwell, the RSD developed a posting and selection procedure for clerical vacancies. This procedure included regularly scheduled tests and referral of more than a single, self-selected candidate to the principal for selection.
The RSD also did not measure its hiring of minority employees against any standard until the 1986-87 school year. In that year, for the first time, the RSD began to annually compare its percentage of minority employees in each category of employment to the available minority pool in the Rockford area. B32977.

CONCLUSIONS OF LAW

Discrimination in the recruiting, hiring, and promotion of staff is a proper subject to be considered in a school desegregation case. See, e.g., Morgan v. Kerrigan, 530 F.2d 401, 432 (1st Cir.), cert. denied, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976); Arthur v. Nyquist, 415 F.Supp. 904, 946-47 (W.D.N.Y.1976); Johnson v. San Francisco Unified School Dist., 339 F.Supp. 1315, 1332 (N.D.Cal.1971); Spangler v. Pasadena Cty. Bd. of Educ., 311 F.Supp. 501, 515 (C.D.Cal.1970). In the school desegregation context, however, the rights of students, and not those of employees or applicants for employment, are at issue. Morgan v. Hennigan, 379 F.Supp. at 456. Accordingly, courts do not strictly apply legal principles developed in employment discrimination eases. See Morgan v. O’Bryant, 671 F.2d 23, 27 (1st Cir.1982) (proof of individual hiring discrimination irrelevant); Arthur v. Nyquist, 520 F.Supp. 961, 966 (W.D.N.Y.1981), appeal dismissed mem., 697 F.2d 287 (2nd Cir.1982).
The individual parts of a full spectrum school discrimination suit are not isolated from each other. See Keyes v. School Dist. No. 1, Denver, Colo., 413 U.S. 189, 207, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973). Thus, the overall evidence of racial discrimination in other areas of the school system and in particular, the assignment of like-race staff and administrators to racially identifiable minority schools, provides relevant support for finding that disproportionately low minority hiring was purposeful. Arthur v. Nyquist, 429 F.Supp. 206, 212 (W.D.N.Y.1977). In this context, school desegregation plaintiffs have frequently proven discrimination in the hiring and promotion of teachers and staff. See Arthur, 415 F.Supp. at 946-47 (11.4% minority teachers in a city that was 21% black); Oliver v. Kalamazoo Bd. of Educ., 368 F.Supp. 143, 177, 180 (W.D.Mich. 1973) (7.5% black teachers in district containing roughly 20% black students); Johnson, 339 F.Supp. at 1332 (9% black teachers and 8% black administrators in district with 28.7% black pupils).
For the past twenty years, the RSD has unlawfully failed to hire minority teachers and staff and has failed to meet its own hiring goals and affirmative action obligations. The RSD never met its QUEFAC-era goals. The only employment areas in which minorities exceeded 15% employment were bus drivers, teacher aides and custodial staff. The RSD has also failed to undertake any serious efforts in the areas of recruitment, hiring and promotion of minorities.

STAFF ASSIGNMENT

INTRODUCTION

Since at least 1963, the overwhelming majority of African-American teachers, at all school levels, taught in predominantly racially identifiable schools. The same pattern of assignment of minority teachers to schools with high numbers of minority students existed for non-professional staff. The highest percentage of minority principals ever employed by the RSD was five out of fifty (or 10%) which was in the 1987-88 school year. With one exception, no African-American principal has ever been assigned to a racially-identifiable white school. In the history of the RSD, no minority has ever been employed as a high school principal.
*1131 The first collective bargaining agreement covering teachers and other professional staff of the RSD was negotiated in 1968. By the time the agreement was negotiated, the pattern of assignment of minority staff to schools with large concentrations of minority students was already established.

FINDINGS OF FACT

Assignment Of Black Teachers To Black Schools
On July 24, 1963, officials of the National Association for the Advancement of Colored People (hereinafter “NAACP”) requested a list of all African-American personnel employed by the RSD. B41498. In response to that request, a document was prepared setting forth the African-American employees of the District divided into three categories: teachers, clerical employees and custodial employees. Id. At that time, the District employed approximately twenty-six African-American teachers. Of those teachers for whom a geographical assignment could be determined, 55% were employed in schools located in the Southwest Quadrant of the city. Seventy-five percent of those African-American teachers were employed in schools in the Western portion of the city; that is, in schools located west of the Rock River. In addition, 23% of the African-American teachers were employed in the special education program. Of those schools and programs in which African-American teachers were employed, only three schools had more than one African-American teacher on its staff: Washington Middle School, Henrietta School and Wilson Middle School. Each of these schools was located in the Southwest Quadrant of the city and had on their teaching staffs four, three and 1.5 African-American teachers, respectively. The special education program employed six African-American teachers. The 1963 report prepared by the District for the NAACP, when correlated to the figures for percentage of African-American enrollment in the schools as of 1960, demonstrated that:
1. At the high school level, one teacher was employed half time as a foreign language instructor. This teacher taught at Auburn School, which was a segregated white school.
2. The District employed six and one-half full-time equivalent minority teachers in its middle schools in 1963. Four of those teachers, or 61.54% of all African-American teachers employed in the middle schools, taught in racially-identifiable minority middle schools. One and one-hálf, or 23%, of the African-American teachers employed in the middle schools taught in integrated middle schools and one, or 15.38%, of the African-American teachers employed in the middle schools taught in racially-identifiable white middle schools.
3. In 1963, the District employed twelve African-American teachers at the elementary school level. Two, or 16.67%, of those teachers taught in racially-identifiable minority elementary schools. Three, or 25%, of those teachers taught in integrated elementary schools and seven, or 58.33%, of those teachers taught in racially-identifiable white elementary schools.
An evidence summary exhibit graphically representing these correlations is reproduced herein as follows:
Correlation Of 1960 PPC Attendance Data To 1963 Report To NAACP On African-American Staff By African-American Enrollment
School % African- # African- # Other Total African-American American African- American Enrollment Teachers American Staff Staff
HIGH SCHOOLS_
[[Image here]]
*1132 School % African-American Enrollment # African-American Teachers # Other African-American Staff Total African-American Staff
[[Image here]]
MIDDLE SCHOOLS[18]
[[Image here]]
ELEMENTARY SCHOOLS[19]
[[Image here]]
*1133 School % African- # African- # Other Total African-American American African- American Enrollment Teachers American Staff Staff
[[Image here]]
B41498.
Teachers
In November of 1968, the District prepared a summary of African-American teachers in the Rockford elementary schools. B41493. As of that date, the District employed twenty-nine African-American elementary school teachers, excluding special education teachers. Of these twenty-nine teachers, twenty-one or 72.4% were employed in schools in the Southwest Quadrant. In addition, while six schools within the Southwest Quadrant had more than one African-American teacher on their staff, no school outside the Southwest Quadrant had more than one African-American teacher on its staff. Of the forty-two elementary schools in operation in Rockford in 1968, only seventeen schools had any African-American teaching staff. Twenty-five of the forty-two elementary schools within the District (59.-5%) had no African-American teaching staff.
During the 1968-69 school year, the District had in operation five middle schools: Jefferson, Lincoln, Roosevelt, Washington and Wilson. Of the 400 teachers employed in the middle schools, twenty-three (5.75% of the total) were African-American. Approximately 90% of those twenty-three African-American teachers were employed in two schools: Washington and Wilson, which were schools located in or near the African-American community.
A subcommittee of the Pupil Placement Committee (hereinafter “PPC”) was formed and was composed of the following persons: John C. Swanson (Guilford Principal), Chair, Lona Huffington, Constance Lane, Margie Sturgis and Richard Stank. On January 15, 1968, the subcommittee submitted its analysis of data gathered through a questionnaire sent to principals regarding the professional staff in the Rockford public schools. The subcommittee’s analysis revealed that the percentage of African-American teachers (less than 5%) appeared to be significantly lower than the percentage of African-American students. The subcommittee recommended that efforts be made to increase the number of African-American teachers, especially at the secondary level. The subcommittee report also noted that the majority of African-American teachers were located in “Title One” schools. This concentration of African-American teachers was “explained in part by the desires of principals in these schools to have negro staff members.” The subcommittee recommended that efforts be made to maintain a balance of teachers by race, education and training throughout the system. These recommendations were never implemented by the Board. T. Shaheen Letter to Jerris Leonard, Assistant Attorney General, 6/13/69, at 12, D23522.
The PPC report also provided the Board with a tabulation of the number of professional staff assigned to each school. Included within this category were counselors, teachers, librarians and special education personnel. Nurses were not included in the tally. The report further provided to the Board a tabulation of the percentage of African-American professional staff in each school. B21810.
In 1967, 10.4% of the total enrollment of the District was African-American with African-American students accounting for 8.6% of secondary school enrollment and 11.4% of elementary school enrollment. Based upon these figures an elementary school was racially identifiable minority if it had more than 26.4% African-American enrollment; a *1134 school was racially identifiable white if it had less than 5.7% African-American enrollment. Further, in 1967, a secondary school was racially identifiable minority if it had more than 23.6% African-American enrollment and was racially identifiable white if it had less than 4.3% African-American enrollment.
At the high school level, the District employed three African-American professionals. One (or 33.33%) of those professionals was assigned to an integrated high school and two (or 66.67%) were assigned to schools that were racially identifiable white. The District employed 11 African-American professionals at the middle school level. Four (or 36.36%) were employed in racially identifiable African-American schools. Seven (or 63.64%) were employed in integrated schools and none were employed in racially identifiable white schools. Finally, the District employed 34 African-American professionals at the elementary school level. Twenty-six (or 76.-47%) worked in racially identifiable African-American schools, four (or 11.76%) worked in integrated schools and 4 (or 11.76%) worked in racially identifiable white schools. The following evidence summary exhibit graphically represents these correlations:
PPC Enrollment And 1967-68 Professional Staff Data Correlated—By American Enrollment African-
School % African-American Enrollment % African-American Professional Staff # African-American Professional Staff
HIGH SCHOOLS[20]
[[Image here]]
MIDDLE SCHOOLS[21]
[[Image here]]
ELEMENTARY SCHOOLS [22]
[[Image here]]
*1135 School % African-American Enrollment % African-American Professional Staff # African-American Professional Staff
[[Image here]]
In 1968, employees of the District prepared a list of elementary schools employing African-American teachers and a copy of the directory of the Rockford public schools showing total staff for each school with hand written notations as to those staff members who were African-American. B41462. When this data is correlated to the 1967 student enrollment percentages set forth in the PPC report, it reveals the following.
The District employed eight African-American teachers at the high school level during the 1968-69 school year. Of those eight teachers, six (or 75%) taught in integrated schools and two (or 25%) taught in racially identifiable white schools. No racially identifiable African-American high schools existed in the Rockford school system in 1968-69. The high schools employing six of the eight African-American teachers were Auburn High School, with an African-American student enrollment of 15% and West High School, with an African-American student enrollment of 12%. East High School, which had an African-American student enrollment of 2%, employed no African-American teachers. Guilford High School, which had an African-American student enrollment of 0%, employed two African-American teachers.
At the middle school level, the District employed twenty-three African-American teachers. Ten (or 43.48%) of the African-American teachers employed in the middle schools were assigned to Washington School, which had a 50% African-American enrollment and was a racially identifiable minority school. Eleven of the twenty-three teachers employed at the middle school level taught at Wilson High School, which had an African-American student enrollment of 22%. Roosevelt Junior High and Jefferson Junior High, which respectively had an 8% and 5% *1136 African-American student enrollment, each employed one African-American teacher. Lincoln School, which was a racially identifiable white school with a 0% African-American student enrollment, had no African-American teachers on its staff. Grouping Wilson, Roosevelt and Jefferson together, the District employed thirteen African-American teachers (or 56.52%) in integrated or racially identifiable middle schools.
At the elementary school level, the District employed thirty-four[23] African-American teachers. Twenty-four (or 70%) of those African-American teachers were assigned to racially identifiable minority schools. Five (or 14%) of those teachers were assigned to integrated schools and three (or 8%) of those teachers were assigned to racially identifiable white schools. An evidence summary exhibit graphically represents these correlations:
Comparison Of Percentage of African-American Student Enrollment to Number and Percentage of African-American Teaching Staff[24]—1968-69
School % African-American Enrollment # African-American Teachers # Total Teachers % African-American Teachers to Total By School
HIGH SCHOOLS [25]
[[Image here]]
MIDDLE SCHOOLS [26]
[[Image here]]
ELEMENTARY SCHOOLS [27]
[[Image here]]
*1137 School % African-American Enrollment # African-American Teachers # Total Teachers % African-American Teachers to Total By School
[[Image here]]
On or about December 16,1971; employees of the District prepared a listing of minority group staff members employed in the schools. B41377. As part of this document, the District noted that it had 1,758 teachers employed at all levels within the District and that ninety-one (or 5.18%) of those teachers were members of minority groups: eighty-eight African-American, one Native American, one Hispanic and one Asian.
During the 1971-72 school year the District employed forty-four minority teachers at the elementary school level. Twenty-eight of those minority teachers (or 68.29% of the total minority elementary school teachers) were employed in nine schools located in the Southwest Quadrant. Those schools were: Barber, Dennis, Ellis, Haskell, Henrietta, Lincoln Park, McIntosh, Muldoon and Peterson. Sixteen of the twenty-two minority *1138 teachers at the middle school level were employed in two schools, both of which were located in or near the minority community. These two middle schools were Washington and Wilson. The District employed twenty-five minority teachers out of 498 at the high school level. Seventeen of these minority teachers were assigned to two schools, Auburn and West, which served the minority community in the District. These seventeen teachers represented 68% of the minority teachers employed by the District. An evidence summary exhibit graphically representing these correlations is reproduced herein as follows:
Comparison of Percentage of African-American Student Enrollment to Number and Percentage of African-American Teaching Staff—1971-72
Schools % African-American Enrollment % African-American Professional Staff # African-American Professional Staff
HIGH SCHOOLS [28]
[[Image here]]
MIDDLE SCHOOLS[30]
[[Image here]]
ELEMENTARY SCHOOLS[31]
[[Image here]]
*1139 Schools % African-American Enrollment % African-American Professional Staff # African-American Professional Staff
[[Image here]]
In July of 1973, testimony in the QUEFAC ease revealed the following facts: Eighty-five percent of minority elementary students and 96% of minority elementary teachers were clustered in twelve elementary schools that were not in compliance with State desegregation guidelines. Seventy-five percent of minority middle school students and 75% of minority middle school faculty were clustered in two middle schools that were not in compliance with State desegregation guidelines.
Principals And Other Administrative Staff
In 1963, despite the presence of African-American teachers and minority clerical and custodial personnel, the District employed only one minority principal. Constance Ren- *1140 ick (Lane) was made principal of Henrietta School in the 1963-64 school year. No other minority assistant principals or other administrators were employed by the District. During the school year 1968-69, the District employed approximately 109 administrative employees, including central office administrators and principals and assistant principals in the schools. Of these 109 employees, three (or approx. 1.5%) were African-American. B41463; D23513; D23526. These three employees were: Constance Lane, Del-ridge Hunter and Robert Black. T. Shaheen Letter to Jerris Leonard, Assistant Attorney General, 6/13/69, at 3, 16; D23513, D23526. Mr. Hunter’s name was deleted from the list of persons for reappointment by Board action on June 7, 1969. D23515; Bd.Min., 7/28/69, D23510-D23529. Mr. Black, who had been hired by the Board on November 11, 1968 as an administrative assistant to Dr. Shaheen, submitted his resignation to the Board on December 8, 1969.
A summary showing the number and percentage of minority principals for selected years from 1964-65 to 1988-89 is reproduced herein as follows:
Comparison of Minority Principals—Selected Years
[[Image here]]
Correlating the data on principal assignment to student enrollment data by year, the District exhibited a pattern of assigning minority principals to schools having a high percentage of African-American and Hispanic-American enrollment. A summary demonstrating such a correlation is reproduced herein as follows:
Correlation of Minority Principals by School and Year to Percentage of Minority Enrollment
[[Image here]]
*1141 [[Image here]]
*1142 [[Image here]]
From 1964 to the end of the 1989-90 school year, only six elementary schools, Beyer, Dennis, Ellis, Henrietta, McIntosh and Walker, had any African-American or Hispanic-American principals during any period, excluding Muhl Center, which was a special education facility. Of the middle schools, only Washington, Wilson, Flinn and Eisenhower had African-American principals during any period. Three of those assignments, at Flinn, Eisenhower and Washington, were held by one employee, Nathaniel Martin.
In the history of the RSD, there have been two non-white middle school principals, Nathaniel Martin and Curtis Anderson. Of the middle schools, Washington was racially identifiable minority during the entire time it had an African-American principal. Wilson school was racially identifiable minority from 1971 through the 1975-76 school year; from the 1977-78 school year until 1988, it was desegregated. Wilson did not have an African-American principal again until the 1985-86 school year. At that time it was still desegregated. Eisenhower school had an African-American principal from 1985 through 1992, and was desegregated during that entire period. The only racially identifiable white middle school in which an African-American principal has been assigned is Flinn, where Nathaniel Martin was employed from 1981-85, following the closing of Washington. The District has never employed an African-American or Hispanic-American principal in its high schools.
Dr. David Bennett, a desegregation expert proffered by Plaintiffs, testified that he observed public schools in Rockford were not only racially identifiable by students, but also by staff. Dr. Bennett began his analysis by looking at the assignment of minority principals within the District. He used this as a starting point because school districts have the fewest constraints placed upon them in the assignment of principals to schools. Principal assignment can, therefore, be a very revealing measure of racial identifiability of staff assignment. In addition, the principal of a school is a high profile, leadership position and plays a major role with regard to a school’s racial identifiability. Dr. Bennett discovered that, through 1989, the Rockford School District had employed only eight minority principals. These eight principals had, collectively, thirteen separate assignments among them. Of those thirteen assignments, only one was to a school that was *1143 a school without a high minority enrollment. This evidence led Dr. Bennett to conclude that principal assignment in the RSD was made on a clearly segregated and racially identifiable basis. Dr. Bennett also analyzed the staff assignment data prepared by Dr. Michael Stolee to determine whether this racially segregated assignment of staff also carried over to teacher assignment. His review of the data led him to conclude that the same pattern was apparent with respect to teacher assignment and that the District assigned minority faculty to schools with large numbers of minority students. The persistence of racially segregated staff assignment continued despite the Board’s awareness of the problem as early as 1973. Bennet Test., Tr. at 2693.
Dr. Bennett testified that some institutions assert that schools and staffs are racially identifiable to provide “role models” for minority students. Dr. Bennett believes, however, that it is important for all students, especially whites, to see “individuals of color in responsible positions, like principal positions and like teacher positions.” Id. at 2690.
During his twenty-eight year tenure as a teacher and principal in the RSD, Nathaniel Martin noted the pattern of disproportionate assignment of minority staff to schools with high concentrations of minority students. In Mr. Martin’s opinion this pattern resulted from the manner in which the RSD assigned teachers when they were first hired to work for the District, and not that African-American teachers desired to be placed in or transferred to schools with large African-American populations. Martin Test., Tr. at 2510-12.
Other Staff
As of July 24, 1963, the District employed' four African-American clerical employees, two of whom were located at the central administrative office and two of whom were located in Auburn High School and Washington Junior Middle School. In 1963, the District employed thirty-eight African-American custodial personnel. Of these thirty-eight employees, 84.2% were employed in the janitor 2 position, 13.6% were employed as janitor/firefighter, and 2.6% were employed as custodian/engineer.
The African-American custodial employees employed in the four Quadrants and the central administration were assigned as follows: twelve employees (31.5%) in the Northeast Quadrant, eleven employees (29.0%) in the Northwest Quadrant, six employees (15.8%) in the Southeast Quadrant, five employees (13.2%) in the Southwest Quadrant and four employees (10.5%) in central administration. An evidence summary exhibit comparing the 1960 Pupil Placement Committee Report data on African-American student enrollment in the schools with the location of African-American staff in those schools, is incorporated herein as follows:
Correlation Of PPC Attendance Data For 1960 To 1963 Report To NAACP On African-American Staff By African-American Enrollment
Schools % Afr-Am # Afr-Am # Other Total Enrollment Teachers Afr-Am Afr-Am Staff Staff
HIGH SCHOOLS_
[[Image here]]
MIDDLE SCHOOLS_
[[Image here]]
*1144 Schools % Afr-Am Enrollment # Afr-Am Teachers # Other Afr-Am Staff Total Afr-Am Staff
[[Image here]]
ELEMENTARY SCHOOLS
[[Image here]]
*1145 Based upon this data, four (33.33%) of the African-American clerical and maintenance staff assigned to high schools worked in integrated high schools and eight (66.66%) of the African-American clerical and maintenance staff assigned to high schools worked in racially identifiable white schools. Further, 1.5 (15.79%) of the African-American clerical and maintenance staff assigned to middle schools worked in racially identifiable African-American schools, three (31.58%) worked in integrated schools and five (52.63%) worked in racially identifiable white schools. In the elementary schools, this data shows that two (13.79%) of the African-American maintenance staff were assigned to racially identifiable African-American schools, 2.5 (17.24%) were assigned to integrated schools, and ten (68.97%) were assigned to racially identifiable white schools. The District employed no African-American clerical staff in its elementary schools in 1963.
A summary comparing the 1960 Pupil Placement Committee Report data on African-American student enrollment in the schools with the location of African-American staff in those schools, is reproduced herein as follows:
PPC Report On African-American Student Enrollment For 1967 Correlated To African-American Custodial And Clerical Staff For 1968-69 School Year
Schools % Afr-Am # Afr-Am # Afr-Am Enrollment Custodians Clerical Total Afr-Am Staff
HIGHSCHOOLS
[[Image here]]
MIDDLE SCHOOLS
[[Image here]]
ELEMENTARY SCHOOLS
[[Image here]]
*1146 Schools % Afr-Am Enrollment # Afr-Am Custodians # Afr-Am Clerical Total Afr-Am Staff
[[Image here]]
By 1968, the assignment pattern for African-American custodial and clerical staff had changed. Four of ten (40%) African-American custodial and clerical employees worked in desegregated high schools with the balance working in racially identifiable white schools. For the middle schools, three (25.-0%) of the African-American custodial and clerical employees assigned to the middle schools worked in racially identifiable African-American schools, seven (58.33%) worked in integrated schools and only two (16.67%) worked in racially identifiable white schools. At the elementary school level, 5.5 (52.38%) of the African-American custodial and clerical staff assigned to elementary schools worked in racially identifiable African-American schools, one (9.52) worked in integrated schools and four (38.10%) worked in white racially identifiable schools. During the 1968-69 school year, the District employed approximately 170 clerical employees, of whom only three (or approximately 1.75%) were African-American.
Dr. Michael Stolee compared minority staff to the percentage of minority pupils in schools at all levels from the early 1970’s to the present. His data shows a correlation *1147 between African-American enrollment and a significant percentage of African-American staff, both professional and non-professional, at all school levels.
Collective Bargaining History: Teachers And Other Professional Staff
Prior to 1967, the RSD did not recognize any union or employee association as the exclusive representative for any category of its employees. The District did, however, conduct informal discussions with two organizations representing teachers employed by the District: the Rockford Education Association (hereinafter “REA”), and the Rockford Federation of Teachers (hereinafter “RFT”). At its meeting of April 3, 1967, the Board of Education passed a resolution authorizing the District to conduct an election between these two groups to determine who would be the exclusive bargaining representative for teachers in their negotiations with the School Board. At its meeting of April 17, 1967, the Board approved a motion defining the employees eligible to vote in this election. This motion defined the bargaining unit as all certified personnel and nurses, excluding central administrative office personnel, assistant principals, principals and deans of girls’ secondary schools. The certification election was conducted on May 10,1967 and the REA received the highest number of votes cast, thereby becoming the exclusive representative of these employees. Bd.Min., 4/3/67, B11482; Bd.Min., 4/17/67, B11496-B11500; B34080.
The District and the REA negotiated and entered into a collective bargaining agreement for the 1968-69 school year, with an effective date of July 1, 1968, and an expiration date of June 30, 1969. B34080; B50557. ■ This contract embodied agreements reached between the District and the REA regarding wages, hours and certain working conditions for all certified personnel and nurses, exclusive of administrators and central office head supervisors. Included among the provisions of this agreement was Article XI, governing transfers by members of the bargaining unit. This provision gave tenured staff members the right to apply for a transfer to any available position in the school system. The provision further required the District to post a list of known and anticipated vacancies on or before February 1st of each school year and to supplement that list between May 1st and May 15th of each year. The provision also required the District to consider “the convenience and wishes of the individual staff member,” but only “to the extent that ... [those wishes] ... do not conflict with the instructional requirements and best interests of the school system.” B34080. In eases where more than one staff member applied for a position, the provision allowed the District to select the staff member “best qualified” for the position. In the event that qualifications were “substantially equal” seniority in the school system was to be the controlling factor.
The transfer provision obligated the District to notify teachers affected by a reassignment by August 15th of the year in which the change was to be made. In the event that notification by August 15th did not take place, the change in assignment was to be “voluntary on the part of the affected staff member.” Id. The District retained the right to involuntarily transfer staff members, subject to the following conditions:
a. a staff member had the right to be released from his contract if he so requestéd;
b. a staff member was entitled to priority consideration for transfer to future vacancies; and,
c. a staff member was to receive his assignment for the following contract year prior to the end of the year spent in involuntary transfer.
Disputes regarding transfer or reassignment were subject to protest through the “procedures for resolving a professional problem.” Id.
Superintendent Thomas A. Shaheen advised the Board of Education in December of 1968, that the restrictions placed on the District’s ability to transfer teachers was a matter that needed “early revision.” Dr. Sha-heen advised the Board that the District needed “greater flexibility in'the transfer of teachers.” B34074. In response to a questionnaire submitted by the United States Department of Justice to the Board, Superin *1148 tendent Shaheen further discussed the impact of the agreement on teacher assignment issues. D23510. The questionnaire asked specifically what steps had been taken to correct the PPC findings that low achievement schools had a greater percentage of non-degree teachers and teachers with less experience. D23524. In his response, Dr. Shaheen noted that “the Professional Agreement with the Rockford Education Association set some very rigid bounds on the movement of teachers from one school to another without their permission. It was, therefore, very difficult to take any major steps to implement the ideas of the Pupil Placement Report.” Id. Dr. Shaheen also noted that “the Professional Agreement ... gives some right of choice to teachers within the system, result[ing] in teachers from low achieving junior high schools often requesting transfer to high achieving junior high schools or to high schools. There was a substantial number of teachers who either resigned or requested transfer from the low achieving Wilson Junior High School to other schools within the city.” Id.
The RBE and the REA entered into a collective bargaining agreement for the 1969-70 school year. B50521. This agreement contained Article XVI regarding teacher transfers. With respect to involuntary transfers, the contract provided that such a transfer would only be allowed for “exceptional eircumstance[s] resulting from the adoption of the middle school concept, school construction, housing construction and/or the entrance of new school districts.” Id. at 12, B50535. Involuntary transfer decisions were subject to the contract grievance procedure, which provided for binding arbitration before a third-party arbitrator of all grievances not successfully resolved by the parties. Id. at 7-9, B50530-B50532. The agreement also provided that “[t]he staff member who has submitted a transfer to the Grievance Procedure shall be maintained in the status quo.” Id. at 13, B50536. The net effect of these provisions was to decrease the District’s ability to transfer teachers in accordance with the contract terms.
The contract between the RBE and the REA also contained a new provision, Article XXXIII, Section C, regarding vacancies in promotional positions. Id. at 23-24, B50456-B50457. This section provided, inter alia as follows:
All vacancies in promotional positions, including specialists and/or special projects teachers, excepting the position of Superintendent, shall be filled pursuant to the following procedures:
[[Image here]]
3. Teachers who desire to apply for such vacancies shall submit their applications in writing to the Superintendent....
4. Such vacancies shall be filled on the basis of qualifications for the vacant post, provided, however, that where two or more applicants are substantially equally qualified, seniority in the Rockford School System shall control.
Id. This provision, if followed, obligated the RBE to fill all administrative positions, including principals, assistant principals, head teachers and all central office administrators (excluding the Superintendent), with qualified teachers applying from within the district before any other person, if qualifications of internal and external applicants were “substantially equal.”
In 1969, an employee of the District named Howard Getts filed a grievance over the denial of a promotion to the position of Director of Personnel and Recruitment. Arbitration Award in REA and RBE, Case No. 51 39 0509 70 (March 23, 1971) at 6, B510713; Bd. of Educ. School Dist. No. 205 v. Rockford Educ. Ass’n, 3 Ill.App.3d 1090, 280 N.E.2d 286 (2nd Dist.1972). This grievance alleged a violation of Article XXXIII, Section C of the 1969-70 agreement. Id. Following a hearing on December 29, 1969 in which the arbitrator found that the grievance regarding the failure to promote Getts was arbitrable, the RSD filed an action in the Circuit Court of Winnebago County, entitled Board of Education in and for the School District of the City of Rockford, No. 205, Winnebago County, Illinois, a Municipal Coiporation v. Rockford Education Association, Inc., a Corporation, and Howard L. Getts, Case No. G-21860, seeking an order for declaratory judgment setting aside the decision regarding arbitrability of grievances regarding staffing *1149 decisions. B510723-B510725. On May 12, 1971, the circuit court granted declaratory and injunctive relief, finding that “the matter of selection or promotion of employees by Plaintiff are not subject to binding arbitration under any circumstances and that such a provision is void as an unlawful delegation of Plaintiffs discretionary powers.” The court further held that Article XI of the agreement [the grievance provision] was “void and of no force and effect” in its provisions “relating] to arbitration of matters of selection or promotion of employees.... ” Id. The REA appealed the decision and it was affirmed. Board of Educ. School Dist. No. 205 v. Rockford Educ. Ass’n, 3 Ill.App.3d 1090, 280 N.E.2d 286 (2nd Dist.1972).
In affirming the decision, the Illinois Appellate Court stated that “a [B]oard of [Education does not require legislative authority to enter into a collective bargaining agreement” and that “such an agreement is not against public policy.” Id., 280 N.E.2d at 287 (citation omitted). The court nevertheless held that “a [BJoard may not, through collective bargaining or otherwise, delegate to another party those matters of discretion that are vested in the [B]oard by statute ...” including the duty to select employees for positions, and determine their qualifications. Id. at 287-288.
Despite this clear ruling, the District and the REA negotiated a series of collective bargaining agreements containing provisions, which, if valid and enforceable, would have limited the Board’s power to select employees for vacant positions. The agreements, covering the period from 1972 through 1980, exempted decisions regarding promotional assignments from the grievance procedure, but still required the Board to select the senior qualified internal applicant over other applicants, unless the other applicant was better qualified. The collective bargaining agreement covering the period 1980-82 deleted the requirement of selecting the most senior applicant for promotion where two applicants were substantially equally qualified. This agreement also deleted the language exempting promotional decisions from the grievance and arbitration provision.
Beginning with the contract covering the 1972-73 school year, the District and the REA entered into an agreement containing the following language regarding promotional vacancies:' “All appointments to the aforesaid [promotional] vacancies and openings shall be made without regard to age, race, creed, color, religion, nationality, sex, or marital status.” B50479. Thus, the agreement prohibited the District from taking the race of applicants into account, even in those situations where significant under representation of minorities in administrative positions was found to exist. This provision was also present in subsequent collective bargaining agreements.
Then, beginning with the contract covering the 1984-87 school years, the District and the REA entered into an agreement combining the transfer, promotional and reduction-in-force (hereinafter “RIF”) provisions into a single article entitled “General Employment Practices.” B50236-B50239. Article 12 of this agreement covered all vacancies for administrative and teaching positions (excepting the Superintendent). It further required that “[i]f more than one applicant has applied for the same vacancy the applicant best qualified for that vacancy shall be appointed and qualifications being substantially equal, seniority in the system shall control.” B50236-B50237. Article 12 also incorporated the race neutral selection procedure for all vacancies (not just promotions, as in past years) and made all decisions regarding appointments to vacancies subject to the grievance and arbitration provisions of the agreement. B50237-B50238. The language in Article 12 did not distinguish between the filing of promotional and other vacancies. The parties interpreted the agreement to require posting of promotional vacancies and bidding by bargaining unit members, but not requiring the selection of the most senior applicant in circumstances where the qualifications of two or more applicants were substantially equal.
In the agreement covering the 1988-89 school year, the REA and the District agreed that the District could reassign all high school and middle school principals without following the vacancy, posting and seniority *1150 provisions. These provisions applied only to vacancies resulting from such reassignments. B50149. The District further agreed to use its “best efforts” to follow the same procedure with respect to elementary principal vacancies. Id. This provision appeared in each of the subsequently negotiated provisions.
Throughout the history of the collective bargaining relationship between the District and the REA, the union has attempted to enforce provisions regarding teacher assignment and promotion. These enforcement efforts included filing grievances over denial of promotion and assignment decisions and periodic requests for arbitration of such grievances when they were denied at the final step prior to arbitration. Requests for arbitration continued even after the REA was enjoined from enforcing the promotion and assignment provisions of its contract by the courts. Despite the injunction prohibiting enforcement of the provisions through arbitration, the District voluntarily complied with some of these obligations, often adjusting grievances in favor of teachers who complained of involuntary transfer or failure to be appointed to a vacancy for which they applied.
In 1983, the District filed an action against the REA seeking injunctive relief with respect to its authority in employee selection matters. Bd. of Educ. v. Rockford Educ. Ass’n, Case No. 83 MR 120 (Circuit Court for the 17th Judicial District, Winnebago County); B510943. On July 13, 1984, the court entered an order against the REA and its agents “permanently enjoining [them] from filing arbitration demands on questions of discretionary teacher appointment.” The court further found that the decision in Board of Educ. v. Rockford Educ. Ass’n, 3 Ill.App.3d 1090, 280 N.E.2d 286 (2nd Dist. 1972) was “[t]he controlling precedent for all issues” presented in the case, and that “notwithstanding anything to the contrary contained within the professional agreement between the parties ... the discretionary appointment of teachers to employment positions is vested exclusively in the School District, is not a delegable power, and is therefore not arbitrable.” Id. This decision was affirmed by the appellate court in Board of Educ. v. Rockford Educ. Ass’n, 150 Ill.App.3d 198, 103 Ill.Dec. 317, 501 N.E.2d 338 (2nd Dist.1986).
In 1983, the Illinois General Assembly passed, and the governor signed, the Illinois Education Labor Relations Act (hereinafter “IELRA” or “the Act”). 115 ILCS 5/1 et seq., formerly Ill.Rev.Stat. ch. 48, ¶ 1701, et seq. The IELRA is a comprehensive legislative scheme regulating the selection of employee representatives and governing collective bargaining in public school districts. The IELRA created a state agency, the Illinois Education Labor Relations Board (hereinafter “IELRB”), to enforce the Act. 115 ILCS 5/5, formerly Ill.Rev.Stat. ch. 48, ¶ 1705. The IELRA contains a section describing a public school district’s duty to bargain with an employee representative. 115 ILCS 5/10, formerly Ill.Rev.Stat. ch. 48, ¶ 1710. This paragraph provides that the educational employer and employee representative have the “authority and duty” to engage in collective bargaining and that the employer has a duty “to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, and to execute a written contract incorporating any agreement reached by such obligation....” 115 ILCS 5/10(a), formerly Ill.Rev.Stat. eh. 48, ¶ 1710(a). The Act further provides that “[t]he parties to the collective bargaining process shall not effect or implement a provision in a collective bargaining agreement if the implementation of that provision would be in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of Illinois.” 115 ILCS 5/10(b), formerly Ill.Rev.Stat. ch. 48, ¶ 1710(b). Finally, the Act makes inclusion of a grievance and binding arbitration provision for resolving disputes under the collective bargaining agreement mandatory, 115 ILCS 5/10(c), formerly Ill.Rev.Stat. ch. 48, ¶ 1710(e), and makes refusal to comply with an arbitration award an unfair labor practice that can be remedied by the IELRB through an order requiring the employer to comply with the award. 115 ILCS 5/14(a)(8), formerly Ill.Rev.Stat. ch. 48, ¶ 1714(a)(8).
*1151 On March 29, 1989⅛ the Illinois Supreme Court issued its decision in Board of Educ. of Warren Twp. v. Warren Twp. High School Fed’n of Teachers, 128 Ill.2d 155, 131 Ill.Dec. 149, 538 N.E.2d 524 (Ill.1989) (rehearing denied, May 26, 1989). In that case, the court held that the IELRA divests the circuit court of jurisdiction to enjoin" arbitration hearings and further held that exclusive primary jurisdiction for deciding questions of arbitrability is vested by the legislature in the IELRB. Id. 131 Ill.Dec. at 154, 538 N.E.2d at 529.
Following this decision, the District and the REA agreed in April, 1989 to the entry of a court order dissolving the permanent injunction entered in 1984. Both before and after the entry of this injunction and its dissolution, the REA continued to file grievances over staff appointment issues and the District continued to resolve grievances regarding appointment issues.
Collective Bargaining History: Clerical Employees
The District entered into its first collective bargaining agreement covering clerical employees in 1984. B50796. The second agreement covered the period January 1, 1988 through December 31, 1990. B50772. Unlike the agreement covering professional employees, the clerical agreement contained no provision requiring assignment based upon seniority where candidates were substantially equally qualified. The agreements required, however, first consideration for internal qualified applicants over qualified non-employees of the District. B50807; B50782-B50783. Selection of an external candidate, by the RSD was allowed only if there was no qualified candidate already within the employ of the District.
On June 22, 1981, the Board adopted a resolution creating the Rockford Public Schools Employee Service System. B49488. The purpose of. this system was to test and recruit employees for all non-certified positions, including clerical positions. Boyer Dep. at 27-28. This system was created in order to replace the services provided by the City of Rockford in testing and certifying applicants for such positions. Id. In the area of promotional examinations for clerical and custodial positions, the rules of the Commission created a system of assigning additional examination points for longevity as a District employee. B49528.
Thomas Boyer was the District’s personnel director from January 1,1978 until March 26, 1990. Boyer Dep. at 6. Mr. Boyer supervised the District’s employee who was responsible for administering the testing procedures and he participated in meetings of the Employee Service Commission, a three member body created by Board resolution, to oversee operation of the testing and recruitment system. Id. at 94; B49532. Mr. Boyer testified that the use of longevity points in scoring promotional examinations resulted in a “skewing [of] the test scores so badly that they were meaningless.” Boyer Dep. at 105. Accordingly, on December 21, 1988, it was reported to the Board that the Employee Service Commission decided to amend its rules to delete references to longevity points. Bd.Min., 12/21/88, at 3, B49503.
African-Americans and Hispanies were underrepresented in the clerical employment workforce during the entire time Mr. Boyer was employed by the District. Boyer Dep. at 36-37. For those years in which data exists comparing minority employment in this category to total employment by category (1986-1992), minority employment among clericals reached its highest level in 1987-88 when minorities represented 3.6% of the total clerical workforce. For the 1990-91 school year, this figure declined to 2.8%. The effect of this historical underrepresentation, coupled with the assignment of longevity points for seniority, was to keep those few minorities employed as clericals locked in the lower-paying clerical jobs and prevented movement of those employees by promotion in order to achieve integration of clerical staff.
Conversely, seniority was never a factor in clerical transfers. Thus, to the extent that minority clerical employees were isolated in schools with high minority enrollment, as demonstrated by the high concentrations of minority staff of all types within the District, the isolation was not a function of the operation of a seniority system. Id. at 90.
*1152 Custodial Staff
The custodial staff, including building engineers, custodians, assistant building engineers, stockroom employees, truck drivers, printers, painters, electricians, steamfitters, plumbers, brickmasons, carpenters, grounds maintenance employees, mechanics, and others, were first covered by a collective bargaining agreement in 1987. B50649. The contract was renegotiated twice. B50622 and B50586. The agreement covering custodial staff required non-promotional vacancies to be filled based upon seniority. B50659-B50660. Further, the contract required seniority be considered along with test scores and other criteria in filling promotional vacancies. Id. Finally, the agreement prohibited involuntary transfer of custodial staff unless: (1) The employee’s position was eliminated, or (2) The District could “demonstrate that the employee’s transfer [was] in the best interest of the District and/or the employee.” Id.
Prior to 1987, however, the District was under no obligation to assign custodial employees by seniority. Thus, the pattern of assigning minority custodial employees to racially identifiable schools, which predated the advent of collective bargaining for those employees, was not a function of the operation of a seniority system.
Other Staff
The District negotiated its first collective bargaining agreement covering teacher aides, library aides, clerical aides, hall aides and special education aides for the period July 1, 1985 through June 30, 1988. B50710. This agreement was subsequently renegotiated twice. B50695 and B50674. Each of the agreements contained a provision regarding job posting and bidding for vacancies. B50714-B50715. The agreements provided that where a permanent vacancy occurred, it would be posted and aide employees would be allowed to bid. Seniority played no role in the selection of candidates for vacancies, with the sole limitation that qualified candidates inside the District were given preference over external candidates. Id. Prior to the advent of collective bargaining, there was no restriction on the ability of the District to assign aides within the school system. Accordingly, the assignment of minority aides to racially identifiable minority schools cannot be explained by reference to collective bargaining agreement provisions.

CONCLUSIONS OF LAW

The assignment of faculty and staff on the basis of race is a significant contributor to school segregation. See, Reed v. Rhodes, 607 F.2d 714, 725 (6th Cir.1979); NAACP v. Lansing Bd. of Educ., 559 F.2d 1042, 1052 (6th Cir.1977); Morgan v. Kerrigan, 509 F.2d 580, 597-98 (1st Cir.1974); Oliver v. Michigan St. Bd. of Educ., 508 F.2d 178, 185 (6th Cir.1974); Berry v. School Dist of Cty. of Benton Harbor, Mich., 505 F.2d 238, 242 (6th Cir.1974). Assignment of teachers on the basis of race adds to the racial identifia-bility of a school, and, as such, it may hasten the segregation of a school (or help to preserve it in a segregated state). Berry v. School Dist. of Benton Harbor, 442 F.Supp. 1280, 1301 (W.D.Mich.1977).
Segregative faculty and staff assignment practices are clearly unlawful. See, United States v. Yonkers Bd. of Educ., 624 F.Supp. 1276, 1527 (S.D.N.Y.1985), aff'd, 837 F.2d 1181 (2nd Cir.1987) (assignment of disproportionate numbers of minority staff to disproportionately minority schools); Reed v. Rhodes, 455 F.Supp. 546, aff'd in part, rev’d in part, 607 F.2d 714 (6th Cir.1979) (84% of African-American elementary and junior high school teachers and 90% of African-American senior high school teachers taught in schools that had 90% African-American student enrollment); Berry, 442 F.Supp. at 1301 (in schools that were 15-100% white, 1.3% of teachers were African-American; in schools that were 75-100% African-American, 41.24% of the teachers were African-American); NAACP v. Lansing, 429 F.Supp. 583, 606 (W.D.Mich.1976), aff'd, 559 F.2d 1042 (6th Cir.), cert. denied, 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977), and aff'd, 571 F.2d 582 (6th Cir.), cert. denied, 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 1150 (1978) (Board stipulated that it assigned African-American teachers to predominantly African-American schools); Morgan v. Kerrigan, 401 F.Supp. 216 (D.Mass.1975), aff'd, 530 F.2d 401 (1st Cir.), cert. denied, 426 U.S. 935, *1153 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976); Arthur v. Nyquist, 415 F.Supp. 904, 944 (W.D.N.Y.1976), aff'd on reconsideration, 429 F.Supp. 206 (1977), aff'd in part, rev’d in part, 573 F.2d 134 (2nd Cir.1978) (significant number of teachers and administrators assigned to schools on basis of race); Morgan v. Hennigan, 379 F.Supp. 410, 459 (D.Mass.), aff'd sub nom., Morgan v. Kerrigan, 509 F.2d 580 (1st Cir.1974) (in school district in which approximately ⅜ of the schools were majority African-American, I of the African-American teachers were sent to those schools); Oliver v. Kalamazoo Bd. of Educ., 368 F.Supp. 143, 177 (W.D.Mich.1973), aff'd, 508 F.2d 178 (6th Cir.1974) (direct correlation between racial proportions of students and teachers at all levels of instruction); United States v. School Dist. 151 of Cook County, 286 F.Supp. 786, 793 (N.D.Ill.1968), aff'd, 404 F.2d 1125 (7th Cir.1969) (with few exceptions, faculty assigned on basis of race).
In some cases, school authorities have tried to offer educational justifications for segregative faculty assignment policies. See Morgan, 379 F.Supp. at 460 (assignment of African-American teachers to predominantly African-American schools purportedly allowed African-American teachers to serve as adult role models to African-American pupils). Such attempts to justify teacher segregation have been uniformly rejected. Omaha, 521 F.2d at 538-39 n. 14; Morgan, 509 F.2d at 596-98; Reed, 455 F.Supp. at 566; Lansing, 429 F.Supp. at 606; Arthur, 415 F.Supp. at 946; Oliver, 368 F.Supp. at 177; cf. Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 274-75, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (interest in providing minority role models insufficient to justify racial classification in layoff provision). Intentional racial segregation, whether the motive behind it is evil or benign, does not pass scrutiny under the 14th Amendment. Arthur, 415 F.Supp. at 946; Oliver, 368 F.Supp. at 177.
Similarly, attempts to justify faculty segregation on the grounds that African-American teachers desired and requested assignment to African-American schools have also been rejected. “[E]ven if ... black teachers requested assignments to black schools, this would not overcome the prohibition of the fourteenth amendment which bans intentional racial segregation in public schools whatever may be the desires of black teachers or parents.” Morgan, 379 F.Supp. at 461.
The court finds that the RSD’s assignment practices with respect to teachers violated the constitutional rights of Plaintiffs through the intentionally disproportionate assignment of minority teachers to schools with a high percentage of minority students and majority teachers to schools with a high percentage of majority students.[32] The court further finds that the RSD’s assignment practices with respect to minority principals also violated the rights of Plaintiffs through the intentionally disproportionate assignment of minority principals to schools with a high percentage of minority students and majority principals to schools with a high percentage of majority students. Similarly, the court finds that the RSD’s assignment practices with respect to African-American custodial and clerical staff violated the rights of Plaintiffs through the intentionally disproportionate assignment of minority persons in these positions to schools with a high percentage of minority students and majority persons in these positions to schools with a high percentage of majority students. Finally, the court finds that the RSD’s assignment practices with respect to total minority staff (professional and nonprofessional) violated the rights of Plaintiffs through the intentionally disproportionate assignment of minority staff to schools with a high percentage of minority students and majority staff to schools with a high percentage of majority students.

*1154
INEQUITABLE ACCESS TO TRANSPORTATION

INTRODUCTION

Unequal burdens in relation to transportation must not be placed on students by a school district because of the color a student’s skin. The RSD placed disparate transportation burdens on minority students. At times, minority students even had to pay for transportation to their assigned schools, while similarly situated white students did not. Further, the RSD’s integration policies included mandatory one-way busing of minority students. No white student was ever involuntarily bused for integration purposes.
The major voluntary integration opportunity for minority students was the Open Enrollment Plan. Through incompetency and intentional discrimination, the RSD transportation policies scuttled the Open Enrollment Plan. The RSD provided no substitute for the Plan.

FINDINGS OF FACT

Transportation Policies And Practices Affecting Desegregation And Desegregation Burdens
The only significant, voluntary integration plans ever offered by the RSD were open enrollment and full-site focus centers. Though the RSD’s stated policy with regard to these plans made provision for Board-paid transportation, the RSD’s transportation practices discouraged and diminished voluntary integration.
The effect of these practices was the elimination of the open enrollment program at the secondary level and a significant decrease in elementary open enrollment transfers. The virtual loss of the voluntary open enrollment program left the RSD with a system of integration that was involuntary for minority students and voluntary for white students. Within this discriminatory system of integration, the transportation policies and practices were both discriminatory and contradictory.
Transportation Policies And Practices Diminished Desegregation
The RSD historically employed four types of integration methods: mandatory reassignment of minority students to predominantly white schools through attendance boundary adjustments and school and grade closings; voluntary transfers to alternative programs; voluntary transfers to focus centers; and voluntary open enrollment. Students transferred by mandatory reassignment were predominantly minority. Students transferred by alternative programs were predominantly white. Accordingly, the focus centers and the open enrollment offered the only significant opportunity for minority voluntary transfer. Open enrollment transfer students were predominantly minority.
In a document entitled “Reflections of District 205 Court Appearance,” Director of Transportation Oscar Blackwell noted that “under the existing voluntary plan blacks were the majority that took part in voluntary busing.” B35781, B35784. In September of 1974, only 47 of the 636 students (7%) in the RSD taking advantage of the open enrollment program were white. B38448. In 1975, only 3% of the open enrollment students were white. Desegregation Progress Report, B31345. As stated by a memorandum dated June 22, 1979 from Patricia Tur-rentine, Coordinator of Transportation, to RBE member Colleen Holmbeck, 88 white students and 766 minority students were bused for open enrollment in the school year 1978-79.
Focus centers were originally primarily full-site programs benefitting both minorities and white students. Eventually, focus centers became partial-site programs and predominantly white. The RSD’s original stated transportation policy with regard to open enrollment and focus transfers was to provide transportation to all open enrollment and focus transfer students if the transfers aided integration. In a memorandum entitled “Meeting on Transportation Policy for School Year 1977-78,” Transportation Director Blackwell stated that the transportation policy with regard to open enrollment was “All students that contribute to integration will be bused. Students must contin *1155 ue to aid in desegregation in order to continue in the feeder pattern school.” B34416. In that same memorandum, Mr. Blackwell reported that for focus center transfers, the transportation policy was that “Students attending the Focus Centers will be transported providing they do not live in the school attendance area. Only students certified for the Focus Center by the Attendance Department or other authorized office, will be transported.” Id.
In the next school year, 1978-79, the open enrollment transportation policy remained the same as in previous years, while transportation to focus centers was to “be determined by the open enrollment policy stated above.” B34380 at B34385. Under the suggestion from the ISBE, the RSD, in the school year 1979-80, made “aiding integration” a condition of enrollment rather than of transportation for open enrollment and focus transfers. B32632. The resulting open enrollment policy was to provide transportation to all open enrollment students permitted to transfer under the “aiding integration” criteria for admittance. Id. at B32633-B32636.
1970’s and Early 1980’s: Transportation Problems Discouraging Open Enrollment Transfers
The open enrollment policies, both before and after the 1979 change urged by the ISBE, provide board-paid transportation to all voluntary transfer students whose movement aided integration. The actual practices during the 1970⅛ and early 1980’s were, however, contrary to the stated policy and served to confuse and discourage open enrollment and focus center transfers. For example, Transportation Director Blackwell believed that prior to the intervention of the ISBE, transportation policies and practices regarding open enrollment transfers were deliberately confusing. Mr. Blackwell stated:
It has been my experience that when you place the transportation and admittance policy together, interpretation is often not clear, and promises are made contrary to interest. I must say that I sincerely be-heve that oftentimes this confusion has been done by design.
Id. at B32636.
As early as 1974, those students who volunteered for open enrollment and who had an early class schedule had to provide their own transportation without any reimbursement from the RSD. Blackwell Memo, 10/2/74, B33228. Mr. Blackwell recognized that the RSD policy of not providing transportation for open enrollment students taking early classes was “counter-productive to voluntary desegregation.” The policy placed several burdens on minority students:
Minority students volunteering to a middle or high school for desegregation purposes who happen to start late in the school day would not be able to finish with school by noon. This fact would not permit them to obtain an afternoon-evening job if they wanted one.
[[Image here]]
Some of the general public could charge District 205 with not providing equal educational opportunity to all youngsters, in as much as the desegregation youngsters may have to start at a later time in order to take part in the desegregation program.
Id. Mr. Blackwell agreed that this policy was contrary to the stated policy of the Transportation Department to provide open enrollment students with transportation on the same basis that other students would receive it, thereby allowing students to have schedules of their own choosing. Id.
Other transportation problems existed, including: late buses, delays in starting open enrollment transportation at the beginning of the school year and lack of transportation altogether in some circumstances. These problems served to discourage open enrollment transfers. In 1974, Mr. Blackwell wrote a memorandum to John Wyeth, Assistant Superintendent in Charge of Operations, highlighting some of the transportation problems for open enrollment students:
In another memo of this date I informed you of the complaint I received from a Mrs. Cousin. I think that when a parent is interested in seeing that his youngster goes to school, arrives on time, and attends *1156 classes while in school, we certainly should not be a contributing factor for the constant tardiness of this youngster.
I have also been concerned about the fact that it takes 2 to 3 weeks for a youngster to get transportation provided to various schools under the desegregation program, and I would like to call to your attention that I am aware of at least 21 youngsters who have withdrawn from the desegregation program since school opened because of inability to receive transportation or the lack of a free lunch program.
Id. at B33229.
Despite the RSD’s knowledge regarding problems with transportation for open enrollment students and its attendant negative effect on the success of the open enrollment program, problems remained from 1977 through 1979, showing little improvement.
In September of 1977, Ms. Margaret New-ell, Chair of the Bloom School teachers, wrote to Mr. Blackwell on behalf of the Bloom School teachers regarding inadequate transportation “to Bloom School for our students from the west side of town.” B27691-B27692. Ms. Newell related problems with bus drivers and with late buses. She stated that these problems were “defeating our purposes and that of voluntary desegregation.” Id. Bloom School principal Keith Wilson testified that when he first arrived at the school in 1975, there was a period of approximately nine weeks when none of the Southwest side students arrived on time for school. Many arrived about an hour after school started.
In January of 1978, Mr. Blackwell met with school principals and with Jelco Bus officials, the persons with whom the RSD contracted for bus services, in order to discuss the open enrollment transportation problems. Mr. Blackwell’s notes of that meeting covered the scope of the problems:
Dr. Connie Tucker, principal of Lathrop/Mclntosh, stated that while the purpose of transportation is to aid integration, “at this point, I cannot give parents any assurance that transportation will be reliable.”
Kent Meyers, principal of Carlson School, stated: “We have been experiencing deteriorating services. Two hundred sixty-two (262) lost student days have been logged so far.”
Curtis Anderson, principal of Wilson stated: “There have been numerous late pickups in the morning and late pickups for children after school. As a result, there has been disorder and discipline problems on some of the buses. Some of the drivers have poor driving habits.”
Harry Hulick, principal at Lincoln Middle School described how the transportation problems affected the white students’ impression of the African-American students: “We have late buses almost daily. The black children are coming in late and naturally make noise. The white students get the impression that this is common behavior of blacks and this increases prejudice instead of aiding the integration of society which is the intent of the district.”
Ed Ruef from Guilford Center reported that the effect of the transportation problems was discouraging open enrollment transfers: “Five students have requested to go back to their home schools because of the frustrating busing. They like the program at Guilford Center but the parents feel that the children are missing too much school because of the poor service.”
Robert Greene from Haskell School stated: “This is the first year of busing to Haskell. Blacks are asking to come back to their neighborhood school. Although the whites are sticking it out, ⅝ are not riding buses but the parents are bringing them in.”
Blackwell Report of 1/25/78 Meeting, B502874-B502875. While Jelco officials admitted that some of the problems were attributable to poor handling by Jelco, they pointed out that a great deal of the problems originated with the RSD’s failure to provide the necessary administrative and informational support and the RSD’s failure to act to correct disciplinary problems. Id. at B502876-B502877. Although Mr. Blackwell stated in a letter to the president of the Bloom P.T.O. that “Mr. Johnson, Superintendent of Schools, Mr. Rundquist, President of District 205’s Board of Education, and all *1157 board members have been kept advised as to the many difficulties we have had ... involving transportation,” the problems continued. B28009.
In 1979, Mr. Blackwell received a letter from Mrs. Hyatt, the parent of a minority open enrollment transferee. Mrs. Hyatt related that her son had frequent absenteeism at his new school, Spring Creek, because of transportation problems. He had missed a full month of school the previous year because a bus never came to pick him up and he had developed bronchitis because he was forced to stand out in the cold many times waiting for a bus that was often late, if it came at all. Letter to Blackwell, 11/2/79, B34333.
The RSD further limited transportation to Guilford High School, expressly including a limitation on transportation for open enrollment students. Regular[33] bused students were transported to Guilford for periods four through nine, while open enrollment students were bused to Guilford for periods three through eight. Ms. Patricia Turrentine from the Transportation Department stated:
My understanding was that unless the students signs [sic] up for classes which correspond with the above busing schedule they will not be transported by school bus. I further understood that even if children are qualified to ride we will not put them on a bus route unless their schedule corresponds with the above because the school does not want them to be in the school for unassigned periods.
Turrentine Memo, 1/27/78, B502872.
1970’s and 1980’s: Discriminatory Provision Of Open Enrollment Transportation
The RSD provided transportation to majority open enrollment students on a more generous basis than that provided to minority open enrollment students, despite the fact that the open enrollment and focus center methods offered the only significant opportunity for voluntary minority transfer.
The RSD’s transportation documents, beginning with the school year 1979-80, show that the RSD employed a coding system for qualifying students for transportation. The available codes under this system were “1” and “3.” Notes on the documents defined a “1” as “more than 1.5 miles from both school and mass transit,” and a “3” as “less than 1.5 miles from mass transit.” B41527 at B41529. For the school years in which the qualifying .codes were used (1979-80,1980-81 and 1981-82), majority open enrollment and focus center students at the secondary level, that is, those attending Westside Auburn High School and Washington Middle School, qualified for Board-paid transportation under a combined “1/3” code. Id. at B41531. The combined “1/3” code meant that a student living more than 1.5 miles from school and mass transit would receive Board-paid transportation. Students living less than 1.5 miles (all other students) would also get Board-paid transportation. Id. All minority open enrollment students, except those attending Kennedy Middle School, qualified for Board-paid transportation under either a “1” or a “3” code.
Notations detailing transportation for minority open enrollment and focus center students indicate that the qualifying criteria for minority students were more restrictive than the criteria applied to majority open enrollment and focus center students. For example, the notation next to “minority open enrollment” at Jefferson stated “all outside Jefferson area—mass transit only.” The “mass transit only” notation also appeared next to: Bilingual-Focus at West High School; Bilingual Focus at Flinn Middle School; open enrollment at Flinn Middle School; minority open enrollment at Lincoln Middle School; and Bilingual Focus at Lincoln Middle School, with additional notation “Board paid, except Washington Area our bus.” Id. The “mass transit only” notation never appeared next to a majority open enrollment or majority focus center classification. A RSD document entitled “Current Transportation Situation” and dated July, 1981 suggested that, not only should the Bilingual Focus transportation be by mass transit only, but also the regular focus center program at Lincoln. B507511 at B507512. The recommendation *1158 for mass transit only transportation for the Lincoln focus center students was implemented in the 1982-83 school year. B41533. In a transportation document entitled “Transportation by Categories 1981-82,” data shows that thirty-three focus center transfers to Lincoln Middle School received Board-provided buses while 115 students rode mass transit buses. In contrast, focus center transfers to Wilson Middle School received Board-provided buses in substantial numbers: 513 focus center students received Board-provided buses while only sixteen focus center transfer students to Wilson rode mass transit buses. Wilson Middle School had predominantly white transfers because Wilson, itself, was predominantly minority.
1970’s and 1980’s: Effects of Discrimination and Transportation Problems on Success of Open Enrollment
The problematic transportation practices utilized for open enrollment had the effect of discouraging open enrollment transfers. Numerous students in the open enrollment program had opted to return to their neighborhood schools because of transportation problems. Teachers and principals from the schools receiving open enrollment transfers related that the transportation problems were discouraging open enrollment transfers and threatening the success of voluntary minority movement for integration purposes. See Newell Letter, B27691; Blackwell Letter, B27688; Blackwell Memo, B502874.
John Johnson, Conklin School Principal, stated in a memorandum to Mr. Blackwell in December of 1977 that one of the first students to attend Conklin through voluntary integration from the Westside had decided to transfer back to her neighborhood school, Haskell, because of an inability to get to Conklin by bus. Mr. Johnson believed that this was just the beginning of a trend of minority students returning to their neighborhood schools because transportation had become so uncertain. J. Johnson Memo, B27600. Mr. Johnson’s prediction in 1977 was correct. In 1978, the number of students transported for open enrollment was 1296; by the 1980-81 school year, the total open enrollment was 674, nearly half of the enrollment for 1978. B33202; D5523.
1980-1989: Direct Restriction of Open Enrollment Transportation
In addition to the policies and practices that had the effect of discouraging open enrollment transfers, the RSD instituted transportation policies directly restricted open enrollment transfer options. In 1980, the RSD adopted and implemented a new open enrollment policy that restricted open enrollment transfer by geographic area. The policy was the first to restrict open enrollment on a district-wide scale.
Restricting open enrollment transfers by geographic area was first recommended in April of 1980 by Patricia Turrentine, Coordinator of Transportation, as means of saving money. B34705. Ms. Turrentine’s recommendation was adopted as the new open enrollment policy of the RSD a few months later. B33166 at B33167; Bd.Min., 6/23/80, B16781. The new policy read as follows:

Open Enrollment

Open enrollment transportation is provided when the transfer contributes to integration at both the sending and receiving schools. Students living south of Kent Creek and East State Street will be transported to schools in that geographic area where efficient transportation can be provided and space is available. Students living north of Kent Creek and East State Street, but east of the Henrietta/McIntosh/Whig Hill area will be transported to schools designated in the northeast quadrant where efficient transportation can be provided and space is available. Students living west of Ellis/Church area and north of Kent Creek and west of the Rock River will be transported to schools designated in the northwest quadrant where efficient transportation can be provided and space is available.
Id. Figure 1 is a map of the RSD showing the geographic areas created by this policy.
The geographic restrictions in relation to open enrollment transportation split up the Southwest Quadrant into three areas and limited Board-paid transportation to schools within each geographic area. Under the policy, of the eighteen Southwest Quadrant *1159 schools, students from only six schools (Church, Ellis, Haskell, Garrison, Walker and^ Roosevelt) were given Board-paid transport tation and allowed to transfer to the desirable Northeast Side schools.
1980-81 Open Enrollment Transportation Policy Map Key Boundaries
Northeast: North of Kent Creek and East State Street East of Henrietta/McIntosh, Whig Hill
Northwest: North of Kent Creek and West of Ellis/Church and West of Rock River
South: South of Kent Creek and West of lis/Church and West of Rock River El-
Elementary School
1. Stiles
2. Dennis
3. Lincoln Park
4. McIntosh
5. Henrietta
6. Church
7. Ellis
8. Haskell
9. Garrison
10. Walker
11. Welsh
12. Summerdale
13. Whig Hill
14. Conklin
15. West View
16. Elmwood
17. Haight
18. Barbour
19. Lathrop
20. King
21. Evergreen
22. Evergreen
23. Gunsolas
24. Froberg
26. Riverdahl
27. Rock River
28. Peterson
29. Hillman
30. White Head
31. Rolling Green
32. Thompson
33. Vandercook
34. Gregory
35. White Swan
36. Cherry Valley
37. Carlson
38. Spring Creek
39. Brookview
40. Guilford Center
41. Bloom
42. Johnson
43. Jackson
44. Kishwaukee
45. Beyer
46. Wight
47. Nelson
48. Hallstrom
49. Turner
Middle School
1. JFK
2. Wilson
3. Roosevelt
4. Washington
5. Eisenhower
6. Marsh
7. Morris Kennedy
8. Lincoln
O O W. ⅞ si
Auburn H
West (M
Guilford CÓ
East
Jefferson
*1160 [[Image here]]
*1161 Students from the remaining twelve southwest side schools were restricted in their choice of transfer school to those located in the Southeast and Northwest in terms of Board-paid transportation.
The 1980 policy on open enrollment transportation had a tremendous effect on open enrollment transfers. In a document listing “students ... not eligible for transportation ... for the 1980/81 school year,” students transferring into schools that were not their “home” schools were identified as being denied transportation to the receiving school. B33176-B33191. Three hundred, thirty-eight elementary students were denied transportation to receiving schools. Thirty-two secondary students were denied transportation to receiving schools.
In 1981-82, the RSD completely eliminated open enrollment transfers to secondary schools. Transportation documents for the 1981-82 school year, and for every year thereafter, specified “no open enrollment in or out of any middle or high school.” B41531 at B41533. The effect of eliminating all secondary open enrollment transfers was to eliminate open enrollment in the RSD. In the school year 1980-81, the number of students involved in voluntary integration transfers was 674; in the school year 1981-82, that number dropped to 277. The number of open enrollments for the next three years never reached higher than 331. D5523. By the 1988-89 school year, the total number of students transported for open enrollment was 124. B502591.
In the early 1980’s, the RSD discontinued transportation to four full-site focus center programs at the elementary level, resulting in decreased voluntary transfers for integration purposes to those schools. In meetings of the RBE in January of 1987 and in January of 1988, the Superintendent admitted that the four elementary focus center programs, those at Bloom, Walker, Haskell and Conklin, were effectively shut down by the discontinuation of transportation to those programs in the early 1980’s. Bd.Min., 1/27/87, B19961; Bd.Min., 1/18/88, B20892.
The RSD eliminated transportation to Bloom Elementary School in 1982. B22615; B22604. According to the individual histories contained in Part M of Michael Driscoll’s 1987 Demographic Study, the focus center at Bloom started in the school year 1977-78. No explanation was given for the elimination of transportation. Id. In the 1981-82 school year, prior to elimination of transportation to Bloom, the number of African-Americans at Bloom was seventy-five; in the 1982-83 school year, after transportation was eliminated, the number of African-Americans at Bloom dropped to fifty-nine. Stolee Tab 24. Although African-American enrollment increased to seventy-three in the 1983-84 school year as a result of students transferred because of the closing of Guilford Center, minority enrollment declined consistently every year thereafter down to fifteen African-American students in 1989. Id.
In 1982-83 the RSD eliminated transportation for transfer students to the focus center program at Walker School. The focus center was started at Walker in the 1975-76 school year. B22772. After transportation was eliminated for focus center students, African-American enrollment at Walker fell from 13.-42% in 1982-83 to 7.33% in 1983-84, reaching a low of 5.74% in 1987-88. Id.
In approximately 1981-82, transportation for focus center transfer students at Haskell School was terminated. Bd.Min., 1/27/87, B19961. The focus center at Haskell, a Southwest side school, was started in the 1977-78 school year. Prior to the focus center, African-American enrollment at" Haskell was 60.06% in the 1976-77 school year. By the 1980-81 school year, the transfer of white students to the focus center reduced the percentage of minority enrollment to 49.39%. After the elimination of transportation for focus center transfers in 1981-82, white enrollment decreased by more than 10% by the 1982-83 school year, while the percentage of African-American students enrolled at Has-kell increased to 57.36% and reached 62.81% the following year. B22772.
In the 1981-82 school year, the RSD eliminated transportation for focus center transfers at Conklin Elementary School on the northwest side. The focus center at Conklin had been started in the 1976-77 school year. At the same time that focus center transportation was eliminated to Conklin, the RSD *1162 mandatorily reassigned minority students to Conklin from Eastside Highland School. The RSD effectively terminated voluntary transfers as a means of integrating Conklin, a predominantly white school prior to the institution of the focus program, and substituted involuntary transfer of minority students who had been attending Highland. B22635.
By instituting policies and practices that nearly eliminated all open enrollment, the RSD eliminated the only significant opportunity for voluntary minority transfers. Without open enrollment and transfers to focus centers, the remaining types of movement for integration purposes in the RSD were involuntary movements of minorities through mandatory reassignments in the form of boundary changes, school closings and grade closings and voluntary movements of majority students through alternative programs.
Discriminatory Transportation Policies and Practices As Between Minority Integration Participants and White Integration Participants
The RSD transportation policy with regard to alternative program participants was to provide transportation if a student lived more than 1.5 miles from school, regardless of the student’s proximity to a Rockford Mass Transit District (hereinafter “RMTD”) bus stop. Students mandatorily reassigned by way of school boundary changes were not governed by a distinct transportation policy as were alternative program students. Rather, such students qualified for transportation only under the “regular” transportation policy. The regular transportation policy provided that a student qualified for Board-paid transportation only if he/she lived more than 1.5 miles from school and more than 1.5 miles from a RMTD stop. B34390. Since mandatory reassignment students were from the Southwest Quadrant, most lived within 1.5 miles from a RMTD bus stop and so were required to ride a bus and pay for it themselves. The RMTD route map showed four bus lines servicing the Southwest Quadrant. RMTD Route Map, B51195.
A Transportation Department document dated January 7,1986, revealed the extent to which minority students were dependent on the RMTD. The document discussed the possible reduction in RMTD services due to a lack of Federal funding. The effect of a RMTD reduction on minority students was noted: “should this occur, they [the RSD] would anticipate reducing service to East and West High Schools which would affect students living in Southwest Rockford.” Tur-rentine Memo, 1/7/86, B507475. Superintendent Bowen testified that when he was principal at the Northeast side East High School, “[t]he city bus lines were always within a mile and a half of where they [minority students] lived.” Bowen Dep. at 99. This meant that “[t]here was [sic] black students at East that were never provided transportation ever and still are not. And that was— they had to pay to ride the city bus. There’s no yellow buses at East High School.” Id.
Transportation documents confirm that mandatorily reassigned students, including all minority mandatorily reassigned students at the secondary level, received no Board-paid transportation. In 1988, the total number of mandatory reassignment students who attended Eastside high schools and middle schools, but who did not receive Board-paid transportation were:
East 05 00 CQ
Guilford N t-H
West 00 ^ H
Eisenhower tr-l H
John F. Kennedy IQ H
Lincoln H (M
Total: 1242 students
In 1986, 250 minority students were manda-torily reassigned to Eisenhower Middle School. B19103. A 1986 transportation document showed that none of these 250 students received Board-paid transportation. B41659.
Students who were mandatorily reassigned by way of school closings received some *1163 Board-paid transportation at the elementary level but received no Board-paid transportation at the secondary level. Although the RSD sometimes regarded school closing students as open enrollment transfers, the mandatory nature of the transfers, resulting from closing schools or grades, was recognized by the RSD. See B33176-B33191; see also, B25500. Director of Transportation and Integration, Oscar Blackwell, referred to the Muldoon School closing students as mandatory reassignments: “The closing of Muldoon resulted in one-way busing of blacks to all-white schools, placing great burdens, inconveniences, and responsibility to those blacks being bused.” B35783.
Transportation documents for the years 1979-1988 showed that some school closing students at the elementary level received Board-paid transportation, while school closing students at the secondary level were treated as “regular” for transportation purposes, thus receiving no Board-paid transportation. B41527-B41549; B41656-B41657; B511216. Transportation documents for the school years 1980-81, 1986-87 and 1988-89 showed Board-paid transportation by student category. The 1980-81 document showed no Board-paid transportation under the school closing category for secondary students, except for three students at Lincoln, whether by Board bus or Board-paid RMTD bus. Similarly, the 1986-87 and 1988-89 documents showed no Board-paid transportation for school closing students at the secondary level. These documents were consistent with other transportation documents that stated that school closing students at the secondary level were “treat[ed] as regular.” B41527-B41549.
These same transportation documents highlighted the contrast between the provision of transportation for alternative program students and the absence of Board-paid transportation for mandatory reassigned students. The 1986-87 document showed that the RSD provided Board-paid transportation for 453 of Auburn’s alternative program students in the school year 1986-87 and Board-paid transportation for 484 of Auburn’s alternative program students in 1988-89. B511216; B41659. An enrollment document prepared by the District’s Director of Attendance, Michael Driscoll, showed that the total alternative program enrollment at Auburn for the 1987-88 school year was 587. Driscoll Report, 1987, B24820-B24821. These figures revealed that a majority of alternative program students at Auburn, almost 500 out of 587, received Board-paid transportation. The form of transportation for these students was by yellow bus, since the Board provided RMTD travel to Auburn for only sixteen students during the 1988-89 school year. B511217.
Eleanor Brown, a former student in the gifted program at Wilson testified that the disparities in transportation did not end with transportation to and from school. The transportation provided for field trips taken by alternative students and “regular” students was also unequal. Ms. Brown stated: “I know they went to the zoo when we went to the Madison and Chicago area, we all went to that. We went separate, but we all went.” E. Brown Dep. at 14. She also noted the difference in the mode of transportation. Regular education students rode on regular yellow school buses, but the gifted students rode on the more expensive motor coaches. Id
The inequities of the RSD’s transportation practices were summed up by Michael Dris-coll, the RSD’s Attendance Director:
Qualifications for riding District 205 buses do not depend entirely on district or state regulations but on a program or where you five in the city. Students who live on the southeast side of town may be treated differently from students who live on the northwest side of town even when similar situations exist. Students in the regular high school programs are treated differently than students in alternative programs even though distance and situations may be comparable.
[[Image here]]
After reviewing the situation only one recommendation seems to be in order and that is to have a single set of clear, concise rules. These rules should be applied to all students. This would alleviate any ill feel *1164 ings about any certain groups being treated unfairly at the expense of others.
B46276 at B46277.
The RSD ignored the demands of minorities for equitable distribution of transportation services, while generously providing transportation to alternative program students. In 1975, RBE member Dick Parrott met with the “Save Our Children Committee.” The Committee demanded that the Board provide free transportation to the Southwest Quadrant students because there was no high school in that section of the District. The RBE did not pay for minority transportation in response to this demand. B15183. In contrast, the RBE provided transportation to white students who had been mandatoi'ily reassigned. In February of 1970, the RBE approved a motion regarding transportation that stated:
Within the existing Board policy and within state statutes, students who choose to attend high schools in which they are now enrolled, and who have received free transportation from the Board of Education for high schools shall continue to receive such free transportation on the same basis.
B12488.
Similarly, at a RBE meeting on September 5, 1973, parents brought to the attention of the RBE transportation problems with regard to alternative program enrollees. A demand was made for the provision of Board-paid transportation to the alternative program sites. On September 10,1973, a report was submitted to the RBE regarding the alternative programs at Latham Park, Haight and First Presbyterian Church. The report stated that all three alternative schools were without Board-paid transportation. Bd.Min., 9/10/73, B14066. One month later, Superintendent Salisbury announced that the RSD had an adequate number of drivers to alternative schools and all students who were supposed to receive transportation to alternative schools were getting it. B14120.
On February 18, 1981, the Superintendent recommended to the RBE that additional monies could be saved by charging all families with alternative education bus riders for the actual cost of transportation to such programs, with those charges being waived for any family who currently or in the future qualified under the RSD’s free lunch program. The RBE rejected the Superintendent’s recommendation. B16967-B16968.
The differing transportation policies for minority integration students and majority integration students created various burdens for the minority students. The RSD did little to alleviate these burdens. The cost of transportation alone was burdensome for minority mandatory reassignment students. At the student rate of $0.35 per round trip on the RMTD bus for 176 school days per year, minority parents of two children mandatorily assigned to Eastside secondary schools would pay $61.60 per child per year, for a total transportation expenditure of $123.00 annually. In contrast, under the RSD’s policy, parents of alternative program students would expend $0.00 per year on transportation costs.
The RBE was placed on notice that the cost of RMTD transportation was burdensome for minority parents. At a meeting of the Education Committee of the RBE on February 24, 1976, a Southwest side parent protested the inequitable provision of transportation to majority voluntary desegregation students and minority mandatory desegregation students. The minutes of the Committee read:
Mrs. Florence Ausler, a parent, said since the district provides free transportation for elementary and middle school children in integration programs, all high school children in the southwest quadrant should have free transportation because there is no high school in that area. “That 40 cents a day per child is killing us on the southwest side,” Mrs. Ausler said.
B3824.
In September of 1982, Henrietta Washington told the Board she represented fifteen mothers upset with the Board’s busing policies for high school students. Ms. Washington stated that eight years after the voluntary desegregation plan the RSD had one-way busing. She believed that the transportation burden was on the minority community and that the Board policy of requiring *1165 some Westside students to take city buses to Eastside high schools was costly to the family. Bd.Min., 9/28/82, B506488.
Beyond the cost factor, qualitative differences between transportation by the RMTD and transportation by yellow school bus existed. Travel by the RMTD for mandatory desegregation students meant crowded conditions, with many more students than bus seats. Superintendent Bowen explained:
Well, they had what they call trippers, where the mass transit would have several buses lined up there and pack the kids in. If there was seats for 30, they’d have 80 and drive to East High School. And when I complained about that, one guy actually told me, well, if it tipped over, it’s better off to have more kids in there because they wouldn’t get as hurt when it rolled around. They wouldn’t tip.
Bowen Dep. at 103.
Travel by the RMTD also meant a longer trip for minority mandatory reassignment students because of the need to transfer buses. Id. at 102-104. Superintendent Bowen testified that due to the public transportation rule, students on the Westside had to walk to the bus, ride downtown to the transfer point and then get on another bus out to East High School. The entire process from home to the bus line to the transfer point to East would take an hour and a half. Id. at 103-104. The situation was even worse for those students who wished to go to the Vocational Center. These students had to go through all of the transfer steps from the Southwest Quadrant to East High School and then take a special bus from East to go out to the Vocational Center. Id. at 104. In order to accommodate the increase in transportation time occasioned by having to transfer buses, minority students mandatorily reassigned to Eastside schools had to wake up especially early. Id. Moreover, because public transportation to the Eastside high schools was only available immediately after the end of the school day, the students riding the RMTD bus back to the Southwest side were impaired in their ability to participate in extracurricular activities. Id. at 138.
Transportation Costs As Pretext For Anti-Busing Stance
The RBE members and the RSD top administrators have, over the years, opposed mandatory busing using the purported justification that the transportation costs for mandatory busing were prohibitive. Despite this stated reason, the RSD provided Board-paid transportation for many reasons including: mandatory busing for purposes other than desegregation; mandatory busing of minority students; and busing for white voluntary desegregation transfers. In fact, the RSD’s transportation of students increased precipitously over the past three decades, thus exposing the RSD’s cost concerns as pretextual. The RSD’s opposition to mandatory busing for desegregation was, in reality, opposition to forced busing of white students for desegregation purposes.
Over the years, the RSD cited the cost of transportation as prohibitive of mandatory busing for integration purposes. Cost was offered as a factor in opposition to mandatory busing for integration purposes despite the RBE’s knowledge that most transportation costs were reimbursable by the State. In November of 1973, in response to a survey regarding the community’s opinion on various desegregation plans, Director of Integration Oscar Blackwell said that the plan for 7% to 21% minority enrollment at all schools was most likely impossible because of the transportation problems and costs. B506294. In February of 1975, the RBE prepared and presented to Judge Bauer and the ISBE its “Recommendations for Student Housing in 1975-76 and Proposals for the Integration of the Rockford RSD #205.” This document was prefaced by a statement from the RBE that “the transportation fund will permit little, if any additional transportation of students for the next school year.” In December of 1976, Superintendent Johnson told representatives of several community groups that “finances will determine the progress of integration in Rockford Public Schools.... If we don’t have the money for transportation, then we’ve got to pull the ring in, so to speak.” B506426. In a special meeting of the Board on January 19, 1988, the Board discussed the program delivery study. *1166 Board President Kearny asked if transportation costs were involved in the delivery study. Don Erickson responded that transportation costs were not considered because most in relation to transportation were reimbursable. B20892.
Despite its purported concern with the cost of transportation for integration purposes, the RSD transported an increasingly greater percentage of the student population since 1968. The RSD’s figures show that during the period 1968 to 1986, the RSD’s provision of transportation increased from 4% of the student population transported in 1968 to 60% transported in 1986. B24848-B24849. Board minutes from May 2, 1988 established that in 1988, the RSD was still transporting 60% of the student population. Bd.Min., 5/2/88, B21145. In fact, during the period of time from 1980 to 1986, when the RSD retreated on integrative measures, the RSD’s provision 'of transportation actually increased at a rate greater than the entire preceding eleven year period. The period 1968-1979 showed an increase in Board-paid busing from 4% of student population in 1968 to 24% in 1979. B24848-B24849. In the period 1980-1986, Board-paid transportation increased from 28% of student population in 1980 to 60% in 1986. Id. The RSD prepared a graph that illustrated this rapid increase in Board-paid transportation from 1980 to 1986. Id. (Figure 2).
*1167 [[Image here]]
*1168 None of the transportation figures represent mandatory busing of white students for integration purposes as white students were never involuntarily bused for this reason. The transportation figures, however, do represent Board-paid busing for many other purposes, including voluntary busing of students for integration purposes and a publicly unknown practice of providing privileged transportation services, or “privy stops,” discussed below.
Comments and actions from Board members and top administrators over the years indicated that the RSD was willing to provide transportation for purposes such as overcrowding, safety, annexation and voluntary integration movement. Also, in at least one instance where the RBE opted to forego transportation, the Board did so where the transportation would have constituted mandatory busing of white students into minority schools, even though the cost of foregoing transportation was greater than the cost of the transportation itself. The following findings illustrate the RSD’s willingness to transport for any reason other than mandatory integration movement of white students.
In May of 1968, Assistant Superintendent Dr. Herbert Smith and Superintendent Sha-heen stated that the purpose of busing was to relieve crowding, not necessarily to achieve racial balance. B506101. In July of 1969, in a move aimed at integrating schools and reducing overcrowding, the Board voted 4-2 to move approximately 150 minority students from public housing areas to elementary schools outside of their neighborhood. The Jane Adams Village students were bused to Carlson School and the Fairgrounds Housing Project students were bused to Walker School. B506135; Bd.Min., 7/10/69, B12224-B12225.
At its Board meeting of August 11, 1969, a motion was made and passed authorizing Board-paid transportation for two groups of students: students from an annexed district and students affected by the pilot project at Walker and Carlson Schools. Bd.Min., 8/11/69, B12267. In June of 1970, the RBE unanimously voted to move the Carlson students back to their neighborhood schools. The Board voted to extend for one year the busing program at Walker School only because there was no room in the neighborhood schools for students from the Fairgrounds Housing Project who were being bused to Walker. Bd.Min., 6/22/70, B12682.
For safety reasons, the RBE closed Montague School in the Southwest Quadrant, after intense protest from the minority community, and agreed to bus students free of charge to Page Park School for the 1971-72 school year. The busing had nothing to do with busing for integration purposes. B506180.
At a special meeting of the RSD in September of 1973, Dr. Michael Bakalis of the ISBE responded to the RBE’s resistance to an involuntary desegregation plan. Dr. Bak-alis stated: (1) transportation of students is not foreign to Rockford or to the State of Illinois; (2) students have been transported since 1945 in vehicles everyday going back and forth to school and that is not anything new or made up by the courts; (3) the majority of the communities in Illinois that bus students have nothing to do with desegregation; and (4) when you say you don’t want transportation, we can empathize, but it is not appropriate or accurate to say that students are not transported. In response to Dr. Bakalis’ comments, Board member Ronald Webster stated that there was a difference between transportation and forced transportation. Dr. Bakalis replied that after the consolidation of schools through annexation, transportation was forced. B14035.
In January of 1980, the RBE unanimously voted to buy the Lou Bachrodt Chevrolet Dealership for 1.4 million dollars. The District did so in order to operate its own bus system out of the facility. With this purchase, the RSD made a commitment to run its own bus service for regular and vocational-education students, starting with the 1980-81 school year. B506461.
At a RBE meeting in January of 1981, when the Board was discussing whether to close Roosevelt School, Darlene Hanna, a parent of a student at Roosevelt School, pointed out to the Board that no busing was necessary at Roosevelt. Roosevelt was the only school that was naturally integrated. B16951. Despite the fact that closing Roosevelt would create additional transporta *1169 tion burdens where none otherwise existed, the RBE voted in February of 1981 to close Roosevelt. Bd.Min., 2/18/81, B16963.
Similarly, in 1989, the RBE adopted its Reorganization Plan that called for the closing of naturally integrated West High School. The RBE closed West High School despite the fact that West required less transportation than the other high schools in the district. Over a five-year period, the decision to close West instead of, for example, Jefferson High School, cost the district $2,118,948 in additional transportation costs.

Additional Transportation Inequities (“Privy Stops”)

Prior to 1989, the RSD developed an unpublicized system of privileged transportation stops. Bowen Letter to Sullivan, B46283. These “privy” stops, as they were called, constituted an exception to the regular transportation policy that permitted transportation of a student who lived 1.5 miles from both a RMTD stop and a school. “Privy” stops were also an exception to the rule that students were required to walk up to six blocks in order to take a yellow bus. Id.
Privy stop practice allowed a student who would not otherwise qualify for transportation, or who would otherwise be required to walk to a designated bus stop, to receive transportation or to receive transportation pick-up at a location contrary to the six block rule. Id. The granting of privy stops was a wholly subjective process. The RSD’s transportation consultant, Michael Turza, reported: “No set criteria or guidelines were established for adding these stops.” Id.
The result of the privy stop practice was a little known system of privileged transportation that disproportionately benefited students whose parents were knowledgeable and articulate enough to request and pursue special treatment with regard to transportation. Privy stops were granted in response to parent requests and/or complaints. B46283. The highest number of privy stops was in the Spring Creek Elementary School area on the Northeast side, with nineteen privy stops in that area. Sullivan Dep., Ex. 5, B507294. The second highest number of privy stops was in the Bloom Elementary School area, also on the Northeast side, with sixteen privy stops. Id.
*1170 [[Image here]]

*1171
CONCLUSIONS OF LAW

Transportation is one of the “Green factors” used to determine whether a school district is operating a dual system. Transportation, and its attendant burdens must be operated in a unitary and non-discriminatory fashion. Clearly, a school district may not intentionally allocate inferior services or equipment to minorities. See, Carr v. Montgomery Bd. of Educ., 289 F.Supp. 647, 655 (M.D.Ala.1968), aff'd, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).
In school districts implementing desegregation programs, transportation policies that unduly burden minority students are unlawful. Lansing, 429 F.Supp. at 620. Desegregation must not be effectuated solely, or even primarily, by transporting minority students to majority schools. Diaz v. San Jose Unified School District, 861 F.2d 591, 596 (9th Cir.1988); Parent Ass’n of Andrew Jackson High School v. Ambach, 598 F.2d 705, 717 (2nd Cir.1979). Such one-way busing programs place the burden of desegregating a school system disproportionately on minorities and have the effect of maintaining a neighborhood school policy a reality for majority students, while making such a policy chimerical for minorities. As a result, courts must closely scrutinize charges that the burdens of desegregation have been distributed inequitably. Id.
Unequal burdens must not be borne by certain racial groups unless a compelling justification is present. Diaz, 861 F.2d at 596; United States v. Lawrence County School Dist., 799 F.2d 1031, 1049 (5th Cir.1986); Higgins v. Bd. of Educ. of City of Grand Rapids, 508 F.2d 779, 793 (6th Cir.1974). Whether a group is burdened impermissibly turns on “the validity of the Board’s justifications for its proposals and the availability of feasible alternatives” to the objectionable measures. Diaz, 861 F.2d at 596; Arvizu v. Waco Independent School District, 495 F.2d 499, 504 (5th Cir.1974); see also Keyes v. School Dist. No. 1, Denver, 521 F.2d 465, 479 (10th Cir.1975). Courts have condemned one-way busing plans that ignore other opportunities to achieve integration and place the burdens of integration solely on minorities. Lansing, 429 F.Supp. at 620; Brice v. Landis, 314 F.Supp. 974, 978 (N.D.Cal.1969). Even if the motivation for instituting such plans is not pernicious, the plans are nonetheless impermissible. Lansing, 429 F.Supp. at 621.
The RSD’s longstanding practice of requiring the mandatory assignment of minority students to schools outside their neighborhoods for desegregation purposes, while imposing no similar burden on white students, was unfair, impermissible and unconstitutional. The RSD persisted with its practice of one-way busing despite widespread protests from the minority community. The transportation policies adopted by the RSD restricted and discouraged open enrollment and transfer to full-site focus centers.
Furthermore, the RSD discriminated against minority students by providing more generous transportation services to voluntary integration students, predominantly majority students, as opposed to involuntary integration students, predominantly minority students. Minority secondary students were required to bear the cost of RMTD transportation and to suffer the qualitative differences of transportation from the transportation provided to majority students. The RSD’s invocation of transportation costs as a justification for its anti-busing stance was pretextual. The RSD’s opposition to mandatory busing for desegregation purposes was, in reality, opposition to the forced busing of white students for desegregation purposes. The RSD also unlawfully developed an unpublicized system of preferential transportation services that benefited white students.

DISCRIMINATORY CONDITIONS IN THE COMPOSITION OF THE BOARD

INTRODUCTION

The minority community and the Southwest Quadrant have been severely underrepresented in the makeup of the Rockford Board of Education. From 1965 to 1989 only two Board members resided in the Southwest Quadrant. From 1965 to 1989 only three Board members were African-American and none were Hispanic.
The RBE intentionally maintained an electoral system that it knew would minimize minority participation on the Board. Sub *1172 stantial evidence exists showing that the RBE, from 1965 through 1989, intentionally pursued a policy to keep the Southwest Quadrant underrepresented on the Board.

FINDINGS OF FACT

Board Members: 1965-1989
From the time of the first elected Board in 1965 until the filing of the present suit in April 1989, a disproportionate number of RBE members resided in the Northeast Quadrant. This geographic underrepresentation resulted in severe minority under-representation on the RBE and a concomitant dominance on the Board of opponents of busing for integration during the critical 1970⅛. Additionally, the underrepresentation of elected minorities was aggravated by the RBE’s manipulation of appointments to preclude or minimize Southwest/minority representation on the RBE.
Basic information
Prior to 1965, the RBE members were appointed by the Mayor of Rockford. Bd. Min., 10/28/63, B009228. On numerous occasions in 1963, the RBE discussed changing the method of Board member selection from appointment by the Mayor to election at-large. See, e.g., Bd.Min., 11/26/63, B009249; B009260; Bd.Min., 1/13/64, B010499. In January 1964, the RBE adopted a resolution to place on the ballot of April 14, 1964, a proposition to elect School Board members. Bd. Min., 1/13/64, B010499. In that election, the voters passed the referendum for the election of Board members at large. Bd.Min., 4/27/64, B010614. The first elected Board Members were then chosen in the April 1965 election. Bd.Min., 4/12/65, B011006.
Board members elected and appointed (to fill vacancies) from 1965 through 1989 were as follows:
1965 Carlson, Harris, Severin, Thompson, Hollingsworth, Zaugg and Shafer elected.
1966 President Clifford Carlson reelected; John Floden elected.
1967 Marcella Harris reelected; Robert Taylor elected.
1968 Monte L. Atkinson, Harry E. Olson elected; Ben Zaugg reelected. Harry Olson resigned.
1969: Ben Zaugg resigned; an election held in April to replace the two resigned Board members and to fill vacancies for two expired terms of Board members. R. Page Reese, John Floden, Dr. John Schade and Robert Spangler elected to three and two year terms.
1970: Harold Seeber, Robert Cook, Edward Calhoon and W. Crawford Tucker elected.
1971: David Gustafson elected.
1972: David Hauman and Alice Heath elected to three year terms.
1973: Ronald Webster and Harold Seeber elected for three year terms.
1974: Richard A. Rundquist, Harry W. Darland and R.R. Dick Parrott elected to three year terms.
1975: Robert Beck, David Peterson and Mary Lou Yankaitis elected.
1976: Harold Seeber reelected; Delores Nilson elected.
1977: Dick Parrott and Richard Rundquist reelected; Carol Parker elected.
1978: Harry Darland and Colleen Homebeck elected to three year terms.
1979: Delores Nilson and Harold Seeber reelected to three year terms; Robert Niemann elected to a one year term.
Carol Parker reelected; Robert Bates and Donald Goldman elected. to 00 o
Donald Goldman resigned and Carl Towns appointed. Colleen Holmbeck and Dr. Harry Darland elected to four year terms; and Carl Towns elected to two year term. to 00 t—[1]
1982: Dr. Robert Bates resigned. Norman Kearney appointed. Harry Darland submitted his resignation. Randy Sturm appointed.
*1173 1983: Norm Kearney, Edward Conklin, Darlene Hanna, Robert McCarthy, Steven Imholt and Helene Price elected.
1985: Steven Imholt resigned. Michael Williams appointed. Jacqueline Confer, Terry Hodges, Robert McCarthy and Michael Williams elected.
1987: Robert McCarthy dies; Avery Gage appointed. Jo Minor and Mr. George Stevens elected.
School Board President Norm Kearney resigns. 00
Jacqueline Confer, Charles Holzwarth, Sara Ingrassia, Fred Wham and Terry Hodges elected. 05
Figure 1 shows the composition of the RBE from 1965 to 1989.
*1174 [[Image here]]
*1175 Board Member Residency
From 1965 to 1989 Board members resided in the following Quadrants of Rockford:
27 Board members resided in the Northeast Quadrant;
6 Board members resided in the Southeast Quadrant;
15 Board members resided in the Northwest Quadrant;
2 Board members resided in the Southwest Quadrant.
Figure 2 shows the geographic representation of the RBE from 1965 to 1989.
Defendant has stipulated to this Figure/Table.
Figure. 2 Map Key
RBE Member Residency by Quadrant (1965—1989)[1]
NW (15 people)
R.E. Hollingsworth
Frances Shafer
Ben Zangg
R. Page Reese
Robert Spengler
John Schade
David Gustafson
Dick Parrott
Robert Berk
Marylou Yankaites
Ed Conklin
Darlene Hanna
Jacqueline Confer
George Stevens
Terry Hodges
SW (2 people)
Marcella Harris
Michael Williams
SE (6 people)
Montie Atkinson
Robert Cook
David Peterson
Dolores Nelson
Carl Towns
Terry Hodges
NE (27 people)
Clifford Carlson
Armer Severin
John Pheden
Sanwel H. Thomson
Robert Taylor
Edward Calhoun
W. Crawford Tucker
Hardd Seeley
David Hauman
Ron Webster
Alice Heath
Harry Darland
Richard Rundquist
Carol Parker
Colleen Holmbeck
Robert Nieman
Robert C. Bates
Stephen Inholt
Avery Gage
Fred Wham
Sara Ignassia
Donald Goldman
Norm Kearney
Robert McCarthy
Helen Price
Jo Minor
Charles Holzwarth
Hairy Olson and Randy Strum not accounted for, addresses not found.
Terry Hodges counted twice, changed residence from Southeast to Northwest in 1989.
Board Member Race
Although minorities constituted an increasingly greater portion of the RSD from 1965 to 1989 (10% in 1967 to 25% in 1989), an overwhelming percentage of Board members were white. Marcella Harris, Carl Towns and Michael Williams were the only African-American members on the RBE from 1965-1989. No Hispanics ever served as members of the RBE. Hiram Gregory Luna, an Hispanic and former member of the School Desegregation Committee, was a candidate for the RBE in 1973. He lost the election to Dr. Harold Seeber, an anti-bussing candidate supported by the Community Education Committee. Of the 175 Board member years from 1965 to 1989 (25 years times 7 board seats), only 12 and one-half years, or 7%, have been served by African-Americans, and zero by Hispanics.[34]
*1176 Figure 3 shows the racial makeup of the RBE for the years 1965 to 1989.
Board member for 4 years and 9 months (March 26, 1985 to November 1989).
No non-incumbent African American candidate was ever elected to the RBE during the period 1965-1989. Marcella Harris was elected after her initial appointment by the Mayor. Michael Williams was elected after his initial appointment to fill a vacancy on the RBE. Carl Towns was elected after his initial appointment to fill a vacancy on the RBE.
*1177 [[Image here]]
*1178 Electoral System: The RBE’s Role In Maintaining An Electoral System That Had A Disparate Impact On Minority Representation On the Board Of Education
At present, Rockford School Board members are elected by geographic subdistrict. Though the Illinois statute authorizing election by subdistrict was first passed eighteen years ago, the first election of Board members by subdistriet in Rockford was held in November 1991. Over the years, beginning as early as 1978, the Board received recommendations from minorities, county officials, its own advisory committees and others that election by geographic subdistrict was necessary to “broaden the democratic base of Rockford’s educational system” and to correct the virtual nonrepresentation of minorities on the Board under the existing at-large election system.
In mid-November, 1972, as part of its discussions relating to school desegregation, the Board of Education created an Advisory Committee to prepare a study and report on a system of electing Board members by geographic subdistrict. The basic tenant of the study was that geographic elections would facilitate a broadening of the democratic base of Rockford’s education system. The Advisory Committee’s conclusion was that election by geographic subdistrict would enable “minorities to be more effectively represented.”
On December 10, 1973, the Advisory Committee submitted its finished report to the Board regarding election of Board members by geographic district. Despite Committee member comments in July to the contrary, the Committee concluded that the election of School Board members by geographical area “was a step in the right direction” to broadening the democratic base of Rockford’s education system. The Committee submitted its final report to the Board on December 10, 1973. The Committee’s report enumerated the following list of pros and eons of geographical representation:

Pros

(1) Minorities will be more effectively represented.
(2) More citizens will be interested in running.
(3) Campaigning will be easier and less expensive.
(4) Pressure groups’ ability to dominate will be minimized.
(5) Board members will be accountable to specific constituents.
(6) People will have a more direct involvement in both:
(7) The election of their representative;
(8) Working with their representative.
(9) Elections will be less partisan and less expensive to conduct.

Cons

(1) A Board member will tend to represent only his/her district.
(2) All minorities will not be represented.
(3) District boundaries will change periodically and therefore cause confusion.
(4) Citizens will vote less often in voting by district.
(5) Pressure groups will be better able to dominate.
B506362. After consideration of these pros and cons, the Committee stated: “[W]e affirm the principle of election by geographic areas ... and we recommend that the Board request our local legislative representation to initiate ... legislation_” Id.
In February of 1973, a subcommittee appointed by the RBE to study desegregation proposed a seven point desegregation plan to the Board. Part one of the plan related to school governance. That section of the plan stated:
[The condition of segregation] is directly attributable to the present school electoral process: At Large School Elections. It is our feeling that this process in itself is discriminatory. In this regard, we make the following recommendations: (a) that the Rockford School District No. 205 move toward electing its School Board Members by geographic sub-divisions, rather than at-large; (b) that a committee be set up by the Board of Education, composed of the Superintendent, teachers, and parents, (selected from the four quadrants), to investigate and make recommendations regarding Board selection by districts; (c) that *1179 this process be begun immediately, upon acceptance of the School Desegregation Plan.
B003003, B003010.
At its meeting of February 21, 1973, the RBE received the desegregation proposals of numerous groups, including a group representing the Latin American community. Among other things, the Latin American group proposed that election of School Board members be by geographic subdistrict. No action was taken by the Board.
On April 2, 1973, the Central Committee on Desegregation (steering committee for the Community Desegregation Committee) presented to the RBE its recommendations. As part of its recommendations, the Committee urged the RBE to consider the election of Board members by geographic subdistrict for the April 1974 election. No action was again taken by the Board.
In 1975, a second Advisory Committee was appointed by the Board to again study the pros and cons of election by geographic sub-district enumerated by the 1973 Committee. The second Advisory Committee studied the election returns from all School Board elections since before the District became at-large in 1965. The Committee also did a demographic study of all the School Board candidates since 1965. Still no action was taken by the Board.
In August 1984, more than fifty Southwest residents met with Superintendent Mell Grell. The meeting was sponsored by the Booker Washington Center and was composed of minority organizations. The minority organizations expressed to Grell their concerns about minority under-representation on the School Board and in the school system.
Despite numerous attempts,[35] the RBE only once placed the issue of election by subdistrict on the ballot. Then in 1989, 10% of the electorate placed the issue on the ballot by petition and the referendum for election by subdistrict was finally passed.
RBE Gerrymandering of Subdistrict Electoral Boundaries[36]
Subsequent to the November 1989 referendum, the Board adopted an electoral map that interfered with the voting and representational rights of minority voters in the District. Also, after passage of the subdistrict referendum in November 1989, and prior to the first election by subdistrict in November 1991, Board member Holzworth, on several occasions during Board or Board committee meetings, urged the RBE to gerrymander the new subdistricts to avoid creating a sub-district with a majority of African-Americans.
Holzworth further objected to hiring someone to draw the districts. He stated that he could draw them himself if he was given a pen. Holzworth also wanted to pick people in the community to draw them. Additional *1180 ly, Holzworth made comments to the effect that he would not be responsible for creating a minority district. Mr. Holzworth believed that no such district should be created. Minor Dep. at 45; Confer Dep. at 104-106.
On more than one occasion, Holzworth stated that if the boundaries were drawn correctly no minority candidate would win a board seat. He again offered to draw districts that could accomplish this result. Minor Dep. at 47; Confer Dep. at 106. In the fall of 1991, while the issue of the electoral map was pending in this court, Holzworth stated that he didn’t want to have “a district where an ignorant black could be elected,” and that the subdistricts could be gerrymandered to avoid such a result. Minor Dep. at 48; Confer Dep. at 105-106, 114.
Although other former Board members have subsequently disavowed any sympathy for Holzworth’s position, the RBE did, in fact, adopt an electoral subdistrict map that did not create a subdistrict with a majority of African-Americans and that fractured the African-American community. The map was adopted by the RBE as drawn despite the fact that it was possible to create a subdis-trict with a majority of African-Americans.
On May 21, 1991, the RSD adopted the proposed subdistrict electoral map for the election of Board members by subdistrict and submitted it to the court for approval. Plaintiffs filed an alternative electoral map with the court on July 15, 1991. This alternative map created a subdistrict with a strong African-American majority of total population and a 50% African-American voting age population.
On September 12, 1991, Judge Stanley J. Roszkowski made the following findings of fact:
The African American community in School District 205 is sufficiently large and geographically compact to constitute a majority in a single subdistrict.
The census figures demonstrate that almost 70% of Rockford’s African American population resides in a geographically contiguous and cohesive area in the southwest quadrant of Rockford. Within the borders of the African American community live approximately 25,671 persons, of whom approximately 15,489 (60.37%) are African-Americans.
Using the average subdistrict size of 25,-884, there is ample population within the African American communities to form a subdistrict with a total population over 60% African American and a voting age population over 50% African-American.
Despite these facts, the Defendant by its map failed to create a single subdistrict with a voting age population over 50% African-American.
No subdistricts under the Defendant’s Map contained even an African-American majority of total population.
Under the Defendant’s map, the African-American population was “fractured” and significant groups of African-American voters were separated from contiguous African-American communities and assigned to white majority subdistricts.
Under the Defendant’s Proposed Map, the African-American community in the southwest quadrant was divided among three subdistricts that contain a large white majority of both total and voting age population and one subdistriet that is comprised of 47% white voting age and 39% African-American voting age population.
The African-American community is politically cohesive. African-Americans tend to vote as a group and to vote for African-American candidates.
The African-American community is subject to majority bloc voting against its candidates. In addition to lay witness testimony in this regard, the evidence is that no non-incumbent African-American candidate has ever been elected to the School Board.
There exist significant additional social and historical factors which interact with the Defendant’s proposed fracturing of the African-American community to cause minority vote dilution.
These additional factors include lower income levels, depressed housing conditions, and school segregation, for African-Americans in Rockford.
These additional factors are supportive of Plaintiffs’ claim of minority vote dilution.
*1181 In its September 12, 1991 Order, the court held that the evidence “suggests a reasonable possibility that electoral subdistrict boundaries can be drawn which comport both with the dictates of the Voting Rights Act, and with the state law requirements and the federal legal norms of compactness and contiguity.” The court then ordered the parties to immediately commence a joint effort to conform subdistrict boundaries to the requirements of Section 2 of the Voting Rights Act and Section 7-4(c) of the Illinois School Code. In sum, the court ordered the parties to create a map that would contain:
a. a subdistriet with a voting age population over 50% African-American;
b. a second subdistrict with a significant concentration of African-American and other minority voters;
e. no subdistrict which has an “excessive majority” of African-Americans (in line with Thornburg v. Gingles, 478 U.S. 30, 46 n. 11 [106 S.Ct. 2752, 2764 n. 11, 92 L.Ed.2d 25] (1986)); and
d. subdistrict boundaries which circumscribe only territories which are “compact and contiguous”, as that phrase is defined under Illinois law.
On September 23,1991, the parties submitted to the court a joint electoral map. The joint map created a subdistrict with a voting age population over 50% African-American; a second subdistrict with a significant concentration of African-American and other minority voters; no subdistrict with an excessive majority of African-Americans; and subdistrict boundaries that circumscribed only territories that were compact and contiguous. On October 18,1991, the court subsequently approved the parties’ joint map as meeting the legal requirements of the Voting Rights Act in that, as drawn, it did not diminish or defeat the representational rights of African-American voters.

CONCLUSIONS OF LAW

The court finds that the RSD pursued an intentional policy to keep minorities off the Board. The RSD did this in two ways. It unlawfully manipulated appointments to preclude or minimize minority representation. It further refused to allow election to the Board by subdistricts. By keeping election to the Board systemwide, the RSD assured that the Board would be white dominated. The actions of the Board subsequent to 1989 repugnantly display this intent to the court.

EXTRACURRICULAR ACTIVITIES

INTRODUCTION

As Defendant has pointed out, literally hundreds of minority students in the RSD have excelled in football, basketball, baseball, and other sports. This includes both male and female students. Plaintiff does not challenge this fact. If given equal opportunity, minority students have faired well, if not excelled. The evidence indicates that minority students were not at all times given an equal opportunity. Two specific examples of such discrimination were the RSD’s transportation policies and the selection of students for activities such as the cheerleader squads.

FINDINGS OF FACT

Desegregation Transportation Policies
The RSD had a desegregation policy that involved the mandatory busing of minority students. This policy forced minority students away from their neighborhoods. School buses would operate based upon the normal school day. For the most part, the buses would not run in late afternoon or early evening. Therefore, if minority students wanted a ride back to their neighborhood, they would have to take the school bus home when the normal school day was over. Without access to alternate transportation, they could not participate in after-school activities.
Superintendent William Bowen testified that when he was principal at East High School, mandatory reassignment students attending East were effectively precluded from participating in extracurricular activities by virtue of the fact that mass transit transportation was not available after regular school hours and the RSD did not provide buses for after-school activities. No activity buses were provided by the RSD to allow minority participation in extracurricular activities. Bowen Dep. at 138-139.
*1182 Several witnesses testified on behalf of Plaintiffs attesting to this fact and the resulting problems. Mr. Ousley Walker, an African-American, testified that he participated in a multi-racial parents group at East High School in 1973. One of the problems the group attempted to address was the lack of African-American students in extracurricular activities at East. Walker Dep. Ex. at ¶ 9. Linda Brown, an African-American female, had two children who attended the Rockford Public Schools. Ms. Brown enrolled her daughter, Eleanor, through the open enrollment program at Maud Johnson Elementary School. She testified that it was “impossible for Eleanor to join in after school activities because her school bus left right after class.” Brown Dep. Ex. 1 at ¶ 14. Sidella Hughes testified that her children were bused to Brookview School in the Northeast Quadrant. Her children were unable to participate in certain programs since those programs “began 15 minutes after buses left the school to return children to the west side.”
Finally, Alicia Benford, an African-American female who was mandatorily assigned to Guilford High School and graduated from Guilford in 1991, testified that “because I rode the school bus, I was prevented from joining many of the extracurricular activities at Eisenhower and during my first two years at Guilford.” For example, she testified, “I wanted to join the Student Council at Guil-ford, but I did not try because the group met after school and if I stayed for a meeting I may not have had a way home.” Benford Dep. at 11.
Despite RSD recognition of the transportation problem faced by desegregation students desiring to participate in extracurricular activities, the lack of transportation remained an obstacle to minority access to after-school programs. As early as 1974, the Board recognized that lack of transportation diminished minority access to extracurricular activities. The Board discussed transportation for desegregation students who wished to participate in intramural events. According to the handwritten notes of the meeting, the following alternatives were proposed: (a) one bus was to come early and another to come later; (b) one late bus going to several schools; and (e) one additional late bus for one school only. B34059. Despite the Board’s early recognition of the problem, lack of transportation has remained in recent years an obstacle to extracurricular participation by minorities involved in movement for desegregation.
In response to a drop-out study presented to the Rockford Board of Education by the Research and Development Committee on April 12, 1988, minority Board member Mike Williams pointed out that extracurricular activities are less accessible to students who are at high risk of dropping out (minorities). He attributed the inaccessibility to lack of transportation. Williams noted that parents wanted their children to participate in after school activities but lacked transportation for such activities. Bd.Min. 4/12/88, B21080; Williams Test., Tr. 2364.
Historical Discrimination In The Selection of Cheerleaders
RSD Superintendent William Bowen testified regarding the entrenched nature of racially exclusive cheerleader squads at East High School in the 1970’s. When Mr. Bowen first became principal at East in the 1970’s, “one of the huge issues” for African-American parents and African-American students in terms of unfair treatment was the fact that there were no African-American cheerleaders. The cheerleader selection process in the 1970’s was such that all the judges were white and the white girls “had a farm system.” Bowen testified: “[Tjheir sisters were cheerleaders, their neighborhood had a cheerleader, they taught each other the cheers that were used in the selection process. They knew what to do. They knew how to do those cheers. They were trained, and so consequently when they tried out they would do better.” Bowen 1992 Dep. at 71-72.
In connection with the multi-racial parent committee at East, Bowen changed the cheerleading faculty advisors the second year, developed a new judging process intended to be more objective and offered workshops for children in minority neighborhoods so they could learn the cheers. Bowen’s acts of changing the faculty advisor and changing the selection process, were both signals that he, as the school’s principal, wanted to change the racial composition of the cheerleading staff. He also sent a lot of *1183 other signals showing that the intention of these changes was to have some African-American cheerleaders, and “everybody knew that this was a big issue in the school.” Despite the change in procedures, the result was the same—all white cheerleaders. Id. at 73-74.
At that point, even though the Athletic Conference rule was a maximum of six cheerleaders, Bowen increased the number to eight and put two African-American cheerleaders on the squad. Bowen testified that once on the squad, they were competent cheerleaders, as good as anybody else. Id. at 74, 77.
Bowen further testified that his integration of the cheerleading staff was “not universally accepted” by the school staff. Staff members thought he had unfairly advantaged the minority cheerleaders to the detriment of the traditional selection process, the same process that resulted in all white cheerleaders. Some staff members were angry about Bowen’s actions. Next year, Bowen put the African-American members of the faculty on the cheerleader selection team, provided more training for minority students and invited parents to come and watch the selection process. That year the selection process resulted in two or three African-American cheerleaders out of eight. This integration of the cheerleading squad remained during Bowen’s tenure as principal. Id. 78-79. • Based on his experience at East and later as Director of Secondary Education, Bowen testified that the same racial disproportion problems existed at other RSD high schools. Id.
Former Auburn High School student Gwen Robinson, an African-American, also testified regarding the racial identifiability of the cheerleading squad at Auburn. Before 1964, Auburn, like other Rockford high schools, had a history of whites-only cheerleading teams. Ms. Robinson testified that during her middle school years, all of the older neighborhood minority girls who tried out for high school eheerleading were rejected and were consistently rejected over the years, despite their selection to cheerleading squads at the junior high level. When Ms. Robinson tried out during her junior year (1964), some members of the boys’ basketball team threatened to boycott practice the day of the tryouts and threatened to quit the team if she was not selected as a cheerleader. The selection process involved instructors “walking among us and watching us, and then they began to week out those who they felt were not qualified ... What was interesting is that when they finally got the group down to, I would say, a magic number of, I am not sure what that number was, I was the only minority or black participant left.” Robinson Dep. at 7-8.
Ms. Robinson’s selection to the team was a major event in Rockford, gaining newspaper coverage. The selection process and her participation on the team, however, were not without incident. When Robinson was selected to the cheerleading team, her family and she received death threats and harassing phone calls at her home. “I remember callers saying that I had better not show up to cheer at particular schools. Another caller told me that he didn’t want to see a ‘nigger messing up the cheers.’ ” Robinson Dep. Ex. at ¶ 9.
When the Auburn cheerleaders went to other schools, they were frequently jeered and booed by people in the stands. The cheerleading coach would not allow the girls to do flips because people “had complained to the coach that they did not want to ‘see some nigger girl’s ass.’ ” Id. at ¶ 10. After she made the squad, Robinson was treated differently from the other cheerleaders by the RSD staff. She was told by the staff at Auburn High School that she would not be going to the cheerleading camp at Williams Bay since her parents could not afford the clinic. She attended the camp, nonetheless, since her parents, in fact, could afford to send her there. Id. at ¶ 11.

CONCLUSIONS OF LAW

A unitary school system extends beyond the classroom to extracurricular activities. Green v. County School Bd. of New Kent Co., Va., 391 U.S. 430, 435, 88 S.Ct. 1689, 1692-93, 20 L.Ed.2d 716 (1968). Segregation or discrimination in extracurricular programs is unlawful. See Arvizu v. Waco Independent School District, 732 F.Supp. 721, 725 (W.D.Tex.1989). The full range of extracurricular programs is subject to strict scrutiny. See, Quarles v. Oxford Municipal Separate *1184 School Dist., 868 F.2d 750, 757 (5th Cir.1989) (school musical); Arvizu, 732 F.Supp. at 724-25 (cheerleader tryouts).
Every child, no matter their color, should have the opportunity to participate in all activities offered by a public school system. The RSD allowed subjective selection criteria to be used in connection with a student’s participation in certain extracurricular activities. This subjective selection criteria resulted in racial identifiability and underrepresen-tation of minorities in these extracurricular activities. No barrier to participation in extracurricular activities based upon a child’s skin color may exist. .
Further, the RSD’s desegregation policy of busing minority students away from their neighborhoods while retaining neighborhood schools for white students, coupled with the RSD’s policy of refusing to provide after-school transportation services to the bused minority students, resulted in the inability of minority students to participate in after-school events due to a lack of transportation home. The RSD has a legal obligation to see that this type of discrimination does not continue.

BILINGUAL EDUCATION AND OTHER EDUCATIONAL DISCRIMINATION ISSUES AFFECTING HISPANICS

INTRODUCTION

The RSD engaged in discriminatory conduct against Hispanie-American students with regard to the District’s Bilingual Program and with regard to other educational issues. The discriminatory actions of the RSD included the following:
1. Involuntary movement of bilingual students for desegregation purposes while imposing no involuntary transfer burdens for desegregation purposes on white students;
2. Segregation of bilingual students within receiving schools;
3. Provided transportation for bilingual students that was qualitatively inferior to the transportation provided to voluntary white desegregation students;
4. Refused to provide bilingual special education programs for Hispanic-Americans while providing special education programs for English-speaking students; and
5.Provided lower quality education to bilingual students as compared to white students.

FINDINGS OF FACT

Disproportionate Desegregation Burdens Placed On Hispanie-American Students
Like other minority students, Hispanies in the Bilingual Program were mandatorily reassigned for desegregation purposes while white student participation in desegregation programs was voluntary. The RSD frequently moved the Bilingual Program for purposes of desegregation. The relocations had negative effects on the bilingual students involved. '
The Bilingual Program was established in 1972 at the urging of the Hispanie-American Community. Mr. Andy Campos, an activist in the Rockford Hispanic community, approached Superintendent Johnson regarding the institution of a bilingual program in the RSD. A need for a bilingual program existed in the school system as Spanish speaking students were tested and taught in English. Accordingly, many Hispanic students failed classes and were labeled as mentally retarded because they could not respond to the tests in English. Campos Test., Tr. at 3470.
In March of 1972, the Education Committee of the RBE voted unanimously to approve a bilingual education program. Bd. Min., 3/4/72, B506205. The committee reported that the Bilingual Program “was designed to exit the bilingual student when the language proficiency of the student [was] equal in both English and Spanish, and the student [was] performing at grade level.” B27697.
The RSD’s first Bilingual Programs were housed at Southwest Quadrant Barbour and King schools. The curriculum initially consisted of a pull-out program in which children in kindergarten through third grade spent half a day with a bilingual teacher implementing the curriculum in their native language. The other half of the school day was spent in the regular English-speaking classroom. Through this method, the program *1185 gave the students the assistance they needed and integrated them into the population of the building. In subsequent years, the program expanded to include a preschool program at King Elementary School, kindergarten-sixth grade at Barbour, a junior high school program at Washington and a high school component. Throughout this period, Ms. Victoria Mayer served as head teacher and then coordinator of the Bilingual Program. The Bilingual Program was successful at Barbour. Mayer maintained that in the six years of the program, the bilingual children experienced interaction and cohesiveness with the other children in the building. She believed that the program provided a real opportunity for cultures, especially Latino and African-American, to meet and interact. The same cohesiveness existed between the bilingual teaching staff and the other teachers in the school. Mayer further observed that there was a great deal of communication between parents and teachers in the program.
Hispanie-American parents were also pleased with the programs at Barbour and King, in part because the programs were housed in the center of the Latino community in Rockford. B32708; Gerdes Dep. at 21. In 1977, however, the RSD moved the King and Barbour programs out of the Southwest Quadrant to the Southeast Quadrant as part of its desegregation program.
The RSD desegregation plan included the transfer of the Bilingual Program to Whitehead School, from Barbour and King Schools, in order to reduce the minority population at King and Barbour. The distance from the King/Barbour area to Whitehead school was approximately 5.5 miles. The RSD moved the bilingual program to the Eastside despite the existence of an alternative option that would have accomplished desegregation but retained the Bilingual Program at the Southwest side Barbour School. This alternative option involved the pairing of Barbour with a majority school. Such an alternative was illustrated in a memo to the RBE on January 10, 1977 from Superintendent Johnson in which he stated:
Another option would be to retain the bilingual-bicultural program at Barbour and pair Barbour with a majority school interested in such a program so that the number of majority and minority students are balanced to comply with school district integration objectives.
Johnson Memo, 1/10/77, B544117.
Parents of the bilingual students expressed many concerns about moving the program to Whitehead School. The children had become quite attached to Barbour and the move of the Hispanic students to an Eastside site had the effect of removing the program from the center of the Latino community in Rockford. B32708. Even though Mayer was coordinator of the Bilingual Program, neither she nor anyone on her staff was consulted by Superintendent Johnson, or any other administrator, before the decision was made to move the Bilingual Program to Whitehead. Resistance to the Bilingual Program occurred once it was moved to Whitehead. Mayer recounted one particular incident where a sign stat-. ing “Speak English Here” was placed in the faculty lounge. According to Mayer, the obvious reference was directed to the Bilingual Program teachers who often spoke Spanish in the lounge.
Even though the RSD moved the Bilingual Program from Barbour and King to the predominantly white Whitehead School in order to reduce the minority percentages at King and Barbour, the RSD failed to effectuate any significant changes • at Barbour. The movement of the Bilingual Program only reduced the minority percentage at Barbour by less than two percent. No white students were added to Barbour after the Hispanic American students were relocated. Enrollment data for the school years 1976-77 and 1977-78 reveal that, while the transfer of the Bilingual Program out of Barbour reduced the Hispanic American percentage at Barbour from twenty-six to four percent, the total minority percentage at Barbour changed only slightly, from 85.66% in 1976-77 to 83.-27% in 1977-78. Stolee Tab 24, Barbour and Whitehead Schools.
The use of the Bilingual Program over the years as a desegregation device (beginning with the Barbour-Whitehead move), served to place greater desegregation burdens on Hispanic American students than on white students. The elementary Bilingual Program was moved an average of once every *1186 three years beginning with the move to Whitehead in 1977-78, up to and including the most recent move in 1989-90. The Bilingual Program remained at Whitehead for only two school years. Id., Staff History at 1.
In 1979-80, the Program in the lower elementary grades was moved from Whitehead to New Milford (predominantly white), a Southeast side school. The upper elementary grades were moved to Gregory (predominantly white), a Southeast side school. Id.; B500248. Gregory was seven miles from the Latino community in the King/Barbour area of the Southwest Quadrant; New Milford was eight miles. Milage Chart, B2018. In 1983-84, the RSD moved the Program from New Milford to Walker (predominantly white) in the Northeast Quadrant. Bd.Min., 4/30/83, B506500; Stolee Tab 24, Staff History at 1. Walker was three miles from the Hispanic-American community in the King/Barbour area of the southwest quadrant. Milage Chart, B2018. In 1989-90, the RSD moved the elementary Bilingual Program from Walker, in the Northwest Quadrant, back to the Southeast Quadrant to Nashold (predominantly white). Stolee Tab 24, Staff History at 1. The distance from the Barbour/King area to Nashold was six miles. Milage Chart, B2018.
The RSD’s express purpose in moving the Bilingual Program was to establish increased minority enrollment at predominantly white schools. The RSD always labeled the Bilingual Program as a desegregation program. The move from King and Barbour to Whitehead was primarily for desegregation purposes. B39277. The Program was moved from Whitehead because that school was overcrowded. The Program was moved to New Milford because New Milford had a minority enrollment of only 0.4%. B500248. All subsequent moves were made to schools where the majority enrollment exceeded 80% (Walker 85.26% and Nashold 82.88%). Sto-lee Tab 24, Hispanic at 1. In transportation documents, the Bilingual Program over the years was consistently referred to as a “focus” program, the name assigned to the voluntary magnet schools.
The RSD’s labeling of the Bilingual Program as a “focus” program implied that it was voluntary in the same sense as the predominantly white alternative and focus (magnet) programs established to lure white students to Southwest side schools. The essential educational function of the Bilingual Program, however, distinguished it from the educationally supplemental white alternative and focus (magnet) programs. For example, State regulations require that whenever a school has twenty or more non-English-speaking children or children for whom English is a second language, there is to be a bilingual program in that school. 105 ILCS 5/14C-3, formerly Ill.Rev.Stat. ch. 122, ¶ 14C-3. In contrast, the predominantly white alternative/foeus programs provided enhanced educational experiences for then-students.
The RSD persisted in its discriminatory use of the bilingual students as involuntary participants in desegregation despite opposition by the Hispanic-American community. The transfer of the bilingual students from Barbour and King to Whitehead drew opposition from Hispanic-American parents concerned about the removal of the program from the heart of the Hispanic community. B32708. In December of 1979, the Bilingual Parent Advisory Council (hereinafter “BPAC”) initiated a boycott of the Bilingual Program because of transportation problems, frequent relocation of the Program and placing of the program so far away from the Hispanic community so that parents could not easily get to the schools. Gerdes Dep. at 38; Bd.Min., 12/10/79, B16586-B16596; Puli-do-Logeman Dep. at 16. Despite a promise to the BPAC (in response to the boycott) that it would attempt to curtail the frequent transfer of the Bilingual Program, the RSD failed to keep its promise. Gerdes Dep. at 42. In 1986, Hispanic parents met with Superintendent Mell Grell voicing opposition to the relocation of the bilingual program. The response of the Board was another relocation.
Given the fact that bilingual education is essential for non- or limited-English-speaking students, transfer of the Bilingual Program from school to school over the years was essentially a mandatory reassignment of the Hispanic-American students for desegregation purposes. Like the burden placed on *1187 African-American students in the RSD, the mandatory reassignment of Hispanic-American students for desegregation purposes was unmatched by the mandatory reassignment of white students for desegregation purposes,
Segregation Of Elementary Bilingual Students
When the RSD’s Bilingual Program began at Barbour School, the curriculum consisted of participants attending classes with regular students for part of the day and then attending “pull out” bilingual classes for the other part of the day. Such a multi-cultural system served to integrate bilingual students into the school’s student body.
Despite this success, however, the RSD terminated the pull out program and instituted a full-time Bilingual Program. Ms. Victoria Mayer testified that bilingual students spent a whole day with the bilingual teacher. Thus, the only interaction they had with the “regular” students at the school was during lunch and recess.
Transportation Discrimination
The RSD transportation for bilingual students was qualitatively different from the transportation provided for white desegregation students. White student participation in desegregation was voluntary in the RSD. The RSD transportation policy with regard to the voluntary alternative/focus programs (predominantly white) was to provide a yellow school bus to students who lived more than 1.5 miles from school, regardless of their proximity to an RMTD bus stop.
The bilingual students were provided with Board-paid transportation. Unlike alternative-and majority focus program students, however, the transportation for bilingual students was, in most cases, through the Rockford Mass Transit District (hereinafter “RMTD”) and not by yellow school buses. This was so, even though, for reporting purposes, the RSD called bilingual students “focus program” participants. See, supra, Inequitable Access to Transportation. Transportation Department documents showed that majority open enrollment, focus and alternative students qualified for Board-paid transportation both if they lived less than 1.5 miles from an RSD stop and if they lived more than 1.5 miles from an RMTD stop. Accordingly, these white desegregation students qualified for Board-paid transportation under all circumstances. In contrast, when transportation was provided to bilingual students, it is always “mass transit only.” No similar notation appeared next to any majority alternative, open enrollment or focus transfers. Id.
Even for those few bilingual students who rode yellow school buses, the burden of crosstown busing was substantial. Raul Me-drano, a former student in the RSD’s bilingual program, was bused, along with other students in his neighborhood, to Whitehead School. Medrano testified that because of the great distance and the long bus ride, his day usually began at 6:30 a.m. He walked five or six blocks to a bus stop for the 7:30 a.m. bus. The bus ride usually lasted 45-50 minutes. The bused students would then arrive 10-15 minutes before school began but were forced to remain on the school bus while neighborhood students were allowed on the playground.
Educational Deficiencies
Serious educational deficiencies in the Bilingual Program existed in the RSD. The educational services received by Bilingual Program students were not equal to those received by students in the regular instructional program. Furthermore, the RSD failed to adequately identify and assess students who were in need of bilingual services.
State of Illinois And U.S. Department of Education Findings of Deficiencies
In April of 1980, the Illinois State Board of Education (hereinafter “ISBE”) issued findings with regard to the “degree of district conformance with requirements for transitional bilingual education programs.” Bethke Letter, 4/17/80, B500230. As to the Bilingual Programs districtwide, the ISBE found that procedures for the identification of students in need of bilingual education “were inadequate.” No standard procedures existed and “program personnel evidenced little understanding as to how students enter and exit the program.” The ISBE further found that referrals for special services were not processed in a timely manner. Finally while the administrative staff at the building level demonstrated support for the efforts of the program, the ISBE reported that the *1188 RSD failed to provide the necessary leadership at the central staff level for communicating with parents and developing staff and curriculum. The RSD provided leadership that was said to be “diffused and unfocused.” Id. at B500281.
The ISBE also reported numerous deficiencies with the Bilingual Program at both the elementary and secondary levels. At Gregory, for example, the ISBE found that the staff appeared to be “insufficient” for the English reading instruction, and stated that it was “doubtful that students receive[d] a full program.” Id. at B500230. At Flinn Middle School, the ISBE reported that the “[English as a Second Language] ESL instruction was insufficient.” Mr. Bethke of the ISBE explained:
Only one period of ESL is available to most students. Two periods per day should be the minimum. Required courses must be available to the students and 90 minutes of instruction using Spanish is required. This program should be examined thoroughly and restructured for the next year.
Id. at B500281.
The same findings were made with regard to the program at West High School. The West High program did “not conform to statutory requirements” and was ordered to be modified for FY-81. Id.
In July of 1980, after an investigation of the RSD’s practices with regard to non- and limited-English-speaking students, the U.S. Department of Education, Office for Civil Rights (hereinafter “OCR”) made several findings of educational discrimination by the Rockford School District. B32390-B32399. First, the OCR found that the RSD failed to identify and assess adequately those students who were non- and limited-English-speaking and who were, therefore, unable to participate effectively in the RSD’s regular program of instruction. B32390. Identification and assessment procedures were said to be seriously flawed. To illustrate, on an annual basis, the District determined which students were from non-English-language backgrounds and, thus, potentially non- and limited-English speaking. Principals, classroom teachers and secretaries generally relied on personal knowledge about the student’s families to provide this information. In two schools, the Ethnic Code from the Student Information Form was used to identify non-English-language background students, even though ethnicity and home language background are not synonymous. In several other elementary schools, such information was provided by the students themselves or “in conjunction with students.” B32391. The OCR considered this last method to be especially inappropriate with elementary-age students who may not have fully understood the questions or the reasons for which the information was sought. Id. The RSD also placed students in nonexistent language groups, for example, “East India, Oriental, Hawaiian, and Indian.”
District staff admitted that students from non-English language backgrounds were missed, thus confirming the inadequacy of the identification process. Id. The result was that the non-English-speaking students were excluded from further consideration for bilingual or other special language services. As only the students who were from non-English backgrounds, according to the District’s own records, were assessed for their English proficiency, those students who had not been initially identified in the screening process simply fell through the cracks. B32392.
Where students had successfully been identified as being from non-English backgrounds, classroom teachers and principals were personally responsible for determining whether students were limited English proficient and, therefore, eligible for bilingual services. District personnel indicated that these determinations were not based upon the' results of a standardized valid instrument measuring English language proficiency; instead, District staff relied on other information (e.g., observations of students) which the OCR found to be an invalid method of determining English language proficiency. Id.
In addition, even when students were assessed by these flawed methods, there was no consistent District-wide procedure for evaluating the students’ English language proficiency. For example, at one school, the only students who were identified as having limited English proficiency were those who spoke virtually no English (level I of the *1189 ISBE definition of English language fluency). In other schools, limited-English students were defined as those whose English language proficiency corresponded to levels I, II, III and IV of the ISBE definition. The bilingual coordinator indicated that it may have been appropriate to include even level V students in this category. Id.
In sum, many students who needed bilingual services were missed. In fact, the OCR investigators found that a number of recently-immigrated Laotian students who spoke very little English were not so identified. Id. The net effect of the District’s procedures was that many students who were non-English-speaking or limited-English-speaking were entitled to bilingual services but never received such services since only those students who were initially identified as having limited English proficiency were eligible to receive a bilingual education. Id.
Second, the OCR found that the RSD failed to take adequate affirmative steps to insure that all non- and limited-English-speaking students received educational services equally effective to those offered students in the .regular instructional program. B32393. The OCR determined that students who spoke a non-English. language other than Spanish and those who had not been identified as needing bilingual services due to the above-described methods, were not receiving the bilingual education to which they were entitled. Id.
To illustrate, the OCR found that three Hispanic students attended schools in which no bilingual program existed. Furthermore, sixty non- and limited-English-speaking Hispanic students in twenty-two schools were not receiving bilingual services. Id. District staff maintained that these students could transfer, at District expense, to a school with a Bilingual Program. The OCR determined, however, that otherwise-eligible students did not choose to do so for two primary reasons: (1) the District had no uniform procedure to notify parents, in their own language, that their children were eligible for bilingual instruction; and' (2) some parents believed their children would have to be transported an unreasonable distance in order to participate in the Bilingual program. Id. The OCR concluded that parental notification of the Bilingual Program availability was not calculated to actually inform the parents since the notices were sent home in English. No translations of these notices to languages other than Spanish were available. The OCR also found that the perceived “unreasonable” distances to bilingual programs that caused parents not to exercise the school transfer option did not obviate the District’s responsibility to provide special bilingual services to non- and limited-English-speaking students. Id.
Third, and finally, when bilingual education was actually delivered despite these obstacles, the OCR found that the District did not deliver “equally effective educational services” as required by Title VI. For example, non- and limited-English-speaking Hispanic students at Flinn Middle School and West High School learned only one required subject in Spanish, Social Studies. No mathematics or science courses, also required subjects, were taught in Spanish. B32394. The net effect of the District’s failure to offer all required courses in Spanish was that some non- and limited-English-speaking students were enrolled in only three one-period courses: BBP (bilingual bicultural program) social studies, BBP English and physical education. Id. The OCR further found that at Flinn Middle School, the main emphasis of the bilingual social studies course was on Latino American countries. As such, the course was not comparable to the curriculum received by English-speaking students in the regular classroom.
Educational Deficiencies Persist
Educational deficiencies in the Bilingual Program .of the RSD remain today. Hispanics in Rockford have the highest dropout rate of all racial and ethnic groups. Pulido-Loge-man Dep. at 8. Specifically with regard to the Bilingual Program, the RSD’s failure to provide sufficient space has resulted in overcrowding of bilingual students and the holding of bilingual classes in inappropriate areas.
At Nashold, two bilingual classes at one time were held in the same room. Approximately fifteen to twenty students were on each side of the room. Children would turn around and listen to the other teacher. Noise and instruction from each class inter *1190 fered with the other. Also at Nashold, the bilingual classes were moved into the gym. The bilingual students were put “on the stage while gym classes were going on” or the students “would stand in the aisle ... waiting for the gym to empty in order for them to go” back to class. Sometimes the class was held in the hallway. Campos Dep. at 19-24.
Ms. Mercado, a bilingual teacher at East, testified that during each of her four years at East, she ordered bilingual algebra books. She never received the books and the students had to share books. Ms. Mercado filed a grievance, but the algebra class was subsequently dropped, so the grievance was never handled. Mercado Dep. at 87.
Educational deficiencies in the Bilingual Program extended to problems in the manner in which counselling was provided to the bilingual students. Ms. Mercado testified that the counselors at East High School rejected her attempts to help bilingual students schedule their classes. When Ms. Mercado explained to the head counsellor that the students didn’t speak English, the counselor replied “we understand each other.” Id. at 31.
Ms. Mercado also testified that counselors steered the bilingual students toward easier classes. Every year Ms. Mercado helped her students prepare their schedules prior to their guidance counseling appointments and every year at least half of them came back to her with changed schedules. Instead of upper level classes, the girls were put into food and child development and the boys into technology. The justification offered by the counselor at East was that the classes that the bilingual students requested were too hard for them. Id. at 32. Ms. Mercado also observed a counselor at East laugh in a bilingual student’s face because the student wanted to take French. Id. at 33.
Failure to Provide Effective Special Education to Non- and Limited-English-Speaking Students
In 1980, during the course of its investigation into the practices of the RSD with regard to the Bilingual Program, the OCR discovered that the RSD also failed to assess and serve appropriately non- and limited-English-speaking students who required special education services. The RSD used bilingual psychologists to evaluate such students, and when bilingual psychologists were not available, the District obtained evaluations through the Northwestern Illinois Association (hereinafter “NIA”). The OCR found, however, that often there was a considerable delay between the referral to the bilingual NIA psychologist and the completion of the evaluation. B32396. For example, one student was referred for an NIA evaluation on November 28,1979, but was not scheduled to be tested until June 19, 1980. Id. In contrast, District officials told the OCR investigators that monolingual-English-speaking special education students were generally evaluated and staffed within sixty days, as prescribed by State regulations. Id.
Even when non- and limited-English-speaking students were timely evaluated, the appropriateness of those evaluations was doubtful. No determination was ever made of the student’s English language proficiency, even though the District conducted evaluations of these students in English by monolingual English-speaking professionals. Id.
In addition to the flawed and inadequate evaluation procedures, the OCR found that the RSD did not provide appropriate special education services to non- and limited-English-speaking students in a language they could understand. Id. The RSD employed only one Spanish-speaking learning disabilities (hereinafter “LD”) teacher. However, because of the District’s practice of assigning LD teachers to particular schools, Spanish-speaking students in schools to which she was not assigned could not be evaluated or receive direct services from her except in unusual circumstances. B32397. Additionally, because this teacher conducted a large number of evaluations during the first year of her assignment to schools with bilingual programs, Spanish-speaking LD students did not receive direct services from her comparable to that received by monolingual English-speaking LD students from other LD teachers. Id. The OCR found that there was at least one limited-English proficient Spanish-speaking student who was determined to be mentally impaired (hereinafter “MI”). However, because there was no bilingual MI *1191 teacher, this student received educational services in the regular bilingual program; no direct services were provided by an MI teacher in either language. Id.
In light of its findings, the OCR ordered the RSD to “develop a comprehensive plan acceptable to the Department [of Education] which provides equally effective educational services to non- and limited-English-speaking national origin minority students.” Id. In response to the OCR’s mandate, the RSD made several changes. The RSD addressed the problem of parental notification of the existence of Bilingual Programs by distributing a survey to determine the home language background of all students in the District. B2598-B2603. The District followed up its survey with an assessment procedure to determine the English language fluency of students from non-English language backgrounds. B2598.
Despite these steps, the RSD’s assessment of non- and limited-English-speaking students for special education remains inadequate and its education of special needs students who are non- and limited-English-speaking remains inferior to the special education it provides English-speaking students. Although English-speaking students are provided with self-contained special education classes at the middle and high school levels, the RSD does not presently offer a self-contained learning disabilities classroom or resource room or a behavior disorder class for bilingual students at the middle and high school levels. Mercado Dep. at 6-8. The result is that bilingual students who need special education are either left in bilingual classes without special education or are placed in special education classes where only English is spoken. Id. at 13-17. Furthermore, the RSD does not employ a bilingual learning disability/behavior disorder teacher at the secondary level. Id. at 8. The RSD also does not employ a LD/BD resource person for bilingual students at the high school level. Id. at 12. Accordingly, bilingual teachers must attempt to deal with the problems of the LD or BD student while trying to conduct a regular class. Id. The lack of bilingual teacher’s aides has aggravated the problems caused by the shortage of bilingual special education teachers.
The absence of effective special education for students with non- or limited-English-speaking ability has left such students in the middle of an administrative stalemate. Ms. Mercado testified that she has expressed her concerns about bilingual LD/BD students to the Director of Special Education and to the coordinator of bilingual education:
I have asked them both for help. I have expressed my concerns about the students. I have told them their behaviors. And I have asked them if we could get someone to work with these kids. And the special education lady said that it is bilingual’s job to hire a teacher to work with them. And bilingual said that it is special education’s job to hire a teacher to work with those kids.
Id. at 23.
In addition to failing to provide effective special education services for non- or limited-English-speaking students, the RSD’s LD/BD assessment procedure is also lacking. Though the OCR, thirteen years ago, found that the RSD’s referral of bilingual students to an outside bilingual psychologist for evalu- . ation of learning behavior disorders resulted in an unjustifiable delay in the assessment of these students, the RSD, at present has no bilingual psychologist on staff. The students continue to be referred to an outside contractor and the delays in assessment continue to result. Id. at 7-8.

CONCLUSIONS OF LAW

A court may consider the school district’s conduct relating to Bilingual Education Programs in evaluating the entire school system. See e.g., Lorain NAACP v. Lorain Bd. of Educ., 979 F.2d 1141 (6th Cir.1992); Coalition to Save Our Children v. Buchanan, 744 F.Supp. 582 (D.Del.1990); United States v. Bd. of Educ. of City of Chicago, 588 F.Supp. 132, 169 (N.D.Ill.1984), vacated on other grounds, 744 F.2d 1300 (7th Cir.1985), cert. denied, 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985).
•The goal of language remediation programs is to integrate Spanish-speaking students into the English language classroom. Castaneda v. Pickard, 648 F.2d 989, 998 n. 4 (5th Cir.1981). A properly implemented pro *1192 gram raises the academic achievement of limited-English-proficient students, thus creating equal educational opportunities for these students. United States v. Bd. of Educ. of City of Chicago, 588 F.Supp. at 169. Given these goals, language remediation programs should not isolate their participants from English speaking children. Castaneda, 648 F.2d at 998; Cintron v. Brentwood Union Free School Dist., 455 F.Supp. 57, 64 (E.D.N.Y.1978). As much as possible, the program should encourage contact between non-English and English-speaking children. Id Allowing participation in mainstream academic and extracurricular programs is one manner of achieving this goal. See Coalition to Save Our Children, 744 F.Supp. at 594.
In reviewing the appropriateness of a school district’s language remediation program, three factors are relevant: (1) whether the school system is pursuing a program informed by an educational theory recognized as sound by experts in the field; (2) whether the programs and practices actually used by a school system are reasonably calculated to implement effectively the educational theory adopted by the school; and (3) whether, after a sufficient period of time, the program actually overcomes the language barriers confronting students. Castaneda, 648 F.2d at 1009-10. Further, the school district’s transportation policies with respect to specialized programs, such as bilingual education, should not place disproportionate or stigmatizing burdens on minority students. See United States v. Yonkers Bd. of Educ., 624 F.Supp. 1276, 1455 (S.D.N.Y.1985).
The court finds that the RSD operated its Bilingual Education Program in violation of the constitutional rights of Hispanic students. The RSD placed an unlawful transportation burden on Hispanic students by requiring the involuntary movement of bilingual students for desegregation purposes. No involuntary transfer burdens for desegregation purposes were imposed on majority students. Repeated relocation of the Bilingual Program furthered the unlawful transportation burden on Hispanic students. Bilingual students were provided transportation that was qualitatively inferior to that provided to white desegregation students.
The court further finds that the RSD administered the Bilingual Program in violation of the constitutional rights of Hispanic students. The RSD converted the elementary half-day pull-out bilingual program which allowed bilingual students to interact with the general school population into a whole-day program completely segregated from the rest of the school. Bilingual students were steered toward easier and less beneficial classes by English-only speaking counselors and were inadequately provided with educational services and curricula comparable to white students. Furthermore, the RSD failed to adequately identify and assess non- and limited-English-speaking students as eligible to participate in the Bilingual Program. Finally, the RSD failed to provide effective and meaningful special education services to non- and limited-English-speaking students.

SPECIAL EDUCATION

INTRODUCTION

Special Education students should be exempt from desegregation programs. They have enough problems without being moved around in order to make a building appear numerically integrated. In the school year 1988-89, the RSD assigned 99.6% of the Southwest Quadrant elementary students to non-Southwest schools. The court has not been convinced that the assignment was an act of intentional discrimination. The RSD should continue to exempt special education students from desegregation programs.

FINDINGS OF FACT

In June of 1974, the RSD recommended to the QUEFAC court that elementary special education students be “exempt” from participating in desegregation programs due to their needs for special facilities and equipment. In subsequent status reports to the court, the RSD restated its position that special education students were exempt from desegregation programs.
Notwithstanding the RSD’s stated policy that elementary special education students were “exempt” from desegregation activities, the RSD assigned all elementary students to non-Southwest schools. Most of these students were assigned to Eastside schools. This practice was evident as early as the first *1193 school-by-school Self-Contained Special Education (SCSE) data in 1980 and continued until entry of the Second Interim Order in 1991.
Dr. David Bennett testified regarding the RSD’s assignment of SCSE students. Dr. Bennett noted that behavior disorder students are provided a program based in self-contained environments because of their fragile nature. Dr. Bennett noted that usually an effort is made by a school district to keep SCSE as close to the child’s home as possible. Parents and guardians are frequently brought into the school to deal with the day-to-day behavior of these students. Illustrating this point, Dr. Bennett stated that parents are often brought in to the school because of behavior problems involving the child, emergency situations based upon the delicate nature of the child’s behavior, and also to discuss with teachers and administrators appropriate program choices. Dr. Bennett found, however, that SCSE students in the RSD who lived on the Southwest side of Rockford were assigned to schools outside of the Southwest Quadrant. He observed this trend from 1981 to 1989.
In the 1980-81 school year, full-time SCSE students were much more likely to be assigned to non-Southwest schools. While the Southwest schools constituted roughly a third of all elementary schools, they received only 13.6% of the SCSE students. As a result, non-Southwest schools had an average number of full-time elementary SCSE students that was roughly double that for Southwest schools (an average of 42 versus an average of 22, respectively).
[[Image here]]
Thereafter, the policy of assigning minority SCSE students out of the Southwest Quadrant became pervasive. In the school year 1988-89, prior to commencement of this lawsuit, there were virtually complete racial disproportions in the RSD’s assignment of students. During the school year, 36% of the elementary SCSE students lived in the attendance areas of the ten Southwest Quadrant elementary schools and, consequently, were predominantly minority students. The RSD, however, assigned 99.6% of elementary SCSE students to non-Southwest schools. All Southwest elementary SCSE students, except two, were assigned by the RSD to attend non-Southwest schools, but no SCSE students from elsewhere in the District were assigned to attend Southwest elementary schools. See D5291, D5334, B507386, B507061.
A similar, but somewhat less severe, pattern occurred at the high school level. During this same period, 44% of high school SCSE students lived in the attendance areas of Auburn and West, Southwest Quadrant schools, but 82% of all high school SCSE students were assigned to attend Eastside facilities. A less pronounced pattern occurred at the middle schools: 46% of SCSE students lived in the attendance areas of Kennedy or Wilson, also Southwest Quadrant schools, but 59% were assigned to Eastside schools.
This assignment policy of the RSD represented both a unique burden on minority students and an instance of within-school segregation by the placement of substantially minority special education classes in otherwise predominantly white schools. The RSD’s continued placement of SCSE stu *1194 dents from the Southwest Quadrant in schools outside of that Quadrant was also in sharp contrast to the policy the District was implementing in relation to other students. Specifically, in 1989, the RSD, through its Reorganization Plan, was attempting a policy that would have children attending school in their own neighborhood. This policy clearly was not pursued with regard to SCSE students on the Southwest side, who are “literally the most fragile students in the school district.” The minority SCSE students who lived in the Southwest Quadrant were not given the opportunity to attend schools close to their homes while their white counterparts in other areas of the city were able to attend self-contained classrooms reasonably close to their homes. This occurred despite the fact that decreasing enrollments in Southwest Quadrant schools made available space for SCSE students.
Not only did these conditions exist, but the RSD special education staff were well aware of the SCSE assignment patterns. On January 12, 1989, Janet Jones, then Director of Special Education, submitted a memorandum to John Hartwig, Director of Student Services, presenting data that compared the residence and school assignments of SCSE students. Ms. Jones stated in her memorandum: “It is interesting to see where most children who are bused to self-contained programs live ... You may want to share this with [Supt.] Swanson.” D5334. This memorandum was written during the month that the 1989 Reorganization Plan was being formulated. Ms. Jones apparently recognized the inequity of the RSD’s assignment policy for SCSE students and suggested rectification of the disparities. However, no corrective action was taken. This fact was reflected by Ms. Jones’ May 26, 1989 list of special education locations for the Fall of 1989 showing all elementary SCSE classes still located outside the Southwest Quadrant.
The burdensome pattern of SCSE student assignment is depicted on the map below. Each dot on the map represents a 1990 SCSE student and each star on the map represents a school to which SCSE students were assigned. The court is not able to tell from the record whether these transferred minority students were in fact “counted” for desegregation purposes. The court states, however, that the District would have a potential numerical motive to have made these kinds of transfers.
*1195 [[Image here]]

*1196
CONCLUSIONS OF LAW

Evidence of discrimination in the operation of a special education program is relevant in a school desegregation case. See United States v. Yonkers Bd. of Educ., 624 F.Supp. 1276, 1877 (S.D.N.Y.1985), aff'd, 837 F.2d 1181 (2nd Cir.1987), cert. denied, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). In Yonkers, for example, the court found the defendant school district liable for discriminatory classification, transportation and other unlawful treatment of minority Special Education students. Id. The assignment policy of the RSD placed a burden on minority students and constituted an instance of within-school segregation through the placement of substantially minority special education classes in otherwise predominantly white schools. The court, however, does not have sufficient evidence to come to the conclusion that the actions of the RSD constituted an act of intentional discrimination.

THE LAW OF EDUCATIONAL SEGREGATION AND ITS APPLICATION TO THE EVIDENCE

Overview of the Law

In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the United States Supreme Court held that “in the field of public education, the doctrine of ‘separate but equal’ has no place” and that “separate educational facilities are inherently unequal.” Id. at 495, 74 S.Ct. at 692. The Court further observed that “[t]o separate [minority children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.” Id. at 494, 74 S.Ct. at 691.
The law governing liability in a school desegregation case can be summarized in one sentence: a State or local authority may not intentionally segregate or discriminate against minority students because of their race. A prima facie case establishing liability contains three elements: (1) “segregation or discrimination” (minority students must, in fact, experience either segregated conditions or suffer the detrimental effects of discriminatory conduct—or both); (2) “causation” (school authorities must have caused, created or maintained such segregation or discrimination); and (3) “intent” (the conduct of school officials must have been undertaken “intentionally”).
This standard derives from the Equal Protection Clause that provides that “no state ... shall deny to any person within its jurisdiction the equal protection of the laws.” The Equal Protection Clause requires State and local governments to treat similarly situated groups of persons in similar fashion when classifying individuals to receive particular benefits and burdens. Hooper v. Bernalillo County Assessor, 472 U.S. 612, 618, 105 S.Ct. 2862, 2866, 86 L.Ed.2d 487 (1985). While courts ordinarily defer to governmental classifications unless they lack a rational justification, classifications that burden “discrete and insular minorities” are “inherently suspect” and are subject to “strict” judicial scrutiny. See United States v. Carotene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938).
Race is the paradigm “suspect” classification triggering strict scrutiny. Palmore v. Sidoti, 466 U.S. 429, 433-34, 104 S.Ct. 1879, 1882-83, 80 L.Ed.2d 421 (1984). State action that, on its face, involves a racial classification is presumptively invalid and can be upheld only upon an extraordinary justification. Personnel Administrator v. Feeney, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292-93, 60 L.Ed.2d 870 (1979). Facially neutral State action violates the Equal Protection Clause when the action is intended to have a racial effect and, in fact, has such an effect. Washington v. Davis, 426 U.S. 229, 240-41, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976).
The mere existence of racially segregated schools does not constitute a constitutional violation nor does it create an obligation on the part of a school board to take remedial action. Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 464, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979). Racial imbalance in a school system only violates the Equal Protection Clause when intentional government conduct has caused or perpetuated the situation. Keyes v. School Dist. No. 1, Denver, Col., 413 U.S. 189, 213-14, 93 S.Ct. 2686, 2700, 37 L.Ed.2d 548 (1973). A State statute or constitutional provision requiring separa *1197 tion of the races in schools is the most obvious type of government conduct causing or perpetuating segregation and is facially unconstitutional under Brown, 347 U.S. at 495, 74 S.Ct. at 692.
Cases subsequent to Brown, however, have clearly established that many less blatant forms of government conduct that lead to racial imbalance in school systems also violate the Constitution. A constitutional violation occurs in school districts that have never been subject to statutorily-mandated racial segregation where “school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system.” Keyes, 413 U.S. at 201, 93 S.Ct. at 2694. In order to prove unconstitutional racial imbalance in a school system, a plaintiff must show that (1) the governmental authorities created or maintained racial segregation in the schools and (2) their actions were motivated by segre-gative intent. Keyes, 413 U.S. at 208, 93 S.Ct. at 2697; Diaz v. San Jose Unified School Dist., 733 F.2d 660, 662 (9th Cir.1984), cert. denied, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985).
In a racially unbalanced school system, the existence of racial segregation need not be numerically absolute so long as the public schools are substantially segregated and “racially identifiable.” United States v. Yonkers Bd. of Educ., 624 F.Supp. 1276, 1378 (S.D.N.Y.1985), aff'd, 837 F.2d 1181 (2nd Cir.1987). What constitutes a racially identifiable school will depend upon the facts of each particular case. Keyes, 413 U.S. at 196, 93 S.Ct. at 2691. A court must examine the racial and ethnic composition of particular schools as well as “every facet of school operations—faculty, staff, transportation, extra-curricular activities and facilities.” Green v. County School Bd. of New Kent County, 391 U.S. 430, 435, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716 (1968). Further, a court should consider the quality of education afforded to both white and minority students. See Freeman v. Pitts, — U.S. -, -, 112 S.Ct. 1430, 1446, 118 L.Ed.2d 108 (1992). Thus, a plaintiff may prove a school system is racially identifiable by factors that may, but need not, include student assignment. Brown v. Bd. of Educ., 892 F.2d 851, 861 (10th Cir.1989), vacated on other grounds, — U.S. -, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992).
With respect to causation, the first Keyes factor, the conduct of school authorities need not be the sole cause of racial segregation, but such conduct must have more than a de minimis impact. Yonkers, 624 F.Supp. at 1379. A plaintiff must demonstrate that the defendant’s conduct contributed in a substantial manner to the creation or perpetuation of racial segregation. Berry v. School Dist. of Benton Harbor, 442 F.Supp. 1280, 1292 (W.D.Mich.1977). The “conduct” under scrutiny includes acts of omission as well as affirmative acts. Yonkers, 624 F.Supp. at 1379.
In addition to proving that the defendant’s conduct created or maintained racial imbalance in the schools, a plaintiff must show that the conduct was motivated by segre-gative intent, the second Keyes factor. Ordinarily, only circumstantial evidence is available to establish segregative intent. Diaz, 733 F.2d at 662. Evidence of the discriminatory impact of acts, omissions or policies is one type of circumstantial evidence supporting an inference of segregative intent. Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 563-64, 50 L.Ed.2d 450 (1977). Other types of circumstantial evidence relevant to proving segregative intent include: (1) the historical background and sequence of events leading up to the conduct maintaining or exacerbating racial imbalance in the schools; (2) departures from typical procedural sequences or substantive criteria normally considered important by the decision-maker; and (3) contemporaneous evidence concerning the decision-making process. Id. at 267-68, 97 S.Ct. at 564-65. If a plaintiff succeeds in establishing a prima facie case of intentional segregation, the burden then shifts to the defendant to establish that the same segregative conduct would have occurred “even had the impermissible purpose not been considered.” Id. at 271, n. 21, 97 S.Ct. at 566, n. 21.
Further, a finding of intentionally segre-gative school board conduct in a meaningful portion of a school system creates a pre *1198 sumption that other segregated activity within the school system is not coincidental. Keyes, 413 U.S. at 208, 93 S.Ct. at 2697. This presumption places a burden upon the defendant to show that segregation in other schools and activities within the system have not resulted from intentionally segregative conduct. Id. In discharging this burden, the school authorities must rely upon more than some allegedly logical, racially neutral explanation for their actions. Id. at 210, 93 S.Ct. at 2698. The school district’s burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated its actions. Id.

Causation—The First Keyes Factor

In Keyes v. School Dist. No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the United States Supreme Court developed two factors that must be established in a desegregation school case. The first of these factors is causation. Id. at 208, 93 S.Ct. at 2697. Accordingly, in order to prevail in a school desegregation case, the plaintiffs must show that the conduct of the defendant school system was State action that caused or maintained racial isolation and segregation. Yonkers, 624 F.Supp. at 1379; Berry, 442 F.Supp. at 1292; NAACP v. Lansing Bd. of Educ., 559 F.2d 1042 (6th Cir.) cert. denied 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977); Oliver v. Kalamazoo Bd. of Educ., 368 F.Supp. 143, 159 (W.D.Mich.1973), aff'd 508 F.2d 178 (6th Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).
The plaintiffs must demonstrate that the defendant’s conduct, including acts of omission, contributed in a substantial degree to the creation or perpetuation of racial segregation in the schools. Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); Oliver, 368 F.Supp. at 159; Reed v. Rhodes, 455 F.Supp. 546, 553 (N.D.Ohio 1978), aff'd in part, rev’d in part, 607 F.2d 714 (6th Cir.1979), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). The defendant is not liable if it only occasionally committed segregative or discriminatory acts and these acts were of trivial importance with no significant relationship to current conditions in the school district.
To meet their burden of proof, the plaintiffs in a school desegregation case are not required to prove de jure segregation as to each segregated school or student in the system. As the Court in Keyes explained:
[W]here plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system.
413 U.S. at 201, 93 S.Ct. at 2694.
In school desegregation cases, courts have imposed liability upon defendants for conduct that entails both affirmative acts and failures to act. Lansing, 559 F.2d at 1046; Oliver, 508 F.2d at 182; Yonkers, 624 F.Supp. at 1379; Berry, 442 F.Supp. at 1293; Bradley v. Milliken, 338 F.Supp. 582, 587-88 (E.D.Mich.1971). Affirmative acts include segregative techniques such as gerrymandering boundaries, assigning staff on the basis of race and employing intact busing. Acts of omission include, for example, a school board that, with segregative purpose, allows a racially-identifiable white school to operate at overcapacity rather than transfer or reassign white students to a nearby racially-identifiable minority school operating at undercapacity. The Board’s failure to act in this instance is hardly benign. See Reed, 455 F.Supp. at 565. As noted by the court in Oliver, “where public issues are framed and questions posed which bear directly on the quality of education, a deliberate negative response from school authorities or a deliberate omission to act, can affect the shape of subsequent circumstances just as materially as can affirmative decisions and action.” 368 F.Supp. at 178.
Similarly, in Keyes, the U.S. Supreme Court established that the proscribed conduct not only includes conduct that causes or brings about segregation, but also includes conduct that maintains segregation. The Keyes Court described the relevant inquiry as determining whether the school district’s “policies and practices ... were ... taken in effectuation of a policy to create or maintain segregation.” 413 U.S. at 213-14, 93 S.Ct. at 2700.
*1199 The court finds that the Rockford Board of Education is a public body created by the State of Illinois to administer and supervise its public schools within its statutorily-defined area and, under the laws of the State of Illinois, may sue and be sued. The court further finds that the current racial segregation of students in the public schools in Rockford was caused, in substantial part, by the acts and omissions of Defendant. Specific practices of Defendant that unlawfully segregated students on the basis of race and ethnic origin include, but are not limited to:
(1) The tracking of students by race into various educational programs offered by the RSD;
(2) The drawing and alteration of school attendance area boundaries in such a way as to create, maintain or increase racial or ethnic segregation of students;
(3) The maintenance of racially and ethnically segregated branches of schools;
(4) The assignment of teachers and staff to schools in such a way as to match the race of the faculty and staff with the race of the students attending the schools;
(5) The failure to design and implement an effective desegregation plan even when ordered to do so by a Federal Court and by the ISBE;
(6) The provision of inequitable transportation and access to transportation to students based upon their race and ethnic origin;
(7) The disproportionate placing of the burdens of desegregation on minority students;
(8) The disparate placement of facilities and equipment so as to burden minority students and not provide them with an equal educational opportunity; and
(9)The perpetuation of discriminatory conditions in the make-up of the Rockford Board of Education.
These practices, among others discussed in this order, occurred over a substantial period of time and in a substantial portion of the Rockford public schools and constituted a system-wide attempt to separate the races.

Intent—The Second Keyes Factor

The second principle established by Keyes is that there must be “a finding of intentionally segregative school board actions in a meaningful portion of a school system.” 413 U.S. at 208, 93 S.Ct. at 2697. Justice Brennan’s opinion defined purposeful segregation as the equivalent of de jure segregation. “We emphasize that the differentiating factor between de jure segregation and so-called de facto segregation ... is purpose or intent to segregate.” Id. at 208, 93 S.Ct. at 2697. However, the Keyes Court did not fully explain the concept of “segregative intent.”[37] The question of who must harbor the requisite intent, individual school officials or the institution of the school board, and whether the standard of proof is subjective or objective, remained unanswered.
During the time period immediately following the Court’s decision in Keyes, lower courts interpreted the segregative intent of school officials in a variety of ways. Those courts decided cases based on the subjective segregative intent of: assistant superintendents, United States v. School Dist. of Omaha, 621 F.2d 630, 540 n. 20, 544 n. 30 (8th Cir.) cert. denied, 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975), superintendents, Amos v. Board of School Directors, 408 F.Supp. 765, 809 (E.D.Wis.1976), School board members, Soria v. Oxnard School Dist. Bd. of Trustees, 386 F.Supp. 539, 540-42 (C.D.Cal.1974), parents, Morgan v. Hennigan, 379 F.Supp. 410, 427, 438 (D.Mass.), aff'd sub nom., Morgan v. Kerrigan, 509 *1200 F.2d 580 (1st Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975) and voters, United States v. Missouri, 515 F.2d 1365, 1370 (8th Cir.), cert. denied, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975). Other courts interpreted Keyes as requiring institutional, rather than individual, intent. Oliver v. Michigan State Board of Education, 508 F.2d 178, 182 (6th Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975); Hart v. Community School Board of Education, 512 F.2d 37, 50 (2nd Cir.1975); Arthur v. Nyquist, 573 F.2d 134 (2nd Cir.), cert. denied, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978).
Some of the language in the Keyes majority opinion appears to endorse the interpretation that segregative intent refers to the subjective motivation of individual school officials. See, Keyes, 413 U.S. at 233, 93 S.Ct. at 2709-10 (Powell, J., concurring in part and dissenting in part) (interpreting majority as referring to subjective intent of school authorities). However, the Court presumed that intent continued among successive boards, despite changes in the identity of individual members. The Court asserted that evidence of the illicit motivations of prior school board officials was relevant to the issue of their successors’ decisions “where, as here, the case involves one school board.” 413 U.S. at 207, 93 S.Ct. at 2697. Further, the reference to the “board’s intent” as opposed to the intent of the members of the board indicate that the Court may have conceived of segregative intent as being institutional rather than individual. See id.
The institutional concept of segregative intent was furthered by the Court’s decision in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Washington Court, citing Keyes, held that strict scrutiny would be applied only where a discriminatory impact on a suspect class was accompanied by a showing of invidious purpose. Id. at 242, 96 S.Ct. at 2049. The adoption of the Keyes segregative purpose requirement forced the Court to reconsider its earlier decision in Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), which rejected motivation as an element of equal protection analysis. In Palmer, the Court held that the segregative purposes of the Jackson, Mississippi, city councilmen could not invalidate an ordinance closing municipal swimming pools in the face of a desegregation order. Washington reconciled its adoption of the “discriminatory purpose” requirement with the holding in Palmer v. Thompson by interpreting Palmer as holding “that the legitimate purposes of the ordinance ... were not open to impeachment by evidence that the councilmen were actually motivated by racial considerations.” Washington 426 U.S. at 242, 96 S.Ct. at 2049. The Washington Court’s reading of Keyes suggests that segregative purpose or intent refers to the subjective motivation of the school board as an institution. This interpretation was fostered by the Court in Village of Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977):
Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the “dominant” or “primary” one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality.
Id. at 265, 97 S.Ct. at 563. The court holds that the Rockford School Board, as an institution, must be shown to have the requisite segregative intent for the Plaintiffs to prevail.
The court now turns to the question of which standard, objective or subjective, is to be used in order to find the requisite intent. The objective theory focuses on the natural and probable consequences of the actor’s conduct, while the subjective theory focuses upon what the actor actually intended.
The post-hoc determination of why various acts and policies were undertaken in the past is often difficult and the subjective intent of a school board is, at best, a nebulous concept. Thus, some courts have found the institutional theory of intent problematic because they have looked to the motives of individuals in order to discern the purposes behind the public acts of a deliberative body.
*1201 When we consider the motivation of people constituting a school board ... we are dealing with a collective will. It is difficult enough to find the collective mind of a group of legislators.... It is even harder to find the motivation of local citizens, many of whom would be as reluctant to admit that they have racial prejudice as to admit that they have no sense of humor.
Hart v. Community School Bd. of Educ., 512 F.2d 37, 50 (2nd Cir.1975); See also, Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (Stevens, J., concurring). In Arthur v. Nyquist, 573 F.2d 134 (2nd Cir.1978), the Second Circuit explained their earlier decision to reject the subjective standard.
In Hart, we rejected a purely subjective standard of proof because we were unable to make good sense of the notion of a “collective will” which “intends” a certain outcome, and because of the “injustice of ascribing a collective will to articulate remarks of particular bigots.... ” [W]e steered a course between objective and subjective theories of segregative intent by holding that foreseeable consequences, while not specifically identifiable with intention, can provide evidence for its presence.
Arthur, 573 F.2d at 142 (citation omitted). The second circuit approach focused on the actions taken by the board itself and not on the mental processes of a changing group of school board members.
At least one other court had harbored similar misgivings attempting to determine the collective will by looking at the subjective motivations of individuals. In Oliver v. Michigan State Bd. of Educ., 508 F.2d 178 (6th Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), the Sixth Circuit avoided the problem by shifting the focus from what the individual actors intended to the foreseeable results of the school official’s actions.
A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials’ action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies.
Id. at 182.
The Supreme Court subsequently rejected the use of such a presumption as a means of establishing segregative intent or shifting the burden of persuasion on the intent issue to the defendant. Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720 (1977). Nonetheless, the Court reaffirmed that “proof of foreseeable consequences is one type of quite relevant evidence of racially discriminatory purpose.” Id. See also, Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 464-65, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979) (foreseeable effect of decision is “one of the several kinds of proofs from which an inference of segregative intent may be properly drawn”); Alexander v. Youngstown Bd. of Educ., 675 F.2d 787, 792-93 (6th Cir.1982) (court may infer discriminatory intent from acts or policies with foreseeable segregative result; inference is permissible rather than mandatory).
The court interprets requisite segregative intent be the institutional intent of the Rockford School Board. Therefore, this court has focused upon what the institution, as actor, actually intended. Further, and upon close review of the Keyes, Washington and Arlington Heights opinions, this court interprets the Supreme Court as requiring the subjective theory of proof regarding segregatory intent. The relevant standard of proof for intent in this case is: Plaintiff must prove that a motivating institutional purpose of the Rockford School Board was to keep the races separate.
The court draws an analogy between the school board’s institutional intent and the concept of legislative intent. “Legislative intent” is not usually reduced to the subjective intents or motives of individual legislators, but rather is conceived as a characteristic of the actions of legislatures as institutions. See, e.g., MacCallum, Legislative Intent, 75 Yale L.J. 754 (1966); See also, Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 130-31, 3 L.Ed. 162 (1810). Thus, given any specific school board policy or decision, the individual board member’s subjective intent, and what subse *1202 quently becomes the school board’s subjective institutional intent, may or may not be one in the same. “Legislation is frequently multipurposed: the removal of even a “subordinate purpose” may shift altogether the consensus of legislative judgment supporting the statute.” Arlington Heights, 429 U.S. at 266 n. 11, 97 S.Ct. at 563 n. 11 (citing McGinnis v. Royster, 410 U.S. 263, 276-77, 93 S.Ct. 1055, 1063, 35 L.Ed.2d 282 (1973)).
Further proof of discriminatory intent must not be confused with proof of evil motive, racial hostility or a subjective desire to harm minority children. Omaha, 521 F.2d at 535; Higgins, 508 F.2d at 793; Armstrong, 451 F.Supp. at 7; Morgan, 379 F.Supp. at 478. As noted in Oliver, “when constitutional right are involved, the issue is seldom whether public officials have acted with evil motives or whether they have consciously plotted with bigotry in their hearts to deprive citizens of the equal protection laws.” 508 F.2d at 182. The required intent in relation to segregation is simply the intent to keep the races separate. Omaha, 521 F.2d at 535; Armstrong, 451 F.Supp. at 866. Such intent may be shown even when there is no desire to inflict educational harm upon any racial group. Id.
The issue of the presence or absence of unlawful intent is one of fact. Armstrong v. O’Connell, 451 F.Supp. at 822. The ultimate determination of segregative intent rests upon examination of the record as a whole, including the multiplicity and cumulative effect of the defendant’s policies and practices. Morgan, 379 F.Supp. at 479. A plaintiff may prove intent by direct, indirect or circumstantial evidence. Armstrong, 451 F.Supp. at 826; Berry, 442 F.Supp. at 1291; Lansing, 429 F.Supp. at 590. Since direct evidence is difficult to obtain, ordinarily only circumstantial evidence is available to establish segre-gative intent. Diaz, 733 F.2d at 662.
In the context of school desegregation cases, courts have cited a myriad of factors that by themselves or in combination with other facts support an inference of discriminatory intent. Evidence of the foreseeable segregative impact of decisions is one type of circumstantial evidence supporting an inference of segregative intent. See Arlington Heights, 429 U.S. at 266, 97 S.Ct. at 563-64. Arlington Heights identifies several other types of evidence this court has used that supports the inference of intent:
1) “[T]he historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes;”
2) “the specific sequence of events leading up to the challenged decision;”
3) “contemporary statements by members of the decision making body, minutes of its meetings or reports;”
4) “departures from the normal procedural sequence;”
5) “substantive departures [from prior policies] ... particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached;” and
6) “[t]he legislative or administrative history ... especially where there are contemporary statements by members of the decision making body, minutes of its meetings, or reports.”
Arlington Heights, 429 U.S. at 266-69, 97 S.Ct. at 563-66. The Supreme Court explicitly recognized this list as being non-exhaustive of the potential factors probative of intent. Id. at 268, 97 S.Ct. at 565.
Of particular significance in assessing whether segregation is the result of intentional acts is whether there is evidence of “classic” segregative techniques, including: intact busing; busing minorities to racially identifiable minority schools that are further away than majority schools with extra capacity; use of optional or multiple attendance zones; the existence of disparities between the physical quality of minority and majority schools; gerrymandering of attendance zones; and discriminatory use of transfer policies. Higgins, 508 F.2d at 787. In the present case, as the foregoing sections have shown, the RSD has engaged in all of these segregative practices.
In evaluating the cause of segregated conditions, a court must be sensitive to meaningful patterns of behavior by government agencies. Parents Ass’n of Andrew Jackson High v. Ambach, 598 F.2d 705, 713 (2d Cir.1979); Oliver, 368 F.Supp. at 163. Although each school board decision taken alone might *1203 not compel the conclusion that the school board intended to foster segregation, the decisions taken together may lead to the conclusion that a purposeful pattern of racial discrimination existed. United States v. Bd. of School Commissioners of Indianapolis, 474 F.2d 81, 84 (7th Cir.1973); Oliver, 368 F.Supp. at 163. This rule is derived from the evidentiary rule that if actions having a particular effect are repeated, the inference is stronger that the effect of the actions was intended. See, Yonkers, 624 F.Supp. at 1294; 2 Wigmore, Evidence, § 312 (3d Ed.1940).
Based upon an examination of the record as a whole, including the multiplicity and cumulative effect of the RSD’s policies and practices, the court concludes that the RSD’s conduct in eleven of the twelve areas covered by the foregoing findings[38] was undertaken with unlawful intent.

The Scope of Liability—Once the Keyes Factors Have Been Established

When intent and causation are established, the Keyes court advanced two presumptions to aid a trial court in determining the scope of liability. The first Keyes presumption is that:
[C]ommon sense dictates the conclusion that racially inspired school board actions have an impact beyond the particular schools that are the subjects of those actions. This is not to say, of course, that there can never be a case in which the geographical structure of, or the natural boundaries within, a school district may have the effect of dividing the district into separate, identifiable and unrelated units. Such a determination is essentially a question of fact to be resolved by the trial court in the first instance, but such cases must be rare. In the absence of such a determination, proof of state-imposed segregation in a substantial portion of the district will suffice to support a finding by the trial court of the existence of a dual system.
413 U.S. at 203, 93 S.Ct. at 2695 (emphasis added).
The second presumption established in Keyes is that:
[A] finding of intentionally segregative school board actions in a meaningful portion of a school system ... creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions.
[[Image here]]
... [I]t is not enough, of course, that the school authorities rely upon some allegedly logical, racially neutral explanation for their actions. Their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions.
413 U.S. at 208, 210, 93 S.Ct. at 2697, 2698.
On the factual record established in this case, both principles are operative. First, since Plaintiffs have proven state-imposed segregation in a substantial portion of the RSD, a finding that the RSD has operated as a dual system is warranted. Second, inasmuch as Plaintiffs have proven intentionally segregative conduct by the RSD in a meaningful portion of the school system, a presumption arises that other segregated conditions and discriminatory conduct in the system were not adventitious. This shifts the burden to the RSD to establish that these other conditions and conduct were not intentional. The RSD has completely failed to meet this burden. The court will discuss the actual and implied defenses offered by the RSD.

Liability For The Conduct Of Agents And Employees

Defendants have argued that they should not be held accountable for conduct of individual employees because the conduct was not taken pursuant to official policy of the Board. This argument has been made by other defendants. See Yonkers, 624 F.Supp. at 1447 n. 112; Armstrong, 451 F.Supp. at 847. The reason that this argument is incorrect is because the liability of a school board in a school desegregation case is not predicated on a theory of respondeat superior. Yonkers, 624 F.Supp. at 1447 n. 112.
*1204 In Yonkers, the court explicitly rejected the school board’s argument that it could not be held hable for the individual acts of employees (principals, guidance counselors and teachers) because the acts were not pursuant to official board policy. Id. The district court held that the defendant’s liability was “not predicated on an isolated instance of unauthorized discriminatory conduct against an individual victim but on the Board’s conduct in the face of a pattern of discriminatory acts and omissions over time.” Id.; see also, Turpin v. Mailed, 619 F.2d 196 (2nd Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); Owens v. Haas, 601 F.2d 1242 (2nd Cir.), cert. denied, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). Imposing liability in these circumstances comports with the general rule that a municipality may be held Hable for the unconstitutional acts of its employees in circumstances where there was a continued widespread pattern of such conduct. See, e.g., Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1480-81 (11th Cir.1991); Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir.1987), cert. denied, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). In Yonkers, the fact that the school board’s conduct, in the face of a pattern of discriminatory acts and omissions over time, was consistent with its own segregative practices, strengthened the basis for holding the school board legally responsible for the discriminatory conduct of its employees. Yonkers, 624 F.Supp. at 1447, n. 112.
An additional reason for rejecting this defense was noted in Armstrong. In that case, the defendant school board argued that it should not be held Hable for the decision by individual school principals to have segregated recesses. 451 F.Supp. at 847. Despite the fact that the school board never had a poHey requiring separate recesses, the district court held the school board accountable for the actions of the principals stating: “The requirements of the Constitution cannot be avoided by a fragmentation of authority among various government agents.” Id.

Natural Residential Segregation/Neighborhood Schools Defense

Defendant’s response to the overwhelming evidence brought forth by Plaintiffs was minimal at best. Defendant suggested that its actions over the past thirty years were, for the most part, motivated by the racially benign poHey of neighborhood schools. Defendants argued that it should not be held Hable because the segregated conditions in its schools arose from a combination of residential segregation, including the impact of public housing, and the neighborhood school policy, rather than Defendant’s intentional seg-regative conduct. Defendant’s defense is completely unavailing in this action.
The interrelationship between racial segregation in the schools and residential segregation has been recognized in many school desegregation cases. See Freeman v. Pitts, — U.S. -, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); Columbus Bd. of Educ. v. Penick, 443 U.S. at 465 n. 13, 99 S.Ct. at 2950 n. 13; Keyes, 413 U.S. at 202, 93 S.Ct. at 2694; United States v. Bd. of School Commissioners of Indianapolis, 573 F.2d 400, 408-09 n. 20 (7th Cir.1978); Lansing, 559 F.2d at 1049 n. 9; Armstrong v. O’Connell, 463 F.Supp. at 1307; Hart, 383 F.Supp. at 706. These cases observe that “housing and school patterns feed on each other.” Hart, 383 F.Supp. at 706.
As a general matter, assigning children to schools in their neighborhoods does not offend the Constitution. See, e.g., Lansing, 559 F.2d at 1049; Higgins, 508 F.2d at 790. The appHcation of a neighborhood school policy is supported by a variety of nondiscriminatory considerations and therefore may generally be considered a permissive form of action. See Keyes, 413 U.S. at 245-48, 93 S.Ct. at 2715-17 (Powell, J., concurring in part and dissenting in part); United States v. Texas Education Agency, 564 F.2d 162, 168-69 & n. 9 (5th Cir.1977); Lansing, 559 F.2d at 1049; Deal v. Cincinnati Bd. of Educ., 369 F.2d 55, 60 (6th Cir.1966).
First, as long recognized in this Circuit, a vaHd neighborhood school doctrine presupposes “innocently arrived at” de facto segregation with “no intention or purpose” of segregating minority students. United States v. School District No. 151 of Cook County, 404 F.2d 1125, 1130 (7th Cir.1969), cert. denied, 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971). If, on the other hand, the school board made discriminatory decisions and followed discriminatory practices that contrib *1205 uted to the racial identifiability of the schools, the neighborhood school policy offers no defense. Board of School Commissioners of Indianapolis, 474 F.2d at 84. In fact, maintenance of a neighborhood school policy in such circumstances provides additional grounds for inferring segregative intent. Keyes, 413 U.S. at 208, 93 S.Ct. at 2697; Yonkers, 837 F.2d at 1229; Morgan, 379 F.Supp. at 473-74. As noted by Judge Bauer in the QUEFAC litigation: “All things being equal, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation.” Quality Education For All Children, Inc. v. School Bd. of School Dist. No. 205 of Winnebago County, Illinois, 385 F.Supp. 803, 809 (N.D.Ill.1974). The litany of segregative conduct for which Defendant is guilty precludes a valid neighborhood school/residential segregation defense.[39]
Second, the neighborhood school defense is available only if the neighborhood school policy is a genuine one and is applied in a consistent manner. Yonkers, 624 F.Supp. at 1381. If a defendant’s adherence to a neighborhood school policy is selective, and there is a pattern of deviations or manipulations which exacerbate the racial identifiability of the schools, the court should infer segre-gative intent. Yonkers, 837 F.2d at 1229. In the present case, the RSD had no coherent or consistent “neighborhood school” policy. For example, the RSD considered the gargantuan 1989 mega-school boundary extending from the Rock River on the east to Meridian Road on the west, and from Montague Street on the south to north of Auburn Street, a “neighborhood school.” Similarly, the RSD’s purported “neighborhood school” policy was no impediment to satellite attendance zones, the one-way busing of minority students (such as the Muldoon-Ellis students) or the intact busing of minority bilingual education students.
Third, the RSD made segregative student assignment and school construction decisions where less segregative alternatives were available and could have been implemented without violating a neighborhood school policy. Diaz, 733 F.2d at 665; Reed, 455 F.Supp. at 556; Lansing, 429 F.Supp. at 624. This consideration recognizes the distinction between a policy requiring students to attend schools within neighborhood attendance areas and the decisions relating to the siting of schools and drawing of attendance zones. While a school district may insist that it follows a neighborhood school policy, “it must be emphasized that generally the Board defines the ‘neighborhood’ when it draws the boundaries.” Diaz, 733 F.2d at 665; Lansing, 429 F.Supp. at 624. In the present case, the RSD’s pattern of segregative school construction and attendance zone decisions were inconsistent with a viable neighborhood school defense.
Finally, the RSD’s neighborhood school defense was unsupported by evidence in the record and was actually at odds with the demographic evidence submitted at the liability hearing. Dr. Lichtman’s testimony indicates that residential segregation in Rockford decreased during the 1970’s and 1980’s. (Lichtman Dep. Ex. 2; see also, Walhout Test., Tr. at 482) During the 1980’s, however, segregation in RSD schools increased (whereas in 1980-1981, 46.14% of minority elementary students attended schools with minority enrollments 15% greater than the district average, in 1988-89, 56.66% of minority elementary students attended such schools). Under these circumstances, it is hardly tenable for the RSD to blame the increasingly segregated conditions in the schools on decreasingly segregated residential housing. The direct and clearly predominant cause of segregation in RSD schools was the pervasive pattern of affirmative seg-regative conduct by the RSD, and not residential segregation.

*1206
Incremental Segregative Effect

In school desegregation cases where only a few discrete and isolated incidents of discrimination are established, a court must determine how much incremental segregative effect the violations had on the racial distribution compared to what would have occurred in the absence of the violations. Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775-76, 53 L.Ed.2d 851 (1977). However, when the violations proven are widespread, as in this case, a plaintiff need not “prove with respect to each individual act of discrimination precisely what effect it has had on current patterns of segregation.” Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 540, 99 S.Ct. 2971, 2980, 61 L.Ed.2d 720 (1979) (“Dayton II”); United States v. Board of School Commissioners, 637 F.2d 1101, 1113 (7th Cir.), cert. denied, 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980). Moreover, the policies of systemwide application in this case necessarily had systemwide impact. Penick, 443 U.S. at 466-67, 99 S.Ct. at 2951. Thus, Plaintiffs need not show the incremental segregative effect of violations in this action.

Equitable Relief Is Appropriate

To be entitled to permanent injunctive relief, a plaintiff not only must prevail on the merits of its claim but also must carry the burden of what is referred to as “balancing the equities” or as drawing the “balance of convenience”. 7 Moore’s ¶ 65.18[3], at 65-136. As the Supreme Court put it in Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07, 79 S.Ct. 948, 954-55, 3 L.Ed.2d 988 (1959): “The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.”
Moore’s explicitly (and Beacon Theatres implicitly) suggest that a district court considering a permanent injunction should apply the same criteria our court of appeals has required for preliminary injunctive relief, substituting actual victory on the merits for a mere reasonable likelihood of success. See, e.g., United States v. Rural Electric Convenience Co-Op. Co., 922 F.2d 429, 432 (7th Cir.1991).
Applying these principles to the present case, Plaintiffs meet the burden with regard to each of the criteria:
1. Plaintiffs have prevailed on the merits of their claim and have established that the Defendant has violated the constitutional rights of Plaintiffs;
2. Plaintiffs have demonstrated that the balance of equities weighs in favor of the grant of injunctive relief, inasmuch as:
a. Plaintiffs have no adequate remedy at law;
b. Plaintiffs face irreparable injury in the absence of injunctive relief;
c. No undue or unnecessary hardship is placed on Defendant by requiring it to carry out its affirmative duty to remedy the effects of its intentionally segregative and discriminatory acts; and,
d. The public interest is best served by granting permanent injunctive relief.
3. There are no inherent difficulties in shaping injunctive relief that is appropriate, narrowly tailored and adequate to protect Plaintiffs’ rights.
A federal court in a school desegregation case has broad remedial authority and may employ its full equitable powers upon determining that intentional systemwide segregation or discrimination has occurred. Milliken v. Bradley, 433 U.S. 267, 280-81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977). A school desegregation remedy should be tailored to the nature and scope of the constitutional violation and designed to restore the victims to the position they would have occupied had the discrimination not occurred. Id. Within these parameters, however, a district court may order remedial programs even in areas in which intentional discrimination has not existed if it concludes that the remedy is necessary to “treat the condition that offends the Constitution” and that the “constitutional violation caused the condition for which remedial programs are mandated.” Id. at 282, 286 n. 17, 287, 97 S.Ct. at 2758, 2760 n. 17, 2760-61. Each action of the school system, even though not unconstitutional in itself or prompted by discriminatory motives, may be examined by a district court and set aside if it interferes with efforts to desegregate the system. Wright v. Council of City of Emporia, 407 U.S. 451, 462, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972).
*1207 In recognition of their desire to maintain a stable remedial framework in this case, the parties have concurred and voluntarily consented that all present and future remedial matters in this case, without limitation, shall be referred to the Magistrate Judge under 28 U.S.C. § 636(e)(1) and (c)(3), and under the Rules of the United States District Court for the Northern District of Illinois.

CONCLUSION

If one factor is uniform in a continuing series of events that are brought to pass through human intervention, the law would have to have the blindness of indifference rather than the blindness of impartiality not to attribute the uniform factor to man’s purpose. The purpose may not be of evil intent or in conscious disregard of what is conceived to be a binding duty. Prohibited conduct may result from misconception of what duty requires.[40]
It is the Report and Recommendation of the Magistrate Judge that an appropriate Injunction and Declaratory Order be entered by the District Court. Further, the Magistrate Judge recommends that, pursuant to the consent of the parties and Order of this court, this matter be referred to the Magistrate Judge for a remedial hearing in the near future.

DEFINITIONS

The court hereby finds and does employ the following definitions throughout this opinion:
1) “The AcademyGifted program at Auburn High School.
2) “The Board": Rockford Board of Education, School District #205.
3) “CAPA”: Creative And Performing Arts alternative program.
4) “CASS ”: Career Awareness and Survival Skills alternative remedial program.
5) “CDB" and/or “CDB Capacity”: Capital Development Board capacities for schools as indicated in the Final Report Facility Utilization Study, Rockford School District #205, dated November, 1980.
6) “CDC The Community Desegregation Committee formed by the Rockford Board of Education in 1973 to develop desegregation plans.
7) “Desegregated School” or “Integrated School Having a school minority population of not more than 15% above and not less than 50% of the district-wide minority population percentage for that category or level of school in a given year.
8) “The District Rockford School District #205.
9) District Quadrants: The terms “Northeast Quadrant”, “Northwest Quadrant”, “Southeast Quadrant” and “Southwest Quadrant” have been employed by the Rockford School District in describing the areas of the District and are adopted by the court. The east/west boundary of the Quadrants is the Rock River; the north/ south boundary west of the Rock River is Auburn Street; the north/south boundary east of the Rock River is State Street to Charles Street, then southeast on Charles Street to Alpine Road, then north to State Street.
10) “GIT”: Get It Together alternative remedial program.
11) “ISBE ”: The Illinois State Board of Education. On January 13, 1975, the former Office of the Superintendent of Public Instruction transferred its powers and duties to the Illinois State Board of Education. Therefore, the use of the term “ISBE” refers to the current State Board of Education as well as its predecessor, the Office of the Superintendent of Public Instruction.
12) “Minority”: African-Americans, Hispanics, Asian-Americans and Native Americans either individually or collectively as specified within the opinion.
*1208 13) “PPC”: Pupil Placement Committee of the Rockford Board of Education, District #205.
14) “Racially Identifiable Minority School” and/or “Minority School”: Having a school minority population of more than 15% above the district-wide minority population percentage for that category or level of school in a given year.
15) “Racially Identifiable White School” and/or “White School Having a minority school population of less than 50% of the district-wide minority population percentage for that category or level of school in a given year.
16) “RAES Rockford Alternative Elementary School alternative magnet program.
17) “RAMS”: Rockford Alternative Middle School alternative magnet program.
18) “RBE Rockford Board of Education, School District #205.
19) “REA”: Rockford Education Association.
20) “RSD Rockford School District # 205.
21) “SCSESelf-Contained Special Education programs.
22) “Segregation”: The separation of students by race or ethnicity regardless of the intent or motivation for doing so.
23) “TDC”: Teacher Development Center formerly located at Welsh School in the Rockford School District #205.
24) “Title I ” or “Chapter I Refers to Federal grant monies and programs to be used to meet the special educational needs of disadvantaged children pursuant to the Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. §§ 2701 et seq.

. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Rule 702. Federal Rules of Evidence. Testimony by Experts.

. Dr. Heald testified that he agreed with Dr. Oakes's conclusions that Rockford’s procedure of how it places students in ability group tracking did not fit the theory of how students should be ability grouped.

. "[Dr. Oakes] examined a broad range of objective documentary material provided by the District. Her analyses included data tapes of the 1st through 6th grades for the years 1986 and 1987. She also reviewed the 10th and 12th grades for the same years. In addition, she examined middle school student data from 1988-89 and 1989-90. The data tapes examined by Dr. Oakes, therefore, cover the time period 1987 through 1990." Report and Recommendation at 940.

.The defendant’s intent is what is at issue here, not its motivation. "[W]hen constitutional rights are involved, the issue is seldom whether public officials have acted with evil motives or whether they have consciously plotted with bigotry in their hearts to deprive citizens of the equal protection of the laws.” Oliver v. Michigan State Bd. of Educ., 508 F.2d 178, 182 (6th Cir.1974). Intent may be proven even when there is no desire to inflict educational harm upon any racial group. Armstrong v. O’Connell, 451 F.Supp. 817, 866 (E.D.Wis.1978).

. Quality Education For All Children, Inc. v. School Board, 362 F.Supp. 985 (N.D.Ill.1973) (“QUEFAC ").

. Rule 701. Federal Rules of Evidence. Opinion Testimony by Lay Witnesses.

. The court notes that many of these witnesses may have easily been qualified to testify as expert witnesses on certain aspects of this case and specifically on the disparities in facilities and equipment. Dr. and Mrs. Shaheen would certainly be well-qualified as would Marcella Harris and Carl Towns, both former Board Members and all of the witnesses who were former teachers in the District. See Federal Rule of Evidence 702.

. One can only speculate on what the District's action would have been if this were a school serving majority, rather than minority students.

. The Board was informed by Superintendent Shaheen, the QUEFAC plaintiffs, and board member Michael Williams, of the disparate effects of its gifts policy, and in its 1989 Reorganization Plan, publicly recognized these disparate effects. Report and Recommendation at 1094; Pl.Prop. Findings at 21-22 of "Facilities & Equipment”.

. The Illinois School Code requires that a: "school board may, on its own motion, or shall, upon the petition of the lesser of 2,500 or 5% (the statute, as originally passed, required that the petition be signed by the lesser of 1000 or 10% of the voters registered in the district. These numbers were changed to "the lesser of 2500 or 5% in 1975) of the voters registered in the district, order submitted to the voters of the district at a regular school election or at the general election, the proposition for the election of board members by school board district rather than at large, and such proposition shall thereupon be certified by the secretary of the board for submission. If the proposition is approved by a majority of those voting on the proposition, the board shall divide the school district into 7 school board districts, each of. which must be compact and contiguous and substantially equal in population to each other district.” 105 ILCS 5/9-22 (1993).

. For a full understanding of the Magistrate Judge's finding see pp. 1179-81 of the Report and Recommendation.

. See Order of April 8, 1993 (Docket No. 1114). This order affirmed the Magistrate Judge's order allowing the admission of evidence of actions after May 11, 1989, (the date of the filing of this lawsuit) upon a showing of a close relationship between such post-May 1989 evidence and the defendant's intent prior to that date.

.The court had previously found that the defendant expressed to the court its good faith willingness to alter its adopted map to conform to the dictates of Section 2 of the Voting Rights Act. See Order of September 12, 1991 (Docket No. 498).

. Courts have agreed that segregative intent should not he confused with proof of evil motive, racial hostility or subjective desire to harm minority children. United States v. School District of Omaha, 521 F.2d 530, 535 (8th Cir.1975) Higgins v. Board of Education, 508 F.2d 779, 793 (6th Cir.1974); Armstrong v. O’Connell, 451 F.Supp. 817, 822 (D.C.Wis.1978); Morgan v. Hennigan, 379 F.Supp. 410, 478 (D.Mass.), aff'd sub nom, Morgan v. Kerrigan, 509 F.2d 580 (1st Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). The required intent is simply the intent to keep the races separate. Omaha, 521 F.2d at 535; Armstrong, 451 F.Supp. at 822. Conduct motivated by such intent is actionable even when there is no desire to inflict educational harm upon any racial group. Id. '

. This is, of course, an equitable action in which the plaintiffs request injunctive relief. The court is the finder of fact and no Seventh Amendment right to a jury is implicated. See Wooddell v. International Broth. of Elec. Workers, Local 71, *933 —. u.S. -, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991).

. A federal court in a school desegregation case has broad remedial authority and may employ its full equitable powers upon determining that intentional systemwide segregation or discrimination has occurred. Milliken v. Bradley, 433 U.S. 267, 280-81, 97 S.Ct. 2749, 2757-58, 53 L.Ed.2d 745 (1977).

. Dr. Oakes expertise, integrity and credentials were acknowledged by Defendant’s lead counsel, Mr. Anthony Scariano. Tr. at 318, 322.

. Dr. Oakes gave an interesting account of the history of tracking. The court refers those who desire further background to the transcript of her testimony found within the court record at Oakes Test., Tr. at 822-830.

. The court notes that the RSD’s system of tracking was very visible. Dr. Oakes in particular mentioned that, at times, the Rockford School system used colored forms for a child to take home that showed the ability level of the child. Dr. Oakes described this as “quite astonishing.” Id. at 849.

.Dr. Oakes pointed out that there was no empirical evidence to support any of these assumptions and, in fact, indicated that the empirical data that does exist is leaning toward the conclusion that what one learns is not a function of who is sitting next to you in class.

. Intelligence is developmental. Children learn to be intelligent as their interests and interactions change. Human beings can expand their intelligence. The notion of measuring someone's intelligence at one point, then putting that student in a situation based on that measurement and tailoring instruction for their particular amount of intelligence as if it cannot ever be changed, is something that is generally discredited.

. Full-site programs, in theory, place transfer students into a school's regular classrooms. In contrast, a partial-site program places students in classrooms separate from the regular students in the school where transfer students may not have much contact with regular students.

. Overcrowding of east side secondary (and some elementary) schools existed in the RSD for at least three decades. Never in the history of the RSD were students from a racially-identifi-ahle white school mandatorily assigned to any of the less crowded integrated or racially-identifiable African-American schools. The only such assignments were voluntary as part of the integration programs of the 1970’s and 1980’s.

. Three years later, the Community Desegregation Committee premised its comprehensive desegregation plan on school pairing. B33030 The Community Desegregation Committee Proposal based on school pairing was rejected by the RBE in 1973. See B500511-B500514.

. Data for the intervening year is unavailable.

. Members of the Community Education Committee were openly opposed to all busing for integration purposes. Jo Minor Dep. at 23-24; see also, B506157; B506198; B506118. Rather, members were in favor of neighborhood schools and were opposed to Federal involvement in the RSD. Id.

. RSD contracts with the REA frequently called for school capacities well in excess of CDB capacity, so-called “contract capacities."

. Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. § 2701 et seq.

. Lines represent trends fitted using least squares regression.

. On the rare occasion that the Board exercised discretion over allocation of gifts, the Board did not take the opportunity to redress the EMS imbalance between African-American and white schools. Instead, the Board aggravated the imbalances by allocating to predominantly white schools the PTO funds from the closed Highland School, which was predominantly white. No African-American schools that received the minority Highland school closing students received any PTO funds from the closed school. In other words, funds from the Highland School PTO never followed, not even in proportion to their enrollment, minority students who were sent back to Southwest side schools. Driscoll Memo, 9/19/81, B46539.

. This, information is based on a review of Board Minutes from the stated time periods and has been stipulated to by the parties.

. Average racial composition of the three schools to which Vandercook students would be assigned. February 28 Plan at 6, B509184.

. Although the figures reported by the Pistrict show the percentage of minority employment for certified employees is 7% in 1974-75, that figure is rounded-off. Using the actual reported numbers, the percentage is 7.24%, the same percentage as in 1991-92.

. Schools listed above the first set of double lines are racially identifiable African-American schools; schools listed between the sets of double lines are integrated schools; and schools listed below the second set of double lines are racially identifiable white schools,

. Id.

. Schools listed above the double lines are integrated; schools listed below the double lines are racially identifiable white schools.

. See, supra, note 17.

. Id.

.Plaintiffs’ Proposed Findings suggested there were 32 African-American teachers employed at the elementary school level. In reviewing Plaintiffs’ Proposed Finding and the tables and calculations involved, there was an apparent arithmetic error. The court utilized the total found within the subsequent table and re-calculated the percentages found within this paragraph.

. Using 1968-69 enrollment data in response to Justice Department and 1968-69 School Directory-

. See, supra, note 19.

. See, supra, note 17.

. Id.

. See, supra, note 19.

. See, supra, note 17.

. Id.

. The RSD introduced no credible or material evidence that proved to this court that these staff assignment patterns were the result of the RSD’s desire to provide African-American role models to African-American students or the insistence of African-American teachers that they teach in schools with high African-American enrollments. See Martin Test., Tr. at 2510-12. Generally, it was not true that African-American teachers desired to be placed in or transferred to schools with high African-American enrollments. Such . circumstances would be legally insufficient in any event. Morgan, 379 F.Supp. at 461.

. "Regular” students were students who lived within the Guilford High School attendance boundaries and qualified for Board-paid transportation.

 Board member addresses located in RBE meeting minutes (1965-1989)

. Marcella Harris served as an elected Board member for 5 years (1965-70). Carl Towns served as an appointed Board member for approximately 2.5 years (2 years, four months, August of 1981 to November of 1983). Michael Williams served as an appointed and elected

. In addition to the aforementioned attempts, on January 12, 1976, the Board discussed election of School Board members by geographic area. The Board refused to exercise its option under Section 9-22 of the Illinois School Code of placing the issue by Board resolution on the ballot for the upcoming election.
In March, 1976, a petition for election of School Board members by district was presented to the Board by VOICE, Volunteer Organization to Improve Community Efforts, but was twice rejected as not containing the required number of signatures to place the issue on the ballot. The Board itself then placed the issue on the ballot by Board resolution. That referendum to change School Board elections from an at-large system to elections by geographic sub-district was defeated at the polls.
From 1976 to 1981, the RBE took no action in regard to the issue of election by sub-district. On July 27, 1981, Board member Bates moved to place the issue of election by geographic subdis-trict on the next election ballot. Upon seconding of the motion and its passage, Bates then moved to table the motion, thus precluding RBE consideration of the issue.
On August 29, 1983, the RBE received petitions seeking placement of the issue of election by subdistrict on the next election ballot. Because the petitions did not contain a sufficient number of signatures, County Auditor Michael Rotello addressed the RBE asking them to place the issue on the next ballot by Board resolution. The Board took no action with regard to the recommendation of Mr. Rotello.

. Pursuant to the court's order regarding the admission of post-1989 evidence, the court finds this evidence on the electoral sub-districting to be sufficiently relevant and related to Defendant’s actions prior to the filing of this lawsuit to be considered by the court. Plaintiffs have shown a pattern of conduct that began prior to 1989 and this information merely completes the circle.

. Courts have agreed that segregative intent should not be confused with proof of evil motive, racial hostility or subjective desire to harm minority children. United States v. School District of Omaha, 521 F.2d 530, 535 (8th Cir.1975); Higgins v. Board of Education, 508 F.2d 779, 793 (6th Cir.1974); Armstrong v. O’Connell, 451 F.Supp. 817, 822; Morgan v. Hennigan, 379 F.Supp. 410, 478 (D.Mass.), aff'd sub nom, Morgan v. Kerrigan, 509 F.2d 580 (1st Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). The required intent is simply the intent to keep the races separate. Omaha, 521 F.2d at 535; Armstrong, 451 F.Supp. at 822. Conduct motivated by such intent is actionable even when there is no desire to inflict educational harm upon any racial group. Id.

. The court has not found intent in regard to the section entitled Special Education.

. Moreover, a neighborhood school defense is at best only a partial defense in a school desegregation case. See Morgan, 379 F.Supp. at 470. Neither a neighborhood school policy nor residential segregation can absolve school officials for unrelated practices undertaken with unlawful intent, such as segregated faculty and staff assignments. Id. In the present case, the RSD engaged in numerous segregative and discriminatory practices unrelated to the assignment of students to particular schools.

. Cassell v. Texas, 339 U.S. 282, 293, 70 S.Ct. 629, 634-35, 94 L.Ed. 839 (1950) (Frankfurter, J., concurring) (Equal protection challenge to a grand jury selection system that resulted in the virtual exclusion of African-Americans from grand juries. Justice Frankfurter was responding to the state's argument that its jury commissioners had been acting in good faith when they chose only whites to serve.)

. Information omitted from the proposed findings presented to the court.